# United States Court of Appeals for the Federal Circuit

---◆---

INSULET CORP.,

*Plaintiff-Appellee,*

– v. –

EOFLOW, CO. LTD., EOFLOW, INC., JESSE J. KIM,

*Defendants-Appellants.*

---

*On Appeal from the United States District Court for the District of Massachusetts in No. 1:23-cv-11780-FDS, Honorable F. Dennis Saylor, Judge*

---

## BRIEF FOR DEFENDANTS-APPELLANTS

ELIZABETH M. FLANAGAN
COOLEY LLP
30 South 9th Street, 7th Floor
Minneapolis, Minnesota 55402
(312) 881-6383
bflanagan@cooley.com

ADAM GERSHENSON
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, Massachusetts 02116
(617) 937-2379
agershenson@cooley.com

LOWELL D. MEAD
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5000
lmead@cooley.com

*Counsel for Defendants-Appellants*

JULY 22, 2025

CP COUNSEL PRESS    (800) 4-APPEAL • (383489)

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1807

**Short Case Caption** Insulet Corp. v. Eoflow, Co. Ltd.

**Filing Party/Entity** Defendants-Appellants: EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse J. Kim (a/k/a Jae Jin Kim)

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/23/2025

Signature: /s/ Adam S. Gershenson

Name: Adam S. Gershenson

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| EOFlow Co., Ltd. | | EOFlow Co., Ltd. |
| EOFlow, Inc. | | |
| Jesse J. Kim (aka Jae Jin Kim) | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

| | | |
|---|---|---|
| Alexandra Mayhugh | John C. Bostic | Matthew Oliver |
| Dustin Knight | Jordan Landers | Michael Sheetz |
| HanByul Chang | Kimberley A. Scimeca | Reuben H. Chen |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Attachment 1 – Certificate of Interest

4. Legal Representatives. List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4) [CONT]:

Zachary Sisko

Kyung Taeck Minn

Isabel McGrath

John Wray

Quinn Emanuel Urquhart & Sullivan

Patrick Daniel Curran

Nathaniel Andrew Hamstra

Stacylyn May Doore

William D. Weinreb

Bae, Kim & Lee LLC

Hankil Kang

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ...........................................................................i

TABLE OF AUTHORITIES ........................................................................ viii

STATEMENT OF RELATED CASES ...........................................................xvi

PRELIMINARY STATEMENT ........................................................................1

JURISDICTIONAL STATEMENT ..................................................................3

STATEMENT OF THE ISSUES.......................................................................3

STATEMENT OF THE CASE ..........................................................................4

      I.      FACTUAL BACKGROUND ..................................................4

           A.      EOFlow Developed a Diabetes Patch Pump..............................5

           B.      Insulet Notified Its "Legal Team" of a "Cloned" Product from a Company with Ex-Insulet Employees *Five Years* Before Filing Suit ........................................................6

           C.      Insulet Paired Alarm with Inaction Throughout 2018 and 2019 ...............................................................................8

           D.      "Plain" and "Undisputed" Evidence Showed Insulet Was on Inquiry Notice by Early 2019 .....................................13

      II.      PROCEDURAL BACKGROUND .........................................14

SUMMARY OF THE ARGUMENT ...............................................................17

STANDARD OF REVIEW .............................................................................18

ARGUMENT ..................................................................................................19

      I.      INSULET'S CLAIM WAS TIME-BARRED UNDER THE DTSA STATUTE OF LIMITATIONS.............................................19

           A.      The DTSA Incorporates Inquiry Notice ...................................19

                 1.      Courts Consistently Apply "Inquiry Notice" to the DTSA Statute of Limitations...................................19

2.      Congress Enacted the DTSA's Statute of Limitations to Be "Identical" to the UTSA's .................21

3.      The District Court Erred by Failing to Apply "Inquiry Notice" .........................................25

B.      Correct Interpretation of the DTSA Statute of Limitations Compels Reversal....................................27

1.      Insulet Was on Inquiry Notice Before August 3, 2020 ...........................................................28

2.      Insulet Cannot Prove It Conducted a Reasonably Diligent Inquiry ...........................................32

C.      Even If *Merck* Were Applied, Appellants Should Still Be Awarded Judgment as a Matter of Law.............35

II.      THE COURT'S JURY INSTRUCTIONS ON REASONABLE MEASURES CONSTITUTE REVERSIBLE LEGAL ERROR .......................................36

III.      EOFLOW IS ENTITLED TO JUDGMENT ON THE ASSERTED DHF TRADE SECRET ................................39

A.      Insulet's Asserted DHF "Trade Secret" Was Severely Overbroad.....................................................40

B.      Insulet Did Not Demonstrate What Specific Information in the DHF Constituted a Trade Secret.................41

C.      Insulet's Failure to Adequately Identify Trade Secrets Warrants Judgment as a Matter of Law ....................44

IV.      THE DISTRICT COURT ERRED IN AWARDING $25.8 MILLION IN "AVOIDED COSTS" COMPENSATORY DAMAGES .................................................................48

A.      The Avoided Costs Damages Are Incompatible with the District Court's Permanent Injunction Barring Sales of EOFlow's Product ...............................................49

B.      Insulet's Avoided Costs Presentation Was Speculative and Overinclusive, Providing Insufficient Evidence to Support the District Court's Award .........................................53

vi

C.    The District Court Erred in Imposing Joint and Several Liability on Jesse Kim ...............................................54

V.    THIS COURT HAS JURISDICTION ................................................57

A.    The District Court Dismissed Insulet's Patent Infringement Claims over Six Years After They Accrued ...................................................................57

B.    The District Court's Dismissal Operated with Prejudice .........58

C.    Dismissal With Prejudice Confers Jurisdiction .......................62

CONCLUSION ...................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*100079 Canada, Inc. v. Stiefel Lab'ys, Inc.*,
596 F. App'x 744 (11th Cir. 2014)................................................................35

*Alamar Biosciences, Inc. v. Difco Lab'ys, Inc.*,
No. Civ-S-941856 DFL PAN, 1995 WL 912345
(E.D. Cal. Oct. 13, 1995)..............................................................................38

*Alifax Holding SpA v. Alcor Sci. LLC*,
Nos. 2022-1641, 2022-1723, 2024 WL 2932910
(Fed. Cir. June 11, 2024)..............................................................................45

*Alta Devices, Inc. v. LG Elecs., Inc.*,
No. 18-CV-00404-LHK, 2019 WL 1924992
(N.D. Cal. Apr. 30, 2019) ....................................................................... 21, 24

*Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*,
114 F.3d 108 (8th Cir. 1997) .......................................................................46

*AnywhereCommerce, Inc. v. Ingenico Inc.*,
665 F. Supp. 3d 181 (D. Mass. 2023)...................................................... 30, 31

*Apple Inc. v. Rivos, Inc.*,
No. 5:22-cv-02637-EJD, 2023 WL 5183034
(N.D. Cal. Aug. 11, 2023) ............................................................................47

*Arellano v. McDonough*,
1 F.4th 1059 (Fed. Cir. 2021) (en banc), *aff'd*, 598 U.S. 1 (2023) ........ 60, 61

*Attia v. Google LLC*,
983 F.3d 420 (9th Cir. 2020) .......................................................................21

*Barron v. Lampley*,
No. 4:15-CV-0038-HLM, 2016 WL 5334472
(N.D. Ga. Jan. 25, 2016)...............................................................................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................35

*BioPoint, Inc. v. Dickhaut*,
110 F.4th 337 (1st Cir. 2024) ................................................................. 55, 56

*Card Isle Corp. v. Farid*,
689 F. Supp. 3d 1273 (N.D. Ga. 2023), *clarified on denial of recon. sub nom., Card Isle Corp. v. Edible Arrangements, LLC*, No. 1:21-CV-1973-TWT, 2024 WL 1759175 (N.D. Ga. Apr. 24, 2024)....................46

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004) ...................................... 58, 59, 61, 62

*Ciralsky v. C.I.A.*,
355 F.3d 661 (D.C. Cir. 2004)................................................ 59, 61

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ...................................................35

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
920 F.3d 560 (8th Cir. 2019) ........................................... *passim*

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
No. 16-CV-33-LRR, 2017 WL 6210920 (N.D. Iowa Dec. 8, 2017), *aff'd*, 920 F.3d (8th Cir. 2019)..................................................24

*Compass Mktg., Inc. v. Flywheel Digit., LLC*,
No. GLR-22-379, 2023 WL 2213687 (D. Md. Feb. 24, 2023), *aff'd*, No. 23-1324, 2024 WL 3292676 (4th Cir. July 3, 2024) ....................... 21, 24

*Contour Design, Inc. v. Chance Mold Steel Co.*,
693 F.3d 102 (1st Cir. 2012)...................................................29

*Duffy v. Ford Motor Co.*,
218 F.3d 623 (6th Cir. 2000) ................................................ 59, 61

*Dupree v. Younger*,
143 S. Ct. 1382 (2023)...........................................................18

*Echospan, Inc. v. Medallia, Inc.*,
No. 22-cv-01732-NC, 2023 WL 9019054 (N.D. Cal. Dec. 11, 2023)... 50, 51

*EcoFactor, Inc. v. Google, LLC*,
137 F.4th 1333 (Fed. Cir. 2025) .................................................53

*Elmore v. Henderson*,
227 F.3d 1009 (7th Cir. 2000) ............................................. 59, 61

*Epstein v. C.R. Bard, Inc.*,
460 F.3d 183 (1st Cir. 2006).............................................. *passim*

*eShares, Inc. v. Talton*,
727 F. Supp. 3d 482 (S.D.N.Y. 2024) ........................................47

*Fail-Safe, LLC v. A.O. Smith Corp.*,
674 F.3d 889 (7th Cir. 2012) ........................................36

*Fresenius Med. Care Holdings, Inc. v. United States*,
763 F.3d 64 (1st Cir. 2014) ........................................19

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
857 F. Supp. 2d 997 (S.D. Cal. 2012) ........................................23

*George v. McDonough*,
596 U.S. 740 (2022) ........................................22

*Giraud v. Quincy Farm and Chem.*,
102 Wash. App. 443 (2000) ........................................32

*Goodman v. Bowdoin Coll.*,
380 F.3d 33 (1st Cir. 2004) ........................................19

*Green v. Humphrey Elevator & Truck Co.*,
816 F.2d 877 (3d Cir. 1987) ........................................ 59, 61

*Grit Energy Sols., LLC v. Oren Techs., LLC*,
957 F.3d 1309 (Fed. Cir. 2020) ........................................61

*Hatchet v. Nettles*,
201 F.3d 651 (5th Cir. 2000) ........................................ 59, 61

*Hill Holliday Connors Cosmopulos, Inc. v. Greenfield*,
433 F. App'x 207 (4th Cir. 2011) ........................................36

*Hilton Int'l Co. v. Union de Trabajadores de la Industria
Gastronomica de P.R.*,
833 F.2d 10 (1st Cir. 1987) ........................................ 59, 60, 61, 63

*HiRel Connectors, Inc. v. United States*,
465 F. Supp. 2d 984 (C.D. Cal. 2005) ........................................31

*HiRel Connectors, Inc. v. United States*,
No. CV01–11069 DSFVBKX, 2005 WL 4958547
(C.D. Cal. Jan. 4, 2005) ........................................38

*Iconics, Inc. v. Massaro*,
266 F. Supp. 3d 461 (D. Mass. 2017) ........................................56

*IDX Sys. Corp. v. Epic Sys. Corp.*,
　285 F.3d 581 (7th Cir. 2002) ....................................................................41

*Imax Corp. v. Cinema Techs., Inc.*,
　152 F.3d 1161 (9th Cir. 1998) ..................................................................44

*In re Intelligroup Sec. Litig.*,
　527 F. Supp. 2d 262 (D.N.J. 2007).............................................................51

*Insulet Corp. v. EOFlow, Co., Ltd.*,
　No. 2024-1137, 104 F.4th 873 (Fed. Cir. 2024)................................... *passim*

*J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*,
　260 N.E.2d 723 (Mass. 1970).....................................................................36

*Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*,
　796 F.3d 576 (6th Cir. 2015) .....................................................................31

*Kennedy v. Town of Billerica*,
　617 F.3d 520 (1st Cir. 2010).....................................................................19

*Knights Armament Co. v. Optical Sys. Tech., Inc.*,
　654 F.3d 1179 (11th Cir. 2011) ........................................................... 30, 32

*Koch v. Christie's Int'l PLC*,
　785 F. Supp. 2d 105 (S.D.N.Y. 2011), *aff'd*, 699 F.3d 141
　(2d Cir. 2012)............................................................................................27

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
　No. 4:21-CV-10572-TSH, 2021 WL 2982866
　(D. Mass. July 15, 2021)....................................................................... 29, 36

*Kuryakyn Holdings v. Ciro*,
　242 F. Supp. 3d 789 (W.D. Wis. 2017).......................................................21

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
　694 F.3d 51 (Fed. Cir. 2012) .....................................................................53

*Lattimore v. Polaroid Corp.*,
　99 F.3d 456 (1st Cir. 1996)........................................................................18

*Leader Techs., Inc. v. Facebook, Inc.*,
　678 F.3d 1300 (Fed. Cir. 2012) .................................................................18

*Leggett & Platt, Inc. v. Hickory Springs Mfg.*,
　285 F.3d 1353 (Fed. Cir. 2002) ............................................................ 29, 36

*Lexion Med., LLC v. Northgate Techs., Inc.*,
　　641 F.3d 1352 (Fed. Cir. 2011) ....................................................18

*Liu v. SEC*,
　　591 U.S. 71 (2020)........................................................................56

*McCune v. U.S. Dep't of Just.*,
　　997 F. Supp. 2d 487 (S.D. Miss. 2014), *aff'd*, 592 F. App'x 287
　　(5th Cir. 2014) ............................................................................26

*McKenney v. Mangino*,
　　873 F. 3d 75 (1st Cir. 2017).........................................................18

*MedCenter Holdings Inc. v. WebMD Health Corp.*,
　　No. 20-cv-00053, 2025 WL 965853 (S.D.N.Y. Mar. 31, 2025) ..................20

*Memry Corp. v. Kentucky Oil Tech., N.V.*,
　　No. C-04-03843 RMW, 2007 WL 2746736
　　(N.D. Cal. Sept. 20, 2007) ...........................................................23

*Merck & Co. v. Reynolds*,
　　559 U.S. 633 (2010)............................................................ *passim*

*Micrel Inc. v. Monolithic Power Sys., Inc.*, No. C,
　　04–04770 JSW, 2005 WL 6426678 (N.D. Cal. Dec. 9, 2005)....................23

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
　　429 F.3d 1344 (Fed. Cir. 2005) ....................................................53

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
　　659 F. Supp. 3d 138 (D. Mass. 2023)..........................................37

*New Hampshire v. Maine*,
　　532 U.S. 742 (2001).............................................................. 54, 55

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
　　855 F. App'x 701 (Fed. Cir. 2021)........................................ 39, 41

*P2I Ltd. v. Favored Tech USA Corp.*,
　　No. 23-cv-01690-AMO, 2024 WL 4294652
　　(N.D. Cal. Sept. 24, 2024) ...........................................................20

*Parr v. Rosenthal*,
　　57 N.E.3d 947 (Mass. 2016)........................................................32

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013) ...........................................................35

*Phillip M. Adams & Assocs., LLC v. Dell Comput. Corp.*,
519 F. App'x 998 (Fed. Cir. 2013) ...................................... 22, 25

*Phoenix Co., Inc. v. Castro-Badillo*,
No. 23-1371 (RAM), 2024 WL 3742368 (D.P.R. Aug. 9, 2024) ........... 20-21

*Pie Dev., LLC v. Pie Ins. Holdings, Inc.*,
No. 21-60593, 2023 WL 2707184 (5th Cir. Mar. 30, 2023) .......................38

*Porex Corp. v. Haldopolous*,
284 Ga. App. 510 (2007) .............................................................23

*PTP OneClick, LLC v. Avalara, Inc.*,
No. C19-0640JLR, 2020 WL 4729174 (W.D. Wash. May 27, 2020) ..........24

*ResMan, LLC v. Karya Prop. Mgmt., LLC*,
No. 4:19-cv-00402, 2021 WL 3423345 (E.D. Tex. Aug. 5, 2021) ...............49

*Resnick v. Schwartz*,
430 F. Supp. 3d 492 (N.D. Ill. 2019)...............................................26

*REXA, Inc. v. Chester*,
42 F.4th 652 (7th Cir. 2022) ........................................................45

*RoboticVISIONTech Inc. v. ABB Inc.*,
726 F. Supp. 3d 364 (D. Del. 2024) ...................................... 21, 24

*Rodowicz v. Mass. Mut. Life Ins. Co.*,
279 F.3d 36 (1st Cir. 2002)..........................................................19

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025)............................................................ 62, 63

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
580 U.S. 328 (2017)........................................................... 60, 61

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
200 F.3d 358 (5th Cir. 2000) .......................................... 23, 29, 36

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
531 U.S. 497 (2001).......................................................... 59, 62

*Sergros Caracas de Liberty Mut., S.A. v. Goldman, Sachs & Co.*,
502 F. Supp. 2d 183 (D. Mass. 2007)................................................................50

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*,
491 F.3d 350 (8th Cir. 2007) ................................................................46

*Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*,
15 F.3d 1427 (7th Cir. 1994) ................................................ 29, 36

*Source Prod. & Equip. Co. v. Schehr*,
No. 16-17528, 2017 WL 3721543 (E.D. La. Aug. 29, 2017) ....................21

*Steve & Sons, Inc. v. JELD-WEN, Inc.*,
No. 3:16-cv-545, 2018 WL 2172502 (E.D. Va. May 10, 2018) ..................56

*Stratienko v. Cordis Corp.*,
429 F.3d 592 (6th Cir. 2005) ................................................................29

*Syntel Sterling Best Shores Mauritius Ltd v. The TriZetto Grp., Inc.*,
68 F.4th 792 (2d Cir. 2023) ................................................ 51, 52, 53

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*,
966 F.3d 46 (1st Cir. 2020)................................................ 44, 45

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)................................................................26

*Vital State Can., Ltd. v. DreamPak, LLC*,
303 F. Supp. 2d 516 (D.N.J. 2003)................................................................47

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
845 F.3d 384 (8th Cir. 2016) ................................................................35

*Wang v. Palo Alto Networks, Inc.*,
No. C 121–05579 WHA, 2014 WL 1410346
(N.D. Cal. Apr. 11, 2014) ................................................................23

*Watson v. West*,
No. 98-7034, 1998 WL 729251 (Fed. Cir. Oct. 16, 1998)..................... 59, 61

*Winston Rsch. Corp. v. Minn. Mining & Mfg. Co.*,
350 F.2d 134 (9th Cir. 1965)................................................................50

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) ................................................................35

*Zirvi v. Flatley*,
433 F. Supp. 3d 448 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582
(2d Cir. 2020).................................................................... 20, 32

*Zunum Aero, Inc. v. Boeing Co.*,
No. C21-0896JLR, 2024 WL 3822780 (W.D. Wash. Aug. 14, 2024)..........44

**Statutes & Other Authorities:**

18 U.S.C.
§ 1836(b)....................................................................................48
§ 1836(d).................................................................. 22, 25, 30
§ 1839(3).................................................................. 31, 36, 48

28 U.S.C.
§ 1292(a)(1) .............................................................................3, 57
§ 1295(a)(1) ........................................................................ 62, 63
§ 1441(a)....................................................................................62
§ 1658(b)(1)...............................................................................26

35 U.S.C. § 286.......................................................... 58, 60, 61

38 U.S.C. § 5110(b)(1)...............................................................60

Fed. R. Civ. P. 56(a)...................................................................18

H.R. Rep. No. 114-529 (2016)............................................... 21, 22

Uniform Trade Secrets Act § 6 ....................................................22

<u>**STATEMENT OF RELATED CASES**</u>

This Court decided an interlocutory appeal from a grant of a preliminary injunction in the same district court action. *Insulet Corp. v. EOFlow, Co., Ltd.*, No. 2024-1137, 104 F.4th 873 (Fed. Cir. 2024) (Lourie, Prost, Stark, JJ.).

Appeals from the same district court action are co-pending at the First Circuit. *Insulet Corp. v. EOFlow, Co. Ltd., et al.*, Nos. 25-1497, 25-1507 (1st Cir.). The parties are conferring to address those and proceed in the Federal Circuit given this Court's denial of Insulet's motion to transfer this appeal. *See* ECF No. 18.

**PRELIMINARY STATEMENT**

The district court committed a series of legal errors that wrongly decided the outcome of this trade secret case. *First*, unlike every other case ever decided under the Defend Trade Secrets Act ("DTSA"), the district court abandoned the black-letter law holding that "inquiry notice" governs the statute of limitations. The district court explicitly chose to become the "Numero Uno" court to reject this long-standing rule in trade secret law and contradict "[e]very other court to have considered" the issue. This was an especially costly error because under the well-established inquiry notice standard, the district court itself recognized, both before and after trial, the plain and undisputed evidence showed Insulet's claims were time-barred.

*Second*, the district court erroneously instructed the jury to consider whether Insulet took reasonable measures to protect information *only* at the time of misappropriation. The jury should have been permitted to consider relevant evidence that for five years after Insulet made its "legal team aware" that former executives presented a "cloned" version of Insulet's product on Appellants' behalf, Insulet did nothing.

*Third*, the district court erroneously rejected motions before and after trial requiring specific trade secret identification and allowed Insulet to assert that *all* accumulated product knowledge was a trade secret, notwithstanding public disclosures, the product's unrestricted availability, and 700 related patents.

1

*Fourth and finally*, the district court erred in awarding damages that (a) depended entirely on one engineer's memory, unaided by documents, of how every Insulet engineer allocated efforts over a five year span roughly fifteen years ago; (b) reflected double-counting by imposing damages for future sales that were enjoined from ever occurring; and (c) imposed massive joint and several liability on an individual defendant who did not profit from the alleged misappropriation, even though Insulet had promised the jury that defendant would not pay more than $1.

This is not a dispute over peripheral issues. The district court recognized that, if the time-tested inquiry notice standard governs this case, then Appellants (a) would have won summary judgment, and (b) after the trial took place, would almost certainly be entitled to judgment as a matter of law. To abandon that standard—which all parties embraced the last time this case was before this Court—would undermine key tenets of trade secret law and encourage plaintiffs to lie in wait while competitors invest, and ultimately waste, years of engineering efforts and millions of dollars. Rather than invite that unwelcome and unwise sea change, this Court should hold that every other court to address the issue was right, and the district court's decision should be reversed.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), as explained below in Argument Section V. *See* ECF Nos. 11, 18.

## STATEMENT OF THE ISSUES

1.     Did the district court err in holding that "inquiry notice" is irreconcilable with the DTSA, when every other court to address the issue has applied inquiry notice?

2.     Did the district court err in instructing the jury to consider whether the trade secret owner took reasonable measures to maintain secrecy only at the time of the alleged misappropriation, rather than taking into account the owner's actions after the alleged misappropriation?

3.     Did the district court err by failing to require adequate identification of Insulet's asserted trade secrets?

4.     Did the district court err in (a) awarding damages where the evidence lacked reliability, (b) granting a double recovery for future sales *and* an injunction precluding those sales, and (c) imposing unjustified joint and several liability on an individual defendant after Insulet promised the jury that defendant would be liable for just $1?

**STATEMENT OF THE CASE**

## I.   FACTUAL BACKGROUND

This Court's prior opinion captured relevant background in addressing the district court's errors on the statute of limitations and trade secret identification. *Insulet*, 104 F.4th at 880-81.

Both parties make wearable patch pump devices that deliver insulin. The case arose because Insulet employees Luis Malave, Steve DiIanni, and Ian Welsford left that company between 2010-2015, and DiIanni and Welsford retained Insulet documents—years before they joined EOFlow in late 2017. While at Insulet, Malave was Senior VP of Research, Development and Engineering and COO; Welsford was Director of Regulatory Affairs; and DiIanni was a top engineer, so Insulet knew each had full access to the company's information regarding its flagship "Omnipod" product. *E.g.*, Appx20525-20526 (88:8-91:13) (Insulet engineer testifying that DiIanni "knew the details of every aspect of the design and manufacture of the Omnipod product."); Appx321-323 ¶¶ 40-42.

In June 2018, Welsford and Malave appeared at the industry's largest trade show on EOFlow's behalf, promoting EOFlow's new product, EOPatch2. Insulet had long insisted that no other company could make a product similar to Omnipod. Appx20359-20360 (35:23-36:5); Appx20583 (114:9-115:2); Appx308-309 ¶¶ 5-7. But upon seeing EOPatch2, Insulet's executives instantly recognized it as a "clone"

bearing a "stunning resemblance" to Omnipod. Appx43583-43586 at Appx43583; Appx20589 (137:18-138:2). Insulet's alarmed executives notified Insulet's legal team. Appx43583. But for five years following that June 2018 event, Insulet did *nothing* to investigate potential misappropriation before filing suit in 2023.

### A. EOFlow Developed a Diabetes Patch Pump.

Long before the companies collided at that June 2018 ADA conference—and for years afterward, while Insulet stood silent—EOFlow's founder Jesse Kim worked to build a wearable patch pump. Starting in 2011, from EOFlow's South Korean headquarters, Kim pursued a product that would serve patients in countries that Insulet did not serve and last longer on fewer batteries. Appx20772 (129:2-15). EOFlow's device relied on a patented electro-osmotic actuator (hence the name EOFlow). Appx20668-20669 (25:19-26:12); Appx20739 (96:2-21). As EOFlow's marketing literature stated, other aspects of the EOPatch would operate similarly to Omnipod, so year-after-year EOFlow purchased and reverse-engineered Omnipod pumps. Appx20740-20741 (97:2-98:19); Appx20769-20775 (126:14-132:19); Appx54084-54103; Appx54081; Appx54082; Appx54086. EOFlow's initial EOPatch received regulatory approval in Korea but EOFlow sought to improve the device. Appx20741 (98:20-23); Appx20744-20745 (101:22-102:3). EOFlow hired industry veterans Malave and Welsford in late 2017—long after they left Insulet, and publicly announcing their onboarding (Appx20743 (100:3-25))—and engaged

DiIanni as a consultant.  Appx20677-20678 (34:14-35:17); Appx20741-20744 (98:24-101:5).

After unveiling EOPatch2 at the 2018 ADA conference, EOFlow continued to refine the product, and actively sought business partnerships with several companies, including Insulet.  Appx20745-20748 (102:12-105:20); Appx54450 (EOPatch);  Appx20755-20756  (112:2-113:14);  Appx20759-20763  (116:11-120:12).

**B.**    **Insulet Notified Its "Legal Team" of a "Cloned" Product from a Company with Ex-Insulet Employees *Five Years* Before Filing Suit.**

From 2018-2023, Insulet took no action to protect any purported trade secrets vis-à-vis EOFlow or its former employees.  That is not because Insulet lacked notice. Following the June 2018 ADA conference and with each subsequent event, Insulet executives, including its CEO, reported alarm and urged—but did not perform—an investigation.

At the June 2018 conference, EOFlow presented prototype samples of EOPatch2 at its booth, including samples with a transparent case revealing internal components.  Appx20748-20750 (105:15-107:23); Appx20779-20781 (136:23-138:11); Appx20869-20870 (80:13-81:20).  Insulet personnel interacted with EOFlow at EOFlow's booth. Appx20598-20600 (19:13-25:11); Appx20536-20539 (131:4-141:25); Appx54333. EOFlow's promotional poster touted its "soft cannula"

and approach to "occlusion detection," both of which Insulet would later claim to be Insulet "trade secrets."



Appx55334-55335; Appx54105; Appx20746-20747 (103:21-104:19).

Insulet personnel spoke with EOFlow's personnel, including Malave and Welsford, and observed that EOPatch2 bore a "***stunning resemblance to Omnipod***," according to Insulet's senior executive Eric Benjamin. Appx20589 (137:18-138:2).[1] EOFlow's EOPatch2 was the only wearable patch pump product at the conference similar to Insulet's Omnipod. Appx20589-20590 (138:3-143:17); Appx43587-43601 at Appx43587.

---

[1] Unless otherwise noted, all emphases are added, and internal quotation marks are omitted.

Insulet internally raised alarm bells and consulted lawyers. A post-conference summary circulated to Insulet's management on June 28, 2018 shared a picture of EOFlow's product and booth and proclaimed: "***EOFlow has cloned our product and is (presumably) selling it in Korea (only). Our legal team is aware of this. Someone should request samples***." Appx43583. Insulet's internal intelligence assessment called EOPatch2 a "***[v]ery similar product to Insulet's OmniPod as it was started by a former Insulet engineer***." Appx43595.

In the following days, Insulet personnel visited EOFlow's website twenty times. Appx20752-20753 (109:5-110:1); Appx55233-55333 at Appx55274-55276.

Despite Insulet's concerns, Insulet did not contact EOFlow or its ex-employees to raise any IP issue, provide a reminder of confidentiality obligations, request product samples, or otherwise communicate Insulet's concerns. Appx20762 (119:20-23); Appx20763 (120:5-12); Appx20877 (109:12-14); Appx21229-21230 (44:24-45:9); Appx21328 (66:17-67:1). Nor did Insulet conduct any internal investigation into potential misappropriation, such as checking file access logs. Appx21326-21328 (59:19-65:25).

### C. Insulet Paired Alarm with Inaction Throughout 2018 and 2019.

After the 2018 conference, Insulet's scrutiny of EOFlow and its "cloned" product escalated, including to CEO Shacey Petrovic. In October 2018, Petrovic emailed Insulet's VP of competitive intelligence, Brittany Bradrick: "Really good

competitive intel here – do we have a good understanding of the landscape and which technologies we should consider 'taking out' early? ***EO Flow for example***." Appx21226 (31:7-24).

EOFlow presented again at the Diabetes Technology Meeting in November 2018. Insulet reported: "***We had a very good look at EOFlow*** . . . Ian Welsford, their Chief Compliance Officer . . . ***presented details of EOFlow design and issues***." Appx54312-54313 at Appx54313; Appx21226-21227 (32:24-33:20).

On March 14, 2019, CEO Petrovic sounded the alarm after seeing an EOFlow press release announcing it won a "breakthrough" device designation by the FDA. Petrovic directed: "***We also may want to look at their IP, etc*** and see if there is a blocking strategy or ***if they infringe***. . . . ***[I]t looks just like ours and their CEO is former COO of Insulet***." Appx55152-55153; Appx21228-21229 (39:17-41:21).

The next day, March 15, 2019, Insulet's Director of Mechanical and Materials David Nazarro, echoed the CEO's concerns and urged legal action in emails with executive Eric Benjamin referencing Malave, Welsford, and the "designer" Steve DiIanni:

- "***The people running EO flow, Luis M, Ian W, and their designer Steve D. [DiIanni] are past Insulet folks***. They have useful knowledge on how to get a product to market";

- "I would recommend we have Scott's team *do an in depth scrub of domestic and foreign IP for starters*. . . . *If we could get a few devices, that would be ideal*. I think it's possible this becomes real."[2]

Appx43523-43525; Appx54333; Appx20598-20599 (19:13-24:16); Appx20605 (45:19-46:4); *see also* Appx20456-20468 (Ly) (132:20-144:10); Appx43581-43582; Appx54116-54119; Appx20762-20763 (119:20-120:12).

But Insulet did *not* ask EOFlow for "a few," or indeed any, devices. *See, e.g.*, Appx20762-20763 (119:20-120:12). Nor did Insulet communicate any concern to EOFlow or its ex-employees. On the contrary, Insulet communicated with EOFlow only to explore a potential business relationship. In March 2019, Insulet's Bradrick met with Malave. Appx21228 (37:8-39:1). But Bradrick did not request any EOPatch2 samples, raise any reminder of confidentiality obligations from Malave's years at Insulet, or otherwise raise any IP concerns. Appx21229-21230 (43:1-45:9).

At this time, EOFlow readily provided product samples upon request to potential partners, including those who were also potential competitors. Appx20759-20763 (116:11-120:12); Appx55121-55192.

Because of the obvious legal issue staring Insulet in the face, Insulet sent attorneys to attend the June 2019 ADA conference, where they spoke with EOFlow personnel and gathered information about EOPatch2 including "how it worked."

---

[2] "Scott's team" were lawyers. Appx21324 (52:16-21).

Appx20874 (98:10-100:23); Appx53983-54016; Appx20599-20600 (24:17-25:11). EOFlow again visually advertised its "soft cannula" and "fast occlusion detection." Appx54117-54120 at Appx54120; Appx21325-21326 (56:18-57:3). Yet Insulet still did not raise any IP issue to its ex-employees or EOFlow and still did not conduct any internal investigation into possible misappropriation.

Shortly afterward, on July 10, 2019, EOFlow published on its website a press release indicating its "improved" EOPatch2 received regulatory approval in South Korea. Appx54200. The release again touted "the adoption of a soft cannula." *Id.* The next day, Insulet personnel repeatedly visited EOFlow's website. Appx55320.

In July 2020—still more than three years before Insulet sued in August 2023—EOFlow published online its Prospectus for its IPO on the South Korean stock exchange. Appx39838-40344 (Prospectus); Appx41436-41440 at Appx41438 (press release); Appx20764-20766 (121:15-123:22). The Prospectus disclosed technical details about EOPatch2 that Insulet later accused of using Insulet's asserted trade secrets, including detecting "Occlusion" using a mechanism strikingly similar to Omnipod's mechanism (called a "walking man") and a "Soft Cannula." While largely in Korean language (and billion-dollar companies like Insulet translate such documents, *e.g.*, Appx20600 (26:11-20)), the relevant disclosures were in English and pictures. Below compares the Omnipod "walking man" and corresponding EOPatch2 component disclosed in EOFlow's Prospectus:

| Omnipod "Walking Man" | EOFlow Prospectus |
|---|---|
|  | |

Appx54106-54116 at Appx54109 (rotated excerpt); Appx21111 (205:3-13, 206:4-18); Appx39838-40344 at Appx40205.  The Soft Cannula was also featured, with the "nailhead" design Insulet later asserted was its trade secret:



Appx39838-40344 at Appx40208; Appx20512-20513 (36:16-37:15).

**D.    "Plain" and "Undisputed" Evidence Showed Insulet Was on Inquiry Notice by Early 2019.**

As the district court acknowledged at summary judgment, the contemporaneous evidence that Insulet was on notice of alleged misconduct by early 2019 was "plain" and "undisputed." Appx21 ("The undisputed record indicates that by early 2019, plaintiff's senior executives harbored concern that defendants had infringed on the company's intellectual property. . . . Altogether, plaintiff plainly had at least a cause for concern that defendants had engaged in prohibited conduct by early 2019."); Appx46 (similar). Insulet trial witnesses attempted to excuse their failure to investigate by insisting they had no reason to believe misappropriation occurred. *E.g.*, Appx20598 (19:11-20:15). But this testimony could not erase the overwhelming documentary proof. Even *after* trial, the district court recognized that "[a]n inquiry-notice standard would, in all likelihood, render plaintiff's claims time-barred." Appx104.

Insulet did not file suit until August 3, 2023—more than five years after the 2018 ADA conference. Only after Medtronic announced in May 2023 that it planned to acquire EOFlow, Insulet filed suit to block that acquisition. Appx306-367, at Appx343 ¶ 111. Following Insulet's filing, Medtronic canceled the acquisition. *See Insulet*, 104 F.4th at 884.

## II.   PROCEDURAL BACKGROUND

The district court granted Insulet a preliminary injunction, which this Court reversed, holding that the district court erred on all four prongs of the injunction analysis. *Id.* at 880-85.

After remand, and after fact discovery closed, Insulet asserted a purported trade secret that had never been mentioned before, the "Design History File," or DHF.  Appx55495-55517; Appx3043-3045 (41:24-43:3).  This file purportedly contained *all* possible information about the design and manufacture of the Omnipod. Appx5179-5243 at Appx5211; Appx6361-6387 ¶¶ 32, 58, 94(b).  Though no fact witness had ever been asked a single question about it, the district court allowed Insulet to pursue it as a "combination trade secret," but excised two of its seventeen components as even Insulet admitted those had never been mentioned even in its many shape-shifting lists covering hundreds of purported secrets. Appx3043-3047 (41:9-45:18); Appx22132-22133 (27:11-28:7).

Given evidence that Insulet was on inquiry notice more than three years before filing its trade secret claim, EOFlow moved for summary judgment that the DTSA's three-year statute of limitations had expired.  Appx5179-5244 at Appx5188-5205 (MSJ brief); Appx5245-6123, Appx6236-6272 (MSJ record); Appx8020-8048 at Appx8021-8033 (undisputed facts); Appx12713-12779 at Appx12714-12736 (Insulet responses).  Throughout the litigation and before this Court, everyone had

recognized that the DTSA statute of limitations starts running upon "inquiry notice," when a reasonable person would have inquired into the issue. For example, Insulet's appeal brief to this Court acknowledged that "inquiry notice" is the standard and disputed only whether factually "Insulet was on inquiry notice of potential misappropriation before August 3, 2020." Appellee's Principal Br. at 26, 32, 33, 34-35, 37, *Insulet Corp. v. EOFlow Co.*, No. 2024-1137 (Fed. Cir. Feb. 6, 2024), ECF No. 20. At oral argument, the panel stated that the appropriate standard was whether Insulet "was on inquiry notice in 2018 or 2019" under "what is really the test, which is: with the exercise of reasonable diligence starting in 2018 or 2019, would you not have had a claim within three years"—and Insulet agreed with the legal framework ("Right"). ECF No. 9-3 at 250-251 (19:23-20:11).

At summary judgment, however, Insulet newly argued for a different statute of limitations standard that no trade secret case had ever adopted. That standard was tenuously based on an extension of *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), which had interpreted a different statute, with different text and structure, from the inapposite securities fraud context. In the 15 years since that decision, *no* court had ever applied *Merck* to a trade secret statute of limitations, but the district court decided to contradict "[e]very other court to have considered it" and be, in its own words, "Numero Uno." Appx16632 (27:13-20).

15

Given the dispositive nature of this legal issue, EOFlow requested an interlocutory appeal. Appx19277-19281. The district court acknowledged the issue is dispositive and held that "[i]f the appellate court subsequently determines that inquiry notice, and not the *Merck* standard, is the governing law, then defendants would almost certainly be entitled to summary judgment on the trade secret claim." Appx46. But the district court nonetheless refused to certify and instead held trial under its novel standard. That trial lasted five weeks, cost millions of dollars, and—over EOFlow's objections (Appx19889-19991 at Appx19972-19973) and under the *Merck* standard—resulted in a jury verdict for Insulet, a sweeping injunction, denials of JMOL and motions for a new trial, and this subsequent appeal.

Insulet moved to transfer this appeal out of the Federal Circuit, which had previously ruled against Insulet, arguing that the dismissal of its patent claims *after* trial and in anticipation of this appeal divested this Court of jurisdiction. EOFlow opposed, noting the dismissal operated "with prejudice" because the patent claims were now time-barred. ECF No. 11. This Court denied Insulet's motion to transfer and instructed the parties to address jurisdiction alongside the merits. ECF No. 18.

EOFlow moved this Court to stay the district court's permanent injunction. ECF No. 9. This Court, noting that a stay requires a "strong showing of a likelihood of success on the merits," granted a partial stay. ECF No. 18.

The district court's numerous legal errors warrant reversal. *First*, the district court erred by failing to apply the "inquiry notice" standard that every other court has applied to the three-year DTSA statute of limitations. Under the proper "inquiry notice" standard, the evidence required summary judgment (and, after trial, judgment as a matter of law) that Insulet's DTSA claim was time-barred. Plus, even if *Merck* applied, the evidence required judgment that Insulet's claim was time-barred because Insulet had sufficient information in 2018-2019 to state a claim.

*Second*, the district court erred by wrongly instructing the jury that it should confine its consideration of whether Insulet took the necessary "reasonable measures" to maintain secrecy over its purported trade secrets strictly to the time of the alleged misappropriation. The DTSA statute contains no such temporal limitation, and the law requires trade secret owners to exercise "eternal vigilance" over their secrets. Where a party like Insulet does absolutely nothing when its asserted trade secrets are allegedly taken, that failure to take reasonable steps is relevant to evaluating whether the information qualifies as a protectable trade secret.

*Third*, the district court erred by failing to require reasonable identification of trade secrets. The problem this Court recognized at the injunction stage, Insulet's invoking a "hazy grouping of information that the court did not probe with particularity to determine what, if anything, was deserving of trade secret

17

protection," only worsened through summary judgment and trial.

**Fourth and finally**, the district court erred in entering the damages award. Notwithstanding its reduction in damages, the award still constitutes double counting because it awards Insulet damages on future sales while enjoining those sales from happening. Plus, the award imposes joint and several liability on Mr. Kim when he retained no financial benefit from the alleged misappropriation and Insulet assured the jury it would seek from Mr. Kim only $1.

These errors warrant reversal or at a minimum, remand for consideration under the right legal standard.

## STANDARD OF REVIEW

This Court reviews denials of motions for summary judgment, JMOL, and new trial under regional circuit law. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011); *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012). These decisions are reviewed de novo. *McKenney v. Mangino*, 873 F. 3d 75, 80 (1st Cir. 2017); *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 463 (1st Cir. 1996); *see also Dupree v. Younger*, 143 S. Ct. 1382, 1390-91 (2023) (review of denial of summary judgment based on legal issue).

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). JMOL is appropriate where a verdict "depends on an

incorrect legal regime." *Fresenius Med. Care Holdings, Inc. v. United States*, 763 F.3d 64, 68 (1st Cir. 2014); *see also Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 49 (1st Cir. 2002).

The First Circuit reviews denial of a new trial for abuse of discretion. *Kennedy v. Town of Billerica*, 617 F.3d 520, 529 (1st Cir. 2010) (reversing because instructions "prevented the jury from fairly and adequately understanding the elements" of a claim). "An erroneous jury instruction warrants a new trial if the preserved error "prejudiced the objecting party." *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 47 (1st Cir. 2004).

## ARGUMENT

**I.    INSULET'S CLAIM WAS TIME-BARRED UNDER THE DTSA STATUTE OF LIMITATIONS**

**A.    The DTSA Incorporates Inquiry Notice.**

**1.    Courts Consistently Apply "Inquiry Notice" to the DTSA Statute of Limitations.**

Before this case, every court to address the issue applied "inquiry notice" to the DTSA statute of limitations. "A plaintiff is considered to be on 'inquiry notice' when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 187-88 (1st Cir. 2006) (affirming dismissal of trade secret claim where "a reasonable person would have inquired into the issue" within three years).

The Eighth Circuit and Second Circuit, for example, have expressly recognized that "inquiry notice" triggers the DTSA statute of limitations. In *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, the Eighth Circuit affirmed summary judgment barring a DTSA claim because the plaintiff was on "inquiry notice" more than three years before filing suit. 920 F.3d 560, 564-66 (8th Cir. 2019). The period starts "when the plaintiff first becomes aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause," with an "ultimate focus [on] whether the plaintiff was aware a problem existed." *Id.* Similarly, in *Zirvi v. Flatley*, the Second Circuit affirmed dismissal of a DTSA claim as time-barred where the "circumstances surely put a person of 'ordinary intelligence' on at least inquiry notice." 838 F. App'x 582, 586 (2d Cir. 2020).

District courts nationwide have likewise consistently applied "inquiry notice" to the DTSA. *See*, *e.g.*, *MedCenter Holdings Inc. v. WebMD Health Corp.*, No. 20-cv-00053, 2025 WL 965853, at *6 (S.D.N.Y. Mar. 31, 2025) (dismissing DTSA claim where "a reasonably diligent person should have been put on inquiry notice that [plaintiff] had trade secrets claims"); *P2I Ltd. v. Favored Tech USA Corp.*, No. 23-cv-01690-AMO, 2024 WL 4294652, at *6 (N.D. Cal. Sept. 24, 2024) (dismissing DTSA claim where plaintiff was "on inquiry notice of its trade secret misappropriation claim"); *Phoenix Co., Inc. v. Castro-Badillo*, No. 23-1371 (RAM),

20

2024 WL 3742368, at *4–5 (D.P.R. Aug. 9, 2024) (DSTA claim barred by "inquiry notice"); *RoboticVISIONTech Inc. v. ABB Inc.*, 726 F. Supp. 3d 364, 368 (D. Del. 2024) (same); *Compass Mktg., Inc. v. Flywheel Digit., LLC*, No. GLR-22-379, 2023 WL 2213687, at *7 (D. Md. Feb. 24, 2023) (same), *aff'd*, No. 23-1324, 2024 WL 3292676, at *1 (4th Cir. July 3, 2024); *Alta Devices, Inc. v. LG Elecs., Inc.*, No. 18-CV-00404-LHK, 2019 WL 1924992, at *12-14 (N.D. Cal. Apr. 30, 2019) (same).

### 2. Congress Enacted the DTSA's Statute of Limitations to Be "Identical" to the UTSA's.

When enacting the DTSA, Congress borrowed the "identical" limitations period from the preexisting Uniform Trade Secrets Act ("UTSA"). H.R. Rep. No. 114-529, at 13 (2016) ("This limitations period is now identical to the limitations period of the UTSA[.]"). "Congress was aware of the role and limitations of the UTSA as model legislation for the states, and it recognized the DTSA and the UTSA as similar," which "is critical for purposes of [courts'] statutory interpretation analysis." *Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020); *see also, e.g.*, *Kuryakyn Holdings v. Ciro*, 242 F. Supp. 3d 789, 797 (W.D. Wis. 2017) ("[C]ourts may look to the state UTSA when interpreting the DTSA," particularly where "substantively the UTSA and DTSA are essentially the same"); *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017) ("[E]xisting state law on trade secrets informs the Court's application of the DTSA.").

UTSA law informs the DTSA because their statutes of limitations are deliberately identical. *See* Uniform Trade Secrets Act § 6 (claim must be brought within "3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."); 18 U.S.C. § 1836(d) (action "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered").

"Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022). The UTSA's statute of limitations provision, which incorporated "inquiry notice," *see Epstein*, 460 F.3d at 187, is the "legal source" for the DTSA's statute of limitations. *See* H.R. Rep. No. 114-529, at 13. Congress's identical DTSA's statute of limitations incorporates the UTSA's "cluster of ideas," including inquiry notice. *George*, 596 U.S. at 753.

Before the DTSA's 2016 enactment, courts applied "inquiry notice" to the statute of limitations for UTSA and common law trade secret claims. For example, in a 2013 decision—three years after *Merck*—this Court applied inquiry notice to the UTSA statute of limitations with substantively identical language as the DTSA. *Phillip M. Adams & Assocs., LLC v. Dell Comput. Corp.*, 519 F. App'x 998, 1005-08 (Fed. Cir. 2013) (affirming summary judgment that the UTSA claim was time-

barred because "[a]ll that is required to trigger the statute of limitations is sufficient information . . . to put them on *notice to make further inquiry* if they harbor doubts or questions about the defendant's actions"); *see also, e.g.*, *Epstein*, 460 F.3d at 187-88 ("inquiry notice"); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 365 (5th Cir. 2000) (state UTSA statute of limitations with same language as DTSA began to run when events "should have put [plaintiff] on notice of possible misappropriation"); *Wang v. Palo Alto Networks, Inc.*, No. C 121–05579 WHA, 2014 WL 1410346, at *5-7 (N.D. Cal. Apr. 11, 2014) (finding claim time-barred under state UTSA with same text as DTSA, where facts known more than three years before suit "put [plaintiff] on inquiry notice"); *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003-07 (S.D. Cal. 2012) (under state UTSA with same language as DTSA, "[w]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins"); *Memry Corp. v. Kentucky Oil Tech., N.V.*, No. C-04-03843 RMW, 2007 WL 2746736, at *7 (N.D. Cal. Sept. 20, 2007) (same); *Micrel Inc. v. Monolithic Power Sys., Inc.*, No. C 04–04770 JSW, 2005 WL 6426678, at *3-4 (N.D. Cal. Dec. 9, 2005) (analyzing "inquiry notice" and holding UTSA claim time-barred); *Porex Corp. v. Haldopolous*, 284 Ga. App. 510, 516 (2007) ("[K]nowledge of 'every fact necessary to prevail on the claim' is not required to put the plaintiff on inquiry notice and trigger the accrual period")

(quoting *Epstein*, 460 F.3d at 188).

After the DTSA's enactment, courts continue to interpret the DTSA and UTSA statutes of limitations consistently using "inquiry notice." For example, in *CMI Roadbuilding*, the district court and Court of Appeals both applied "inquiry notice" "[u]nder both the DTSA and UTSA." *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, No. 16-CV-33-LRR, 2017 WL 6210920, at *8 (N.D. Iowa Dec. 8, 2017), *aff'd*, 920 F.3d at 564-65 560, 564 (8th Cir. 2019) (applying the DTSA and "similar" UTSA).

Courts in numerous other cases have applied "inquiry notice" to address the DTSA alongside substantially similar state UTSA statutes. *Alta Devices*, 2019 WL 1924992, at *12 ("inquiry notice" for DTSA and California UTSA); *RoboticVISIONTech*, 726 F. Supp. 3d at 368 ("inquiry notice" for DTSA and Delaware UTSA); *Compass Mktg., Inc.*, 2023 WL 2213687, at *6 n.2 (holding DTSA claim barred by "inquiry notice" and observing the claim under "the Maryland analog to the DTSA, the MUTSA" would be "time-barred for the same reasons"), *aff'd*, 2024 WL 3292676, at *1; *PTP OneClick, LLC v. Avalara, Inc.*, No. C19-0640JLR, 2020 WL 4729174, at *8-9 (W.D. Wash. May 27, 2020) (applying "inquiry notice" to hold that both "UTSA and DTSA claims" time-barred, where "[a]ll that is required is a 'reasonable' suspicion that a specific wrongful act has occurred" to trigger the statute of limitations).

### 3. The District Court Erred by Failing to Apply "Inquiry Notice."

No other known case has rejected the application of "inquiry notice" to the DTSA statute of limitations. The district court admittedly contradicted "[e]very other court to have considered it." Appx16632 (27:15-20). The district court asserted that inquiry notice allegedly "conflicts with," or is "not reconcilable with," the statute. Appx18; Appx63. The district court's ruling is the one that cannot be reconciled with a wealth of precedent, Congress' stated intent, canons of statutory interpretation, and the text and structure of the DTSA.

*Merck* has never been cited in any other known decision to interpret the DTSA's statute of limitations. There is no indication that Congress intended the DTSA statute of limitations to be interpreted based on *Merck*. On the contrary, Congress explicitly modeled the DTSA statute of limitations on the "identical" limitations period of the UTSA, and courts interpreting the "identical" UTSA provision consistently apply the "inquiry notice" concept. *See, e.g.*, *Phillip M. Adams*, 519 F. App'x at 1005-08; *CMI Roadbuilding*, 920 F.3d at 564-65.

Fundamental canons of statutory interpretation also foreclose the (mis)application of *Merck* to the DTSA. The DTSA text differs in critical respects from *Merck*'s securities fraud statute. The DTSA expressly refers to the date on which the defendant's misconduct "[1] is discovered *or* [2] by the exercise of reasonable diligence should have been discovered," 18 U.S.C. § 1836(d). By

contrast, the statute in *Merck* includes only the first clause—"the discovery of the facts constituting the violation," 28 U.S.C. § 1658(b)(1). *Merck* held that this clause's reference to "discovery" *sub silentio* encompasses "when a reasonably diligent plaintiff *would have* discovered 'the facts constituting the violation.'" 559 U.S. at 637. Thus, if Congress considered, acknowledged, or adopted *Merck* in drafting the DTSA, it would have made no sense to include the second clause—"by the exercise of reasonable diligence should have been discovered"—which, in *Merck*'s view, was already included in the first clause referring to "discovery" of misconduct. Under *Merck*, the DTSA's second clause would have no work to do, which violates the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Courts have repeatedly held that *Merck*'s specific text and statutory context preclude applying its reasoning to other realms. *See, e.g.*, *Barron v. Lampley*, No. 4:15-CV-0038-HLM, 2016 WL 5334472, at *2, 5 n.9 (N.D. Ga. Jan. 25, 2016) (rejecting *Merck* and holding "inquiry notice still applies" for "non-fraud" securities-misrepresentation statute of limitations); *Resnick v. Schwartz*, 430 F. Supp. 3d 492, 497 (N.D. Ill. 2019) (rejecting *Merck* in ERISA case); *McCune v. U.S. Dep't of Just.*, 997 F. Supp. 2d 487, 499 (S.D. Miss. 2014) (rejecting *Merck* in financial privacy

26

case), *aff'd*, 592 F. App'x 287 (5th Cir. 2014); *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114-15 (S.D.N.Y. 2011) (rejecting *Merck* in RICO/fraud case), *aff'd*, 699 F.3d 141 (2d Cir. 2012).

There is no cause to extend *Merck* to the DTSA where Congress explicitly relied on the UTSA, and longstanding precedent and sound policy require a trade secret plaintiff to act promptly. Nor should the rule be changed to follow Insulet's expert's opinion that a plaintiff cannot act until a competitor's product is on the market. Appx21320-21321 (36:16-41:4). That approach—letting plaintiffs lie in wait while competitors invest in research, development, and regulatory proceedings, only to be ambushed at the 13th hour—would only encourage waste.

**B. Correct Interpretation of the DTSA Statute of Limitations Compels Reversal.**

Under the "inquiry notice" standard, Insulet was on inquiry notice of its trade secret misappropriation claims long before August 3, 2020, which time-bars its DTSA claims as a matter of law. The district court reached that conclusion on summary judgment. Appx18-20; Appx46. And no reasonable jury could have found otherwise. Nor is there a credible argument that failing to instruct the jury on inquiry notice was harmless, when the absence of that instruction was urged by Insulet, and dispositive. *See* Appx19972-19973; Appx17416-17417 (Insulet proposal); Appx21391-21392 (171:3-173:11). As the district court acknowledged, "[i]f the appellate court subsequently determines that inquiry notice . . . is the governing law,

then defendants would almost certainly be entitled to summary judgment on the trade secret claim." Appx46. After trial, the district court reconfirmed that "[a]n inquiry-notice standard would, in all likelihood, render plaintiff's claims time-barred." Appx104.

### 1. Insulet Was on Inquiry Notice Before August 3, 2020.

The record established Insulet was on inquiry notice before the time-bar date of August 3, 2020. "A plaintiff is considered to be on 'inquiry notice' when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." *Epstein*, 460 F.3d at 187-88. Here, Insulet not only was reasonably prompted to inquire, but *expressly prompted itself to inquire* into a possible injury at the hands of the EOFlow defendants. From June 2018 onwards, Insulet's personnel, all the way up to CEO Petrovic, repeatedly cited the overlap in employees, the defendants' access to Insulet's information, and seemingly "cloned" technology to urge inquiry into a possible IP claim. Appx8-12; Appx18-20; Appx43583; Appx43595; Appx55152-55153; Appx43523-43525. As Insulet's expert Timothy O'Shea admitted, if these circumstances didn't raise concerns, he didn't know what would. Appx21326 (58:5-59:18).

Under such circumstances, courts commonly find the combination of (1) defendants' access to the trade secret, and (2) similarity with the defendant's design, suffices not only to suspect misappropriation, but also to properly file a

complaint and even help prove misappropriation. "Suspicions should abound when a competitor markets a product similar to that previously developed by a former employer after one of the former employer's employees begins work for the competitor." *Seatrax*, 200 F.3d at 365 (affirming summary judgment that trade-secret claim was time-barred); *Leggett & Platt, Inc. v. Hickory Springs Mfg.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) ("[A]ccess and similarity [] may support a trade secret misappropriation claim."); *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (holding trade secret claim supported by evidence because defendant "had access to [plaintiff's] trade secrets, and [its] product was similar"); *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *29-30 (D. Mass. July 15, 2021) (noting "access to the trade secret by the misappropriating party and similarity between the secret and the defendant's design"); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (collecting cases holding that access plus similarity suffices for trade secret misappropriation claim); *Contour Design, Inc. v. Chance Mold Steel Co.*, 693 F.3d 102, 109 (1st Cir. 2012) (same).

Here, Insulet had ample notice of both access and similarity in 2018-2019. Insulet understood EOFlow had hired at least three of Insulet's ex-employees with extensive knowledge of Insulet's purported trade secrets, including the "designer" DiIanni, and perceived that EOFlow's EOPatch2 "cloned" Insulet's Omnipod with

a "stunning resemblance." Appx8-12; Appx18-20; Appx43595; Appx43523-43525; Appx20589 (137:18-138:2).

Courts also consistently hold that seeing a potentially infringing product at a trade show—as Insulet did—provides inquiry notice of a trade secret claim. For example, in *AnywhereCommerce, Inc. v. Ingenico Inc.*, the court held a DTSA claim untimely because the plaintiff, like Insulet, "saw the [defendant's] product at the [] trade show" and perceived it as "very similar." 665 F. Supp. 3d 181, 201 (D. Mass. 2023); *see also, e.g.*, *CMI Roadbuilding*, 920 F.3d at 565-66 ("exhibits at an [industry] trade show" put plaintiff "continuously on notice" with "a duty to investigate, regardless of [its] exact knowledge"); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1184 (11th Cir. 2011) (affirming trade secret claim time-barred where even the plaintiff admitted the statute of limitations started as soon as it "first viewed [the] competing device at a trade show"). Such claims accrue "[r]egardless of when" a defendant's product comes "on the market." *AnywhereCommerce*, 665 F. Supp. 3d at 201.

The statute of limitations accrued for all of Insulet's asserted trade secrets. The alleged misappropriation commenced when individuals retained Insulet materials upon leaving Insulet in 2010-2015. *E.g.*, Appx8-12; Appx18-20; Appx20618-20619 (100:4-103:2); Appx20879 (119:18-120:12); Appx21001-21002 (139:12-141:19). *See* 18 U.S.C. § 1836(d) ("a continuing misappropriation

30

constitutes a single claim of misappropriation"); *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 796 F.3d 576, 582-84 (6th Cir. 2015) ("limitations period runs not from each time that a trade secret is used, but from the first moment of its reasonably discoverable misappropriation"); *HiRel Connectors, Inc. v. United States*, 465 F. Supp. 2d 984, 988 (C.D. Cal. 2005) ("When a plaintiff brings suit against an individual defendant for separate misappropriations of related trade secrets, or for multiple misappropriations of a single secret, the date of accrual is the date of the initial misappropriation."). Insulet's experts opined that continued misappropriation involving EOFlow occurred by March 2018 (soft cannula), April 2018 (CAD files), and late 2018 (occlusion detection algorithm). Appx21065 (23:6-22); Appx21099-21101 (158:8-161:5, 166:3-167:2). All that related information was part of the all-encompassing "Design History File," and Insulet's expert opined that additional DHF documentation was misappropriated by December 2018. Appx21065 (23:23-24:5); Appx21071-21072 (47:24-52:4); Appx41445-41451.

Insulet's argument that a party must be able to see each specific trade secret in its competitor's product to be on notice makes no sense because if the information were "readily ascertainable" in that way, it would not be a trade secret in the first place. 18 U.S.C. § 1839(3)(B). In the trade show cases, plaintiffs did not see the asserted trade secrets inside the mobile payment devices (*AnywhereCommerce*), engineering parts for asphalt plants (*CMI Road-Building*), or night-vision goggles

(*Knights Armament*); plaintiffs like Insulet were on notice once they saw parties with access to their information promoting similar products.

### 2. Insulet Cannot Prove It Conducted a Reasonably Diligent Inquiry.

The burden-shifting framework for the DTSA statute of limitations is well established: when the alleged misappropriation occurs more than three years before the plaintiff filed suit, the plaintiff "has the burden of proving the discovery rule tolls application of the statutory bar." *CMI Roadbuilding*, 920 F.3d at 565; *see also* Appx21392 (173:18-174:15) (jury instructions).

Even if the DTSA were interpreted using *Merck* (or parts of *Merck*, as that statute has multiple triggers for claim accrual), that would still not change the burden of proof. *Merck* applied the "traditional discovery rule" to the statute of limitations for securities fraud. 559 U.S. at 644-53. Under the traditional discovery rule, the plaintiff carries the burden of proof. *CMI Roadbuilding*, 920 F.3d at 565; *see also, e.g., Parr v. Rosenthal*, 57 N.E.3d 947, 955 (Mass. 2016); *Giraud v. Quincy Farm and Chem.*, 102 Wash. App. 443, 449-50 (2000); *Alamar*, 40 U.S.P.Q.2d at 1440. *Merck* does not address, much less obviate, that burden.

On the record here, Insulet "cannot establish its burden of proving that the discovery rule saves its statutory causes of action" in compliance with its "duty to do such an investigation." *CMI Roadbuilding*, 920 F.3d at 565; *see also Zirvi v. Flatley*, 433 F. Supp. 3d 448, 463 (S.D.N.Y. 2020) (rejecting "as a matter of law"

plaintiffs' "argument that the plaintiffs acted with reasonable diligence in investigating the alleged wrongdoing"), *aff'd*, 838 F. App'x 582 (2d Cir. 2020). The record establishes Insulet's lack of reasonable diligence. Appx21232-21239 (Ashley) (54:6-81:17). From June 2018 through 2019, while Insulet internally rang alarm bells about key ex-employees developing the "cloned" EOPatch2 and urged investigation into an IP violation, Insulet never said a word to EOFlow, DiIanni, Welsford, or Malave about any potential retention or use of Insulet confidential information. Nor did Insulet ever request any product samples, despite knowing from June 2018 that "[s]omeone should request samples." Appx43583. Insulet's engineers, executive, and statute of limitations expert, Timothy O'Shea, admitted Insulet had not conducted any investigation into misappropriation. Appx21326-21328 (59:19-65:25); Appx20598 (19:11-20:15); Appx20537 (133:12-134:15). Under these circumstances, no reasonable jury could find that Insulet conducted a reasonably diligent investigation. *CMI Roadbuilding*, 920 F.3d at 565.

The record also demonstrated what Insulet would have discovered if it had conducted a reasonably diligent investigation. Appx21232-21239 (56:11-81:17). For example, EOFlow provided technical details about EOPatch2 to several other companies who asked EOFlow for information. Appx20759-20762 (116:9-119:10); Appx41690-41887; Appx20929-20930 (53:13-60:20); Appx55191-55192; Appx41598-41603; Appx55336-55408; Appx55193-55203; Appx21237 (74:21-

75:21). EOFlow also gave out product samples upon request, even to potential patch pump competitors, sometimes with no NDA. Appx20755 (112:2-24); Appx20759-20763 (116:9-119:4, 120:10-12); Appx20876 (107:20-108:12); Appx21238 (78:20-79:1); Appx20583 (114:9-24); Appx21281 (67:18-68:3); Appx21301-21302 (148:12-149:7).

Insulet's insistence that it could not have discovered detailed evidence to support a claim because EOFlow's product was not final, or it might have been difficult to obtain samples before the commercial release in 2021, "completely misunderstands the concept of inquiry notice." *Epstein*, 460 F.3d at 188 (affirming dismissal as a matter of law where plaintiff "had cause for concern"). "The discovery rule does not require that a plaintiff know the specific details pertaining to an alleged harm, but instead it imposes a 'duty to investigate' on a plaintiff who has cause for concern." *Id.* "Once a plaintiff is on inquiry notice," it must conduct "a reasonably diligent investigation." *CMI Roadbuilding*, 920 F.3d at 565.

Having undertaken no such investigation, Insulet cannot revive its claim with speculation that it *might* have been unable to discover a claim if it had bothered to investigate. This is especially so where Insulet already had ample basis to state a plausible claim based on what they ultimately alleged five years later—defendants' long-known access to "every aspect of [Insulet's] research and development," their "access to every record regarding the Omnipod product" and their "[v]ery similar,"

34

allegedly "cloned," product. Appx321-322 ¶¶ 40-42; Appx43583; Appx43595.

**C.     Even If _Merck_ Were Applied, Appellants Should Still Be Awarded Judgment as a Matter of Law.**

_Merck_ left open the question of what qualifies as "discovery" for purposes of determining whether a fact was discovered or should have been discovered with reasonable diligence. Courts applying _Merck_ consistently interpret "discovery" to mean that "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint"—not to conclusively establish the fact. _City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc._, 637 F.3d 169, 175 (2d Cir. 2011) ("_MBIA_"); _Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc._, 730 F.3d 263, 275 (3d Cir. 2013) (following _MBIA_); _100079 Canada, Inc. v. Stiefel Lab'ys, Inc._, 596 F. App'x 744, 748 n.8 (11th Cir. 2014) (same); _W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc._, 845 F.3d 384, 389 (8th Cir. 2016); _York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc._, 65 F.4th 459, 465 (9th Cir. 2023) (same); _see also Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 556 (2007) (describing the plausibility standard for a claim to survive a 12(b)(6) motion to dismiss).

Insulet had more than enough information to sufficiently plead a claim for misappropriation of trade secrets before August 3, 2020. Insulet's awareness of EOFlow's "cloned" product presented by Insulet's key ex-employees, including "designer" DiIanni, amply satisfied the classic combination of (1) access to the trade

secret information, plus (2) similarity of designs, that suffices to plead (and can even prove) a trade secret misappropriation claim. *Leggett & Platt*, 285 F.3d at 1361; *Seatrax*, 200 F.3d at 365; *Sokol*, 15 F.3d at 1432; *KPM Analytics*, 2021 WL 2982866, at *29-30.

Indeed, the complaint Insulet belatedly filed on August 3, 2023 relied heavily on the same combination of access plus similarity that was fully available to Insulet in 2018-2019. Appx306-367 ¶¶ 6-8, 40-42. Even under *Merck*, no reasonable jury could have found that Insulet lacked the necessary "discovery"—*i.e.*, the ability to state a plausible claim—before August 3, 2020.

## II. THE COURT'S JURY INSTRUCTIONS ON REASONABLE MEASURES CONSTITUTE REVERSIBLE LEGAL ERROR

To prevail on a DTSA claim, a trade secret owner must take "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). This statutory provision grows out of the longstanding requirement that a trade secret plaintiff must demonstrate "eternal vigilance" in protecting the information's secrecy. *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 260 N.E.2d 723, 730-31 (Mass. 1970); *see Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 893 (7th Cir. 2012) (same); *Hill Holliday Connors Cosmopulos, Inc. v. Greenfield*, 433 F. App'x 207, 214 (4th Cir. 2011) ("'[E]ternal vigilance' imposes a heavy burden on the owner of a trade secret, as it calls for constant warnings to all persons to whom the trade secret has become known . . . .").

As a result, "courts have recognized that actions taken after the alleged misappropriation are relevant to whether information can be properly categorized as a trade secret and whether it was ever valued to begin with." *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 177 (D. Mass. 2023). On this point the DTSA's text explicitly *deviated* from the old Massachusetts UTSA. *Id.* (recognizing that the DTSA does *not* contain the prior limitation that reasonable measures were to be considered "at the time of the alleged misappropriation"). This evolution of the statutory law makes sense. A party's response to the alleged misappropriation— or its utter failure to respond—is telling in terms of whether the information was truly ever a trade secret.

Here, however, in addressing Insulet's DTSA claim the district court erred in repeatedly instructing and emphasizing to the jury that "[t]he issue of whether Insulet took 'reasonable measures' to keep the information secret should be evaluated as of the time of the alleged misappropriation." Appx21389 (161:4-20); *see also id.* ("Again, it is up to you to determine whether Insulet took 'reasonable measures' to keep the disputed information secret *as of the time* of the alleged misappropriation.").

This instruction is inconsistent with the DTSA's plain language and the case law. For example, the Fifth Circuit affirmed dismissal of a DTSA claim for a lack of "reasonable measures" where the plaintiff attended an industry event, "learned of

37

the existence" of competitor with a similar name and business model who had prior access to its trade secret, but then "waited two years without sending any cease-and-desist letter." *Pie Dev., LLC v. Pie Ins. Holdings, Inc.*, No. 21-60593, 2023 WL 2707184, at *3 (5th Cir. Mar. 30, 2023) (per curiam) (affirming that after such a failure, a plaintiff "cannot now assert a [trade secret] claim").

District courts, too, reject trade secret claims where the record demonstrated lax post-misappropriation conduct by the would-be trade secret owner. *See, e.g.*, *Alamar Biosciences, Inc. v. Difco Lab'ys, Inc.*, No. Civ-S-941856 DFL PAN, 1995 WL 912345, at *6 (E.D. Cal. Oct. 13, 1995) (plaintiff's "failure to bring suit, or even approach and warn" the defendant promptly after "suspect[ing]" him of misappropriation, "establishes that [Plaintiff] did not take reasonable steps to protect its trade secrets."); *HiRel Connectors, Inc. v. United States*, No. CV01–11069 DSFVBKX, 2005 WL 4958547, at *6 (C.D. Cal. Jan. 4, 2005) (plaintiff who sued within limitations period but could have filed sooner and merely made a "single non-specific and ineffective demand" failed to demonstrate "reasonable efforts"). Here, the district court effectively warned the jury *against* using the post-misappropriation evidence for the very purpose that the DTSA renders it relevant—to understand whether the owner of the information was taking "reasonable measures."

This was particularly prejudicial in this trial, where Insulet, like the plaintiff in *Pie*, saw its ex-employees displaying a highly similar product for a competitor,

but never requested any sample or documents, and never sent any cease-and-desist communications. *See supra* Factual Background §§ I.B-C; Appx20946 (121:5-122:22, 124:6-21). The jury was entitled to evaluate whether, *in that period*, Insulet took "reasonable measures." Absent that instruction, the jury could not properly evaluate this essential element of Insulet's claim. That failure alone necessitates a new trial.

## III. EOFLOW IS ENTITLED TO JUDGMENT ON THE ASSERTED DHF TRADE SECRET

Insulet bore the burden of proving the existence, scope, and misappropriation of its alleged trade secrets. *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 705 (Fed. Cir. 2021). "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Id.* at 713. Here, this Court previously made clear that Insulet had "advanced a hazy grouping of information that the court did not probe with particularity to determine what, if anything, was deserving of trade secret protection." *Insulet*, 104 F.4th at 881. That problem grew worse as the case proceeded because (1) Insulet asserted the entire Design History File ("DHF") as a new all-encompassing "trade secret" that was even broader than the ones this Court rejected; (2) Insulet failed to point to what *information* within that DHF was trade secret; and (3) even if the DHF could have qualified as a trade secret, Insulet failed to demonstrate that a substantial portion of the DHF was misappropriated.

**A.     Insulet's Asserted DHF "Trade Secret" Was Severely Overbroad.**

This Court previously barred Insulet's attempt to assert as trade secrets essentially all of Insulet's confidential information—including any "design drawings and specifications"—as "severely overbroad." *Id.*  This Court held that advancing such a claim "requires evaluating *which* of the design drawings and specifications" was allegedly secret and subject to reasonable measures, and whether that information "was generally known or reasonable ascertainable," through reverse-engineering, Insulet's patents, "the public availability of the OmniPod, multiple tear-down videos available on the internet, and Insulet's own publications providing a look under the hood, featuring core components of the OmniPod." *Id.* at 881-82.

But after fact discovery, instead of identifying and *narrowing* the asserted trade secrets as required, Insulet asserted that its entire "Design History File"—*i.e.*, *everything* about the Omnipod's design and manufacture—was a compilation trade secret.  *See, e.g.*, Appx5179-5243 at Appx5211; Appx6361-6387 ¶¶ 32, 58, 94(b) (Insulet's expert asserting the DHF reflects "all of Insulet's prior research and development," "all accumulated knowledge that . . . relates to the manufacture of the Omnipod," and "the entirety of Insulet's work on the Omnipod").  At trial, Insulet's primary witness regarding the DHF, Insulet's VP of Global Regulatory Affairs, Julie Perkins, testified the asserted secret was "all of the documentation that demonstrates

how you designed and developed and how you manufacture your device." Appx21027 (45:19-22).

This "lack of a tailored analysis as to what specific information actually constituted a trade secret" fails as a matter of law. *Insulet*, 104 F.4th at 883. For this reason, too, the district court erred in denying EOFlow's motion for summary judgment and its subsequent motions for JMOL or a new trial.

**B.** **Insulet Did Not Demonstrate What Specific Information in the DHF Constituted a Trade Secret.**

"[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition" of a trade secret. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002). Thus, "a person claiming rights in a trade secret bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection . . . and to determine the fact of an appropriation." *Olaplex*, 855 F. App'x at 711-12.

Insulet failed to identify its asserted DHF trade secret with reasonable precision. Instead, Insulet wheeled into court a cart filled with nine binders containing hundreds or thousands of documents—Insulet's witnesses did not know which (*e.g.*, Appx21024 (33:12-21))—and claimed this was the DHF trade secret. Appx21010 (173:19-174:4). At trial, Insulet asserted the DHF trade secret consisted of 15 categories of loosely defined and seemingly overlapping documents, including

"assembly drawings" and "drawings and schematics." Appx21024 (35:19-36:13); Appx21025 (39:2-22); Appx21026 (42:6-43:1).

Trial evidence demonstrated that much of the DHF was generally known and publicly disclosed, including in Insulet's own User Manual. Appx54793-54982; Appx20604 (41:23-42:16, 43:5-44:9) (Insulet's "longtime head of research and development" admitting results of R&D efforts were publicly disclosed); Appx45015-45143 at Appx45028; Appx21079-21082 (80:2-91:20) (Insulet's expert acknowledging that product definition document—a supposed DHF component— contains standards and information well-known in the industry); Appx45312-45319; Appx45320-45323; *see also* Appx21249 (123:13-124:5); Appx21258-21260 (160:15-165:6); Appx41562-41578; Appx54542-54548; Appx54793-54982; Appx21034 (74:12-23). And the sum of Insulet's "accumulated knowledge" relating to its sole, publicly available product cannot all be a trade secret when the company admittedly has over 700 patents related to that product. Appx20604 (43:5-44:9). Trial evidence showed, for example, that Insulet's patents disclosed, among other things, the Omnipod's "basic architecture," "cannula insertion system," and "software, such as algorithms." Appx45015-45143 at Appx45028.

Perkins failed to distinguish what was and was not public in this enormous file. Nor could she. Perkins, hired in 2017, was not at Insulet when the file was created, and did not know what documents were ***excluded*** from the DHF presented

42

to the jury (though she testified what was presented was "just part of the Eros DHF)." Appx21023-21024 (31:14-33:5, 33:12-21, 34:7-20); Appx21026 (41:8-19). Before and throughout trial, the DHF's boundaries remained inconsistent and amorphous.

For example, Insulet asserted "standard operating procedures" ("SOPs") were within the DHF. Appx21022 (26:5-11). But Perkins and the only Insulet engineer to address the issue testified that SOPs are *not* part of the DHF. Appx21024 (36:14-23); Appx20578 (96:20-23). Insulet also asserted that "CAPAs" ("Corrective Action and Preventive Actions") were part of the DHF, but Perkins—the only witness who testified about CAPAs—described them only at a high level and could not explain what "CAPA" information is, or is not, within the DHF. Appx21022 (26:18-27:8); Appx21025 (38:6-19). The same was true for "assembly drawings" and "drawings and schematics"—Perkins did not know which were in, or out of, the DHF. Appx21026 (42:9-43:1). Without identifying even which drawings and specifications were inside or outside the DHF, it was impossible for any reasonable jury to conclude, or for the district court to determine as a matter of law, "what *within* the 'design drawings and specifications' for those physical components was [] a misappropriated trade secret." *Insulet*, 104 F.4th at 881.

Insulet claimed one trial exhibit, Ex. 2177, constituted the DHF, but failed to identify the metes and bounds of the exhibit itself. Perkins testified the exhibit merely represented excerpts of the DHF, Appx21010 (174:8-175:12); Appx21024

43

(34:7-20), yet conversely that it included "all the documentation that would exist in the Omnipod Eros DHF as of 2012." Appx21010 (175:13-15). One thing was clear—the witness Insulet offered to explain the DHF had not performed any thorough identification of trade secret information; she had only "flipped" through the materials. Appx21024 (36:1-8).

## C. Insulet's Failure to Adequately Identify Trade Secrets Warrants Judgment as a Matter of Law

Under such circumstances, courts have consistently awarded trade secret defendants judgment as a matter of law. *See, e.g.*, *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (affirming summary judgment because disclosure "including every dimension and tolerance that defines or reflects that [product] design" was insufficient to distinguish what was, or was not trade secret). In *TLS Management*, after the district court denied summary judgment and a jury ruled against the defendants, the First Circuit reversed because the trade secret identification failed to "establish what aspects were not readily ascertainable," and did not demonstrate "what aspects of the [documents asserted to be trade secrets] were public knowledge and which were not." *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020).

Recent decisions emphasize the importance of this rule requiring specific trade secret identification. *See, e.g.*, *Zunum Aero, Inc. v. Boeing Co.*, No. C21-0896JLR, 2024 WL 3822780, at *14 (W.D. Wash. Aug. 14, 2024) (reversing DTSA

44

verdict because trade secret identification "require[s] precision, and [the plaintiff] did not provide it" when it failed "to "separate [its] trade secrets from the other information known to or ascertainable by the industry").  Here, as in this Court's recent *Alifax Holding* decision, Insulet "not only failed to describe the alleged [] trade secret with sufficient detail but also failed to identify its proper scope" before trial, and the "trial evidence and testimony similarly fail to meet its burden to identify the [] trade secret."  *Alifax Holding SpA v. Alcor Sci. LLC*, Nos. 2022-1641, 2022-1723, 2024 WL 2932910, at *5 (Fed. Cir. June 11, 2024).

Nor can Insulet escape its failure by arguing the DHF was a "compilation" trade secret, such that it did not need to identify what specific information was or was not trade secret.  Such a rule would gut the identification requirement because anything—a device, a set of drawings, a consumer product or software suite—can be framed as a "compilation."  Such claims still require claimants to identify what is, and is not, trade secret.  *See, e.g.*, *TLS Mgmt.*, 966 F.3d at 53-54 (applying specific identification standard to asserted compilation trade secret and faulting plaintiff for not "separat[ing] the purported trade secrets from . . . other information" and describing the purported trade secret information "only . . . at a high level"); *REXA, Inc. v. Chester*, 42 F.4th 652, 662-64 (7th Cir. 2022) (affirming summary judgment where alleged trade secrets were described as "a sketch of the 2002 actuator prototype (contained within the design file), the source code, and testing results"

because they lacked specificity and "several aspects . . . were . . . widely known in the . . . industry"); *Card Isle Corp. v. Farid*, 689 F. Supp. 3d 1273, 1290 (N.D. Ga. 2023) (granting summary judgment where plaintiff claimed "[i]n essence . . . trade secret protection for all information about its software and business" –"[Plaintiff's] combination of unique pieces [was] too indefinite to  qualify as a trade secret"), *clarified on denial of recon. sub nom., Card Isle Corp. v. Edible Arrangements, LLC*, No. 1:21-CV-1973-TWT, 2024 WL 1759175 (N.D. Ga. Apr. 24, 2024); *see also SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ("[S]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status."). In short, Insulet still must prove, and the court must still "assess what within the 'design drawings and specifications' for those physical components was . . . a misappropriated trade secret." *Insulet*, 104 F.4th at 881.

Even if that requirement were waived, EOFlow would still be entitled to judgment as a matter of law because Insulet never proved that all, or even a "substantial portion" of the DHF, was misappropriated as the law requires when addressing compilation trade secrets. *See, e.g.*, *Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 110-12 (8th Cir. 1997) (affirming summary judgment where five elements constituted combination trade secret and defendant

"never received all five elements"); *Vital State Can., Ltd. v. DreamPak, LLC*, 303 F. Supp. 2d 516, 529 (D.N.J. 2003) ("This assertion that the trade secret is the combination of the elements is crucial . . . since it means that, to prove use of the trade secret, [plaintiff] must prove use of each and every element in combination.").

Instead, Insulet misleadingly tried to conflate the "Design History File" with a "project file" retained by Paul Hamm, an ex-Insulet employee who later worked for EOFlow and an EOFlow-related company, Nephria Bio.  Appx20996 (117:7-14) ("Q. And so you retained the entire project file for the Eros, everything documented anyway, right? . . .  A. Yes.  ***Q. And that included the design history file for the Omnipod Eros, correct?  A. I wouldn't say that***.").  Insulet's forensic expert's analysis also confirmed that whatever was retained, any use was far more circumscribed, as Hamm allegedly sent at most ten documents, DiIanni nine documents, and Welsford fifteen—a far cry from the hundreds or thousands of documents reflecting "all the accumulated knowledge" allegedly contained in the DHF.  Appx21117-21118 (232:18-233:1); Appx21122-21124 (252:21-258:19); Appx21125 (261:14-263:2); Appx21134-21135 (26:2-29:4).  *See also eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 493 (S.D.N.Y. 2024) (improper acquisition requires a "level of impropriety that merely accessing or downloading documents onto a personal device does not implicate"); *Apple Inc. v. Rivos, Inc.*, No. 5:22-cv-02637-EJD, 2023 WL 5183034, at *7 (N.D. Cal. Aug. 11, 2023) (mere possession of trade

secrets by a departing employee is not sufficient to establish misappropriation). Even for these handful of documents, Insulet made no effort to demonstrate they were part of Ex. 2177 or the DHF.

At base, Insulet failed to identify, before or at trial, what was in the DHF, and more specifically, what *information* in the DHF was a misappropriated trade secret. Instead, Insulet pointed only to how all its information was stored—in an enormous, amorphous file—and claimed that was its trade secret. *Contra* 18 U.S.C. § 1839(3) (defining trade secret to mean "information," regardless of "whether or how stored, compiled, or memorialized"). This persistent failure to adequately identify the DHF "trade secret," and the district court's denial of EOFlow's motions citing those failures, is a separate and independent grounds for reversal.

## IV. THE DISTRICT COURT ERRED IN AWARDING $25.8 MILLION IN "AVOIDED COSTS' COMPENSATORY DAMAGES

Insulet sought hundreds of millions of dollars while admitting it had *zero* "actual loss[es]." 18 U.S.C. § 1836(b)(3)(B). With no lost sales or profits, Insulet's entire damages theory was that EOFlow, a company with lifetime revenues of $3M, had been unjustly enriched by these vast sums. Appx21148 (81:12-83:21); Appx21157 (117:5-118:10); Appx21183 (25:7-27:10). Insulet posited that EOFlow had been enriched by (a) avoiding research costs, even though resulting sales had not occurred and would only occur in some hypothetical future (perhaps through entirely different products), and (b) *almost* being purchased by Medtronic, though

48

that deal never went through. Appx21151-21154 (94:1-106:16); Appx21155-21156 (110:15-114:5). Insulet's evidence came from the memory of a single engineer who—without looking at any documents, time sheets, or patents—allocated to each of the asserted trade secrets some portion of the work conducted by Insulet engineers from 2008-12 (*i.e.*, twelve to seventeen years ago).

The district court has already had to reduce the jury's overall awarded damages number by 87 percent because Insulet's theories were predicated on EOFlow profiting from future sales that the court enjoined from ever taking place. Appx92-97. This reduction was directionally correct and necessary under the law.

But the adjusted $25.8M compensatory damages award remains erroneous because the award (1) is still double-counting by awarding damages on "enrichment" that EOFlow cannot realize due to the district court's injunction; (2) is unduly speculative; and (3) imposes joint and several liability which is not legally available, particularly after Insulet secured the award by promising the jury it would *not* seek more than $1 from any individual defendant.

### A. The Avoided Costs Damages Are Incompatible with the District Court's Permanent Injunction Barring Sales of EOFlow's Product.

The DTSA provides for injunctions or damages, "limited by the disallowance of double recovery." *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-cv-00402, 2021 WL 3423345, at *3 (E.D. Tex. Aug. 5, 2021). Courts have long recognized that "[t]o enjoin future sales and at the same time make an award based on future

49

profits from the prohibited sales would result in duplicating and inconsistent relief."
*Winston Rsch. Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134, 144 (9th Cir. 1965).
That is why in the recent DTSA case of *Echospan, Inc. v. Medallia, Inc.*, the court
rejected arguments like Insulet's that the damages award did not "fully deprive[]
[defendant] of the benefit it continues to usurp" or "fully [make] whole" the plaintiff.
No. 22-cv-01732-NC, 2023 WL 9019054, at *2 (N.D. Cal. Dec. 11, 2023) (denying
permanent injunction). Those arguments failed because that plaintiff, like Insulet,
used an "unjust enrichment model [that] contemplated future benefits to
[defendant]." *Id.* Put simply, courts can *either* award damages tied to future sales
*or* enjoin those sales.

At trial, Insulet's damages theories were based on predicted "future benefits"
to EOFlow. First, Insulet's expert presented a "head start" theory of unjust
enrichment entirely premised on "sales and profits that EOFlow expected to enjoy
in the future" from current or anticipated products. Appx21154 (107:18-23). Next,
Insulet offered a market value damages estimate purporting to derive the trade
secrets' value from the purchase price Medtronic once agreed to but never paid for
EOFlow. Medtronic's offer was based on EOFlow's stock price, Appx21144 (68:7-
22), which is inherently forward-looking.[3]

---

[3] *See, e.g.*, *Sergros Caracas de Liberty Mut., S.A. v. Goldman, Sachs & Co.*, 502 F.
Supp. 2d 183, 188 (D. Mass. 2007) ("[T]he stock price should reflect expected future

In any event, the Medtronic deal fell through and caused no enrichment of EOFlow or any other defendant. Whether viewed through the lens of future sales that never happened or the stock price for an acquisition that never occurred, Insulet's damages claim necessarily focused on the *future possibility* of enrichment, which has since been foreclosed.

The district court recognized that Insulet's theories "involved analyses of prospective, hypothetical sales of defendants' products and their potential future value." Appx93. The district court thus properly held that enrichment damages under these theories were incompatible with a permanent injunction that would bar those hypothetical future sales and disrupt their value. *Id.*

The district court's error arose, however, when it concluded that such an injunction does not clash with its award of unjust enrichment damages based on previously avoided costs. *Id.* That is because avoided development costs are not unjust enrichment where an injunction locks up the developed product and prevents the defendant from benefitting from those avoided costs.

This refusal to grant "avoided costs" awards in the absence of, or beyond, the benefit secured by the defendant, informed the Second Circuit's decision to vacate a $285 million avoided costs award in the recent DTSA case *Syntel Sterling Best*

_____

profits."); *see also In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 313 (D.N.J. 2007) ("corporate finance theory unvaryingly holds that the . . . stock price reflects the market's estimation of the future stream of dividends," not "corporate assets").

*Shores Mauritius Ltd v. The TriZetto Grp., Inc.*, 68 F.4th 792, 811-14 (2d Cir. 2023). *Syntel* recognized that the trade-secret defendant had realized approximately $800,000 in unjust profits and cost the plaintiff approximately $8.5 million in lost profits. *Id.* at 811. Beyond those lost profits, though, the plaintiff "suffered no compensable harm" supporting an avoided costs award—especially because a permanent injunction "ended [defendant's] use of [plaintiff's] trade secrets, and, therefore, *its ability to profit from any avoided costs*." *Id.* *Syntel* rejects the notion that avoided costs are available in every trade-secret misappropriation case relating to an owner's product, because that approach would "overlook[] the remedial benefits . . . of a timely injunction that prevents the dissemination and use of a trade secret." *Id.* at 813.

In other words, avoided costs damages are premised on the defendant's ability to extract value from those avoided costs. Where an injunction eliminates that ability—and protects against future harm to the plaintiff—there is no basis for an avoided costs award. The unjust enrichment theory no longer applies because the injunction prevents the defendant from being unjustly enriched at the plaintiff's expense.

Here, the district court focused on dicta in *Syntel* suggesting that avoided costs may be appropriate in other cases depending on factors like (1) whether the defendant has used the secret in developing its own product, (2) the extent to which

the misappropriation has destroyed the secret's value, or (3) the extent to which the defendant can be stopped from profiting further from its misappropriation into the future. Appx95 (citing *Syntel*). Although the district court concluded EOFlow used Insulet's information to develop its product, sales of that competing product have not caused Insulet measurable harm, there is no allegation that EOFlow destroyed the value of the claimed trade secrets, and the permanent injunction would effectively prevent EOFlow from profiting from the claimed trade secrets in the future. On these facts, avoided costs damages are rendered moot by the injunction and the two remedies are mutually exclusive. To award both constitutes reversible legal error.

**B.** **Insulet's Avoided Costs Presentation Was Speculative and Overinclusive, Providing Insufficient Evidence to Support the District Court's Award.**

A plaintiff suing for trade secret misappropriation must show damages with "reasonable certainty." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1358 (Fed. Cir. 2005). Similarly, in patent cases, this Court vacates arbitrary and speculative awards that lack sufficient support. *EcoFactor, Inc. v. Google, LLC*, 137 F.4th 1333, 1345 (Fed. Cir. 2025) (stressing the importance of "the sufficiency of the expert's basis" to the opinion's ultimate reliability); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 81 (Fed. Cir. 2012).

Here, Insulet's enormous damages demand tottered on the slenderest reed—a

single engineer's document-free purported recollection of what he *and all his colleagues worked on*, in what proportions, roughly fifteen years ago. Appx20573-20577 (73:17-89:6). This astonishing memory exercise was not a sufficiently reliable basis to sustain Insulet's damages award.

No reasonable jury could conclude this was reliable. That defect is magnified because no one knows what the jury decided (if anything) regarding costs avoided. Insulet never requested that avoided costs be separately identified on the verdict form, so the jury never made this determination. Appx20177-20187. Absent that determination, the district court is necessarily speculating about the jurors' thinking or substituting its own judgment for the jury's in awarding the adjusted damages figure of $25.8 million.

On this record, the avoided costs damages award cannot stand. If the Court does not reverse the district court due to the legal errors tied to liability, it should remand for a new trial on avoided-cost damages with instructions that Insulet cannot offer these unsupported, speculative estimates.

### C. The District Court Erred in Imposing Joint and Several Liability on Jesse Kim.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Here, Insulet prevailed in securing a mammoth overall damages award by

promising the jury that *only* the Korean corporation EOFlow Ltd. Co. would pay "all of the damages." Appx21362 (55:19-56:1). Insulet's closing argument explained that only that company "got the benefit" from the alleged theft so it "should be the defendant that pays the damages." Appx21362 (56:2-12). Jurors were assured they could find overall whatever huge number Insulet requested without concern for any individual defendant, because if the jurors simply found individuals liable for just $1, Insulet would not look to "take away any individual's retirement account or bankrupt them." *Id.*

As soon as Insulet secured the overall verdict for nearly a half-billion dollars, Appx20177-20187, Insulet turned around and told the district court Mr. Kim should be held jointly and severally liable for the total—and the district court agreed. Appx21693-21772 at Appx21726; Appx79-80. That was legal error. Insulet cannot both prevail during the jury-trial phase by promising that *only one* defendant would pay all the damages, then prevail again in the post-trial phase by convincing the court that *multiple defendants* were responsible for all the damages.

Even if estoppel had not attached, insufficient evidence supports the imposition of joint and several liability on Mr. Kim. Before imposing joint and several liability, a trial court "must determine, based on the facts of each case, whether joint-and-several liability would be consistent with traditional equitable principles at common law." *BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 351-52 (1st

Cir. 2024) (citing *Liu v. SEC*, 591 U.S. 71, 91 (2020)).  Joint and several liability may be *inappropriate* under circumstances such as here "where the defendants' finances were not commingled," "where one defendant did not enjoy the fruits of the scheme," and "where other circumstances would render a joint-and-several disgorgement order unjust."  *Id.* (reversing imposition of joint and several liability on a high-ranking executive because he had not profited from the scheme aside from his salary and commissions); *see also Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 467-68 (D. Mass. 2017); *Steve & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-545, 2018 WL 2172502, at *6 (E.D. Va. May 10, 2018) (citing cases).

Here, the district court based joint and several liability on the idea that, as EOFlow's CEO and a significant shareholder, Mr. Kim "*stood to earn* a substantial profit" from the agreed-upon, but never consummated, sale to Medtronic.  Appx79-80.  The district court's reliance on speculative, unrealized profits from a transaction that never occurred cannot support joint and several disgorgement where the record contains no evidence of *any* unjust enrichment *actually obtained* by Mr. Kim as an individual.  Courts have imposed joint and several liability on company leaders under other circumstances but reject that remedy where the individual benefitted only indirectly.  *See BioPoint*, 110 F.4th at 352-53 (reviewing cases).  Here, Insulet admitted it was EOFlow itself that "got the benefit" of the alleged misappropriation and that defendant alone who should pay any damages.  Appx21362 (56:2-12).  This

Court should reverse the Judgment imposing joint and several liability for Jesse Kim.

## V. THIS COURT HAS JURISDICTION

This Court retains jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court's dismissal of Insulet's patent infringement claims operated with prejudice as it occurred after the applicable statute of limitations ran.

### A. The District Court Dismissed Insulet's Patent Infringement Claims over Six Years After They Accrued.

In August 2023, Insulet initiated this action including claims for patent infringement. Appx306-367 ¶¶ 145-150, 156-161, 167-172. Insulet alleged that EOFlow infringed three patents by importing a sample EOPatch2 device into the U.S. for a trade show in **June 2018**. *Id.* ¶¶ 146, 157, 168 (alleging infringement because "EOFlow imported at least one sample of the EOPatch device for display at the 2018 ADA Meeting").

Insulet chose to expedite the trade secret claim over the patent infringement claims. On January 9, 2024, the parties filed a proposed schedule lacking patent-specific deadlines. Insulet later filed a Second Amended Complaint to add another party but did not change its pleaded patent infringement claims, which governed the case through trial. Appx1093-1144 ¶¶ 134, 140, 146.

Months later, the parties agreed to stay Insulet's patent claims and stipulated that "no party will oppose a motion for partial judgment on the trade secret and related claims following resolution of the trial as to those claims." ECF No. 11-2,

addendum pages 482-487. In other words, the status of Insulet's patent claims could not be used to thwart a party's right to an appeal, like this one, from the trial of Insulet's trade secret claim.

**June 2024** marked six years after EOFlow's alleged acts of patent infringement by importation. *See* 35 U.S.C. § 286 (six-year statute of limitations for patent infringement claims).

In late 2024, the litigation proceeded through dispositive motions and trial on Insulet's trade secret claim. The jury rendered a verdict of liability and damages on December 3, 2024.

On January 3, 2025—well over six years after EOFlow committed the June 2018 act of alleged patent infringement, and when Insulet was presumably contemplating the forum for this appeal—Insulet moved to voluntarily dismiss its claims for patent infringement, purportedly "without prejudice" (Appx21408-21412)—but the statute of limitations had already run.

**B.      The District Court's Dismissal Operated with Prejudice.**

The dismissal of Insulet's patent infringement claims operated *with prejudice* because it occurred more than six years after the alleged act of infringement, thereby extinguishing the claims. 35 U.S.C. § 286.

Under Supreme Court precedent, "the difference between dismissals with and without prejudice . . . is functional, rather than semantic." *Chamberlain Grp., Inc.*

*v. Skylink Techs., Inc.*, 381 F.3d 1178, 1190 (Fed. Cir. 2004) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505-06 (2001)). "The primary meaning of 'dismissal without prejudice,' . . . is dismissal without barring the [party] from returning later, to the same court, with the same underlying claim." *Id.* (quoting *Semtek*, 531 U.S. at 505). Thus, a "dismissal without prejudice" has been defined as a "dismissal that does not bar the plaintiff from refiling the lawsuit within the applicable limitations period." *Id.* (quoting *Semtek*, 531 U.S. at 505-06).

Consistent with the Supreme Court's guidance, circuit courts consistently hold that dismissal by a district court, "even though labelled 'without prejudice,' is, in fact, with prejudice if the statute of limitations has run." *Hilton Int'l Co. v. Union de Trabajadores de la Industria Gastronomica de P.R.*, 833 F.2d 10, 11 (1st Cir. 1987); *Ciralsky v. C.I.A.*, 355 F.3d 661, 672 (D.C. Cir. 2004); *Hatchet v. Nettles*, 201 F.3d 651, 652-53 (5th Cir. 2000); *Duffy v. Ford Motor Co.*, 218 F.3d 623, 629 (6th Cir. 2000); *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000); *Watson v. West*, No. 98-7034, 1998 WL 729251, at *1 (Fed. Cir. Oct. 16, 1998); *Green v. Humphrey Elevator & Truck Co.*, 816 F.2d 877, 878 n.4 (3d Cir. 1987).

This well-settled rule applies to both voluntary and involuntary dismissals. "This is clearly the rule if the dismissal is voluntary." *Hilton*, 833 F.2d at 11 (citing cases). "[I]ndeed, any other result there would be most unfair. Consistency of legal

meaning, and hence effect, of an order seems far more important than its particular source." *Id.*

The district court's dismissal of Insulet's patent infringement claims, "even though labelled 'without prejudice,' [was], in fact, with prejudice" because "the statute of limitations [had] run." *Hilton*, 833 F.2d at 11. Section 286 imposes a six-year statute of limitations for seeking a remedy for an act of patent infringement. 35 U.S.C. § 286; *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 328-29 (2017) (holding the "statute of limitations" in 35 U.S.C. § 286 precludes the equitable defense of laches). As this Court explained in *Arellano v. McDonough*, under *SCA Hygiene*, "each individual act of patent infringement gives rise to a discrete claim that starts its own six-year limitations period for seeking a remedy for that act." 1 F.4th 1059, 1070-71 (Fed. Cir. 2021) (en banc), *aff'd*, 598 U.S. 1 (2023).[4] "In short, *each* infringing act starts a new limitations period." *Id.* Thus, § 286 operates "just as a traditional statute of limitations would to foreclose pressing of stale claims." *Id.* at 1071.

Here, in both the original Complaint and the SAC, the pleaded basis for Insulet's patent infringement claims was "[s]pecifically, EOFlow imported into the United States at least one sample of the EOPatch device for display at the 2018 ADA

---

[4] The Supreme Court affirmed this Court's ruling in *Arellano* after granting certiorari on the issue of whether the veterans' benefits statute, 38 U.S.C. § 5110(b)(1), is subject to equitable tolling. *Arellano*, 598 U.S. at 1-3.

Meeting." Appx306-367 ¶¶ 146, 157, 168; Appx1093-1144 ¶¶ 134, 140, 146. At the time Insulet filed this action on August 3, 2023, that alleged act of infringement had occurred within the six-year statute of limitations under § 286, in June 2018. But on January 3, 2025, when Insulet moved to voluntarily dismiss those claims and the district court dismissed them, the six-year limitations period had expired: § 286 forecloses Insulet from reasserting those claims. *SCA Hygiene, LLC*, 580 U.S. at 328-29; *Arellano*, 1 F.4th at 1070-71. The dismissal therefore operated *with prejudice*. *Hilton*, 833 F.2d at 11; *Green*, 816 F.2d at 878 n.4; *Hatchet*, 201 F.3d at 652-53; *Duffy*, 218 F.3d at 629; *Elmore*, 227 F.3d at 1011; *Ciralsky*, 355 F.3d at 672; *Watson*, 1998 WL 729251, at *1. As in *Chamberlain*, the words "without prejudice" were used, but that mere "semantic" formality cannot overcome the dispositive "functional" reality: Insulet "*is* barred from reasserting these claims." 381 F.3d at 1190.

Insulet cannot avoid the dispositive effect of the dismissal by arguing that "§ 286 of the Patent Act is not a *true* statute of limitations"—the argument "the Supreme Court rejected" in *SCA Hygiene*. 580 U.S. at 336-38; *Arellano*, 1 F.4th at 1091; *see also id.* at 1071 ("each individual act of patent infringement gives rise to a discrete claim that starts its own six-year limitations period for seeking a remedy for that act"); *Grit Energy Sols., LLC v. Oren Techs., LLC*, 957 F.3d 1309, 1320 (Fed. Cir. 2020) ("[T]he dismissal was without prejudice and the statute of

limitations has yet to run, leaving [the patentee] free to pursue its previous claims of infringement in the future") (citing *Semtek*, 531 U.S. at 505).

## C.  Dismissal With Prejudice Confers Jurisdiction.

Because Insulet's patent infringement claims were dismissed with prejudice under the governing law, this Court has jurisdiction. "Dismissals *with prejudice* are adjudications on the merits, and not constructive amendments to the complaint. In all such cases, we retain jurisdiction to hear all appeals on all issues." *Chamberlain*, 381 F.3d at 1189-90. The parties were not "left in the same legal position with respect to the patent claims as if they had never been filed." *Id.* at 1190. By choosing to dismiss its patent claims after the statute of limitations ran, thereby foreclosing Insulet from reasserting them, Insulet lost its claims and EOFlow prevailed. By granting a dismissal that operated with prejudice, "the trial court's rulings altered the legal status of the parties with respect to that patent claim." *Id.* This Court "therefore [has] jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(1)." *Id.*

Insulet appears eager to transfer this case out of this Court, which previously ruled against it. But this Court's jurisdiction is unaffected by *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), cited by Insulet. *Royal Canin* merely holds that when a case is filed in state court asserting federal claims and then removed to federal court under 28 U.S.C. § 1441(a), "if, after removal, the plaintiff amends her complaint to delete all the federal-law claims, leaving nothing but state-law claims

behind," then the federal court may not "still adjudicate the now purely state-law suit." *Id.* at 25. The case does not address this Court's jurisdiction under 28 U.S.C. § 1295(a)(1), does not discuss the distinction between dismissals with and without prejudice, and does not disturb the longstanding rule that a dismissal, "even though labelled 'without prejudice,' is, in fact, with prejudice if the statute of limitations has run." *Hilton*, 833 F.2d at 11.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's judgment and permanent injunction order. In the alternative, the Court should vacate the judgment and permanent injunction and remand for a new trial.

Dated: July 22, 2025

COOLEY LLP

*/s/ Adam S. Gershenson*
ADAM S. GERSHENSON
500 Boylston Street
Boston, MA 02116
(617) 937-2300
agershenson@cooley.com

LOWELL D. MEAD
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
lmead@cooley.com

ELIZABETH M. FLANAGAN
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383
bflanagan@cooley.com

63

*Counsel for Defendants-Appellants
EOFlow Co., Ltd., EOFlow, Inc., and
Jesse J. Kim*

# Addendum

| ECF No. | Description | Date Filed | Page No. |
|---|---|---|---|
| 740 | Electronic Order on Defendants' Motions in Limine and Supporting Papers | 10/28/2024 | Appx1 |
| 753 | Order on Cross-Motions for Summary Judgment | 10/31/2024 | Appx3 |
| 758 | Order on Defendants' Motion to Certify Order for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) and for Stay Pending Appeal | 11/1/2024 | Appx44 |
| 834 | Electronic Order Denying Parties' JMOL Motions | 12/3/2024 | Appx48 |
| 865 | Order on Plaintiff's Motion for Attorney Fees and Motion for Adverse Inference Instruction | 12/23/2024 | Appx50 |
| 945 | Order on Defendants' Renewed Motion for Judgment as a Matter of Law and New Trial | 4/24/2025 | Appx60 |
| 946 | Order on Plaintiff's Motion for a Permanent Injunction and Defendants' Motion for a Stay of Judgment | 4/24/2025 | Appx84 |
| 947 | Order as to Final Judgment | 4/24/2025 | Appx106 |
| 948 | Permanent Injunction | 4/24/2025 | Appx110 |
| 950 | Order on Plaintiff's Motion for Post-Verdict Discovery | 5/6/2025 | Appx119 |
| 976 | Jury Charge Conference Transcript | 11/27/2024 | Appx125 |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 10/29/2024 at 10:34 AM EDT and filed on 10/28/2024

| | |
|---|---|
| **Case Name:** | Insulet Corporation v. EOFlow, Co. Ltd. et al |
| **Case Number:** | 1:23-cv-11780-FDS |
| **Filer:** | |
| **Document Number:** | 740(No document attached) |

**Docket Text:**
**Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference held on 10/28/2024. Case called; Arguments heard on motions. Final Pretrial to remain set for 10/29/24 at 1:30pm.**

**ORDERS ON MOTIONS:**
**Court found as Moot [478] MOTION to Compel the Deposition of Seung Ha Kim as stated on the record.**
**Counsel stipulated to [635] SEALED MOTION in Limine No. 2 as stated on the record and was found as Moot.**
**Court Granted [636] SEALED MOTION in Limine No. 3 as stated on the record.**
**Court Denied [637] SEALED MOTION in Limine No. 4 as stated on the record.**
**Court Denied [638] SEALED MOTION in Limine No. 5 as stated on the record.**
**Court Denied [639] SEALED MOTION in Limine No. 6 as stated on the record.**
**Court Denied [640] SEALED MOTION in Limine No. 7 as stated on the record.**
**Court Denied without prejudice [641] SEALED MOTION in Limine No. 8 as stated on the record.**
**Court Granted in Part and Denied in Part [642] SEALED MOTION in Limine No. 9 as stated on the record.**

**(Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Robert Carroll, Alexandra Lu and Matthew Ginther for the plaintiff. Elizabeth Flanagan, John Wray, Timothy Madden, Alexandra Mayhugh, Matthew Oliver, Zacahry Sisko, John Bostic and Lowell Mead for the defendants.) (McKillop, Matthew)**

**1:23-cv-11780-FDS Notice has been electronically mailed to:**

Michael Sheetz (Terminated)     msheetz@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

T. Christopher Donnelly     tcd@dcglaw.com, jlf@dcglaw.com

Christopher Centurelli     christopher.centurelli@klgates.com, kathleen.barrett@klgates.com, klgateseservice@klgates.com

Matthew Oliver     moliver@cooley.com

Timothy H. Madden     thm@dcglaw.com, kh@dcglaw.com

Robert D. Carroll     rcarroll@goodwinlaw.com

Robert Frederickson, III     rfrederickson@goodwinlaw.com

Adam S. Gershenson (Terminated)     agershenson@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Scott T. Bluni     sbluni@goodwinlaw.com

Reuben H. Chen     rchen@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Brendan M. Shortell     shortell@lambertpatentlaw.com

John C. Bostic     jbostic@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Jenny Zhang     jzhang@goodwinlaw.com, DG-Insulet-EOFlow@goodwinlaw.com

Appx1

Alexandra Lu    alu@goodwinprocter.com

Elizabeth M. Flanagan    bflanagan@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Michael R. Creta    michael.creta@klgates.com

Brandon R. Dillman    brandon.dillman@klgates.com, klgateseservice@klgates.com

Alexandra D. Valenti    avalenti@goodwinlaw.com

Gerard J. Cedrone    gcedrone@goodwinlaw.com

Zachary Sisko    zsisko@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

William E. Evans    wevans@goodwinlaw.com

Justin P. Tinger    tinger@lambertpatentlaw.com

Kimberley A. Scimeca    kscimeca@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Matthew Ginther    mginther@goodwinlaw.com

Dustin Knight (Terminated)    dknight@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

James P. Breen    jamesbreen@goodwinlaw.com

Mead Lowell (Terminated)    lmead@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Timothy Keegan    tkeegan@goodwinlaw.com

Isabel Lily Catanzaro    icatanzaro@cooley.com

Alexandra Mayhugh    amayhugh@cooley.com

John Wray    jwray@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com, jgalligan@cooley.com

Arshjit Raince    araince@goodwinlaw.com

Danit Maor    dmaor@goodwinlaw.com

HanByul Chang    hanbyul.chang@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Jordan Landers    jlanders@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Kyung Taeck Minn    rminn@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

**1:23-cv-11780-FDS Notice will not be electronically mailed to:**

Hankil Kang
Covington & Burling, LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
INSULET CORPORATION,                     )
                                         )
              Plaintiff,                  )
                                         )        Civil Action No.
       v.                                )        23-11780-FDS
                                         )
EOFLOW CO., LTD., et al.,                 )
                                         )
              Defendants.                 )
_____)


<u>**MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**</u>

**SAYLOR, C.J.**

This is a dispute concerning the alleged misappropriation of trade secrets for the design

and manufacture of a medical device.  The device at issue is an insulin patch pump, the

Omnipod, manufactured by plaintiff Insulet Corporation.  The defendants are EOFlow Co., Ltd.,

and EOFlow, Inc. (collectively, "EOFlow"); Nephria Bio, Inc.; EOFlow's Chief Executive

Officer, Jesse Kim; and three former Insulet employees, Luis Malave, Steven DiIanni, and Ian

Welsford.  The second amended complaint asserts claims for violation of the Defend Trade

Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"); unfair competition in violation of Mass. Gen.

Laws ch. 93A; and civil conspiracy.[1]

Both parties have moved for partial summary judgment.  Defendants assert that (1) the

DTSA claims are time-barred; (2) the descriptions of two of plaintiff's trade secrets lack

sufficient specificity; (3) the alleged misconduct did not occur "primarily and substantially" in

Massachusetts, as required by Mass. Gen. Laws ch. 93A; and (4) the intra-corporate conspiracy

---

[1] Insulet also asserted claims for patent infringement under 35 U.S.C. § 271, which have been stayed by
assent pending resolution of the other claims.

Appx3

doctrine bars the civil-conspiracy claim.  Plaintiff's motion seeks summary judgment as to the statute of limitations defense.

For the following reasons, defendants' motions will be granted in part and denied in part, and plaintiff's motion will be denied.

## I.      Background

The following facts are undisputed unless otherwise noted.

### A.      Factual Background

#### 1.      Parties

Insulet Corporation is a Delaware corporation founded in Massachusetts in 2000.  (Sec. Am. Compl. ¶ 3).  It designs and manufactures disposable insulin patch pumps.  (*Id.*)  Its flagship product is the Omnipod, an adhesive wearable device that monitors patient glucose levels and directly delivers insulin to them.  (*Id.* 3-5).

EOFlow Co., Ltd., is a Korean corporation founded in 2011.  It has a subsidiary, EOFlow, Inc., which is based in the United States.  (Defs.' Stmt. Undisp. Mat. Facts ["Defs.' SMF"] ¶ 29-30, 33).  EOFlow is also in the business of designing and manufacturing disposable insulin patch pumps.  Its flagship product is the EOPatch.  (Sec. Am. Compl. ¶ 8).  Like the Omnipod, the EOPatch is an adhesive wearable device.  (*Id.*).

Nephria Bio, Inc., is a Delaware corporation founded in 2021 and headquartered in New Hampshire.  (*Id.* ¶ 22).  EOFlow is the majority owner of Nephria Bio.  (*Id.*).  Pursuant to a consulting agreement, Nephria Bio provides EOFlow with research and development and regulatory support for its diabetes-related products, including the EOPatch.  (Defs.' SMF ¶ 43).

Jesse Kim is a United States citizen residing in South Korea.  (*Id.* ¶ 32).  He is the founder and current Chief Executive Officer ("CEO") of EOFlow.  (*Id.* ¶ 32-33).  Kim led the

2

Appx4

development of the EOPatch and oversees EOFlow's operations and subsidiary entities.  (*Id.* ¶ 33; Sec. Am. Compl. ¶ 23).

Luis Malave is an individual residing in California.  (Defs.' SMF ¶ 45).  He worked at Insulet from January 2002 until August 2010.  (Sec. Am. Compl. ¶ 24).  Malave held multiple senior-level positions throughout his tenure with Insulet, including Senior Vice President of Research, Development, and Engineering and Chief Operating Officer ("COO").  In October 2017, he began working for EOFlow and served as its president until January 2022.  (*Id.*).

Steven DiIanni in an individual residing in Massachusetts.  (*Id.* ¶ 25).  Like Malave, DiIanni began working at Insulet in January 2002 in various technical capacities, including Senior Development Engineer.  (*Id.*).  Insulet terminated DiIanni in January 2015.  (Defs.' SMF ¶ 13).  In October 2017, he began working as a third-party consultant for EOFlow.  (*Id.* ¶ 51).

Ian Welsford is an individual residing in Oregon.  (*Id.* ¶ 49).  Insulet employed Welsford as its Director of Regulatory Affairs from 2008 until 2010, and then as a consultant.  (Sec. Am. Compl. ¶ 25).  In 2017, Welsford began consulting for EOFlow, eventually transitioning to a full-time role with the company in April 2018.  (Defs.' SMF ¶ 46).  At EOFlow, Welsford served as its Chief Compliance Officer ("CCO"), then as its Chief Technology Officer ("CTO").  He has also served as the CEO of Nephria Bio.  (*Id.* ¶ 49).

### 2. Alleged Misappropriation of Insulet's Trade Secrets

#### a. Insulet's Development of the Omnipod

In 2005, after five years of research and development, Insulet received approval from the U.S. Food and Drug Administration ("FDA") to launch its first-generation Omnipod insulin patch pump system.  (Pl.'s Stmt. Mat. Facts ["Pl.'s SMF"] ¶ 3).  The Omnipod offered patients a uniquely compact and wearable product providing regular insulin delivery for patients with diabetes.  (Sec. Am. Compl. ¶ 3).

Appx5

Over the years, Insulet has released different iterations of the Omnipod patch pump as it has refined the product's design. (*Id.* ¶ 4). In 2011, the company launched the "Eros" version of the Omnipod, which included mechanical and structural updates and implemented the baseline hardware platform used in subsequent Omnipod products. (*Id.* ¶ 42). In 2019, the company developed the "DASH" version of the Omnipod system, adding a smartphone-based app to connect to the wearable patch pump. (*Id.* ¶ 43).

Insulet estimates that by 2019, it had invested more than $600 million in research and development costs for its patch-pump devices. (*Id.*). Although other companies have attempted to develop and launch patch-pump products of their own to compete with the Omnipod, no competitor has yet successfully launched such a device in the United States. (Pl.'s SMF ¶ 4).

### b. EOFlow's Development of the EOPatch

After founding EOFlow in Korea in 2011, Kim began leading a team of engineers to develop the company's first-generation wearable insulin patch pump, the EOPatch 1. (Defs.' SMF ¶ 33). The device received regulatory approval in Korea in December 2017. (*Id.* ¶ 34).

Early EOPatch models, including the EOPatch 1, employed a different pumping mechanism than the Omnipod. (Pl.'s SMF ¶ 24). The EOPatch 1 varied in size and shape from the Omnipod, and the two products were technologically distinct from one another. (*Id.* ¶ 24-25).

In 2017, EOFlow hired several former high-level Insulet employees, including Malave, DiIanni, and Welsford. (Defs.' SMF ¶ 27, 46, 51).

While working at Insulet, Malave, DiIanni, and Welsford had served in multiple high-level roles, including COO, Senior Development Engineer, and Director of Regional Affairs, respectively. (Sec. Am. Compl. ¶ 54-55). For several years, the three of them had extensive

4

Appx6

access to detailed technical and regulatory information about the Omnipod, including the patch pump's designs and specifications.  (*Id.*).

Insulet required Malave, DiIanni, and Welsford to sign confidentiality and non-disclosure agreements at the beginning of their employment with Insulet.  (Pl.'s SMF ¶ 9-10).  The agreements provided, among other things, that they would still owe a duty of confidentiality to the company even if they moved to a competitor in the future.  (*Id.*).

Upon DiIanni's departure from Insulet in 2015, he initially refused to sign a termination agreement requiring him to return company documents and reiterating his duty to abide by the terms of his prior confidentiality agreement.  (Defs.' SMF ¶ 14-15).  He instead retained copies of Insulet's documents containing the asserted trade secrets.  (*Id.* ¶ 16).

Plaintiff's second amended complaint alleges that during their employment with Insulet, DiIanni and Welsford transferred thousands of confidential corporate documents to their personal computers; kept those documents after their tenure with Insulet ended; and later provided the information from those documents to Malave (who by that time had begun working for EOFlow), Kim, and EOFlow.  (Sec. Am. Compl. ¶ 56, 68).  Among other things, those documents included detailed information concerning the design and the engineering history of the device, including such things as failure analyses.  (*Id.* ¶ 56)

In 2017, the same year that EOFlow hired Insulet's former employees, EOFlow began developing its second-generation EOPatch 2.  (Defs.' SMF ¶ 34).  The device received regulatory approval in Korea in 2019.  (*Id.* ¶ 35).  Two years later, in 2021, EOFlow launched the product commercially in Korea.  (*Id.* ¶ 35-36).  Soon thereafter, the company received approval to sell the EOPatch 2 in Europe.  (*Id.* ¶ 37).  To date, the FDA has not approved the product for sale in the United States.  (*Id.* ¶ 40).  The EOPatch 2 was a commercial success, and

Appx7

in May 2023, Medtronic—a large medical device company and one of Insulet's competitors—announced its intention to acquire EOFlow for $738 million.  (Sec. Am. Compl. ¶ 15).[2]

In February 2023, Insulet obtained and analyzed a sample EOPatch 2 device.  (Pl.'s SMF ¶ 54).  According to the second amended complaint, Insulet determined at that time that rather than improving the first-generation EOPatch design, the EOPatch 2 utilized a system that was substantially identical to that found in the Omnipod.  (Sec. Am. Compl. ¶ 8).  It alleges that "[n]early every aspect of the EOPatch pumping mechanism is substantially identical to Insulet's Omnipod product," including its external appearance and internal components.  (*Id.* ¶ 10).  It further alleges that the design similarities resulted from the misappropriation of trade secrets by Malave, DiIanni, and Welsford, who allegedly stole information about the Omnipod's design while working at Insulet and later disclosed that information to EOFlow.  (*Id.* ¶ 120-123).

Insulet brought this action on August 3, 2023.  (Pl.'s SMF ¶ 58).

### 3.  Insulet's Discovery of the Alleged Misappropriation

The parties dispute when Insulet knew, or reasonably should have known, about EOFlow's misappropriation of its internal documents.  Insulet's position is that it did not discover, and could not reasonably have discovered, the misappropriation until February 2023, when it physically acquired and inspected the EOPatch 2.  (*Id.* ¶ 60-61).  Defendants contend that Insulet should have known about the misappropriation as early as mid-2018.  (Defs.' Memo. Supp. Mot. Summ. J. ["Defs.' Memo."] at 12).

It is undisputed that Insulet became aware of EOFlow's existence in 2016, when it identified it as one of a handful of prospective competitors for the company to monitor going

---

[2] Medtronic's acquisition of EOFlow was put on hold and eventually canceled after Insulet brought this suit.  *See Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 884 (Fed. Cir. 2024).

Appx8

forward.  (Pl.'s SMF ¶ 26).  At the time, Insulet understood EOFlow to still be in the pre-commercial stage of developing its own patch pump.  (*Id.* ¶ 27).

In January 2018, Insulet learned that Malave, its former COO, had become EOFlow's president.  (Defs.' SMF ¶ 59).  Around the same time, Insulet's competitive-intelligence team reported internally that EOFlow was "copying/targeting the Omnipod" with a product that "looks very similar to the Omnipod and most of the features mimic the Omnipod."  (*Id.* ¶ 60).

The parties dispute the degree to which Insulet perceived EOFlow to be a competitive threat at that point.  Although internal Insulet documents acknowledged EOFlow as the "furthest along" among a set of similarly situated companies, it also knew that EOFlow had not yet received any regulatory approval for the EOPatch 2.  (*Id.* ¶ 61; Pl.'s Resp. to Defs.' SMF ¶ 61).

In June 2018, representatives from both Insulet and EOFlow attended an American Diabetes Association ("ADA") Conference.  At the conference, EOFlow had a booth that showed a prototype of the EOPatch 2.  (Pl.'s SMF ¶ 29-31).  EOFlow's booth also displayed three posters advertising the EOPatch 2's "soft cannula" and "fast occlusion detection" features—features that are also found in the Omnipod.  (Defs.' SMF ¶ 67-68).

Insulet contends that at the conference, it was unable to handle or closely inspect the EOPatch 2 prototype and that it was unable to gather any information about the prototype's mechanics.  (Pl.'s SMF ¶ 32-33).  According to Insulet, discovery has since shown that Malave, Welsford, and Kim had discussed how to "'gracefully' explain[] how our design is similar to Omnipod's, without making it sound like piracy."  (*Id.* ¶ 84).[3]  In addition, it has submitted evidence that at the conference, EOFlow employees described the prototype as having "poor design and poor usability."  (Pl.'s Resp. to Defs.' SMF ¶ 65).

---

[3] Defendants contend that these comments were made in reference to EOFlow's presentation at a different conference that year, not the ADA Conference.  (Defs.' Resp. to Pl.'s SMF ¶ 84).

Appx9

According to defendants, EOFlow employees provided "extensive" proprietary information to Insulet about the product and company at the conference, and handed out sample prototypes to multiple attendees at their booth.  (Defs.' Resp. to Pl.'s SMF ¶ 32-33, 43; Defs.' SMF ¶ 65-66).  Either way, during and after the conference, Insulet personnel commented on the "stunning resemblance" between the EOPatch 2 prototype and the Omnipod, and noted that the two devices' exteriors "look[ed] almost identical."  (Defs.' SMF ¶ 72, 74).  Shortly after the conference, on June 28, 2018, an Insulet employee sent an internal email stating that "EOFlow has cloned our product and is (presumably) selling it in Korea (only).  Our legal team is aware of this.  Someone should request samples."  (*Id.* ¶ 77).

In March 2019, EOFlow publicly announced that it had received "breakthrough designation" status from the FDA for its continued development of the EOPatch.  That announcement led Insulet's then-CEO, Shacey Petrovic, to encourage her staff to "look at [EOFlow's] IP" to see "if they [are] infring[ing]," because EOFlow's product "looks just like ours and their CEO [sic] is former COO of Insulet."  (*Id.* ¶ 87).

The following day, Insulet's Director of Mechanical and Materials Engineering, David Nazzaro, sent an email to a colleague commenting that "[t]he people running EO flow . . . are past Insulet folks.  They have useful knowledge on how to get a product to market, but [in my opinion] were not the strong leadership that really made Insulet successful."  (*Id.* ¶ 89).  The email went on to state that Nazzaro "would recommend we . . . do an in[-]depth scrub of domestic and foreign IP" because "it's possible this becomes real."  (*Id.* ¶ 90).

Insulet then arranged a non-confidential virtual meeting with two EOFlow employees, including Malave, to gather information about the EOPatch.  (Pl.'s SMF ¶ 37-38).  Insulet maintains that no confidential information concerning the EOPatch 2's design was exchanged in

8

Appx10

the meeting, and that these types of meetings are standard practice in the medical-device industry.  (*Id.* ¶ 38, 43).

Representatives from both companies again attended the ADA Conference in 2019. There, Insulet employees were able to look more closely at the external appearance of an EOPatch 2 prototype, although none of them were able to handle or inspect the product.  (*Id.* ¶ 44-45).

Shortly after the conference, EOFlow issued a press release on its website stating that the EOPatch 2 had been approved by regulators in South Korea.  (Defs.' SMF ¶ 97).  Several Insulet personnel visited EOFlow's website the next day.  (*Id.* ¶ 99).

In July 2020, EOFlow filed a 507-page prospectus with Korean financial regulators in advance of its public offering.  (Pl.'s SMF ¶ 62).  Written in Korean, the prospectus contained several pages discussing the EOPatch 2's technical design and operation.  (*Id.* ¶ 62-63).  The parties disagree as to whether Insulet obtained or reviewed the prospectus in 2020, and whether it contained a sufficient level of relevant detail to indicate possible misappropriation.  (*Id.* ¶ 64-71; Defs.' Resp. to Pl.'s SMF ¶ 64-71).

In early 2021, after EOFlow announced that it would sell the EOPatch 2 device in Korea, Insulet attempted to obtain samples of the device for inspection and analysis.  (Pl.'s SMF ¶ 46-47).  Among other things, Insulet investigated whether its European employees or its Korean business partners could acquire samples, but its efforts were not successful.  (*Id.* ¶ 47).  The company did not reach out to EOFlow directly to inquire about obtaining a sample EOPatch 2. (Defs.' Resp. to Pl.'s SMF ¶ 47).  The parties dispute whether Insulet had a physical presence in Korea through which it could acquire an EOPatch 2, or whether the company would have been able to legally import an EOPatch device into the United States, as the product had not yet been approved by the FDA.  (Pl.'s SMF ¶ 48, 50; Defs.' Resp. to Pl.'s SMF ¶ 48, 50).

Appx11

Insulet finally obtained an EOPatch 2 device in February 2023, after the product launched commercially in Europe in late 2022.  (Pl.'s SMF ¶ 53-54).  Insulet inspected the device and concluded that EOFlow had infringed on its patents and potentially misappropriated its trade secrets.  (*Id.* ¶ 55-57).

Defendants contend that as early as January 2018, prior to acquiring the actual device, Insulet had already known or should have known about the misappropriation, thereby time barring Insulet's present action.  (Defs.' Resp. to Pl.'s SMF ¶ 55-56).  Insulet, however, asserts that it needed to physically inspect the inner mechanics of the EOPatch 2—a step that could not have reasonably been taken much earlier than February 2023—to determine whether its trade secrets had been misappropriated.  (Pl.'s SMF ¶ 72).

**B.      Procedural Background**

On August 3, 2023, Insulet brought this suit.  The second amended complaint asserts claims for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (DTSA) (Count 1); patent infringement under 35 U.S.C. § 271 (Counts 2-4); unfair competition in violation of Mass. Gen. Laws ch. 93A (Count 5); and civil conspiracy (Count 6).  As noted, the patent infringement claims have been stayed pending resolution of the other claims.

On August 18, 2023, Insulet moved for a temporary restraining order and preliminary injunction.  After a hearing, the Court entered the requested TRO on August 29, 2023, enjoining EOFlow from disclosing or using any technical information related to the EOPatch and Omnipod products.  On October 6, 2023, after another hearing and review of additional evidence, the Court entered the requested preliminary injunction, prohibiting EOFlow from manufacturing, marketing, or selling the EOPatch.  On October 24, 2023, the Court granted defendants' motion to modify the injunction to accommodate EOFlow's existing patient population in Korea, Europe, and the United Arab Emirates.

Appx12

Two weeks later, defendants appealed this Court's decision to the Federal Circuit.  While the appeal was pending, the parties moved this Court to again modify the injunction, which the Court granted on April 24, 2024.

On May 7, 2024, the Federal Circuit issued a temporary stay of the Court's October 24, 2023 injunction, and the Court subsequently issued a temporary stay of its April 24, 2024 injunction.  On June 17, 2024, the Federal Circuit reversed the preliminary injunction and remanded the case to this Court.

On September 17, 2024, defendants moved for summary judgment as to Counts 1, 5, and 6 of the second amended complaint, contending that (1) plaintiff's DTSA claims are time-barred; (2) plaintiff's descriptions of two of its trade secrets lack sufficient specificity; (3) the alleged misconduct did not occur primarily and substantially in Massachusetts, as required by Chapter 93A; and (4) the intra-corporate conspiracy doctrine bars the civil-conspiracy claim.  The same day, plaintiff moved for summary judgment as to the statute of limitations defense.

For the following reasons, defendants' motions for summary judgment will be granted as to the Chapter 93A claims; granted in part as to the civil-conspiracy claims; and otherwise denied, and plaintiffs' motion for summary judgment will be denied.

## II.     Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of

11

Appx13

either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

III.     **Analysis**

   A.     **Statute of Limitations**

Defendants first contend that the DTSA claims are barred by the applicable three-year statute of limitations. *See* 18 U.S.C. § 1836(d). They contend that the limitations period began to run as early as mid-2018, shortly after the 2018 ADA Conference, and approximately two years before the statutory bar date of August 3, 2020. (Defs.' Memo. at 10). Plaintiff asserts that the limitations period did not begin to run until February 2023, when it acquired, disassembled, and inspected the EOPatch 2. (Pl.'s Memo. Supp. Mot. Summ. J. ["Pl.'s Memo."] at 14).

Both parties seek summary judgment as to the question of whether the DTSA claims are time-barred. The central issue, at this stage, is when those claims accrued.

      1.     **Burden of Proof**

The statute of limitations is an affirmative defense. *See Ouellette v. Beaupre*, 977 F.3d 127, 135 (1st Cir. 2020). Where, as here, a defendant moves for summary judgment on the basis of that defense, it bears the burden of proof and "cannot attain summary judgment unless the evidence that he provides on that issue is conclusive." *See Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998).

Appx14

Appx15

If the defendant does produce such evidence, then "the burden shifts to the plaintiff to establish that the statute of limitations does not apply." *Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez*, 659 F.3d 42, 50 n.10 (1st Cir. 2011). The plaintiff may, for example, provide evidence that the statutory bar should be tolled.

### 2.       Legal Standard for Accrual

Under the DTSA, private civil actions "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Misappropriation is defined as (1) acquisition of a trade secret "by improper means" or (2) "disclosure or use of a trade secret of another without express or implied consent" by one who either used "improper means" or "at the time of disclosure or use," had reasons to know it was acquired by "improper means." 18 U.S.C. § 1839(5).

As noted, the central issue here is when the DTSA claims accrued. The parties dispute both the relevant legal standard and the underlying facts.

Defendants contend that the proper legal standard is "inquiry notice," arguing that the clock starts the moment a plaintiff "has a cause for concern" of a violation. (Defs.' Memo. at 11). They thus contend that the limitations period should commence "when the first event occurs that would prompt a reasonable person to inquire into a possible injury." (*Id.*) (quoting *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 187 (1st Cir. 2006)). Plaintiff contends that its claims accrued only when it "discovered or through reasonable diligence should have discovered the facts of [defendants'] misappropriation." (Pl.'s Memo. at 12-13).

Plaintiff largely relies on the Supreme Court's decision in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). *Merck* involved the accrual of the limitations period of a private action for securities fraud. The applicable statute of limitations, 28 U.S.C. § 1658(b), provides that such an

action "may be brought not later than . . . 2 years after the discovery of the facts constituting the violation." *Merck*, 559 U.S. at 637.  The Court held that claims for securities fraud accrue under the statute "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first." *Id.* (quotations omitted).

The statute at issue in *Merck* used the term "discovery," and did not contain any reference to the exercise of "reasonable diligence."  Nevertheless, the Court noted that "in the statute of limitations context, the word 'discovery' is often used as a term of art in connection with the 'discovery rule,' a doctrine that delays accrual of a cause of action until the plaintiff has 'discovered' it." *Id.* at 644.  Under the "discovery rule," a claim accrues when the plaintiff actually discovers the facts constituting the violation, or should have discovered those facts in the exercise of reasonable diligence.  *Id.*[4]  The Court concluded that "Congress intended courts to interpret the word 'discovery' in § 1658(b)(1) similarly." *Id.* at 646.  In other words, it concluded that the term "discovery" encompassed both actual discovery and the hypothetical discovery that would occur through the exercise of reasonable diligence.

The Court noted that in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), it had interpreted a predecessor statute to require that a private securities-fraud action "must be commenced within one year *after the discovery of the facts constituting the violation,*" and that "[s]ubsequently, every Court of Appeals to decide the matter held that 'discovery of the facts constituting the violation' occurs not only once a plaintiff *actually* discovers the facts, but also when a hypothetical reasonably diligent plaintiff would have

---

[4] The Court also observed that the discovery rule first arose in the context of fraud cases; that "both state and federal courts have applied forms of the 'discovery rule' to claims other than fraud"; and that legislatures "have codified the discovery rule in various contexts." *Id.* at 644-45.

discovered them."  *Merck*, 559 U.S. at 646-47.  Congress then enacted the statute of limitations at issue in *Merck*, which "repeated *Lampf's* critical language."  *Id.* at 647.  "We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."  *Id.* at 648.

The Court then considered—and expressly rejected—the argument that the limitations period began to run when the plaintiff was on "inquiry notice."  *Id.* at 650.

> If the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'  But the statute says that the plaintiff's claim accrues only after the 'discovery' of those latter facts.  Nothing in the text suggests that the limitations period can sometimes begin before 'discovery' can take place.  . . . [T]he court-created 'discovery rule' exception to ordinary statutes of limitations is not generally available to plaintiffs who fail to pursue their claims with reasonable diligence.  But we are dealing here with a statute, not a court-created exception to a statute.  Because the statute contains no indication that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have begun investigating, we cannot accept Merck's argument.

*Id.* at 651.

In summary, the Supreme Court in *Merck* concluded that a claim for securities fraud accrues under § 1658(b)(1) when the plaintiff actually discovers the facts constituting the violation or when a reasonably diligent plaintiff would have discovered those facts, whichever comes first.  And it expressly rejected the "inquiry notice" standard for determining accrual. Specifically, the Court rejected the notion that the statutory clock begins when "a plaintiff possesses a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry."  *Id.* at 650.

It is true that *Merck* did not address trade-secret misappropriation claims under the DTSA, and therefore is not binding here.  Nonetheless, the question presented is whether the reasoning of *Merck* requires a similar result.

Appx17

The two statutes—that is, the one at issue in *Merck* and the one at issue here—are not literally identical.  However, as interpreted, they are substantially alike:

§ 1658(b):   an action "may be brought not later than"
DTSA:        an action "may not be commenced later than"

§ 1658(b):   "2 years after"
DTSA:        "3 years after"

§ 1658(b):   "the discovery of the facts constituting the violation"
DTSA:        "the misappropriation with respect to which the action would relate is discovered"

§ 1658(b):   [as interpreted in *Merck*]: "or when a reasonably diligent plaintiff would have discovered [those facts]"
DTSA:        "or by the exercise of reasonable diligence [the misappropriation] should have been discovered"

It is noteworthy that the Supreme Court did not reject the "inquiry notice" standard because securities-fraud cases have special features not present in other types of cases; its ruling was based on the language of the relevant statute of limitations.  It is also significant that *Merck* was issued in 2010, and the DTSA was enacted in 2016.  As the *Merck* court noted, it is normally assumed "that when Congress enacts statutes, it is aware of relevant judicial precedent."  *Id.* at 648.

As a matter of logic, it would seem to follow that this Court should reject the "inquiry notice" standard here, on the ground that the adoption of such a standard conflicts with the language of the relevant statute of limitations.  As in *Merck*, nothing in the text of the DTSA indicates that the accrual period can begin before the point at which a plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the misappropriation.

The principal problem with that conclusion is that it appears to conflict with the conclusion of every court to have thus far considered the issue.  *See CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565 (8th Cir. 2019) (holding that the inquiry notice standard

16

Appx18

applies to DTSA claims, and that the limitations period begins when "the plaintiff was aware a problem existed. . . . The plaintiff need only know a problem exists."); *Hardwire, LLC v. Freyssinet Int'l Et Cie*, 2023 WL 1819321, at *3 (E.D.N.Y. Feb. 8, 2023) (stating that the DTSA "incorporate[s] the concept of inquiry notice to determine whether a plaintiff should have been aware of the misappropriation"); *Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 1924992, at *13 (N.D. Cal. Apr. 30, 2019) (stating that a DTSA claim begins to accrue when a plaintiff is on "inquiry notice," meaning that he "by the exercise of reasonable diligence should have [] discovered" the misappropriation); *RoboticVISIONTech, Inc. v. ABB Inc.*, 2024 WL 1299691, at *4 (D. Del. Mar. 27, 2024) (stating that a DTSA claim begins to accrue when "notice of facts from which the basis for the cause of action could have been discovered by the exercise of reasonable diligence"); *Phoenix Co., Inc. v. Castro-Badillo*, 2024 WL 3742368, at *4 (D.P.R. Aug. 9, 2024) (similar); *PTP OneClick, LLC v. Avalara, Inc.*, 2020 WL 4729174, at *11 (W.D. Wash. May 27, 2020) (holding that DTSA claims begin to accrue when a plaintiff is "on notice of its trade secret misappropriation claims"); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y. 2020), aff'd, 838 F. App'x 582, 586 (2d Cir. 2020) (stating that "[t]he existence of a patent application or a public patent puts parties on notice of their existence and therefore starts the clock on the [DTSA] limitations period").

None of those courts, however, considered whether the reasoning of *Merck* should apply to DTSA claims.  Indeed, none even mentioned that decision.[5]  Furthermore, the analysis

---

[5] Plaintiff suggests that the Third Circuit has previously applied *Merck* to the Pennsylvania equivalent of the DTSA.  *See Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 734 (3d Cir. 2019).  But the *Heraeus* court did not cite *Merck* for the specific proposition that the DTSA (or a state equivalent) requires actual or hypothetical discovery in lieu of inquiry notice.  Rather, the court was asserting that scienter is a necessary element of a Pennsylvania trade-secret misappropriation claim, and must therefore be established before the limitations period can commence.  *Id.*  In support of its argument, the court included a "*cf.*" citation to *Merck* for the proposition that "'scienter' is a fact which a plaintiff must discover in order for the statute of limitations to begin running" under a securities-fraud claim.  *Id.* (quotations omitted).

performed by those courts is limited at best.  Several decisions simply relied on state law to determine the federal accrual standard.  *See CMI Roadbuilding*, 920 F.3d at 565 (applying Iowa law); *RoboticVISIONTech*, 2024 WL 1299691, at *2 (applying Delaware law); *PTP OneClick*, 2020 WL 4729174, at *5 (applying Washington law).  The court in *Alta Devices* essentially assumed that the DTSA incorporates an inquiry notice standard, without providing any explanation as to why that is the case.  2019 WL 1924992, at *12.  The court in *Phoenix* relied principally on the *RoboticVISIONTech* decision and provided no reasoning for why inquiry notice is the proper rule.  2024 WL 3742368, at *4.  The court in *Hardwire* declared that "[c]laims under [the DTSA] incorporate the concept of inquiry notice to determine whether a plaintiff should have been aware of the misappropriation," without providing any citation or analysis justifying its assertion.  2023 WL 1819321, at *3.  And the court in *Zirvi* applied an inquiry-notice standard without explanation, finding that the plaintiffs were "on inquiry, if not actual, notice" when third-party litigation commenced concerning the patents at issue in the case. 433 F. Supp. 3d at 459.[6]

In light of the absence of any detailed analysis, the Court does not find that authority persuasive.  It of course gives this Court considerable pause to adopt a standard that is at odds with every other reported decision on the issue.  But it also gives the Court pause to ignore the clear implications of a Supreme Court opinion interpreting almost identical language.  Under the circumstances, the more prudent course appears to be to follow the principles articulated in *Merck*, and to reject the use of the "inquiry notice" standard here.

---

[6] In affirming the district court's decision, the Second Circuit took as given that the DTSA incorporated the inquiry-notice standard without considering an alternative standard.  838 F. App'x at 586.

18

Appx20

Accordingly, and based on the statutory language, the Court concludes that a cause of action accrues under the DTSA when "the misappropriation with respect to which the action would relate" is (1) actually discovered or (2) "by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d).  And based on the reasoning of *Merck*, it does not accrue when the plaintiff merely has sufficient information to put it on inquiry notice. *See* 559 U.S. at 650-51.

The question then becomes the application of that standard to the facts of this case.

### 3.   Analysis

The undisputed record indicates that by early 2019, plaintiff's senior executives harbored concern that defendants had infringed on the company's intellectual property.  For example, one internal email sent shortly after the 2018 ADA Conference stated that "EOFlow has cloned our product and is (presumably) selling it in Korea (only).  Our legal team is aware of this.  Someone should request samples."  (Defs.' SMF ¶ 77).  Others working for plaintiff at the time commented that the EOPatch 2 bore a "stunning resemblance" to the Omnipod, and that the two devices "look[ed] almost identical."  (*Id.* ¶ 72, 74).  In 2019, after a publicized announcement concerning EOFlow's development, plaintiff's senior executives sought to "look at [EOFlow's] IP" to see "if they [are] infring[ing]," since EOFlow's product "looks just like ours."  (*Id.* ¶ 87).  By that point, plaintiff's employees were also aware that a handful of former colleagues had joined EOFlow in senior-level positions.  (*Id.*).  Altogether, plaintiff plainly had at least a cause for concern that defendants had engaged in prohibited conduct by early 2019.

But a mere cause for concern is not enough to trigger the running of the limitations period under the DTSA.  Instead, the analysis turns on when a hypothetical similarly situated company, exercising reasonable diligence, should have discovered the misappropriation.

Appx21

Here, there are genuine disputes of material fact as to when a reasonably diligent company, standing in plaintiff's shoes, should have discovered the alleged misappropriation. Defendants note that after the 2018 ADA Conference, plaintiff failed to contact EOFlow directly to request samples of the EOPatch or technical details about the product. (Defs.' Memo at 17). In defendants' view, such a query would have led plaintiff, and presumably any reasonable company in its position, to discover the alleged misappropriation.

Plaintiff responds that a direct outreach to EOFlow would have been unlikely to yield useful information, as competitors are generally hesitant to divulge confidential information to one another, much less confess to misappropriation. When competitors do divulge information, it is generally under the auspices of highly restrictive non-disclosure agreements. (Pl.'s Memo. at 17-18). And the non-confidential introductory meeting that the parties did hold apparently offered little insight into defendants' technology. (Pl.'s SMF ¶ 37-38, 43).

Defendants further contend that plaintiff should have proactively investigated its own internal files to determine which documents its former employees had retained after their departure from the company. (Defs.' Memo at 16). But plaintiff responds that it had no reason to believe that its former employees kept confidential materials after they had left the firm, and that in any event, the former employees had all previously signed agreements requiring that confidentiality be maintained even after departure. (Pl.'s Memo at 22).

Moreover, even assuming a reasonable company would have reviewed its internal files for possible theft, plaintiff maintains that an objectively reasonable company still could not have discovered the alleged misappropriation without physically obtaining and opening the EOPatch 2. The parties again dispute whether plaintiff could have obtained a sample EOPatch 2 before the statutory bar date. Plaintiff contends it could not even examine a sample EOPatch 2 at the ADA Conferences, let alone procure a device for its own use. It instead asserts, and defendants

20

dispute, that a hypothetical company in its position could not have reasonably acquired the EOPatch until its commercial availability in Europe in 2022.

In any event, there are multiple material factual disputes concerning the time at which a reasonably diligent company should have discovered the alleged misappropriation. The question of the accrual of the statute of limitations is thus proper for the jury. The Court will therefore deny both plaintiff's and defendants' motions for summary judgment as to the statute of limitations defense.

### B.      Specificity of Plaintiff's Trade Secrets Claims

Defendants further contend that they are entitled to summary judgment on two of plaintiff's asserted trade secrets for failing to define them with the specificity required to sustain a DTSA claim.

The definition of what may be deemed a "trade secret" under the DTSA is broad. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). Under the DTSA, a trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible." 18 U.S.C. § 1839(3). The information must "derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information." 18 U.S.C. § 1839(3)(B).

A protectable trade secret may include "any confidential information used in a business that gives [the owner] an advantage over competitors who do not know or use it." *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 167 (D. Mass. 2023) (quoting *Sensitech Inc. v. LimeStone FZE*, 548 F. Supp. 3d 244, 261 (D. Mass. 2021)). Notably, "[a] trade secret can exist

Appx23

in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Sutra, Inc. v. Iceland Exp., ehf*, 2008 WL 2705580, at \*4 (D. Mass. July 10, 2008) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)).

For the purposes of bringing a DTSA claim, a plaintiff must "adequate[ly]" describe the asserted trade secrets "with clarity that can be understood by a lay person." *Neural Magic*, 659 F. Supp. 3d at 166-167 (quoting *Sutra*, 2008 WL 2705580, at \*4). "[A] court should not have to 'sift through technical data to distill out a trade secret.'" *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 456 (D. Mass. 2017) (quoting *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004)).

Although "courts have required specificity" when evaluating the adequacy of a trade secret description, "specificity is highly fact dependent." *Iconics*, 266 F. Supp. 3d at 456. Ultimately, courts must approach the analysis with "a modicum of common sense" that recognizes the fundamental purpose of requiring plaintiffs to describe their trade secrets with specificity:  to allow defendants to effectively prepare a rebuttal and to ensure that the trier of fact can actually understand the claims asserted. *See Broad-Ocean Techs., LLC v. Lei*, 649 F. Supp. 3d 584, 594 (E.D. Mich. 2023).

Defendants have moved for summary judgment as to two of plaintiff's trade secrets: first, the computer-aided design ("CAD") files for the Omnipod ("Trade Secret 1") and second, the Omnipod Eros design history file ("DHF") ("Trade Secret 2").  The Court will discuss each in turn.

### 1.     Trade Secret 1

Defendants challenge plaintiff's Omnipod CAD files on the grounds that plaintiff has

22

failed to (1) identify the boundaries of the trade secret and (2) distinguish public from non-public information contained in the CAD files.  (Defs.' Memo. at 36).[7]

Trade Secret 1 is defined by plaintiff as follows:

<u>CAD Files for the Omnipod</u>. Insulet's CAD files for its components, sub-assemblies, and complete assembly provide detailed 3-dimensional renderings with precise nominal dimensions for the Omnipod components as well as the relative positioning of different components (e.g., offsets) within an assembly, including, among other things, native assembly CAD files and the .STP export of the 13800-PODASSEMBLY.

(Defs.' Memo. Ex. 3 at 1).  Plaintiff also provided a follow-up description of Trade Secret 1, in which it stated that the CAD files at issue included "the 13800-pod-assembly file for the Eros Omnipod (including EOFLOW_04366457) and the CAD files cited in Exhibit G to the Expert Report of M. McGowan."  (Defs.' Memo. Ex. 4 at 2).  Exhibit G of McGowan's expert report contains a list of more than 1,300 files.  (Defs.' Memo. Ex. 60).

"It is well settled that detailed manufacturing drawings . . . are prima facie trade secrets." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (quoting *A.H. Emery Co. v. Marcan Products*, 389 F.2d 11 (2d Cir. 1968)).  And "[w]hen material such as design drawings or manuals are trade secrets based on a unique combination of both protected and unprotected material, a plaintiff should not be obligated to identify which components of the protected material is secret." *Mike's Train House*, 472 F.3d at 411.

As a result, courts have held that a plaintiff satisfies its burden of specifically defining a trade secret when it refers to "dimensions and tolerances" or other details contained in the "engineering drawings and blueprints" constituting the trade secret.  *See Imax Corp. v. Cinema*

---

[7] A CAD file is "a digital file format of an object generated using CAD software, containing a blueprint, technical drawing, schematic, or 3D rendering of an object. . . . [T]hese files may contain other data used to create a CAD project, such as information on materials, dimensions in an architectural plan, construction processes, etc." Anindita Sengupta, CAD File, Technology Glossary Definitions—G2 (last visited Oct. 22, 2024), https://www.g2.com/glossary/cad-file-definition.

23

Appx25

*Techs., Inc.*, 152 F.3d 1161, 1166 (9th Cir. 1998) (citing *Forro Precision, Inc. v. Intern. Business Machines*, 673 F.2d 1045, 1057 (9th Cir. 1982)).  Of course, a plaintiff must do more than merely allege that its "computer-aided design files are secret because they contain computer-aided design models."  *Broad-Ocean*, 649 F. Supp. 3d at 593.  But when a plaintiff provides concrete evidence that its misappropriated files contain valuable trade secrets, that is sufficient to avoid summary judgment on the ground of lack of specificity.  *See id.* at 595.

Here, plaintiff describes Trade Secret 1 with sufficient particularity for a lay person to understand.  Its description of the bounds of its trade secrets articulates the substance of the secrets in narrative form—stating that the secrets at issue are the "three-dimensional renderings" containing "precise nominal dimensions for the Omnipod components" along with the "relative positioning of different components"—and by citing a specific set of files containing that information—namely, "the 13800-pod-assembly file for the Eros Omnipod" and the files appended to McGowan's report.  At this stage, plaintiff's references to various aspects of the product's blueprints captured in specifically listed CAD files are adequate to define the bounds of Trade Secret 1.

Moreover, plaintiff need not spell out every single piece of public and non-public information contained within the CAD files.  The CAD files at issue in Trade Secret 1 surely comprise information that is both protected and unprotected.  But requiring plaintiff to detail the murky line between each public and non-public piece of information within the CAD files would be impractical, and goes well beyond plaintiff's legal obligation to "adequate[ly]" describe the asserted trade secret.  *See Neural Magic*, 659 F. Supp. 3d at 167.

Defendants contend that the First Circuit's decision in *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46 (1st Cir. 2020), holds that a trade secret cannot stand as a matter of law if it fails to separate what is and is not public information.  (Defs.' Memo at 22).  In *TLS*,

Appx26

the plaintiff claimed that its report for a client constituted a trade secret, even though the plaintiff conceded that the report contained no trade secrets, and was instead made up of only "public and general information such as the meaning of tax terms, . . . case law, IRS regulations and tax statutes, state tax laws," and "individual client information."  966 F.3d at 53.  The court asked the plaintiff to "articulate what aspects of the [report] qualified as a trade secret," which it could not do.  *Id.*  The plaintiff cited vague references to business recommendations— recommendations that may not have even been in the report—to support its trade secret claim, and nothing more.  *Id.* at 54.  Without any further guidance from the plaintiff, the court held that it had not established a trade secret because it failed to "separate the [purported] trade secrets from the other information . . . [that was] known to the trade."  *Id.* (quoting *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002)).

The specificity requirement of *TLS* is not as demanding as defendants suggest.  First, the present case deals with CAD files, which are "inherently [] more secret than the business processes and strategies" at issue in *TLS*.  *Broad-Ocean*, 649 F. Supp. 3d at 594.  Second, and more importantly, the *TLS* court's primary frustration with the plaintiff's claim was that it had failed to "identify" any colorable trade-secret information whatsoever.  966 F.3d at 54.  The court did not demand that the plaintiff categorize every piece of information as private or non-private.  Instead, it simply asked for some "articulat[ion]" of the alleged trade secret, as the plaintiff had already conceded that the report at issue contained no trade secret information at all. *Id.* at 53.

Plaintiff here has adequately identified the trade secrets contained in its CAD files, including the dimensions and positioning of the component parts, which are distinct from "other general information" that may also exist in the CAD files.  Thus, at this stage, it has submitted sufficient evidence demonstrating that the CAD files at issue in Trade Secret 1 contain a defined

Appx27

set of valuable, confidential information, thereby meeting its burden to survive a specificity challenge at summary judgment.

The Court does, however, agree with defendants' concern about plaintiff's inclusion of the phrase "including, among other things" in its description of the CAD files at issue. Sometimes the term "including" may refer to a defined and exhaustive list.[8]  But here, plaintiff uses it to indicate that the enumerated files are (or may be) a representative, non-exhaustive list of the files constituting Trade Secret 1.  Indeed, plaintiff maintains that such language is necessary to preserve flexibility as it reviews delayed or yet-to-be-produced documents.

At this stage, at least, that door cannot be left ajar.  The Court will not permit plaintiff to expand the bounds of Trade Secret 1 by the use of the phrase "including, among other things."  It will therefore limit the scope of Trade Secret 1 to the specific set of files listed in plaintiff's follow-up description:  "the 13800-pod-assembly file for the Eros Omnipod (including EOFLOW_04366457) and the CAD files cited in Exhibit G to the Expert Report of M. McGowan."  (Defs.' Memo. Ex. 4 at 2).

With that limitation, the Court will deny defendants' summary judgment motion as to Trade Secret 1.

### 2.       Trade Secret 2

Defendants similarly contend that plaintiff's DHF for the Omnipod Eros lacks sufficient specificity and fails to distinguish private and non-private information, thereby requiring a grant of summary judgment for Trade Secret 2.  (Defs.' Memo. at 23, 25).

Plaintiff has defined Trade Secret 2 as follows:

The "Design History File" for the Omnipod Eros, including, among other things,

---

[8] For example, one might properly say that "the teams in the AFC East include Buffalo, Miami, New England, and New York," without necessarily suggesting that there are other, unnamed teams that could be included.

Appx28

    a.  Insulet's Product Definition Document
    b.  Insulet's Design Failure Modes Effects Analysis
    c.  Insulet's Software Failure Modes Effects Analysis
    d.  Insulet's Hardware Requirements Specifications
    e.  Insulet's Hardware Description Documents
    f.  Insulet's Software Requirements Specifications
    g.  Insulet's Software Design Documents
    h.  Insulet's Quality Control Instructions
    i.  Insulet's Documented and Controlled Procedures
    j.  Insulet's Standard Operating Procedures
    k.  Insulet's procedures and learnings related to corrective and preventative actions
    l.  Insulet's Bill of Materials
    m.  Insulet's Assembly Drawings for Omnipod
    n.  Insulet's Safety Assurance Case for Omnipod
    o.  Insulet's drawings and schematics for Omnipod

(Defs.' Memo. Ex. 4 at 2-4).  Trade Secret 2 comprises the 15 individually listed components, as well as the combination of those components.  As with Trade Secret 1, plaintiff provided defendants with additional follow-up details identifying file names and types from each of the 15 DHF categories.  (*Id.*).

For similar reasons as those discussed for Trade Secret 1, plaintiff sufficiently specifies the boundaries and contents of Trade Secret 2 to avoid summary judgment.

To begin, the scope of Trade Secret 2 is confined by the phrase "Design History File," which plaintiff represents is a term of art in the medical-device industry.  Under FDA regulations, manufacturers such as plaintiff must "establish and maintain a DHF for each type of device," which must "contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements of this [regulation]."  21 C.F.R § 820.30(j).  According to plaintiff, medical-device manufacturing companies in the United States understand that a DHF is a standard collection of information, generally comprising documents that spell out the development and design of the medical device in question.  Such boundaries, tightened by plaintiff at the Court's instruction to 15 categories

Appx29

and further supplemented with specific file names, allow for a layperson to adequately understand the scope and contents of the DHF.[9]

Plaintiff has also presented evidence showing that the combination of those 15 components constitutes a valuable trade secret. For example, plaintiff's expert noted that the DHF serves as a "playbook" for any medical-device company, including a competitor, to manufacture the subject device in an economically advantageous way. (Defs.' Memo. Ex. 61 ¶ 58-59). Plaintiff has also alleged that the DHF in its entirety was particularly valuable to defendants to facilitate Medtronic's due diligence leading up to the planned acquisition. (Pl.'s Resp. to Defs.' SMF ¶ 161). Thus, at this stage, plaintiff has met its burden of specifying the boundaries and contents of the component and collective trade secrets at issue in Trade Secret 2.

Defendants again contend that *TLS* requires plaintiff to distinguish between public and private information in the DHF. But again, *TLS* required a plausible identification of the trade secret, not a detailed differentiation of every public and non-public aspect of the alleged trade secret.[10] And, in any event, the present case is much different than *TLS*. Unlike the plaintiff in *TLS*, plaintiff here has not stipulated that the DHF contains no trade secrets. To the contrary, plaintiff has presented evidence that the DHF contains "invaluable information" not disclosed by its public patents, such as "manufacturing instructions, and material sourcing information."

---

[9] In this context, the use of the phrase "among other things" is arguably permissible to the extent it refers to the two additional categories in the DHF that the Court struck for failure to make adequate disclosure. Nonetheless, to avoid ambiguity, the Court will not permit the use of the phrase.

[10] Defendants' reliance on the decision of the Seventh Circuit in *IDX* faces the same limitation. There, the court held that the plaintiff's "43-page description of the methods and processes . . . making up [the plaintiff's] software package" was insufficiently specific. *IDX*, 285 F.3d at 583. The court pointed out that the report was nothing more than a summary description of the software alleged to be a trade secret; the plaintiff failed entirely to identify anything secret about the software. Indeed, the *IDX* court noted that "the algorithms that the software uses to do real-time error checking . . . may be genuine trade secrets, but [the plaintiff] has not tried to separate them from" other general information. *Id.* at 584. Here, plaintiff has done more than the plaintiff in *IDX*. Plaintiff has provided evidence that components of the DHF are valuable secrets and that the file, as a whole, forms a definite, economically advantageous package of information supporting a trade-secret claim.

28

(Defs.' Memo. Ex. 67 ¶ 43). It has also presented evidence indicating that combination of information within the DHF provides distinct economic advantage, thereby constituting a trade secret. (Defs.' Memo. Ex. 61 at 12). It has therefore gone much further than the plaintiff in *TLS*, who provided essentially nothing to the court that could substantiate a trade secret. Although defendants contest the validity of plaintiff's proffered evidence, a reasonable jury could find that the DHF—as a whole and in its parts—forms a defined trade secret. Plaintiff has thus met *TLS*'s requirements by identifying plausible trade secrets in the DHS that are "separate" from other general and public information.

It is plausible, as defendants note, that the DHF contains a voluminous amount of information. But that is not enough to render a trade-secret description insufficiently specific. *See, e.g.*, *Motorola, Inc. v. Lemko Corp.*, 2012 WL 74319, at *15 (N.D. Ill. Jan. 10, 2012) (finding that the identification of over four million files had no bearing on whether the trade secret was sufficiently particularized). Nor does the fact that the DHF "sweeps in public information," (Defs.' Memo at 29), render the DHF ineligible as a trade secret, *see Integrated Cash*, 920 F.2d at 174 (stating that a unique combination of publicly known components may still qualify as a trade secret). And, again, the combination of the listed DHF files alone can constitute a trade secret, even if items within individual files themselves do not. *See Sutra*, 2008 WL 2705580, at *4.

The Court will therefore deny defendants' motion for summary judgment as to Trade Secret 2. As with Trade Secret 1, the Court will limit the scope of Trade Secret 2 to exclude the phrase "among other things," and instead confine it to the 15 listed DHF categories, plus the combination of those categories.

Appx31

### C.       Mass. Gen. Laws ch. 93A

Defendants next seek summary judgment on plaintiff's unfair-competition claim under

Mass. Gen. Laws ch. 93A ("chapter 93") because the alleged misconduct did not occur

"primarily and substantially" within Massachusetts.

Section 11 of chapter 93A expressly provides that no action may be brought under the

statute unless the complained-of conduct occurred "primarily and substantially within the

commonwealth."  Mass. Gen. Laws ch. 93A, § 11.  Defendants bear the burden of proving that

the alleged misconduct occurred primarily or substantially outside of Massachusetts.  *Zyla v.*

*Wadsworth*, 360 F.3d 243, 255 (1st Cir. 2004).

The Supreme Judicial Court has indicated that the critical inquiry is "whether the center

of gravity of the circumstances that give rise to the claim is primarily and substantially within the

Commonwealth."  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787

(2003).  That requires a holistic, fact-based analysis, in which the relevant factors include, but

are not limited to, "where the defendant commits the unfair or deceptive act or practice," "where

the plaintiff receives or acts on the wrongful conduct," and "where the plaintiff sustained losses

caused by the wrongful conduct."  *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2024 WL

1558167, at *19 (D. Mass. Apr. 10, 2024) (quoting *Kuwaiti*, 781 N.E.2d at 798 n.13).  Despite

the inquiry's fact-intensive nature, courts may still grant summary judgment when the

undisputed facts demonstrate that the center of defendants' misconduct occurred outside of

Massachusetts.  *See Spring Inv. Servs.*, 2013 WL 1703890, at *12-13.

Importantly, in conducting its analysis, a court may only consider the actionable conduct

that gave rise to the alleged violation; other conduct, no matter where it takes place, may not be

considered.  *Kuwaiti*, 781 N.E.2d at 787.  If the alleged misconduct occurred in multiple

jurisdictions, such that "the significant contacts of the competing jurisdictions are approximately

in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." *Neural Magic*, 659 F. Supp. 3d at 182-83 (quoting *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005)). Thus, if the alleged wrongdoing has "relevant and substantial impact" across the country or globe, the "primarily" requirement of chapter 93A is not satisfied. *Id.*

Based on the record evidence, no reasonable jury could find that the alleged misconduct occurred "primarily and substantially in the commonwealth." Mass. Gen. Laws ch. 93A, § 11. The second amended complaint alleges that "[d]efendants' misappropriation of [plaintiff's] intellectual property" constitutes the basis of its chapter 93A claim. (Sec. Am. Compl. ¶ 153). Misappropriation refers to the improper acquisition, disclosure, or use of confidential information. *See Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 405 (S.D.N.Y. 2021). Mere possession of confidential information does not constitute misappropriation. *Id.* Thus, retention of confidential documents alone by plaintiff's former employees would not constitute misappropriation. Instead, the misappropriation (that is, the unfair conduct) that is potentially actionable under chapter 93A occurred when plaintiff's former employees allegedly disclosed—and EOFlow allegedly acquired and used—the confidential information concerning the Omnipod.

The "primary and substantially" analysis therefore focuses on the center of gravity related to the transfer of confidential information from plaintiff's former employees to EOFlow, and defendants' subsequent use of that information. Based on the record, the center of gravity of defendants' alleged misconduct occurred primarily and substantially in Korea, not Massachusetts. Plaintiff's former employees delivered the trade secrets to EOFlow in Korea, where the company was headquartered. Defendants then allegedly used plaintiff's trade secrets in Korea to develop and manufacture the EOPatch 2 there. Defendants then sold the EOPatch 2

Appx33

exclusively in Korea before later expanding to Europe; without FDA approval, defendants have never been permitted to sell their product anywhere in the United States, including in Massachusetts. Thus, the misappropriation constituting the alleged unfair practice under chapter 93A occurred primarily and substantially in Korea, not Massachusetts.

Plaintiff points to a number of apparent contacts that defendants had with Massachusetts to support its position that the center of gravity of defendants' conduct lies in the Commonwealth. For example, plaintiff highlights that its injuries have manifested primarily in Massachusetts, where the company is headquartered and where thousands of its employees work. (Pl.'s Opp. at 43-44). But that argument fails for two reasons. First, defendants' product has never been sold in Massachusetts or anywhere else in the United States, preventing it from competing with the Omnipod in Massachusetts. As a result, harm to plaintiff's sales or competitive advantage in the patch pump market resulting from defendants' unfair practices could not be concentrated in Massachusetts, and instead are more likely to be felt in other markets, such as Europe, where both products are commercially available and do in fact compete.

Second, even if plaintiff suffered its injuries in Massachusetts, the relevant inquiry is ascertaining the center of gravity of *defendants'* wrongful conduct, not plaintiff's place of injury. *See Neural Magic*, 659 F. Supp. 3d at 183. Several courts have held that a place of injury within Massachusetts is not by itself a sufficient basis to find the misconduct occurred primarily and substantially within the Commonwealth. *See, e.g.*, *id.* (stating that the "primarily and substantially" test is not satisfied even when the plaintiff was a Massachusetts company and its former employee signed his employment contract in Massachusetts); *see also Korpacz v. Women's Prof'l Football League*, 2006 WL 220762, at *5 (D. Mass. Jan. 27, 2006) (stating that "although plaintiffs themselves reside in Massachusetts and any losses they may have suffered

32

Appx34

would have been incurred here, defendants' conduct occurred outside of the state"); *Central Mass. Television, Inc. v. Amplicon, Inc.*, 930 F. Supp. 16, 27 (D. Mass. 1996) (stating that "when 'place of injury' is the only factor weighing in favor of a claimant, the admonition of Massachusetts courts that liability under chapter 93A is not to be imposed lightly is particularly relevant").  Indeed, if the analysis hinged chiefly on the place of *injury*, "practically no case involving a Massachusetts plaintiff would be exempt from chapter 93A status, no matter how negligible the defendants' business activity in this [s]tate." *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 518 N.E.2d 519 (Mass. App. Ct. 1988).  Accordingly, plaintiff's location in Massachusetts, without more, does not satisfy the standard.

Beyond its presence in the Commonwealth, plaintiff also points to contacts between its former employees and Massachusetts, including the fact that they all worked in Massachusetts during their employment with plaintiff, accessed confidential information that had been developed in Massachusetts, and violated confidentiality agreements under Massachusetts law. (Pl.'s Opp. at 44).  In addition, DiIanni remained in Massachusetts throughout the misappropriation scheme and his laboratory was listed as a registered office for EOFlow.

Again, those facts fail to establish Massachusetts as the center of gravity of the alleged unfair misconduct.  Nothing suggests that plaintiff's former employees disclosed—that is, misappropriated—confidential information to defendants during their tenure with the company. Rather, the alleged misappropriation occurred after the ex-employees' tenure with plaintiff had ended, when every individual defendant but DiIanni lived and worked outside of Massachusetts. Thus, the fact that plaintiff's former employees worked in Massachusetts while at the company does not change the analysis.

Moreover, merely accessing documents located in Massachusetts during one's employment in Massachusetts does not constitute an unfair or deceptive practice.  And although

33

Appx35

the individual defendants may have violated confidentiality agreements governed by Massachusetts law, the underlying misconduct occurred overwhelmingly in Korea. Finally, DiIanni's continued residence and opening of a laboratory registered as an EOFlow office in Massachusetts does not show that defendants unfair and deceptive practices occurred primarily and substantially in Massachusetts, "since mere presence here is not sufficient." *Neural Magic*, 659 F. Supp. 3d at 184.

On balance, the majority of defendants' alleged unfair practices—including their use of plaintiff's trade secrets, development of the EOPatch 2, and sale of their competing product— occurred outside of Massachusetts, primarily and substantially in Korea. Thus, "[e]ven reading the record in the light most favorable to [plaintiff]," defendants' alleged wrongful conduct did not occur primarily and substantially in Massachusetts. *EMC Corp. v. Pure Storage, Inc.*, 2016 WL 7826662, at *2 (D. Mass. Aug. 19, 2016).

Accordingly, the Court will grant defendants' motion for summary judgment as to plaintiff's chapter 93A claim.

### D. Civil Conspiracy

Finally, defendants have moved for summary judgment on the civil-conspiracy claim, arguing that the claim is barred by the intra-corporate conspiracy doctrine.

"Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009). "The 'true conspiracy' is a very limited cause of action that requires an element of coercion"—an element not alleged in plaintiff's complaint. *Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 391 (D. Mass. 2012). Thus, the civil-conspiracy claim here is necessarily based on § 876 of the Restatement (Second) of Torts.

34

Appx36

To prove a civil-conspiracy claim based on § 876 of the Restatement, "the [plaintiff] must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.'" *Blake*, 898 F. Supp. 2d at 392 (citations omitted).  Here, the second amended complaint alleges that defendants engaged in a civil conspiracy by acting in concert to misappropriate plaintiff's trade secrets in violation of DTSA. (Sec. Am. Compl. ¶ 158).

Defendants contend that the conspiracy claim is foreclosed by the intra-corporate conspiracy doctrine, which states that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is *not* an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153, (2017) (emphasis added).  The doctrine reflects the fact that a conspiracy requires an agreement between or among two or more separate persons to conduct an illicit act.  *Id.*  But "[w]hen two agents of the same legal entity make an agreement in the course of their official duties, . . . as a practical and legal matter their acts are attributed to their principal."  *Id.*  In such a case, there is no agreement between two or more separate entities, and thus no civil conspiracy.  If, however, the agents acted "for their sole personal benefit and thus outside the course and scope of their employment," then the intra-corporate conspiracy doctrine does not apply.  *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999).

Plaintiff relies on the assertion that the intra-corporate defense "requires showing a 'complete unity of interest'" between the principal and its agents.  (Pl.'s Opp. at 49) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)).  Because plaintiff's former employees could benefit from the alleged misappropriation individually and separate from EOFlow, plaintiff argues that the parties lacked a "complete unity of interest" such that the intra-corporate defense does not apply.

Appx37

The Supreme Court in *Copperweld*, however, did not go so far as to say that *every* application of the intra-corporate conspiracy doctrine requires a "complete unity of interest." 467 U.S. at 771. Rather, the court simply observed that in the case before it, a parent company and its wholly owned subsidiary do exhibit such unity of interest, thereby eliminating any legal possibility of an agreement between those two entities under the Sherman Act. *Id.* A complete unity of interests may be a sufficient condition for the application of the intra-corporate conspiracy doctrine, but the *Copperweld* Court's discussion does not suggest that it is a legal requirement. In fact, some courts have set the minimum threshold much lower, barring application of the intra-corporate conspiracy doctrine only when employees act "for their sole personal benefit." *See, e.g.*, *BlueRadios, Inc. v. Hamilton, Brook, Smith & Reynolds, P.C.*, 2022 WL 138642, at *9 (D. Mass. Jan. 14, 2022) (quotations omitted).

Thus, defendants need not have complete unity of interest to assert a valid intra-corporate conspiracy doctrine defense. They need only show that they acted as agents of a principal— here, EOFlow—and did not act for their "sole personal benefit" in the coordination and execution of the alleged misappropriation of plaintiff's trade secrets. *Id.*

### 1.    Malave, Welsford, and Kim

It is undisputed that Malave and Welsford had both already started working for EOFlow as full-time employees at the time of the alleged misappropriation. And the record does not suggest that either of them coordinated the theft of plaintiff's confidential information at any point before their employment with EOFlow began. It is also clear that Malave and Welsford were acting in their official capacities as officers (COO and CTO, respectively) of EOFlow to carry out the alleged misappropriation, as opposed to acting in a solely personal capacity. Thus, the intra-corporate conspiracy doctrine bars a civil-conspiracy claim against Malave and Welsford as agents of EOFlow.

Appx38

There is also no question that Kim—the founder and CEO of EOFlow—was an officer of the company during the entirety of the alleged tortious conduct. Thus, because "an entity cannot conspire with itself," summary judgment as to Malave, Welsford, and Kim on the civil-conspiracy claim will be granted. *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130-31 (1st Cir. 2008).

### 2.   DiIanni

As for DiIanni, plaintiff maintains that his undisputed status as an independently contracted consultant, as opposed to a full-time employee, forecloses the possibility that he may have acted as an agent of EOFlow in misappropriating plaintiff's trade secrets. Plaintiff's position contradicts its initial characterization of DiIanni's role in the scheme that "[a]t all times relevant to this action, DiIanni acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow." (Sec. Am. Compl. ¶ 25). As a result, defendants ask the Court to judicially estop plaintiff from now staking out a new, opposing view.

"[A]t a minimum, two conditions must be satisfied before judicial estoppel can attach. First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (citations omitted). Courts also frequently consider whether "the party asserting the inconsistent position [would] derive an unfair advantage" in the absence of an estoppel. *Id.*

Plaintiff's apparent shift on the nature of DiIanni's relationship with EOFlow satisfies the first requirement of judicial estoppel. However, the Court has not previously accepted its prior position on the issue. The Court's order granting plaintiff's motion to leave to file a second amended complaint was not evidence that it accepted plaintiff's position regarding DiIanni's status. In that order, the Court explicitly declined to opine on whether the alleged conspiring

37

Appx39

parties are "independent agents, not employees of the same enterprise." (ECF No. 270 at 5). In fact, the Court permitted plaintiff to add to its complaint that "Malave and Kim recruited and conspired with DiIanni, *and his company Coral C Ventures LLC*, . . . to further EOFlow's [tortious conduct]." (*Id.*) (emphasis added). At no point did the Court rely on plaintiff's representation of DiIanni as an independent contractor as a relevant factor in granting it leave to file a second amended complaint. Nor is it clear that plaintiff would derive an unfair advantage in the absence of an estoppel. Thus, the Court declines to judicially estop plaintiff from revising its position that DiIanni acted in an independent capacity to effectuate the alleged conspiracy with EOFlow.

Because there are material factual disputes as to whether DiIanni acted independently or under the control and direction of EOFlow to carry out the alleged misappropriation, the Court will deny summary judgment as to the civil-conspiracy claim against DiIanni.[11]

### 3.   Nephria Bio

Defendants similarly seek summary judgment on the civil-conspiracy claim as to Nephria Bio. Defendants assert that Nephria Bio, whose majority owner is EOFlow and whose CEO during the relevant period was Welsford, acted as an agent of EOFlow in carrying out the alleged misappropriation, thereby barring a civil-conspiracy claim between Nephria Bio and EOFlow.

The intra-corporate conspiracy doctrine applies not just to employees, but also to corporate affiliates controlled by a parent entity. *See Copperweld*, 467 U.S. at 771. When

---

[11] Courts have taken different positions as to whether an independent contractor may ever be considered a corporate agent in the civil conspiracy context. Some courts have allowed for the possibility that the "intra-corporate conspiracy doctrine extends to . . . independent contractors of a corporation" where "they were acting within the scope of their duties." *Lucero v. Safeway, Inc.*, 2022 WL 79860, at *7 (D. Colo. Jan. 7, 2022); *see also United States v. Premier Med., Inc.*, 2023 WL 9060896, at *13 (D.S.C. Sept. 28, 2023). Other courts, however, have suggested that the intra-corporate conspiracy doctrine does not apply to independent contractors. *See, e.g.*, *Morgan v. Noss*, 2023 WL 11866929, at *13 (W.D. Pa. Aug. 28, 2023). Because the factual record is ambiguous as to whether DiIanni operated as an agent within the scope of his consulting duties to carry out the alleged misappropriation, the Court declines to address whether the intra-corporate conspiracy doctrine can, as a matter of law, bar a civil-conspiracy claim against an independent contractor.

Appx40

determining whether two separately incorporated entities are capable of conspiracy, a court focuses on the "substance, not form" of the entities' relationship. *Id.* at 773 n.21. "[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010). Rather, "[t]he question is whether the [allegedly conspiratorial] agreement joins together 'independent centers of decision[-]making.'" *Id.* at 196 (quoting *Copperweld*, 467 U.S. at 769).

Two centers of decision-making "are not 'independent' if one sufficiently controls the other." *Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 394, 402 (D. Mass. 2018) (quoting *In re Aluminum Warehousing Antitrust Litig.*, 95 F.Supp.3d 419, 445 (S.D.N.Y. 2015)). By extension, "a non-wholly owned affiliate cannot conspire with its parent . . . if they are jointly controlled," just as "agents [] merely carrying out the decisions of principals . . . are not separate entities" and thus cannot conspire with each other. *Martino-Fleming*, 334 F. Supp. 3d at 402-03. Therefore, the intra-corporate conspiracy doctrine may bar a civil-conspiracy claim against a non-wholly owned subsidiary, like Nephria Bio, if its majority stakeholder exercises sufficient control over it.

Defendants argue that plaintiff has previously benefitted from its characterization of Nephria Bio as an agent working at the direction of EOFlow, and therefore the Court should hold plaintiff to the same position here. Again, for judicial estoppel to apply, "a party [must have] adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage." *Alternative Sys. Concepts*, 374 F.3d at 33 (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003)).

Plaintiff has consistently maintained that Nephria Bio was controlled by EOFlow in the execution of the alleged misappropriation. In its second amended complaint, for example,

plaintiff alleges that Nephria Bio "acted as an agent of EOFlow" in furtherance of its tortious conduct.  (Sec. Am. Compl. ¶¶ 22, 31, 92, 161).  Moreover, in arguing for and securing an adverse-inference sanction stemming from Welford's spoliation of evidence, plaintiff repeatedly asserted that Nephria Bio acted pursuant to EOFlow's direction.  (Pl.'s Mot. Adv. Inf. at 3, 16).  To persuade the Court that the adverse inference should extend beyond Welsford to Nephria Bio and EOFlow, plaintiff explicitly adopted an agency theory and represented that "[a]t all times during the development of EOPatch 2, Nephria took direction from EOFlow and acted as its agent," (*id.* at 3), and that "Nephria . . . takes direction from EOFlow," (Pl.'s Reply Supp. Mot. Adv. Inf. at 13).

Relying in part on plaintiff's characterization, the Court granted its motion for an adverse-inference instruction against Nephria Bio, Welsford, and EOFlow.  (ECF No. 532). Plaintiff thus successfully convinced the Court to accept its prior position—which is directly inconsistent with its current view—in a decision that delivered a benefit to plaintiff in this case. Allowing plaintiff to reverse course at this point would give it an unfair advantage.  Under the circumstances, plaintiff is estopped from arguing that Nephria Bio was not acting under the control of EOFlow throughout the alleged tortious conduct.

The Court will therefore grant defendants' summary judgment motion in favor of Nephria Bio as to the civil-conspiracy claim.

## IV.   Conclusion

For the foregoing reasons,

1.   Plaintiff's motion for summary judgment as to defendants' statute of limitations defense is DENIED.

2.   Defendants' motions for summary judgment are GRANTED in part and DENIED in part, as follows:

Appx42

Appx43

a.      the motion concerning the statute of limitations defense is denied;

b.      the motion concerning the specificity of Trade Secrets 1 and 2 is denied;

c.      the motion concerning the chapter 93A claim is granted; and

d.      the motion concerning the civil-conspiracy claim is granted as to

defendants Malave, Welsford, Kim, and Nephria Bio, and denied as to

defendants DiIanni and EOFlow.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  October 31, 2024                          Chief Judge, United States District Court

Appx43

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
INSULET CORPORATION,                    )
                                        )
            Plaintiff,                  )
                                        )          Civil Action No.
      v.                                )          23-11780-FDS
                                        )
EOFLOW CO., LTD., et al.,               )
                                        )
            Defendants.                 )
_____)


**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO CERTIFY ORDER
FOR INTERLOCUTORY APPEAL AND FOR STAY PENDING APPEAL**

**SAYLOR, C.J.**

This is a dispute concerning the alleged misappropriation of trade secrets for the design

and manufacture of an insulin patch pump, the Omnipod, manufactured by plaintiff Insulet

Corporation.  The defendants are EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow");

Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet

employees, Luis Malave, Steven DiIanni, and Ian Welsford.  The second amended complaint

asserts claims for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA");

unfair competition in violation of Mass. Gen. Laws ch. 93A; and civil conspiracy.[1]

Trial is set to begin in three days, on Monday, November 4, 2024.  On September 17,

2024, both parties moved for summary judgment as to defendants' statute of limitations defense

under the DTSA.  The parties disputed the proper legal standard to apply to the DTSA's

limitations provision, which provides in relevant part that private civil actions "may not be

_____

[1] Insulet also asserted claims for patent infringement under 35 U.S.C. § 271, which have been stayed by
assent pending resolution of the other claims.

Appx44

commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d).  Defendants argued for an inquiry notice standard, in which the limitations period commences when the first event occurs that would prompt a reasonable person to inquire into a possible injury.  Plaintiff, relying on the Supreme Court's decision in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), contended that its claims accrued only when it discovered or through reasonable diligence should have discovered the facts of defendants' misappropriation.

The parties filed opposition briefs on October 1, 2024, and a motion hearing was held on October 16, 2024.  At a status conference on October 28, 2024, the Court advised the parties that it would deny both summary judgment motions and that it would essentially apply the *Merck* standard, not the inquiry notice standard.  The Court then issued a written memorandum and order to that effect on October 31, 2024.  The Court concluded that a cause of action accrues under the DTSA when "the misappropriation with respect to which the action would relate" is (1) actually discovered or (2) "by the exercise of reasonable diligence should have been discovered," as the statute's text directs.  18 U.S.C. § 1836(d).

On November 1, 2024, defendants filed emergency motions asking the Court to certify an order for interlocutory appeal under 28 U.S.C. § 1292(b) as to the relevant legal standard applicable to the DTSA's statute of limitations, and to grant a stay pending appeal.  For the following reasons, the motions will be denied.

As noted, trial is now scheduled to commence on November 4, 2024.

I.      **Analysis**

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal when (1) the order involves a controlling question of law; (2) a substantial ground for difference

of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation.  28 U.S.C. § 1292(b).

Here, the Court's order denying summary judgment as to the statute of limitations defense involves a controlling question of law.  The Court likewise finds that there is a substantial ground for difference of opinion concerning the proper accrual standard under the DTSA.  However, permitting an appeal on the issue at this point would not materially advance the litigation.

First, and in simple terms, the statute of limitations issue would not need to be re-tried by a jury if the appellate court later determined that inquiry notice, and not the *Merck* standard, properly governed the DTSA accrual analysis.

The point is best illustrated by considering the possible outcomes of the Court's decision to deny defendants' motion.  In the first scenario, the jury—which will be instructed to render a separate verdict specific to the statute of limitations issue—could determine that, even under the *Merck* standard, plaintiff failed to file suit within three years of the point at which it should have discovered the alleged misappropriation.  In that case, defendants would win the trade secret claim and would not need to seek an appeal on that issue.

In the second scenario, the jury could find for plaintiff on the statute of limitations issue, and defendants could then appeal the final decision as of right.  If the appellate court subsequently determines that inquiry notice, and not the *Merck* standard, is the governing law, then defendants would almost certainly be entitled to summary judgment on the trade secret claim.  A jury would not need to re-consider the issue because, as the Court stated in its summary judgment order, "plaintiff plainly had at least a cause for concern that defendants had engaged in prohibited conduct by early 2019," before the statutory bar date of August 3, 2020.

Appx46

Alternatively, if the Court were to grant defendants' motion, the issue could resolve if the appellate court overturned this Court's determination, but it could also result in a very substantial delay of the trial if the Court's decision is affirmed.

The second issue is fairness to plaintiff, which has expended considerable resources to get to this point in the litigation.  Again, trial is set to commence within 72 hours.  Defendants' request comes far too late in the process.  They have known about the statute of limitations issue for more than a year; indeed, the issue was raised from the very beginning of the litigation in August 2023.  Yet defendants waited until late September 2024 to request summary judgment on that basis.

Indeed, the Court scheduled a condensed litigation timeline in part because defendants requested it.  The Court decided on February 23, 2024, to schedule a jury trial on a relatively expedited basis to commence on November 4, 2024.  The Court will not now—on November 1—permit defendants to stay a trial at the very last moment that was scheduled expeditiously, in part, at their request.

Accordingly, defendants' motions to certify an order for interlocutory appeal and for a stay pending appeal are DENIED.


**So Ordered.**


                                                    /s/ F. Dennis Saylor IV
                                                    F. Dennis Saylor IV
Dated:  November 1, 2024                             Chief Judge, United States District Court

4

Appx47

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 12/5/2024 at 7:34 AM EST and filed on 12/3/2024

| | |
|---|---|
| **Case Name:** | Insulet Corporation v. EOFlow, Co. Ltd. et al |
| **Case Number:** | 1:23-cv-11780-FDS |
| **Filer:** | |
| **Document Number:** | 834(No document attached) |

**Docket Text:**
**Chief Judge F. Dennis Saylor, IV:**

**ORDERS ON MOTIONS:**
**Court Granted in Part and Denied in Part [540] MOTION to Exclude Plaintiff's Expert Opinions (Daubert Motion) as stated on the record.**
**Court Granted in Part and Denied in Part [553] MOTION to Exclude the Opinions of Certain Defendants' Proffered experts as stated on the record.**
**Court Granted in Part and Denied in Part [632] Plaintiff's MOTION in Limine as stated on the record.**
**Court Granted in Part and Denied in Part [634] MOTION in Limine No. 1 as stated on the record.**
**Court Granted in Part and Denied in Part [694] MOTION Regarding Late Disclosure of Steven Dilanni's Severance Agreement as stated on the record.**
**Court Denied [796] MOTION for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(A),**
**Court Denied [799] Defendant Steven Dilanni's Rule 50(A) MOTION for Judgment as a Matter of Law.**
**Court Denied [800] Defendant Luis J. Malave's 50(A) MOTION for Judgment as a Matter of Law.**
**Court Denied [801] Defendant Ian G. Welsford's Rule 50 (A) MOTION for Judgment as a Matter of Law.**
**Court Denied [817] Insulet Corporation's MOTION for Judgment as a Matter of Law.**
**Court Denied [821] MOTION for Judgment as a Matter of Law (Renewed).**

**(McKillop, Matthew)**

**1:23-cv-11780-FDS Notice has been electronically mailed to:**

Michael Sheetz (Terminated)      msheetz@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

T. Christopher Donnelly      tcd@dcglaw.com, jlf@dcglaw.com

Christopher Centurelli      christopher.centurelli@klgates.com, kathleen.barrett@klgates.com, klgateseservice@klgates.com

Matthew Oliver      moliver@cooley.com

Timothy H. Madden      thm@dcglaw.com, kh@dcglaw.com

Robert D. Carroll      rcarroll@goodwinlaw.com

Robert Frederickson, III      rfrederickson@goodwinlaw.com

Adam S. Gershenson (Terminated)      agershenson@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Scott T. Bluni      sbluni@goodwinlaw.com

Reuben H. Chen      rchen@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Brendan M. Shortell      shortell@lambertpatentlaw.com

John C. Bostic      jbostic@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Appx48

Jenny Zhang     jzhang@goodwinlaw.com, DG-Insulet-EOFlow@goodwinlaw.com

Alexandra Lu     alu@goodwinprocter.com

Elizabeth M. Flanagan     bflanagan@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Michael R. Creta     michael.creta@klgates.com

Brandon R. Dillman     brandon.dillman@klgates.com, klgateseservice@klgates.com

Alexandra D. Valenti     avalenti@goodwinlaw.com

Zachary Sisko     zsisko@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

William E. Evans     wevans@goodwinlaw.com

Justin P. Tinger     tinger@lambertpatentlaw.com

Kimberley A. Scimeca     kscimeca@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Matthew Ginther     mginther@goodwinlaw.com

Dustin Knight (Terminated)     dknight@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

James P. Breen     jamesbreen@goodwinlaw.com

Mead Lowell (Terminated)     lmead@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com

Timothy Keegan     tkeegan@goodwinlaw.com

Isabel Lily Catanzaro     icatanzaro@cooley.com

Alexandra Mayhugh     amayhugh@cooley.com

John Wray     jwray@cooley.com, efiling-notice@ecf.pacerpro.com, efilingnotice@cooley.com, jgalligan@cooley.com

Arshjit Raince     araince@goodwinlaw.com

Danit Maor     dmaor@goodwinlaw.com

HanByul Chang     hanbyul.chang@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Jordan Landers     jlanders@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

Kyung Taeck Minn     rminn@cooley.com, eFilingNotice@cooley.com, efiling-notice@ecf.pacerpro.com

**1:23-cv-11780-FDS Notice will not be electronically mailed to:**

Hankil Kang
Covington & Burling, LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
**INSULET CORPORATION,**                            )
                                                   )
      **Plaintiff,**                                )
                                                   )
                                                   )    **Civil Action No.**
    **v.**                                      )    **23-11780-FDS**
                                                   )
**EOFLOW CO., LTD., et al.,**                       )
                                                   )
      **Defendants.**                              )
_____)

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR AWARD OF
ATTORNEYS' FEES AND LITIGATION EXPENSES**

**SAYLOR, C.J.**

This dispute concerns the misappropriation of trade secrets for the design and manufacture of an insulin patch pump, the Omnipod, produced by plaintiff Insulet Corporation. Plaintiff sued seven defendants:  EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow"); Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet employees, Luis Malave, Steven DiIanni, and Ian Welsford.

After a month-long trial, a jury returned a verdict on December 3, 2024, finding six defendants liable for misappropriation of trade secrets.  The jury awarded plaintiff $452 million in total damages.

Before the start of trial, on September 4, 2024, the Court granted plaintiff's motion under Fed. R. Civ. P. 37(e)(2) for an adverse-inference instruction against Welsford, Nephria Bio, and EOFlow in connection with Welsford's spoliation of evidence.  (ECF No. 532).  Plaintiff then filed a motion seeking $228,905.85 in attorneys' fees and $50,242.00 in litigation expenses

Appx50

related to the spoliation.  The motion also seeks a finding of joint-and-several liability against the defendants to whom the adverse inference applies.

For the following reasons, the Court will award plaintiff $91,966.88 in fees and costs, which will be imposed against Welsford, Nephria Bio, and EOFlow jointly and severally.

## I.    Background

Plaintiff's motion for an adverse-inference instruction alleged, among other things, that Welsford had authorized the deletion of all server-stored data associated with multiple Nephria Bio employee accounts shortly after he was notified of the litigation.  The parties initially disputed the scope of the alleged spoliation, but appeared to have settled on four employee accounts—those belonging to Joshua Terry, James Neff, Morgan Neff, and Neave Flint—to be the subject of plaintiff's motion.  Other Nephria Bio accounts, including one belonging to Paul Hamm, had been deleted several months prior to the litigation as part of their layoffs from the company, and were not part of Welsford's alleged spoliation.

The Court granted plaintiff's motion, finding that Welsford intentionally destroyed evidence after a duty arose to preserve files for litigation.  Under Rule 37(e), the Court elected to give an adverse-inference instruction at trial that would apply against Welsford, EOFlow, and Nephria Bio, as Welsford—who, at the time, was EOFlow's Chief Technology Officer and Nephria Bio's Chief Executive Officer—acted as an agent of those corporate entities in spoliating the evidence.

The Court went on to state that it would "award reasonable attorney[s'] fees and costs incurred in connection with the motion for spoliation, which presumably will include the costs of that portion of any forensic analysis that was reasonably necessary for the bringing of [the adverse-inference] motion."  (Sept. 4, 2024 Hr'g Tr. 15:2-5).

Appx51

Plaintiff submitted a motion for attorneys' fees on September 18, 2024, that included evidence of attorney time entries and third-party invoices.  Plaintiff seeks to recover four sets of expenses:  (1) fees related to its motion to compel the forensic inspection and analysis of Hamm's laptop; (2) costs paid to a third party to conduct that forensic inspection and analysis; (3) fees incurred due to Nephria Bio's deficient document production; and (4) fees related to preparing its motion for an adverse-inference instruction.

In total, plaintiff requests $228,905.85 in attorneys' fees and $50,242.00 in litigation expenses related to the spoliation.  In addition, the motion seeks a finding of joint-and-several liability against Welsford, Nephria Bio, and EOFlow.

## II.    Analysis

### A.    Reasonable Attorneys' Fees

It is undisputed that in this Circuit "[t]he lodestar approach is the method of choice for calculating fee awards." *Matalon v. Hynnes*, 806 F.3d 627, 638 (1st Cir. 2015).  The lodestar approach "requires the district court to ascertain the number of hours productively expended and multiply that time by reasonable hourly rates." *Spooner v. EEN, Inc.*, 644 F.3d 62, 68 (1st Cir. 2011).  The party seeking the award bears the burden of establishing both the time and rate components of the calculation, *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), and may do so by providing "contemporaneous time and billing records and information establishing the usual and customary rates in the marketplace for comparably credentialed counsel," *Id.* (citing *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295-96 (1st Cir. 2001)).

In fashioning the lodestar, a court first determines "how much compensable time counsel spent on the case, deleting any 'duplicative, unproductive, or excessive hours.'" *Spooner*, 644 F.3d at 68 (quoting *Gay Officers Action League*, 247 F.3d at 295).  "[T]he court has a right— indeed, a duty—'to see whether counsel substantially exceeded the bounds of reasonable

Appx52

effort.'"  *United States v. Metro. Dist. Comm'n*, 847 F.2d 12, 17 (1st Cir. 1988) (quoting *Pilkington v. Bevilacqua¸* 632 F.2d 922, 925 (1st Cir. 1980)).  However, the court need not limit the award to only those fees that "directly relate[] to [the] motion for spoliation of evidence," but instead may also award fees stemming from "[t]hose efforts [that] were a predictable result of the spoliation." *NuVasive, Inc. v. Day*, 77 F.4th 23, 32 (1st Cir. 2023) (internal quotations omitted).

After determining the number of hours reasonably expended, a court then multiplies the compensable time by the prevailing rates in the community, thereby yielding the lodestar amount.  *Gay Officers Action League*, 247 F.3d at 295.  In deciding a reasonable hourly rate, a court must consider "the type of work performed, who performed it, the expertise that it required, and when it was undertaken." *Hefter Impact Techs., LLC v. Sport Maska, Inc.*, 2017 WL 5798642, at *2 (D. Mass. Nov. 28, 2017) (quoting *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984)).

Although the calculated lodestar amount "represents a presumptively reasonable fee," *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992), a court retains "extremely broad" discretion to adjust it up or down based on other factors not captured in the calculation, *see, e.g.*, *Pérez-Sosa v. Garland*, 22 F.4th 312, 320-21 (1st Cir. 2022).  Those factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Diaz v. Jiten Hotel Mgmt.*, 741 F.3d 170, 177 n.7 (1st Cir. 2013) (quoting *Hensley*, 461 U.S. at 430 n.3) (internal quotations omitted).

Appx53

In this case, the Court will award reasonable fees and costs incurred in connection with plaintiff's motion for an adverse-inference instruction, including fees resulting from reasonably necessary forensic analyses.  Thus, plaintiff is entitled to recoup fees that it would not otherwise have incurred in this litigation except for the fact that it had to bring its motion.  *See Hefter Impact Techs*, 2017 WL 5798642, at \*3.

**B.**    <u>**Fees Related to the Motion to Compel the Inspection of Hamm's Laptop**</u>

Plaintiff seeks $61,434.10 for time spent analyzing defendants' production of files from Hamm's laptop, conferring with defendants' counsel regarding deficiencies in those files, and preparing for and arguing a motion to compel a forensic inspection and analysis of the laptop. Even though plaintiff was not aware of any spoliation when it filed its motion to compel on January 12, 2024, it nonetheless contends that the listed costs associated with obtaining Hamm's laptop were a "foreseeable result of the [Welsford] spoliation" and should therefore fall within the ambit of recoverable fees.  (Memo. Supp. Mot. Adv. Inf. at 7).

To support its position, plaintiff contends that Welsford's spoliation led to the deficiencies in defendants' production of Hamm's files in discovery, which in turn required plaintiff to file a motion to compel production of Hamm's laptop, because it knew that his laptop contained confidential information.  Plaintiff then discovered that Hamm, too, had spoliated electronic files.

The problem with that argument is that Hamm's files were not spoliated by Welsford. Although the Court's adverse-inference order addressed evidence deleted by Welsford *after* litigation had commenced, Hamm's Nephria Bio account had been deleted in the ordinary course of his layoff months *before* the start of litigation.  Hamm's account was therefore not a part of the evidence spoliated by Welsford.

Appx54

Thus, even if it is true, as plaintiff suggests, that the deletion of Hamm's account made his laptop the best source of evidence of Nephria Bio's work for EOFlow, plaintiff's efforts to compel production of his laptop were ultimately based on actions that fall beyond the scope of the Court's order.  For that reason, the Court will not factor any attorneys' fees incurred in connection with the motion to compel the inspection of Hamm's laptop into the lodestar calculation.

C.    **Fees Related to the Forensic Analysis of Hamm's Laptop**

As a related matter, plaintiff seeks $50,242 for expenses incurred in connection with the third-party forensic analysis of Hamm's laptop.  The fees include both work performed by a third-party vendor and attorney time spent coordinating that analysis.

Again, plaintiff cannot recover the expenses incurred to perform the forensic analysis of Hamm's laptop.  Defendants' deficient production of Hamm's documents led plaintiff to engage a forensic vendor to analyze the laptop.  But again, Hamm's deleted files were not among those spoliated by Welsford, and so the forensic analysis of his laptop cannot be described as a "predictable result of the spoliation." *NuVasive*, 77 F.4th at 32.

Moreover, although the Court allowed for the possibility that plaintiff may recover the costs of any forensic analyses that it performed, it made clear that any such costs had to be "reasonably necessary for the bringing of [the adverse-inference] motion."  (Sept. 4, 2024 Hr'g Tr. 15:2-5).  Plaintiff has not indicated how, if at all, the forensic analysis of Hamm's laptop was reasonably necessary to bring that motion, or how the analysis revealed any information about the Welsford spoliation.  Thus, plaintiff has not met its burden and cannot recover the costs incurred to perform a forensic analysis of Hamm's laptop.

Appx55

**D.      Fees Related to Nephria Bio's Deficient Document Production**

Next, plaintiff seeks $21,456.57 in fees related to its review of Nephria Bio's deficient production of documents.  It contends that the discovery initially produced by Nephria Bio was so defective that it required 23.1 additional attorney hours (beyond its ordinary discovery work) to sift through corrupted files, review emails produced without attachments, and correspond with Nephria Bio's counsel to resolve those issues.  It contends that the production complications resulted from the spoliation and should therefore qualify for fee reimbursement.

The Court does not doubt that Welsford's deleted evidence likely caused plaintiff additional delay and expense in its review of the Nephria Bio production.  The Court will therefore permit recovery of fees for the incremental efforts that plaintiff had to undertake during discovery that "were a predictable result of the spoliation." *NuVasive*, 77 F.4th at 32.

However, the amount of incremental attorney time incurred solely because of the Welsford spoliation is not readily apparent.  Plaintiff's billing records fail to distinguish between time spent addressing production issues stemming from the Welsford spoliation and time spent engaging in ordinary discovery work.  The Court recognizes that plaintiff's time records were created before the adverse-inference motion was filed, but plaintiff has done little to connect specific work performed to the spoliation itself.  It is true that plaintiff has provided certain email and letter correspondences with Nephria Bio's counsel that appear to address discovery issues likely caused by spoliation, but even those correspondences raise other points that are unrelated to the deleted evidence.  Thus, even though some of the discovery delays undoubtedly arose from the spoliation, plaintiff has not met its burden of establishing that all of its requested incremental discovery efforts were the product of the spoliation.

The Court will therefore reduce the requested attorney time reviewing deficient Nephria Bio production by 50% to 11.55 hours.  Defendants do not challenge the rate charged by

plaintiff's counsel, and because the overwhelming majority of the reported discovery hours were conducted by attorney Ginther at $924.50/hour, the Court will apply his rate to the lodestar calculation. Thus, the lodestar amount for the incremental discovery time necessitated by the spoliation is $10,677.98.

With the lodestar calculation in hand, the Court turns to the factors that may justify an adjustment to the fee award. Here, the factors do not support any such adjustment. The time and labor required to conduct the additional discovery is not much more than the typical work performed in litigation. Nor does the additional discovery work present particularly novel or difficult questions. The remaining factors either do not apply to this case or are already captured in the rates charged by plaintiff's counsel. The Court will therefore award plaintiff $10,677.98 for the extra discovery work it undertook as a result of the spoliation.

### E.    Fees Related to the Motion for an Adverse-Inference Instruction

Plaintiff next contends that it is entitled to $146,015.18 in attorneys' fees related to the spoliation portion of its motion for an adverse-inference instruction.[1] To support that figure, plaintiff has provided time entries for attorneys Carroll (billing at $1,376/hour), Frederickson ($1,204/hour), Keegan ($1,019.10/hour), Ginther ($924.50/hour), and Maor ($662.20/hour). Plaintiff represents that it limited its fees to those billed by the five attorneys who worked most closely on the motion. According to the records before the Court, the total time those attorneys spent on the spoliation portion of the motion comes to 143.7 hours.

Defendants again do not challenge the rates charged by plaintiff's counsel. Instead, defendants contend that the hours reported are excessive. The Court agrees that the overall time

---

[1] Plaintiff's motion for an adverse-inference instruction addressed two issues:  (1) Welsford's spoliation of evidence and (2) EOFlow's late production of a computer-aided design ("CAD") file. The Court permitted a fee award only for Welsford's spoliation, and therefore the fee award must exclude work conducted in connection to the CAD file production issue.

Appx57

spent on the motion is excessive, as counsel appear to have spent more than three-and-a-half weeks of attorney time on what amounts to roughly 25 pages of total briefing between the opening and reply briefs, plus preparation for and attendance at the motion hearing.

The Court finds that 143.7 hours is an unreasonable expenditure of time for a relatively short, straightforward motion and argument. Eighty hours of attorney time is a more appropriate amount to spend on such a motion. Thus, the Court will reduce the time apportioned to the spoliation portion of the motion from 143.7 hours to 80 hours. Applying the same hourly rate charged by plaintiff's attorneys to the revised hours total yields a proportionately reduced lodestar of $81,288.90.[2]

Again, having determined the lodestar amount, the next step is to apply whatever adjustment might be appropriate to the fee award. And again, no such adjustment is warranted. Although it is true that plaintiff obtained the relief it sought, spoliation issues are not particularly novel or difficult, and no other factor provides a basis for modifying the award. The Court will therefore award plaintiff $81,288.90 for bringing its motion for an adverse-inference instruction.

### F.        **Joint-and-Several Liability**

Finally, plaintiff requests that the fee award be imposed jointly and severally on Welsford, Nephria Bio, and EOFlow. When a plaintiff prevails against multiple defendants on an issue, the court may, in its reasoned discretion, order the fee award to run jointly and severally against the defendants. *See Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 337 (1st Cir. 2008).

Here, Welsford personally executed the spoliation at issue, but the Court nevertheless gave an adverse-inference instruction against Nephria Bio and EOFlow as well. As a high-ranking officer of both EOFlow and Nephria Bio, Welsford acted as an agent of both entities in

---

[2] 80 adjusted hours ÷ 143.7 reported hours = 0.557 hours ratio. 0.557 hours ratio × $146,015.18 requested fee = $81,288.90 adjusted fee.

Appx58

approving the deletion of the employee accounts, and the corporate entities benefitted from the spoliation. And although defendants assert that EOFlow was unaware of Welsford's spoliation when it occurred, EOFlow did nothing to inform Welsford of his duty to maintain records until after he deleted the accounts, even though they were represented by the same legal counsel from the beginning. Thus, for the purposes of the spoliation award, the Court will impose the fee on Welsford, Nephria Bio, and EOFlow jointly and severally.[3]

### III.    Conclusion

For the foregoing reasons, plaintiff Insulet Corporation is awarded $10,677.98 in fees and expenses for the incremental discovery that it had to perform due to the spoliation and $81,288.90 for the fees and expenses incurred to bring the motion for an adverse-inference instruction. The total award of $91,966.88 is imposed against defendants Ian Welsford, Nephria Bio, Inc., EOFlow Co., Ltd., and EOFlow, Inc., jointly and severally.

**So Ordered.**

                                                    /s/  F. Dennis Saylor IV
                                                    F. Dennis Saylor IV
Dated:  December 23, 2024                           Chief Judge, United States District Court

---

[3] At least arguably, that determination is inconsistent with the Court's refusal to impose joint-and-several liability on Welsford and the corporate entities for the unjust enrichment caused by their misappropriation of trade secrets. The situations, however, are distinguishable. In a trade-secret misappropriation case where damages are based on unjust enrichment, traditional equitable principles suggest that joint-and-several liability is proper only when the defendants act as "partners engaged in concerted wrongdoing," evidenced by their shared enjoyment of the fruits of the misappropriation. *See BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 352 (1st Cir. 2024). But Welsford held no stock in EOFlow and received marginal economic benefit, if any, from his participation in the scheme. Thus, holding Welsford jointly and severally liable with EOFlow—an entity that reaped millions of dollars-worth of benefits from the scheme—for trade-secret misappropriation would have been inappropriate and against traditional principles of equity.

Here, however, Welsford, Nephria Bio, and EOFlow all benefitted from the spoliation. The deleted files plausibly contained information that would have been damaging to each party, leading the Court to give an adverse-inference instruction against them all. And again, as an agent of both Nephria Bio and EOFlow at the time, Welsford's actions may be fairly attributable to his principals. Therefore, holding Welsford and the corporate entities jointly and severally liable solely for the attorneys' fees related to the spoliation is consistent with equitable principles.

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

_____
                                          )
INSULET CORPORATION,                      )
                                          )
              Plaintiff,                   )
                                          )          **Civil Action No.**
       v.                                 )          **23-11780-FDS**
                                          )
EOFLOW CO., LTD.; EOFLOW, INC.;           )
NEPHRIA BIO, INC.; and JESSE KIM,         )
                                          )
              Defendants.                  )
_____)


**MEMORANDUM AND ORDER ON DEFENDANTS' RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL**


**SAYLOR, C.J.**

This dispute concerns the misappropriation of trade secrets for the design and

manufacture of an insulin patch pump, the Omnipod, produced by plaintiff Insulet Corporation.

Plaintiff sued seven defendants:  EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow");

Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet

employees, Luis Malave, Steven DiIanni, and Ian Welsford.

After a month-long trial, a jury returned a verdict on December 3, 2024, finding six

defendants—all except Malave—liable for misappropriation of trade secrets in violation of the

Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").  The jury awarded plaintiff $452

million in total damages.

On February 25, 2025, pursuant to a separately negotiated Consent Permanent Injunction

and Judgment between plaintiff and Malave, DiIanni, and Welsford, the Court entered a final

Appx60

judgment under Fed. R. Civ. P. 54(b) and issued a permanent injunction in accordance with the terms of the parties' agreement.  (ECF Nos. 924-25).

The remaining defendants—EOFlow, Nephria Bio, and Kim—have renewed their motion for judgment as a matter of law and, in the alternative, moved for a new trial.  For the following reasons, the motions will be denied.[1]

## I.    Legal Standard

### A.    Rule 50(b)

A renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) is a challenge to the legal sufficiency of evidence supporting the jury's verdict.  *See* Fed. R. Civ. P. 50(a)(1); *see Cook v. State of R.I., Dep't of Mental Health, Retardation & Hosps.*, 10 F.3d 17, 21 (1st Cir. 1993).  The motion is "subject to a demanding standard."  *Astrolabe, Inc. v. Esoteric Techs. PTY, Ltd.*, 2002 WL 511520, at *2 (D. Mass. Mar. 29, 2002).  The jury's verdict "must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of [the moving party] that a reasonable jury could not have returned the verdict."  *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 13 (1st Cir. 2009).  Put another way, judgment as a matter of law "is appropriate only where 'there is a total lack of evidence in support of the plaintiff's case.'"  *Astrolabe*, 2002 WL 511520, at *2 (quoting *Censullo v. Brenka Video, Inc.*, 989 F.2d 40, 42 (1st Cir. 1993)).

The court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence."  *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The jury's verdict must stand unless the evidence "points unerringly to an opposite conclusion."

---

[1] For the sake of convenience, the term "defendants" will hereafter refer only to EOFlow, Nephria Bio, and Kim unless the context indicates otherwise.

Appx61

*Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001). This standard is "weighted toward preservation of the jury verdict." *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 26 (1st Cir. 2019).

Importantly, a party renewing a motion for judgment as a matter of law under Rule 50(b) is "bounded by the movant's earlier Rule 50(a) motion," and may not use a Rule 50(b) "motion as a vehicle to introduce a legal theory not distinctly articulated in its [Rule 50(a) motion]." *Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 25 (1st Cir. 2016) (alteration in original).

### B. Rule 59(a)

A court may grant a motion for a new trial under Fed. R. Civ. P. 59(a) "only 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" *Sánchez v. Foley*, 972 F.3d 1, 16 (1st Cir. 2020) (quoting *Thomas & Betts Corp. v. New Albertson's, Inc.*, 915 F.3d 36, 60 (1st Cir. 2019)).  Although a "district court's power to grant a motion for a new trial is much broader than its power to grant a [judgment as a matter of law,]" *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009), the court's discretion is nevertheless "limited," *see Burnett v. Ocean Properties, Ltd.*, 422 F. Supp. 3d 369, 389 (D. Me. 2019), aff'd, 987 F.3d 57 (1st Cir. 2021).  Thus, the court "may not grant a motion for a new trial merely because [it] might have reached a conclusion contrary to that of the jurors." *Id.* (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598-99 (1st Cir. 1987)). Moreover, even if the court did err during the course of the trial, "[l]egal error does not warrant a new trial if it is harmless (or not prejudicial) to the moving party." *BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 353 (1st Cir. 2024).

Appx62

## II. Analysis

### A. Renewed Motion for Judgment as a Matter of Law

Defendants contend that judgment is warranted in their favor on multiple grounds, including (1) plaintiff's claims are time-barred; (2) plaintiff did not prove that any of its trade secrets were misappropriated; (3) the evidence was insufficient to prove that the misappropriation was willful and malicious; and (4) the jury's damages award was unreasonable.

#### 1. Statute of Limitations

Defendants repeat their position that plaintiff's claims were time-barred under the statute-of-limitations provision of the DTSA, which states in relevant part that private civil actions "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d).

Defendants raise two arguments. First, they assert that the DTSA should be understood as applying an inquiry-notice accrual standard, under which the limitations period would begin to run when a plaintiff has reason to suspect that its trade secrets had been misappropriated. Because certain evidence presented at trial suggested that plaintiff may have had such a suspicion before the limitations cut-off date, defendants contend that plaintiff's claims are barred as a matter of law.

However, for the reasons stated in the Court's October 31, 2024 memorandum and order denying defendants' motion for summary judgment on statute-of-limitations grounds, the clear text of the statute is not reconcilable with an inquiry-notice standard. (*See* ECF No. 753). Drawing on the principles laid out in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010)—where the Supreme Court considered a statute-of-limitations provision nearly identical to that found in the DTSA and explicitly rejected inquiry notice as the applicable accrual standard—the Court

Appx63

determined that the triggering event under the DTSA's accrual standard is not the mere suspicion of misappropriation. Instead, a cause of action accrues under the DTSA when "the misappropriation with respect to which the action would relate" is (1) actually discovered or (2) "by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). And it does not accrue when the plaintiff merely has sufficient information to put it on inquiry notice. *See* 559 U.S. at 650-51.

Defendants next contend that even under the *Merck* accrual standard, the claims are nonetheless time-barred. In their view, "substantial evidence showed that with reasonable diligence, Insulet did or should have discovered the alleged misappropriation before [the limitations cut-off date], and no reasonable jury could have found otherwise." (Def.'s Mot. at 2). However, the record contains substantial evidence supporting the jury's finding that plaintiff neither discovered nor should have discovered the misappropriation before the limitations cut-off date. For example, although plaintiff's employees observed EOPatch 2 prototypes at industry conferences in 2018 and 2019, trial testimony indicated that an observer could not have discovered the misappropriation of the trade secrets merely by viewing the prototype from afar. Meanwhile, publicly available information concerning the EOPatch 2's design prior to the cut-off date would not have led to discovery of the misappropriation. According to evidence introduced at trial, much of the public information available at the time portrayed the EOPatch 2 as incorporating technology distinct from that used in the Omnipod. And the evidence also showed that discovery of the misappropriation would not have been possible without disassembling and studying the EOPatch 2, which was not commercially available until after the limitations cut-off date.

5

It may be true that certain evidence supported defendants' position, such as plaintiff's knowledge that multiple former employees worked at EOFlow. But there was ample evidence to support the jury's finding that plaintiff did not discover, nor reasonably should have discovered, the misappropriation before the limitations cut-off date. Defendants' motion for judgment as a matter of law will therefore be denied as to its statute-of-limitations defense.

## 2.    Trade-Secret Misappropriation

Defendants next contend that judgment in their favor is warranted because plaintiff failed to prove that its trade secrets were misappropriated. Specifically, defendants assert that (1) plaintiff did not employ reasonable measures to protect its information and (2) plaintiff failed to prove multiple elements required to state a claim under the DTSA.

### a.    Reasonable Measures

Under the DTSA, information may only be deemed a trade secret if, among other things, "the owner thereof has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). In defendants' view, "[t]he evidence was wholly lacking on how [plaintiff] protected any of the specific information asserted as trade secret." (Def.'s Mot. at 4). They point to the testimony of their expert witness, Joseph Steinberg, who stated that plaintiff's uniform application of its security protocols to all information, trade-secret or otherwise, was unreasonable. Defendants further note that plaintiff had few policies and trainings specifically concerning its trade secrets and that it failed to ask departing employees whether they retained trade-secret information.

The reasonableness of a company's security measures is evaluated on a case-by-case basis, taking into consideration the totality of precautions employed by the company. *See Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 193 (1st Cir. 2023) (listing multiple security measures employed by a plaintiff—including "confidentiality provisions," restricted access to confidential

6

Appx65

information, and revoked access to company materials upon an employee's termination—that together satisfied the DTSA's reasonable-measures requirement).  Importantly, "the standard is reasonableness, not perfection."  *Id.* (citing *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30 (D. Mass. 2004)).  Thus, just because a plaintiff "could have done more to protect [its] information" does not render the measures that it did implement unreasonable as a matter of law.  *Id.*

Here, plaintiff elicited substantial evidence showing that it took reasonable measures to protect its information.  Specifically, plaintiff's expert witness, Dr. Gregory Rattray, testified that plaintiff met industry-standard security practices through its promulgation of internal-security policies, its requirement that employees execute non-disclosure agreements, and its restriction of access to trade-secret materials.  Other witnesses further elaborated on the specific steps that plaintiff implemented to keep its information confidential, including a number of physical and digital security measures.

It may be true, as defendants claim, that plaintiff could have taken a more rigorous approach to protecting its information—for example, by limiting employees' use of personal devices for work-related matters.  But the DTSA does not require perfection, nor does it require a company to take any particular step to protect its information.  The law only requires that an owner take "reasonable measures."  18 U.S.C. § 1839(3)(A).  And based on the evidentiary record, plaintiff's measures were not unreasonable as a matter of law.  The conflict in opinions offered by the expert witnesses as to the sufficiency of plaintiff's security measures was for the jury to resolve.  It is the jury's proper role to "consider the credibility of witnesses, resolve conflicts in testimony, [and] evaluate the weight of the evidence."  *Barkan*, 627 F.3d at 39.

Appx66

Here, the jury permissibly resolved the conflict in favor of plaintiff.  Because the record contains ample evidence supporting the jury's finding, the motion for judgment as a matter of law as to the reasonableness of plaintiff's security measures will be denied.

### b.      Trade-Secret Misappropriation

The jury found that defendants had misappropriated four trade secrets:  (1) the design history file for the Omnipod Eros ("DHF"); (2) the computer-aided design files for the Omnipod ("CAD files"); (3) the occlusion-detection algorithm for the Omnipod ("ODA"); and (4) the Omnipod soft cannula.  Defendants contend that plaintiff failed to prove its misappropriation claim as to each of those four trade secrets.[2]

### i.      The Design History File

Defendants first contend that the evidence did not support the jury's finding that the DHF was a protectable and misappropriated trade secret.  They start by asserting that plaintiff failed to define the DHF with "reasonable precision."  (Def.'s Mot. at 6).  In defendants' view, plaintiff failed to reasonably define the information comprising the DHF trade secret, thereby failing to meet its burden under the DTSA.

As the Court discussed in its summary-judgment order, a plaintiff asserting a DTSA claim must "adequate[ly]" describe the asserted trade secrets "with clarity that can be understood by a lay person."  *Neural Magic, Inc. v. Meta Platforms*, Inc., 659 F. Supp. 3d 138, 166-67 (D. Mass. 2023) (quoting *Sutra, Inc. v. Iceland Exp., ehf*, 2008 WL 2705580, at *4 (D. Mass. July

---

[2] Defendants also raise an objection under the DTSA's extraterritoriality provision, asserting that plaintiff failed to demonstrate that defendants "act[ed] in furtherance" of a trade-secret misappropriation committed in the United States (as opposed to South Korea), as required under the DTSA.  18 U.S.C. § 1837.  However, defendants failed to raise that argument in their Rule 50(a) motion for judgment as a matter of law, and have therefore waived it.  *See Cornwell*, 830 F.3d at 25 (1st Cir. 2016).  Defendants' motion as to the application of the DTSA's extraterritorial provision will therefore be denied.

Appx67

10, 2008)).  Although "courts have required specificity," *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 456 (D. Mass. 2017), the analysis must be undertaken with "a modicum of common sense" geared towards ensuring the trade secrets are sufficiently defined such that the defendants can effectively prepare a rebuttal and that the jury can understand the claims asserted.  *See Broad-Ocean Techs., LLC v. Lei*, 649 F. Supp. 3d 584, 594 (E.D. Mich. 2023).

Testimony offered by several witnesses support the jury's conclusion that the DHF trade secret was adequately defined.  For example, plaintiff's Vice President of Global Regulatory Affairs, Julie Perkins, described at length the contents and purpose of the DHF and the underlying regulatory scheme dictating its format.  Welsford also explained that the DHF contains the full history of a medical device's design, corroborating the description provided by plaintiff's engineer, Jason O'Connor.  Multiple other witnesses offered similar testimony as to the scope, components, and function of the DHF, supporting the jury's finding that the DHF was adequately defined for the purposes of bringing a DTSA claim.

Defendants next contend that "the evidence was insufficient for a reasonable jury to find that any [d]efendant acquired, used, or disclosed the asserted DHF compilation trade secret[.]" (Def.'s Mot. at 8).  As relevant here, under the DTSA, misappropriation means (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) the "disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret."  18 U.S.C. § 1839(5).  And, as the Court instructed, a compilation trade secret, such as the DHF, may be deemed misappropriated under the DTSA if a defendant acquires, discloses, or uses at least a substantial portion of the unique qualities or

9

characteristics of the compilation that qualify it as a trade secret.  *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314 (11th Cir. 2020).

The record contains substantial evidence supporting the jury's finding that the DHF was misappropriated.  Testimony from Paul Hamm revealed that he had improperly accessed component documents of the DHF while working for Nephria Bio.  Email correspondence between Nephria Bio and EOFlow employees further illustrated defendants' efforts to misappropriate the DHF.  DiIanni also testified that Kim directed an EOFlow associate to take the CAD files—which were part of the DHF—from him at a meeting in 2018.  Taken together, the record provided more than sufficient evidence to support the jury's finding that defendants misappropriated a substantial portion of the DHF.

Defendants further contend that no reasonable jury could find that the DHF trade secret derives independent economic value from not being generally known or readily ascertainable. (Def.'s Mot. at 9).  Under the DTSA, to qualify as a trade secret, information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B).

Multiple witnesses at trial testified that the DHF is a critical component of developing a medical product and contains valuable confidential information about the product's design and development that could not be independently derived.  That testimony was corroborated by evidence that Medtronic, EOFlow's prospective acquirer, wanted to acquire information concerning the DHF for the EOPatch 2, further underscoring the DHF's economic value.  The jury, therefore, reasonably concluded that the DHF qualified as a trade secret.

Appx69

The motion for judgment as a matter of law will therefore be denied as to the jury's finding that the DHF was a protectable and misappropriated trade secret.

### ii.      The Computer-Aided Design Files

Defendants next contend that the jury erred in finding that the CAD files were a protectable and misappropriated trade secret.  They first assert that plaintiff failed to sufficiently identify the scope of the CAD files.  (Def.'s Mot. at 10).  Specifically, they contest the characterization of the CAD files as information that could legally constitute a trade secret in the first place, and they dispute the notion that the exemplary CAD file presented to the jury was the same as that which was misappropriated.

In its summary-judgment order, the Court addressed the question of whether the CAD files could, as a matter of law, constitute a trade secret under the DTSA.  A CAD file is "a digital file format of an object generated using CAD software, containing a blueprint, technical drawing, schematic, or 3D rendering of an object."  Anindita Sengupta, CAD File, Technology Glossary Definitions—G2 (last visited Mar. 12, 2025), https://www.g2.com/glossary/cad-file-definition. Because "[i]t is well settled that detailed manufacturing drawings . . . are *prima facie* trade secrets," the Court found that CAD files could qualify as a trade secret under the DTSA.  *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (quoting *A.H. Emery Co. v. Marcan Products*, 389 F.2d 11 (2d Cir. 1968)).

Defendants assert that the CAD files are not trade secrets because they are readily ascertainable.  (Def.'s Mot. at 11).  They rely primarily on testimony from various witnesses that

Appx70

the information in the files could be reverse engineered because the Omnipod's dimensions—reflected in the CAD file—could readily be measured on the physical device.[3]

There was ample evidence, however, that the CAD files contained information concerning not only thousands of component dimensions, but also component orientations and positionings that are not readily ascertainable by reverse engineering. And, indeed, there was evidence that defendants' experts were not actually able to reverse engineer the Omnipod's nominal dimensions. Again, it is the proper role for the jury to resolve conflicts in the evidence presented. The fact that the jury deemed more persuasive plaintiff's evidence concerning the possibility of reverse engineering is not ground for entering a judgment in defendants' favor.

Defendants next contend that a reasonable jury could not find that any defendant acquired, used, or disclosed the CAD files. (*Id.*). But the record contains clear evidence that DiIanni handed over the Omnipod CAD files to EOFlow at a meeting with Kim and other EOFlow employees in 2018, and that EOFlow employees repeatedly referred to those files to resolve subsequent engineering issues. That evidence unquestionably supports the jury's finding that the CAD files were misappropriated.

Finally, defendants contend that no reasonable jury could conclude that the CAD files derive independent economic value from not being generally known or readily ascertainable. (*Id.*). But multiple witnesses testified otherwise, stating that CAD files contain valuable, non-public information that is critical for large-scale production of the device, which clearly supports the jury's finding. Indeed, if the CAD files were not secret and had no value, EOFlow would not have had any interest in acquiring or using them.

---

[3] Defendants also argue that the misappropriated CAD files differ from those shown to the jury. However, the jury resolved that issue in favor of plaintiff, and that determination is sufficiently supported by the record.

Appx71

Accordingly, the motion for judgment as a matter of law will be denied as to the jury's finding that the CAD files were a protectable and misappropriated trade secret.

### iii.   The Occlusion-Detection Algorithm

Defendants next challenge the jury's finding that the ODA was a protectable and misappropriated trade secret.  First, they contend that the evidence did not "sufficiently identify" the ODA as a trade secret.  (*Id.* at 12).  Specifically, defendants assert that plaintiff failed to state what constitutes the trade secret, whether it be the software code used in the ODA or some other element.

However, testimony by plaintiff's witness, Lane Desborough, explained the elements of the claimed ODA trade secret, including a number of sub-component algorithms that compose the ODA as a whole.  Those elements are also memorialized in various product-design documents that were presented to the jury.  Thus, the evidence supports the jury's determination that the ODA trade secret was sufficiently identified.

Defendants next contend that plaintiff's ODA is readily ascertainable, stating that the concept of occlusion detection is well known.  (*Id.*).  Desborough in fact testified that occlusion detection is a standard feature of all insulin pumps.  But the trade secret alleged by plaintiff and described to the jury specifically concerned plaintiff's ODA—including its multiple component steps and features—not occlusion detection in general.  And Desborough's testimony provided sufficient detail as to how plaintiff's ODA functions and why each component is necessary, insights that a jury could reasonably believe to not be readily ascertainable.

Defendants next contend that the evidence was insufficient for a reasonable jury to find that any defendant acquired, used, or disclosed the ODA trade secret.  (*Id.* at 13).  But plaintiff introduced substantial evidence indicating that DiIanni provided Kim and other EOFlow employees guidance and information drawn from plaintiff's confidential ODA materials, and that

Appx72

EOFlow employees used that information in the process of developing the EOPatch 2. Defendants point out that the evidence does not show that DiIanni ever handed EOFlow's employees the physical forms on which plaintiff's ODA information was stored and described. But that is no defense to a misappropriation claim. A trade secret need not be reduced to a physical document; rather, under the DTSA, a trade secret includes "all forms and types of . . . scientific . . . or engineering *information*." 18 U.S.C. § 1839(3) (emphasis added). Moreover, it may be true that the EOPatch 2's ODA was different from the Omnipod's, but as the Court instructed the jury, use of any substantial portion of a trade secret is sufficient to constitute misappropriation, even when the user makes independent modifications or improvements to the trade secret. *See Benchmark Techs., Inc. v. Tu*, 2023 WL 8371973, at *4 (D. Mass. May 30, 2023). The jury's finding that the ODA was misappropriated is reasonable and supported by the evidence.

Finally, defendants again assert that no reasonable jury could conclude that the ODA trade secret derives independent economic value from not being generally known or readily ascertainable. (Def.'s Mot. at 13). But the record included evidence tending to show that the plaintiff's ODA plays a unique and valuable role in ensuring that the Omnipod works safely for patients, providing a sufficient basis for the jury to conclude that the ODA qualified as a trade secret under the DTSA.

The motion for judgment as a matter of law will therefore be denied as to the jury's finding that the ODA was a protectable and misappropriated trade secret.

### iv.     The Soft Cannula

Defendants next object to the jury's finding that the design and manufacturing process for the soft cannula qualified as a protectable trade secret under the DTSA and that it was misappropriated. They begin by asserting that the evidence presented failed to sufficiently

14

Appx73

identify the alleged trade secret. (*Id.*). However, multiple exhibits introduced at trial—supplemented by testimony from plaintiff's witnesses—detailed the design and manufacturing of the soft cannula that underpinned the asserted trade secret, which is more than sufficient to support the jury's finding.

Defendants next contend once again that the soft-cannula trade secret is readily ascertainable. (*Id.* at 14). Defendants point to testimony by their witness, Boris Leschinsky, that suggested certain dimensions of the soft cannula are measurable and therefore not secret. However, as plaintiff notes, the prototype cannula that Leschinsky prepared for trial to demonstrate that it was capable of being reverse engineered failed in many respects to replicate the functionality of the Omnipod's soft cannula. A jury could reasonably view the disparity in functionality as evidence that the trade secret was not readily ascertainable. Moreover, additional testimony by plaintiff's witnesses contradicted testimony by defendants' witness as to the measurability of the soft cannula's dimensions using only a physical sample. The jury's resolution of that conflict in plaintiff's favor is well-supported by the evidence.

Defendants next assert that no reasonable jury could have found that any defendant acquired, used, or disclosed the soft-cannula trade secret. (*Id.*). Plaintiff introduced evidence that prior to its engagement with DiIanni, EOFlow had very limited experience with designing soft cannulas. Additional evidence revealed that EOFlow employees leaned heavily on DiIanni for guidance on how to engineer a soft cannula for the EOPatch 2, and that the information provided by DiIanni bore unusually specific similarities to the design and dimensions of the Omnipod's soft cannula. Thus, a reasonable jury could infer from the evidence that EOFlow and Kim impermissibly acquired and used plaintiff's soft-cannula design and manufacturing information from DiIanni to build the EOPatch 2.

15

Appx74

Finally, defendants again assert that no reasonable jury could find that the soft-cannula trade secret derives independent economic value from not being generally known or readily ascertainable. (*Id.*). But plaintiff's witness O'Connor testified at length about the importance and value of the soft cannula in the Omnipod's design and success.

The motion for judgment as a matter of law will therefore be denied as to the jury's finding that the soft cannula was a protectable and misappropriated trade secret.

### 3.    Willful and Malicious Misappropriation

Defendants next contend that no reasonable jury could find that EOFlow Co., Ltd., and Kim engaged in "willful and malicious" misappropriation under the DTSA. (*Id.* at 15). Defendants do not contest that the evidence supported a finding that the misappropriation was willful, but instead focus on the sufficiency of evidence showing that EOFlow Co., Ltd., or Kim acted with malicious intent.

Under the DTSA, a plaintiff may be awarded exemplary damages of up to two times the amount of damages awarded for actual loss and unjust enrichment if the misappropriation is found to be willful and malicious. 18 U.S.C. § 1836(a)(3). As the Court instructed the jury, conduct is "willful" if done intentionally, with a purpose or willingness to commit the act or engage in the conduct in question; meanwhile, conduct is "malicious" if done with an intent to cause injury or harm. A defendant's "attempts to conceal its misappropriation support a finding that it was willful and malicious." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 107 (D. Mass. 2024) (internal quotations omitted).

At trial, plaintiff introduced evidence of internal communications between EOFlow employees, including Kim, that reflected both their knowing acquisition of the trade secrets and their intentional concealment of the misappropriation. For example, multiple exhibits presented to the jury revealed that Kim stated that EOFlow would struggle to "gracefully" explain the

16

Appx75

similarities in design between the EOPatch 2 and the Omnipod "without making it sound like a piracy." (Tr. Ex. 443.1). Other evidence introduced at trial showed internal EOFlow documents stressing the importance of not revealing information related to the EOPatch 2 to plaintiff's employees. A jury could reasonably infer from that evidence that Kim—and by extension, EOFlow Co., Ltd.—knowingly sought to conceal the misappropriation.

It may be true, as defendants emphasize, that EOFlow did not hire employees directly from plaintiff, and instead only hired those who had been separated from plaintiff for several years. And perhaps EOFlow did not initially hire those employees for the purpose of acquiring plaintiff's trade secrets. But those assertions do not compel a jury finding in favor of defendants. Rather, the jury could evaluate the evidence presented by both parties and reasonably conclude that defendants' actions rose to the level of willful and malicious misappropriation based on the substantial evidence of theft and subsequent concealment.

Defendants also contend that the jury's determination that only Kim, Welsford, and EOFlow Co., Ltd., acted willfully and maliciously among the defendants is illogical.[4] But the evidence presented, particularly the email correspondences involving Kim, readily allows a rational jury to understand Kim's behavior (which may be attributable to EOFlow Co., Ltd.) to be more egregious than the behavior of the other defendants.

Ultimately, the jury's determination that Kim and EOFlow Co., Ltd., acted willfully and maliciously was well supported by the record evidence. Thus, defendants' motion for judgment as a matter of law will be denied as to that issue.[5]

---

[4] Again, the Court need not address the jury's finding with respect to Welsford because he is subject to the Court's Rule 54(b) final judgment and a separate permanent injunction order, entered pursuant to a separately negotiated agreement between plaintiff and Welsford, Malave, and DiIanni. (ECF Nos. 924-25).

[5] Defendants move in the alternative for a new trial based on the jury's determination that Kim and EOFlow Co., Ltd., acted willfully and maliciously. For the same reasons supporting the denial of the Rule 50(b) motion, the motion for a new trial will be denied as to that issue.

17

####     4.      Damages Award

Defendants next contend that the award of monetary damages was not supported by the evidence.  Under the DTSA, damages may be awarded for "actual loss caused by the misappropriation of the trade secret . . . and . . . for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss." 18 U.S.C. § 1836(a)(3)(B).  Plaintiff did not present evidence concerning any actual out-of-pocket loss from the misappropriation.  Instead, it presented two theories of unjust-enrichment damages at trial.  The first theory estimated the "head start" that defendants obtained by acquiring plaintiff's trade secrets and building the EOPatch 2 with that information in hand.  The second theory estimated the market value of the trade secrets.

Defendants take issue with plaintiff's theories and the jury's damages award, contending that (1) plaintiff's damages theories were based on speculation and unreliable estimates and (2) joint-and-several liability between Kim and EOFlow is inconsistent with the evidence presented at trial.[6]

####     a.      Speculative and Unreliable Damages Estimates

According to defendants, plaintiff's theories of damages were speculative and unreliable because they were based on estimates by Ian McLaughlin concerning the effort that plaintiff's engineers devoted to developing each trade secret.  In defendants' view, McLaughlin's estimates were "heavily dependent on his memory" and therefore not reliable.  (Def.'s Mot. at 18).

---

[6] Defendants also raise objections to the award of damages based on two other legal theories:  (1) plaintiff failed to account for and exclude costs unrelated to the trade secret, and (2) plaintiff failed to account for defendants' limited use of the trade secrets.  (Def.'s Mot. at 20-22).  However, defendants did not raise either of those two arguments in their Rule 50(a) motion, and they are therefore waived.  *See Cornwell*, 830 F.3d at 25 (stating that a Rule 50(b) movant "cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its [Rule 50(a) motion]").

Appx77

A calculation of "damages must be shown with reasonable certainty, though mathematical precision is not required." *Diomed, Inc. v. Vascular Sols., Inc.*, 2006 WL 516756, at *1 (D. Mass. Mar. 2, 2006). And "in business tort cases, where the focus is on the wrongfulness of the defendant's conduct, the award of damages is permissible on meager evidence." *Id.* (internal quotations omitted).

The damages evidence introduced by plaintiff in this case was sufficient to support the award. At trial, McLaughlin testified that he determined his estimates after consulting with other engineers with whom he had worked to develop the Omnipod while employed by plaintiff over the prior two decades. He also testified about his extensive experience developing the Omnipod, allowing a jury to reasonably believe that he could reliably recall the amount of effort expended to create and refine each of the trade secrets. Defendants cross-examined McLaughlin at length, but nothing arose from that examination that would require a finding that McLaughlin's estimates were obviously unreliable. DiIanni himself did not dispute McLaughlin's estimates during his testimony, even though he helped develop the Omnipod while working for plaintiff as an engineer during the relevant time period. The jury ultimately found McLaughlin's testimony credible, and this Court is not free to reject that assessment at the Rule 50(b) stage. *See Barkan*, 627 F.3d at 39.

Defendants further contend that the award of damages for the misappropriation of the DHF was particularly unreasonable because McLaughlin failed to "provide an estimate of the efforts that went into developing [the DHF]," and that, in any event, the award was overinclusive because it did not account for plaintiff's removal of two elements of the asserted DHF trade secret. (Def.'s Mot. at 19-20). But McLaughlin, along with multiple other witnesses, testified that the DHF was a compilation of information and contained the entire set of design work that

19

went into developing the Omnipod.  And at no point during McLaughlin's testimony did he suggest that his work estimates would have materially changed as a result of removing two DHF sub-components from the asserted trade-secrets list.

Plaintiff was not required to present more detailed evidence, as the evidence presented satisfied its burden to establish its damages.  And again, defendants had ample opportunity to cross-examine McLaughlin and others about the specifications of the DHF's value.  The jury's determination of the DHF damages award was thus supported by the evidence.[7]

### b.     Joint-and-Several Liability

Defendants next ask the Court to rule as a matter of law that Kim should not be found jointly and severally liable with EOFlow.  (Def.'s Mot. at 22).  Defendants assert that plaintiff is judicially estopped from seeking joint-and-several liability after it had asked the jury to only award damages of $1 per trade secret for the non-EOFlow defendants.  Defendants further contend that plaintiff did not establish a sufficient basis to support a finding of joint-and-several liability between EOFlow and Kim.

The Court ruled at the close of evidence that as a matter of law, Kim and EOFlow can be held jointly and severally liable.  That is because in a trade-secret misappropriation case where damages are based on unjust enrichment, traditional equitable principles suggest that joint-and-several liability is proper when the defendants act as "partners engaged in concerted wrongdoing," evidenced by their shared enjoyment of the fruits of the misappropriation.  *See*

---

[7] For the reasons stated in the Court's memorandum and order concerning plaintiff's motion for a permanent injunction, the damages award will be reduced to $59.4 million to avoid conferring on plaintiff an impermissible double recovery.  That order does not call into question the evidentiary basis supporting the jury's damages award.  Rather, plaintiff has elected to forgo a substantial portion of the damages award in favor of a permanent injunction that, among other things, enjoins defendants from using, possessing, selling, or otherwise distributing plaintiff's trade secrets anywhere in the world.  *See Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991) (stating that "[g]enerally, an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment").

Appx79

*BioPoint*, 110 F.4th at 352. As EOFlow's Chief Executive Officer and one of its largest shareholders, Kim stood to earn a substantial profit—approximately $100 million in personal gain from the agreed-upon sale to Medtronic, according to the evidence—from the company's misappropriation. Kim may therefore be held jointly and severally liable for the damages award.

Moreover, judicial estoppel does not bar the application of joint-and-several liability. "[A]t a minimum, two conditions must be satisfied before judicial estoppel can attach. First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (citations omitted). Here, plaintiff never asserted that Kim and EOFlow should *not* be held jointly and severally liable. Indeed, it sought joint-and-several liability for all defendants, which the Court only granted as to Kim and EOFlow. Plaintiff's request that the jury only award $1-worth of damages for Kim's misappropriation is not a concession or disclaimer of its consistent position that defendants be held jointly and severally liable. Judicial estoppel is therefore not applicable.

Thus, the motion for judgment as a matter of law will be denied as to the application of joint-and-several liability to Kim and EOFlow.

### B.      Motion for a New Trial

Defendants move for a new trial on multiple grounds. Defendants first repeat the arguments made in their Rule 50(b) motion to contend that the verdict and damages award were unsupported by the weight of the evidence. (Def.'s Mot. at 23). However, nothing in defendants' Rule 50(b) motion raised a concern that the jury's verdict and damages award were, in fact, against the weight of the credible evidence, let alone amounted to a "miscarriage of justice." *Foley*, 972 F.3d at 16 (internal quotations omitted). Thus, for the reasons supporting a

Appx80

denial of defendants' Rule 50(b) motion, defendants' motion for a new trial on the basis of the weight of the evidence will be denied.

Defendants next assert that a new trial is warranted because the final jury instructions, verdict form, and adverse-inference instruction were flawed. (Def.'s Mot. at 24). Aside from stating that their objections are already reflected in the record, defendants do not articulate the legal error or prejudice that they believe the jury instructions and verdict form presented. And as for the adverse-inference instruction, after a thorough examination of the relevant facts, the Court found that Welsford intentionally destroyed evidence after a duty arose to preserve files for litigation. That finding properly supported an adverse-inference instruction under Fed. R. Civ. P. 37(e). To avoid potentially confusing the jury, the Court decided against referring to a separate instance of file deletion by Hamm, another Nephria Bio employee, in that adverse-inference instruction. Nothing about the final jury instructions, verdict form, and adverse-inference instruction rise to the level of an injustice that would warrant granting a new trial.

Defendants next contend that the Court's explanations and instructions during the course of trial improperly "amounted to clues to the jury" that unfairly prejudiced defendants. (Def.'s Mot. at 24). But the Court's instructions during trial were not only permissible, but were important "to acquaint the jury with the governing law." *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 47 (1st Cir. 2015). The mid-trial explanations served to clarify the applicable law and ensure that the jury could reasonably understand the case as it developed. None of the statements that defendants expressly object to in their motion are inherently unfair to defendants; rather, they merely explain the relevant aspects of trade-secret-misappropriation law.

Furthermore, defendants did not contemporaneously object to essentially any of the Court's explanations to the jury during trial. That failure alone renders defendants' argument

22

Appx81

waived. *See Matton v. White Mountain Cable Const. Corp.*, 190 F.R.D. 21, 23 (D. Mass. 1999) (stating that "where a party seeks a new trial based on allegations of judicial misconduct, [a]n objection to the alleged misconduct is ordinarily required, either at the time of the misconduct or at the next available opportunity outside the jury's presence").

Finally, defendants assert that the Court made "numerous one-sided, unfair, and prejudicial interjections that . . . stacked the deck against [d]efendants." (Def.'s Mot. at 25). Defendants mischaracterize the Court's statements at trial. In light of the highly complex and technical concepts involved in the case, the Court intermittently posed brief, clarifying questions to the witnesses to facilitate better jury comprehension. The Court clearly acted within its authority in doing so. *See* Fed. R. Civ. P. 614(b). But beyond that, the Court's questions were especially appropriate in this context given the complicated subject matter. There was no risk of prejudice to defendants, as the questions were balanced and directed only at clarifying technical witness testimony. *See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003).

Moreover, at trial, defense counsel at times advanced improper questions and remarks. In response, the Court directed counsel to stay within the permissible bounds of examination. It is well within the Court's authority to ensure proper, efficient, and fair proceedings, including by requiring defense counsel to adhere to applicable evidentiary and procedural rules. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994). And, again, defendants did not object to the Court's statements during trial, rendering their argument waived. *See Matton*, 190 F.R.D. at 23. A new trial will therefore not be granted.

**III.   Conclusion**

For the foregoing reasons, defendants' renewed motion for judgment as a matter of law and motion for a new trial are DENIED.

23

Appx82

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  April 24, 2025

Appx83

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

INSULET CORPORATION,

         Plaintiff,

         v.

EOFLOW CO., LTD.; EOFLOW, INC.;
NEPHRIA BIO, INC.; and JESSE KIM,

         Defendants.
_____

Civil Action No.
23-11780-FDS

MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION FOR A PERMANENT INJUNCTION AND
DEFENDANTS' MOTION FOR A STAY OF JUDGMENT

**SAYLOR, C.J.**

This dispute concerns the misappropriation of trade secrets for the design and manufacture of an insulin patch pump, the Omnipod, produced by plaintiff Insulet Corporation. Plaintiff sued seven defendants:  EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow"); Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet employees, Luis Malave, Steven DiIanni, and Ian Welsford.

After a month-long trial, a jury returned a verdict on December 3, 2024, finding six defendants—all except Malave—liable for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").  The jury awarded plaintiff $452 million, composed of $170 million in unjust-enrichment damages and $282 million in exemplary damages.

Appx84

Plaintiff has now moved for a permanent injunction seeking, among other things, to prohibit defendants from using, possessing, selling, or otherwise distributing plaintiff's trade secrets.[1]  Plaintiff also seeks to preserve its $452 million damages award.

Defendants oppose the motion on two principal grounds.[2]  First, they contend that the requested injunction would constitute an impermissible double recovery.  Second, they assert that the scope of the proposed injunction is unduly broad.  Defendants separately seek a stay of any injunction and damages award pending appeal.

For the following reasons, the motion for a permanent injunction will be granted in part and denied in part.  In addition, the Court will enter a partial stay of its final judgment, as set forth below.

I.    **Analysis**

A.    **Permanent Injunction**

Plaintiff seeks entry of a permanent injunction that would, among other things, prohibit defendants from using, possessing, selling, or otherwise distributing its trade secrets—and any product, including the EOPatch 2, that uses those trade secrets—anywhere in the world.  (*See* ECF No. 931-1).  Plaintiff also seeks a reassignment of certain patents belonging to defendants that incorporate elements of its trade secrets; disgorgement of a break-up fee due to defendants from Medtronic PLC; and the granting of auditing rights to ensure defendants' ongoing compliance with the requested injunction order.

---

[1] On February 25, 2025, pursuant to a separately negotiated Consent Permanent Injunction and Judgment agreement between plaintiff and Malave, DiIanni, and Welsford, the Court entered a final judgment under Fed. R. Civ. P. 54(b) and issued a permanent injunction in accordance with the terms of the parties' agreement.  (ECF Nos. 924-25).

[2] For the sake of convenience, the term "defendants" will hereafter refer only to EOFlow, Nephria Bio, and Kim unless the context indicates otherwise.

Appx85

1.    **<u>Legal Framework</u>**

The DTSA authorizes courts to grant injunctive relief for trade-secret misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A).  "A plaintiff seeking a permanent injunction is traditionally required to satisfy a four-factor test:  '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  *Greene v. Ablon*, 794 F.3d 133, 156 (1st Cir. 2015) (quoting *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008)).  The First Circuit has stated that "[t]he first two factors together require 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'"  *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 123 (D. Mass. 2024) (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013)).  Thus, "[a]n injunction should not be granted where 'a less drastic remedy' will suffice."  *Greene*, 794 F.3d at 156 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010)).

Starting with the first factor, in general, "[t]he loss of a trade secret . . . constitute[s] irreparable harm."  *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004).  Here, it is clear that plaintiff would face irreparable harm if defendants were permitted to make unfettered use of its trade secrets.  In the absence of an injunction, defendants could freely sell or distribute products incorporating plaintiff's trade secrets, entirely undermining the value of its proprietary information.  Such a prospect is not, as defendants suggest, theoretical.  Indeed, EOFlow already attempted to profit from the stolen trade secrets when it agreed to terms of a sale with one of plaintiff's largest competitors, Medtronic, before

3

Appx86

this lawsuit began.  Without an injunction, defendants could once again profit from the sale of the trade secrets—secrets that plaintiff spent several years and millions of dollars to develop— enabling others to avoid significant upfront costs and compete with plaintiff.

Moreover, although the EOPatch 2 is available only in a select few markets, its continued sale and distribution constitute a genuine threat to plaintiff's ability to expand its market, its pricing power, and its reputation.  And defendants' "brazen actions over a substantial period of time," as recognized by the jury's finding that EOFlow and Kim willfully and maliciously misappropriated certain trade secrets, only heightens the risk of future harm.  *See KPM Analytics*, 729 F. Supp. 3d at 123; *see also Benchmark Techs., Inc. v. Tu*, 2023 WL 8371973, at *3 (D. Mass. May 30, 2023).  Plaintiff has therefore met its burden on the first factor.

As to the second factor, money damages are not adequate to remedy the prospective injury.  At the very least, "the questionable financial condition of [the defendant] reinforces the inadequacy of a remedy at law."  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).  Indeed, "[a] district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the [defendant] before the alternative of money damages can be deemed adequate."  *Id.*  Here, the trial record established that defendants have at most approximately $24 million in net assets, making it highly unlikely that defendants have the financial wherewithal to satisfy the jury award, or even to come close to doing so.

As to the third factor, defendants contend that the balance of equities weighs in their favor because an injunction would force EOFlow to shut down.  But a defendant "cannot escape an injunction simply because . . . its primary product is an infringing one."  *Id.* at 1156.  And nothing prohibits defendants from developing another product through legal means, without the benefit of misappropriated trade secrets.  Meanwhile, requiring plaintiff to compete with a

4

Appx87

product built upon its own stolen property imposes a substantial burden that far outweighs the equities, if any, in plaintiff's favor.

Finally, the public interest in providing robust protection of trade secrets strongly weighs in favor of an injunction. The public interest favors investment and innovation in new technologies, while also deterring willful misappropriation of intellectual property. And any potential short-term hardship faced by current EOPatch 2 users does not alter the appropriateness of a permanent injunction, but could rather be accommodated through other equitable means, including a temporary carve-out of the injunction for those users in order to permit an orderly transition to other means of care.

Plaintiff has therefore satisfied the four-part test supporting its motion for a permanent injunction.

### 2.    <u>Scope of Injunction</u>

The scope of the requested injunction is also reasonable and warranted under the circumstances. "Injunctions must be tailored to the specific harm to be prevented." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000). The jury found that defendants misappropriated four trade secrets belonging to plaintiff, and that EOFlow and Kim did so willfully and maliciously. As noted, multiple future harms will likely flow from defendants' violation, including the further distribution of the trade secrets and the development and sale of competing devices that make use of those trade secrets.

Defendants contest a number of aspects of the injunction. First, they oppose its worldwide application, as they would be prohibited from possessing, using, selling, distributing, or providing services using plaintiff's trade secrets anywhere in the world.

Appx88

The text of the DTSA plainly permits a worldwide injunction, as long as (1) the offender is a citizen or permanent resident of the United States, or an organization organized under the laws of the United States, or (2) an act in furtherance of the offense was committed in the United States. 18 U.S.C. § 1837. Here, Kim is a United States citizen, and EOFlow, Inc., and Nephria Bio are organized in the United States. Moreover, multiple acts occurred in the United States that furthered the misappropriation of plaintiff's trade secrets, thereby extending the DTSA's reach to—and the court's authority to issue an injunction against—EOFlow Co., Ltd., a Korean company.[3]

A worldwide injunction is particularly appropriate in the context of trade-secret misappropriation to prevent further dissemination of confidential information to foreign competitors. *See Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1377 (11th Cir. 1982) (stating that "confidential information is worthy of protection without geographic limitation because once divulged the information or the fruits of the information quickly can pass to competitors anywhere in the world"); *see also Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (finding a worldwide injunction appropriate in certain cases of trade-secret misappropriation and always appropriate in impacted foreign markets). Defendants have already attempted to sell the trade secrets and could readily attempt to do so again to a foreign competitor. Thus, a worldwide injunction is certainly justified under the circumstances.

Defendants next contend that the injunction should be limited in time. They assert that a duration of only three and a half years is sufficient because that accounts for the "head start" they received from misappropriating plaintiff's trade secrets.

---

[3] Defendants did not contest the application of the DTSA's extraterritoriality provision at trial.

6

It may be true that courts often limit the duration of an injunction to a "period of time that would be required for independent development," including reverse engineering.  4 Roger M. Milgrim, *Milgrim on Trade Secrets* § 15.02[l][d].  However, there is limited evidence that plaintiff's trade secrets can actually be reverse engineered, let alone within a three-and-a-half-year period.[4]  There was evidence that legitimate competitors of Insulet have been unable to develop a competing product, despite investing millions of dollars attempting to do so.  The fact that plaintiff's damages expert, Justin McLean, assumed a four-year head start for the purposes of estimating defendants' unjust enrichment does not refute the fact that no other market participant has successfully developed a competing product to the Omnipod to date.  Indeed, McLean did not testify that defendants would have, in fact, developed plaintiff's trade secrets in four years.  Rather, he testified as to the time that defendants saved from their misappropriation. *See Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013).  Thus, without any evidence that plaintiff's trade secrets could actually be independently developed in a specified amount of time, a permanent injunction is appropriate. *See Milgrim on Trade Secrets* § 15.02[l][e] (stating that "courts do not always adhere to a rigidly-conceptualistic test based upon [independent-]development time but instead seek to do equity and will enter an arbitrary-term injunction if needed to accomplish the equitable result").

Defendants next contend that the proposed reassignment of patent application US 2023/0248902A1, along with any other submitted patent applications that disclose the same invention, is unwarranted.  However, "[t]he victim of trade secret misappropriation may be entitled to ownership of any patents obtained by the wrongdoer on the misappropriated trade

---

[4] Plaintiff's expert, Boris Leschinsky, claimed at trial that he was able to reverse engineer the Omnipod, but in fact his testimony demonstrated he was unable to do so successfully.  (*See* 13 Tr. 149:13-150:13; 152:22-153:5; 154:8-155:2; 155:19-156:10; 156:20-161:17).

7

Appx90

secret." *Whiteside Biomechanics, Inc. v. Sofamor Danek Grp., Inc.*, 88 F. Supp. 2d 1009, 1018 (E.D. Mo. 2000), *aff'd sub nom. Whiteside Biomechanics, Inc. v. Danek Med., Inc.*, 13 F. App'x 950 (Fed. Cir. 2001). Plaintiff's expert, Lane Desborough, testified that the patent application at issue describes proprietary aspects of plaintiff's occlusion-detection-algorithm ("ODA") trade secret—a trade secret that the jury found to have been misappropriated by defendants. Equitable reassignment of defendants' patent applications derived from the trade secrets is appropriate to prevent continued use of those trade secrets. *See Ethicon Endo-Surgery, Inc. v. Crescendo Techs., LLC*, 2009 WL 2707805, at *8 (S.D. Ohio Aug. 24, 2009) (stating that "[e]quitable reassignment is appropriate for intellectual property that is misappropriated in a patent application" to ensure that "the wrongdoer is not improperly rewarded for its misappropriation").

Defendants next assert that the requested disgorgement of the anticipated $10 million break-up fee arising out of the terminated Medtronic acquisition is impermissibly duplicative of the jury award. Plaintiff, however, acknowledges that its damages award must be reduced by any amount received from the break-up fee. The disgorgement of the break-up fee serves as a partial payment of defendants' financial obligation, not as a duplicative windfall to plaintiff. Thus, there is no risk of duplicative awards from such a disgorgement.

Defendants finally contend that the auditing provisions of the proposed injunction are overly burdensome and invasive. But the requested auditing rights—which would permit plaintiff to conduct audits up to two times per year per defendant—are justified by the jury's finding that EOFlow and Kim engaged in willful and malicious misappropriation, and help mitigate the threat of future misappropriation.

The Court will therefore enter a permanent injunction, which will be set forth in a separate order. However, as set forth below, that injunction will be crafted to permit sales to

current users of the EOPatch 2 for a limited period of time. Such an injunction will permit current users to transition to other means of medical care, and will also effectively preserve the status quo pending appeal.

### 3. Double Recovery

Defendants next assert that a permanent injunction, combined with the jury's award of monetary damages, constitutes an impermissible double recovery for plaintiff. "[I]t is well settled that, '[t]he law abhors duplicative recoveries; thus[,] double awards for the same injury are impermissible.'" *Americus Mortg. Corp. v. Est. of Belli*, 2014 WL 1338294, at *7 (D. Mass. Mar. 31, 2014) (quoting *Boqan v. City of Boston*, 489 F.3d 417, 425 (1st Cir. 2007)). Under certain circumstances, an award of damages coupled with an injunction may constitute an improper double recovery for a plaintiff. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 811 (2d Cir. 2023) (rescinding the award of monetary damages in part because the district court entered a permanent injunction prohibiting the defendant's use of the misappropriated trade secrets). Thus, although the DTSA permits a court to both "grant an injunction to prevent any actual or threatened misappropriation" and "award damages for any unjust enrichment caused by the misappropriation," 18 U.S.C. § 1836(b)(3), the damages award may not apply to "a period of use that overlap[s] with the period covered by the injunction," *PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 163 (3d Cir. 2022).

Again, the jury awarded plaintiff $452 million in total damages, consisting of $170 million in unjust enrichment and $282 million in exemplary damages based on the jury's finding that defendants misappropriated four trade secrets, three of which were misappropriated willfully and maliciously.

9

Appx92

Plaintiff's damages expert presented two theories of unjust-enrichment damages to the jury. The first, the "head-start" theory, focused on the benefit of an accelerated development process that defendants gained as a result of the misappropriation. The second, the "market-value" theory, represented the value of the trade secrets to a prospective buyer, based in part on the agreed-upon sale of EOFlow to Medtronic. Both theories involved analyses of prospective, hypothetical sales of defendants' products and their potential future value. McLean did not present any estimate of plaintiff's "actual loss," whether suffered through lost sales, market share decline, or another metric. *See* 18 U.S.C. § 1836(b)(3)(B). Instead, McLean and plaintiff focused entirely on the benefits that accrued—or would in the future accrue—to defendants as a result of the misappropriation.

The jury's unjust-enrichment damages-award calculation was thus based in substantial part on defendants' future, unrealized gains. It therefore overlaps to a significant degree with the requested injunction, which, by its nature, is designed to prevent future harm. And both granting the requested injunction and upholding the entire jury award would, in substantial part, constitute an impermissible double recovery.

A district court may, however, fashion an award to avoid duplicative recovery. *See Villarini-Garcia v. Hosp. del Maestro*, 112 F.3d 5, 8 (1st Cir. 1997) (directing a district court to modify, but not entirely annul, the damages award to avoid partial duplication); *see also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (stating that it "goes without saying that the courts can and should preclude double recovery" (internal quotations omitted)).

For the reasons set forth below, the Court concludes that at least a portion of the avoided-cost and exemplary-damages award is not duplicative, and it may therefore issue an injunction together with a reduced damages award. Whether it has the authority to do so, however, does not

10

answer the question of whether it should in fact do so.  That is a matter for plaintiff to decide, as it is an issue of election of remedies.  The time to make such an election is "after a verdict is entered but prior to entry of judgment."  *Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991).  Plaintiff has made that election; in its supplemental post-trial memorandum, it stated that it "chooses to elect for a permanent injunction together with the avoided-cost and exemplary damages that are not duplicative of the injunction."  (ECF No. 934 at 2).

The Court will turn, then, to the questions of whether and to what extent any portion of the avoided-cost and exemplary-damages award is not duplicative of the remedy of injunctive relief.

### a.    Avoided Costs

Plaintiff contends that defendants have already reaped certain benefits from their misappropriation—such as avoiding significant research, development, and regulatory costs as a result of the misappropriation—that are a portion of the jury's award.  Because those benefits are backward-looking, plaintiff contends that they do not overlap with the forward-looking injunction.

Injunctions prohibiting the future use of misappropriated trade secrets may permissibly coexist with unjust-enrichment damages based on previously avoided costs.  *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1133 (7th Cir. 2020) (upholding the jury's unjust-enrichment award, which was calculated as defendant's "avoided research and development costs," even though the district court entered an injunction prohibiting the future use, possession, and retention of plaintiff's trade secrets); *PPG*, 47 F.4th at 163-64 (upholding a damages award "for the development costs [the defendant] avoided" along with a "forward-looking permanent injunction" prohibiting future use of the plaintiff's trade secrets); *see also*

11

*Syntel*, 68 F.4th 811 (indicating that, under certain circumstances, an injunction may coexist with avoided-costs damages).

Defendants cite *Syntel* in support of their assertion that an injunction and an avoided-costs award may only be issued together when the misappropriation "diminish[es]" or "destroy[s]" the value of the trade secrets. *See* 68 F.4th at 812. Because plaintiff here did not put forth a theory of damages based on the harm that it suffered from the misappropriation, defendants assert that an avoided-costs award is inappropriate.

The court in *Syntel* identified a number of factors that bear on whether an avoided-costs award is proper in conjunction with an injunction. Those factors include (1) "the extent to which the defendant has used the secret in developing its own competing product," (2) "the extent to which the defendant's misappropriation has destroyed the secret's value for its original owner," and (3) "the extent to which the defendant can be stopped from profiting further from its misappropriation into the future." *Id.* Notably, the misappropriation at issue in *Syntel* did not implicate any of those three factors, which the court considered "unusual[]." *Id.*

Unlike in *Syntel*, defendants here used plaintiff's trade secrets to develop their own competing product. *See id.* Moreover, the jury found that EOFlow and Kim acted willfully and maliciously, raising concerns that they may again in the future engage in illicit misappropriation. Although plaintiff's damages theory did not rely on the harm that it suffered, the record nonetheless supports the conclusion that defendants' misconduct created a threat to the value of plaintiff's trade secrets—specifically, in their signed sale agreement with Medtronic that nearly disclosed the trade secrets to one of plaintiff's biggest competitors. Thus, the reasoning of *Syntel* does not require that an avoided-costs award be vacated if an injunction is to be entered.

Appx95

### b.    Avoided-Costs Damages Calculation

Plaintiff has submitted a supplemental report by Justin McLean, its damages expert, to support its assertion that the avoided costs associated with the four misappropriated trade secrets total $52.8 million.[5]

Starting with the compiuter-aided design ("CAD") files, soft cannula, and ODA trade secrets, there is no genuine disagreement that the jury adopted McLean's market-value theory to arrive at its damages award of $83 million as to those three trade secrets.  In presenting his market-value damages estimates to the jury, McLean explained that the estimated research and development costs were "roughly" $15 million for the CAD files, $9 million for the soft cannula, and $2.2 million for the ODA.  (12 Tr. 90:2-5).  He went on to testify that he incorporated plaintiff's research-and-development costs into his calculation of the market value of each trade secret.  The market-value damages calculations presented to the jury therefore were a function of his avoided-costs estimates, which totaled approximately $26.2 million for those three trade secrets.

As for the design-history-file ("DHF") trade secret, McLean testified that its market value was approximately $232 million, with corresponding avoided costs of approximately $72

---

[5] Defendants oppose plaintiff's submission of McLean's supplemental report on the ground that it is untimely under Fed. R. Civ. P. 26(a)(2) and 37(c)(1).  They assert that the report consists of new theories and opinions that should have been disclosed long before the trial.  *See Massachusetts Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (stating that if a "declaration submitted after the close of expert discovery differs substantially from the [initial] report, offers a whole new theory, opinion, or methodology, or is outside of the scope or general scheme of the report, then it is an improper supplementation").  The Court shares defendants' misgivings about the permissibility of McLean's supplemental report, and will not consider it to the extent it presents new theories and analyses not previously disclosed.  However, to the extent that it simply restates or summarizes McLean's trial testimony, it appears to be harmless.  *See* Fed. R. Civ. P. 37(c)(1) (stating that if a party fails to timely disclose expert testimony, then it is precluded from using "that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless*." (emphasis added)).

Appx96

million.  However, by awarding only $170 million for the misappropriation of the DHF, the jury evidently did not credit the market-value theory (or the head-start theory) in its entirety.

Because the verdict form does not indicate which aspects of McLean's theory that the jury rejected, plaintiff proposes reducing McLean's estimated avoided costs of $72 million down to $52.8 million, which reflects the same ratio as that between McLean's estimated DHF market value ($232 million) and the jury's award ($170 million).  However, as defendants note, it is possible that the jury substantially rejected an avoided-costs award as to the DHF.  In any event, there is no obvious way to reconstruct the jury's reasoning, and the Court is therefore disinclined to accept plaintiff's proportionality approach.  Instead, and to ensure that there is no real risk of duplicative recovery, the Court will exclude the DHF-related avoided costs altogether in fashioning its relief.

Thus, the Court will award unjust-enrichment compensatory damages of $25.8 million, which represents the avoided costs associated with the CAD files, soft cannula, and ODA trade secrets.[6]

### 4.      **Exemplary Damages**

Plaintiff seeks to preserve the jury's award of $282 million in exemplary damages. Defendants assert that any reduction in the unjust-enrichment award requires a corresponding reduction in exemplary damages.  Defendants further contend that exemplary damages of any magnitude raise double-recovery concerns and should be barred altogether.

---

[6] McLean estimated that the market value of the CAD files, soft cannula, and ODA trade secrets were $47.8 million, $29.6 million, and $7.2 million, respectively.  The jury apparently reduced those values to the nearest million, ultimately awarding $47.0 million, $29.0 million, and $7.0 million for the misappropriation of those three trade secrets, respectively.  To account for the rounding, plaintiff proposes proportionally reducing the $26.6 million of estimated research-and-development costs for those three trade secrets to $25.8 million.  Because there is no genuine dispute as to the jury's adoption of plaintiff's market-value damages for those three trade secrets, the Court will enter an unjust-enrichment award of $25.8 million, comprised of $14.6 million for the CAD files, $9.0 million for the soft cannula, and $2.2 million for the ODA.

Appx97

To begin, plaintiff's exemplary damages must be reduced to comply with the clear text of the DTSA, which states that "a court may . . . if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the [unjust-enrichment] damages *awarded*."  18 U.S.C. § 1836(a)(3) (emphasis added).  The DTSA therefore explicitly connects the cap on exemplary damages to the total unjust-enrichment award.  There is no "award" until there is a final judgment or decision.  Although an award may be granted by both a court and a jury, its critical feature is that it is a final determination.  Thus, an award of exemplary damages under the DTSA may not exceed two times the unjust-enrichment damages ultimately entered for plaintiff—not the unjust enrichment determined (but not ultimately awarded) by the jury.

Plaintiff cites *Dyer v. William S. Bergman & Assocs., Inc.*, 657 A.2d 1132, 1139 (D.C. 1995), in support of its position that it is entitled to the entirety of the jury's award of $282 million in exemplary damages.  In that case, the D.C. Court of Appeals upheld a trial court's decision to proscribe the entire compensatory-damages award on double-recovery grounds, while nevertheless preserving the punitive-damages award.  *Dyer*, 657 A.2d at 1139.  But the *Dyer* court's reasoning is not persuasive in this context.  First, *Dyer* involved a common-law tortious-interference claim, and was thus not governed by a statutory scheme.  *Id.* at 1134.  Second, the *Dyer* court applied a plain error, not *de novo*, review standard to the trial court's damages award, holding that the lower court's decision "to set aside the award of punitive damages was not 'plainly' or 'obviously' wrong."  *Id.* at 1140.  Finally, the *Dyer* court itself acknowledged that its own case law on "whether compensatory damages are a prerequisite for an award of punitive damages [has] not been a model of consistency."  *Id.* at 1140, n.12.  In short, *Dyer* does not

15

provide persuasive authority to depart from the text of the DTSA, and thus plaintiff's exemplary damages will be limited to two times the amount of its final unjust-enrichment award.

As noted, the jury found that EOFlow and Kim willfully and maliciously misappropriated plaintiff's trade secrets, and therefore awarded $282 million in total exemplary damages, consisting of $94 million related to the misappropriation of the CAD files, $14 million for the ODA, and $174 million for the DHF.[7]  And the Court will enter a final unjust-enrichment award for each trade secret—corresponding to the avoided costs—of $14.6 million for the CAD files, $9.0 million for the soft cannula, and $2.2 million for the ODA.  Thus, in accordance with the exemplary-damages cap of the DTSA, plaintiff's punitive damages will be reduced to $29.2 million for the CAD files and $4.4 million for the ODA, for a total of $33.6 million in exemplary damages.

Defendants nonetheless oppose an award of exemplary damages of any magnitude.  Their principal argument is that an award of exemplary damages constitutes an impermissible double recovery with a permanent injunction because they "deter future misconduct." *Forster v. Boss*, 97 F.3d 1127, 1130 (8th Cir. 1996).  But the *Forster* court actually *upheld* an award of punitive damages alongside an injunction, stating that an "award of punitive damages . . . is not duplicative of the relief contained in the injunction" because "punitive damages are not designed to compensate anybody."  *Id.*  Rather, the primary goal of exemplary damages is to "punish misconduct"—namely, *past* misconduct.  *Id.*  Conversely, injunctions are designed as a remedial tool to prevent specific *future* harms.  *See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009).  When "two damages awards serve different purposes[—]that is, when one is remedial and the other is punitive"—then the awards are unlikely to be duplicative.  *Giguere v.*

---

[7] The jury did not find that the soft-cannula trade secret was willfully and maliciously misappropriated.

Appx99

*Port Res. Inc.*, 927 F.3d 43, 51 (1st Cir. 2019); *see also Burnett v. Ocean Properties, Ltd.*, 422 F. Supp. 3d 400, 430 (D. Me. 2019), *aff'd*, 987 F.3d 57 (1st Cir. 2021) (stating that "[p]unitive damages, unlike compensatory damages, are not aimed at making a plaintiff whole; thus the rule against double recovery is inapplicable when the damages awarded are punitive" (quoting *Medina v. D.C.*, 643 F.3d 323, 329 (D.C. Cir. 2011))).

The exemplary-damages provision under the DTSA—which applies only to willful and malicious misappropriation—is unquestionably punitive in nature, and thus does not pose a double-recovery risk when combined with an injunction.  Plaintiff will therefore be awarded $33.6 million in exemplary damages, resulting in a total damages award of $59.4 million.[8]

### 5.    Prejudgment Interest

Plaintiff seeks prejudgment interest on its avoided-costs award at the Massachusetts rate of 12 percent per year set by Mass. Gen. Laws ch. 231, §§ 6B-6C.  It asserts that defendants realized the benefit of the avoided costs during the development of the EOPatch 2 several years ago, and thus prejudgment interest should be entered to adjust for the time-value of that benefit.

Plaintiff, however, has waived the right to seek prejudgment interest.  It could have requested that the question of prejudgment interest be submitted to the jury.  "But the question of prejudgment interest was not submitted to the jury, nor did plaintiff[] ask that the jury be instructed on it," meaning that any subsequent "award of prejudgment interest [would] be [struck]."  *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 14 (1st Cir. 1990) (quoting *Furtado v. Bishop*, 604 F.2d 80, 98 (1st Cir. 1979)); *see also Giorgio v. Duxbury*, 2016 WL 3983232, at *2

---

[8] $25.8 million avoided-costs award + $33.6 million exemplary-damages award = $59.4 million total damages award.

17

Appx100

(D. Mass. July 25, 2016) (stating that "[p]laintiffs are not entitled to pre[]judgment interest where they did not submit the question of pre[]judgment interest to the jury").

Plaintiff asserts that it did not previously seek prejudgment interest because its two damages theories already accounted for the time-value of money, whereas an award of only avoided costs does not, thus justifying an award of prejudgment interest at this stage.

Regardless, an award of prejudgment interest is not warranted, because "[t]he essential rationale for awarding prejudgment interest is to ensure that an injured party is *fully compensated for its loss*." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195 (1995) (emphasis added). At trial, plaintiff did not assert any actual financial loss stemming from defendants' misappropriation; instead, plaintiff's damages theories focused entirely on defendants' unjust enrichment, including their avoided costs. It is true that those avoided-costs benefits began accruing to defendants in 2018, as they developed the EOPatch 2 using plaintiff's trade secrets. But plaintiff has not articulated any quantifiable loss for which it must be made "whole." *See Richwell Grp., Inc. v. Seneca Logistics Grp., LLC*, 433 F. Supp. 3d 58, 64 (D. Mass. 2019) (citing *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)). Nor did it seek (or receive) any damages for "actual loss" under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(B). Moreover, plaintiff's unjust-enrichment and exemplary-damages awards—combined with the permanent injunction—adequately serve the DTSA's purpose of "deter[ring] misappropriation and provid[ing] recovery for trade[-]secret owners" without the addition of prejudgment interest. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 WL 1553926, at *15 (S.D.N.Y. Apr. 20, 2021), *aff'd in part, vacated in part*, 68 F.4th 792 (denying a request for prejudgment interest on damages awarded under the DTSA). Thus, plaintiff's request for prejudgment interest will be denied.

18

Appx101

### B.    Stay of Relief

Defendants have moved to stay judgments of both monetary and injunctive relief pending appeal.  Courts have employed different tests to evaluate the propriety of a stay as to each type of relief.

### 1.    Monetary Relief

Under Fed. R. Civ. P. 62(d), the "execution of a money judgment is automatically stayed pending appeal upon the posting of a supersedeas bond." *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002).  Local Rule 62.2 sets the bond amount at the final damages-award amount plus 10 percent to cover interest and $500 for costs.  *See CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 2016 WL 8710447, at *1 (D. Mass. Dec. 2, 2016).  However, no bond is required if "(1) the defendant's ability to pay is so plain that the posting of a bond would be a waste of money; or (2) the bond would put the defendant's other creditors in undue jeopardy." *Acevedo-Garcia*, 296 F.3d at 17.  If the bond requirement is waived, courts typically require some other form of security instead.  *See, e.g.*, *Bowers v. Baystate Techs., Inc.*, 2001 WL 640876, at *1 (D. Mass. June 5, 2001) (requiring a defendant to pledge a larger percentage of stock to a plaintiff as an alternative security when the defendant was unable to obtain a bond for the full judgment amount).  Ultimately, the "nature and the amount of the bond is entrusted to the discretion of the trial court." *Acevedo-Garcia*, 296 F.3d at 17.

Here, given the damages award of $59.4 million, defendants must post a bond in compliance with Local Rule 62.2 in order to obtain a stay of the monetary judgment.  Defendants, by their own admission, lack the resources to meet the first exception to the bond requirement.  As for the second exception, defendants filed a declaration by EOFlow's head of finance stating that its current debt obligations total approximately $39 million.  It is plausible

19

that defendants' creditors may have been placed at risk if the stay applied to the entirety of the jury's $452 million award. But the cost of a bond for the final judgment award (plus 10 percent for interest and $500 for costs) will be significantly less expensive and will not likely place defendants' creditors in undue jeopardy. Thus, a stay of the monetary judgment will be entered, subject to the posting of a bond by defendants equal to $65,340,500.[9]

### 2.    Injunctive Relief

Stays of injunctive relief are "not a matter of right." *See Nken v. Holder*, 556 U.S. 418, 427 (2009). Such stays must be evaluated under the traditional four-part standard applied to injunctions. *See Acevedo-Garcia*, 296 F.3d at 16. Defendants thus bear the burden of satisfying the following: (1) they must make a "strong showing that [they are] likely to succeed on the merits" in their appeal; (2) they must show that they "will be irreparably injured absent a stay"; (3) they must show that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) they must show that the stay would serve "the public interest." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). In evaluating whether this burden has been met, the "first two factors"—that is, likelihood of success and irreparable injury—"are the most critical." *Id.*

Starting with the first factor, "[i]t is not enough that the chance of success on the merits [is] better than negligible." *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (quoting *Nken*, 556 U.S. at 434-35). That said, "[w]hen the request for a stay is made to a district court, common sense dictates that the moving party need not persuade the court that it is likely to be reversed on appeal." *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 522 (D. Mass. 2019) (quoting *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass.

---

[9] That total represents the $59.4 million final monetary judgment, plus $5.94 million in interest, plus $500.

Appx103

1998)).  Instead, the movant need only "establish that the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear." *Id.*

Here, defendants' principal argument on appeal is that plaintiff's claims are time-barred as a matter of law.  Specifically, defendants maintain, as they have throughout the litigation process, that the statute-of-limitations provision under the DTSA applies an inquiry-notice standard, rather than a discovery-based standard.  An inquiry-notice standard would, in all likelihood, render plaintiff's claims time-barred.  However, for the reasons set forth in the Court's October 31, 2024 summary-judgment memorandum and order, the Court rejected defendants' proffered inquiry-notice standard as being inconsistent with both the clear text of the DTSA and the Supreme Court's reasoning in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). (*See* ECF No. 753).  That said, reasonable minds may differ as to that determination, given that the accrual standard under the DTSA is not yet clearly established.  The appeal therefore raises a substantial question of law on which there is genuine room for meaningful difference of opinion, thereby satisfying the first factor for a stay of injunctive relief.

As for the second factor, "simply showing some possibility of irreparable injury" is not sufficient to warrant a stay.  *Gorbea*, 970 F.3d at 14 (quoting *Nken*, 556 U.S. at 434-35). Defendants assert that a prohibition on all sales of the EOPatch 2, as contemplated under the proposed injunction, would almost immediately force them out of business, thus constituting a real risk of irreparable harm.  That risk, however, does not warrant a stay of the injunction as a whole, but rather supports a partial stay permitting continued sales to existing EOPatch 2 patients in the European Union and Republic of Korea, the only markets in which the EOPatch 2 is presently available.  Defendants could therefore maintain their current revenue stream

throughout the appeal process, but would not be permitted to use the trade secrets to expand their sales, develop competing products, or in any other way benefit from their misappropriation.

A partial stay limited only to existing EOPatch 2 patients also comports with the third factor, because it protects plaintiff from the threats posed by the misappropriation, including a potential sale of its trade secrets to a competitor, the expansion of a competing product into new markets, and the development of new products using its trade secrets. And the fourth factor is also supported by a partial stay, as the public interest is well-served by allowing current EOPatch 2 users to maintain uninterrupted access to their insulin-delivery system while the appeal process plays out.

The Court will therefore enter a temporary partial exception to the permanent injunction to permit continued sales of the EOPatch 2 device only to existing users in the European Union and Republic of Korea, as will be set forth in a separate permanent injunction order. Defendants will also be ordered to notify all current EOPatch 2 users subject to the temporary partial exception about the Court's permanent injunction order and the likely effect that it will have on their access to the device going forward.

## II.    Conclusion

For the foregoing reasons, plaintiff's motion for a permanent injunction is GRANTED in part and DENIED in part. Defendants' motion for a stay of judgment is GRANTED in part and DENIED in part. Total damages of $59.4 million is awarded to plaintiff without prejudgment interest. A permanent injunction order and order as to final judgment will be entered separately. **So Ordered.**

|  |  |
|---|---|
|  | /s/  F. Dennis Saylor IV |
|  | F. Dennis Saylor IV |
| Dated:  April 24, 2025 | Chief Judge, United States District Court |

Appx105

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **INSULET CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **23-11780-FDS** |
| | ) | |
| **EOFLOW CO., LTD.; EOFLOW, INC.;** | ) | |
| **NEPHRIA BIO, INC.; and JESSE KIM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

## ORDER AS TO FINAL JUDGMENT

**SAYLOR, C.J.**

The Second Amended Complaint of plaintiff Insulet Corporation, filed on February 5, 2024, asserted claims against seven defendants:  EOFlow Co., Ltd., and EOFlow, Inc.; Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet employees, Luis Malave, Steven DiIanni, and Ian Welsford.  (ECF No. 273).  The asserted claims were for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") (Count 1); patent infringement (Counts 2-4); unfair competition in violation of Mass. Gen. Laws ch. 93A (Count 5); and civil conspiracy (Count 6).

On October 31, 2024, the Court granted summary judgment in defendants' favor as to the unfair-competition claim (Count 5).  On November 21, 2024, plaintiff voluntarily dismissed with prejudice its claim of civil conspiracy (Count 6).  (ECF Nos. 804, 805).  On January 3, 2025, with leave of court, plaintiff dismissed without prejudice its claims of patent infringement (Counts 2-4).  (ECF Nos. 867, 869).

Appx106

On December 3, 2024, following a trial, the jury rendered a verdict as to Count 1.  (ECF No. 833).  Following trial, the Court heard and addressed post-trial filings submitted by the parties, including plaintiff's Motion for Permanent Injunction, (ECF No. 885), and defendants' Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial, (ECF No. 882).

On February 25, 2025, the Court entered partial final judgment pursuant to Fed. R. Civ. P. 54(b) as to the claims against defendants Luis Malave, Steven DiIanni, and Ian Welsford. (ECF Nos. 914, 925).

The Court now hereby directs that the clerk enter a final judgment as to the claims against defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; and Jesse Kim as follows:

1. **Count 1:**  Judgment as to Count 1 of the Second Amended Complaint shall be entered in favor of plaintiff Insulet Corporation and against defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; and Jesse Kim as follows:

    a. **Computer-Aided Design Files:**  Defendants EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse Kim misappropriated the trade secret comprising the Computer-Aided Design files for the Omnipod, including the file 13800-POD-ASSEMBLY-ASM ("CAD"), in violation of the DTSA.

    b. **Soft Cannula:**  Defendants EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse Kim misappropriated the trade secret comprising the design and manufacturing process for the Omnipod soft cannula in violation of the DTSA.

    c. **Occlusion Detection Algorithm:**  Defendants EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse Kim misappropriated the trade secret comprising the occlusion detection algorithm for the Omnipod ("ODA") in violation of the DTSA.

Appx107

    **d. Design History File:** Defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; and Jesse Kim misappropriated the trade secret comprising the Design History File for the Omnipod Eros ("DHF") in violation of the DTSA.

    **e. Willful and Malicious Misappropriation:** Defendants EOFlow Co., Ltd., and Jesse Kim misappropriated the CAD, ODA, and DHF trade secrets willfully and maliciously within the meaning of 18 U.S.C. § 1836(b)(3)(C).

2. **Counts 2-4:** Counts 2-4 of the Second Amended Complaint have been dismissed without prejudice.

3. **Count 5:** Judgment shall be entered against plaintiff Insulet Corporation and in favor of defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc; and Jesse Kim as to Count 5 of the Second Amended Complaint.  (ECF No. 753).

4. **Count 6:** Count 6 of the Second Amended Complaint has been dismissed with prejudice.  (ECF No. 804; ECF No. 805; 13 Tr. 5:25-6:5).

5. **Monetary Damages:** Monetary damages shall be awarded in favor of plaintiff Insulet Corporation in the total amount of $59,400,001.00, without prejudgment interest.  The damages award comprises the following:

    **a. Unjust Enrichment:** Unjust-enrichment damages under 18 U.S.C. § 1836(b)(3)(B)(i)(II) in the amount of $25,800,000.00, without prejudgment interest, against defendants EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse Kim, payable jointly and severally, and $1 in nominal damages against defendant Nephria Bio, Inc.; and

    **b. Exemplary Damages:** Exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in the amount of $33,600,000.00, without prejudgment interest, against

Appx108

defendants EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse Kim, payable jointly and severally.

6. **Permanent Injunction:** A permanent injunction will be entered against defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc; and Jesse Kim, in accordance with a separately issued order.

**So Ordered.**

<table>
<tr><td></td><td>/s/  F. Dennis Saylor IV</td></tr>
<tr><td></td><td>F. Dennis Saylor IV</td></tr>
<tr><td>Dated:  April 24, 2025</td><td>Chief Judge, United States District Court</td></tr>
</table>

Appx109

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
INSULET CORPORATION,                            )
                                                )
              Plaintiff,                         )
                                                )        Civil Action No.
       v.                                       )        23-11780-FDS
                                                )
EOFLOW CO., LTD.; EOFLOW, INC.;                 )
NEPHRIA BIO, INC.; and JESSE KIM,              )
                                                )
              Defendants.                        )
_____)


## PERMANENT INJUNCTION

**SAYLOR, C.J.**

After a trial, and after careful consideration of the written submissions of the parties, the

Court hereby enjoins defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; and Jesse

Kim as follows:

1. **Definition of "Insulet."** The term "Insulet" means Insulet Corporation.

2. **Definition of "Defendants."** The term "Defendants" means the following persons

   or entities:

   a. EOFlow Co., Ltd.;

   b. EOFlow, Inc.;

   c. Nephria Bio, Inc.; and

   d. Jesse Kim.

3. **Definition of "EOFlow."** The term "EOFlow" means the following entities:

   a. EOFlow Co., Ltd.; and

Appx110

    b. EOFlow, Inc.

4. **Definition of "Trade Secrets."** The term "Trade Secrets" means the following trade secrets of Insulet:

    a. the Computer-Aided Design files for the Omnipod, including the file 13800-POD-ASSEMBLY-ASM ("CAD");

    b. the design and manufacturing process for the Omnipod soft cannula;

    c. the occlusion detection algorithm for the Omnipod ("ODA"); and

    d. the Design History File for the Omnipod Eros ("DHF").

5. **Applicability to Representatives of Defendants.** This injunction applies to any officers, agents, servants, employees, or attorneys of any of the Defendants, as well as any other persons who are in active concert or participation with any of them who receive actual notice of this injunction by personal service or otherwise.

6. **Prohibition on Manufacture, Sale, and Related Activities.** Defendants are hereby enjoined from manufacturing, marketing, advertising, selling, distributing, or seeking regulatory approval for any product that was designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets, anywhere in the world, except as provided in Paragraphs 10 and 11.

7. **Prohibition on Possession.** Defendants are hereby enjoined from possessing any of the Trade Secrets, anywhere in the world, except as reasonably necessary for the purposes provided in Paragraphs 10 and 11.

8. **Prohibition on Disclosure.** Defendants are hereby enjoined from disclosing any of the Trade Secrets to any third party, anywhere in the world, except as provided in Paragraph 14.

Appx111

9. **Notice to Third Parties.** Within seven days of entry of this injunction, Defendants shall provide written notification of this injunction and the final judgment entered in this case to any third party to whom Defendants communicated or distributed any Trade Secret. Defendants shall also request that the third parties return, destroy, or refrain from using any Trade Secret in their possession henceforth. Within 14 days of entry of this injunction, Defendants shall provide Insulet with a copy of all notices provided to third parties along with certified receipts of delivery of those notices.

10. **Temporary Exception and Notice for Existing Korean Patients.** Notwithstanding the foregoing, Paragraphs 6 and 7 shall not apply for a period of six months (that is, until October 24, 2025) to the manufacture, sale, and distribution in the Republic of Korea of EOFlow products designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets; provided, however, that EOFlow (a) may not export such products from the Republic of Korea, except as provided in Paragraph 10, and (b) may not market or promote such products to prospective or new patients in the Republic of Korea or elsewhere. Defendants shall provide notice to existing EOFlow patients in the Republic of Korea of this injunction and the duration of the temporary exception to allow for transition to alternative means of medical care.

11. **Temporary Exception and Notice for Existing EU Patients.** Notwithstanding the foregoing, Paragraphs 6 and 7 shall not apply for a period of six months (that is, until October 24, 2025) to the sale and distribution of EOFlow products designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets to patients residing in the European Union who were using such products as

Appx112

of October 6, 2023, pursuant to a written prescription or other written order from a physician or other licensed health-care provider.  Defendants shall provide notice to existing EOFlow patients in the European Union of this injunction and the duration of the temporary exception to allow for transition to alternative means of medical care.

12. **Transfer of Patent Application.**  Within 60 days of entry of this injunction (or at such other time as mutually agreed to by the parties in writing), EOFlow shall assign to Insulet US 2023/0248902A1, any patent applications submitted in any jurisdiction that disclose the same invention, and any patents that issue from US 2023/0248902A1 or patent applications that disclose the same invention.

13. **Transfer of Medtronic Termination Fee.**  Defendants shall hold, as constructive trustees for Insulet, any payment received from Medtronic PLC relating to its terminated acquisition agreement with EOFlow.  Defendants shall transfer to Insulet any such payment within 14 days of receipt from Medtronic PLC or, if this litigation remains pending at that time, within 14 days of the termination of this litigation and any related appeal.  Any such amount paid to Insulet shall be credited toward the amount of any money judgment owed to Insulet as a result of this proceeding.

14. **Removal and Quarantine of Information.**  Upon entry of this injunction, Defendants shall undertake the following steps to remove from their possession, and to quarantine, any information associated with the Trade Secrets:

    a. **Engagement of Vendor.**  Defendants shall engage an e-discovery vendor to assist with the identification, collection, and removal of any Trade Secrets in Defendants' possession, and the preservation of data sources containing Trade

Appx113

Secrets, under appropriate conditions, in connection with any Defendant's obligations under this injunction or in any legal or regulatory proceedings in the United States and elsewhere.  The engagement of such vendor shall be subject to Insulet's approval; provided, however, that such approval shall not be unreasonably withheld.

b. **Inspection of Data Sources.**  The e-discovery vendor shall be granted access to, and shall inspect, all data sources (including backup, deleted, and archived files) in Defendants' possession, custody, or control used by any individual who was involved in the design, development, manufacture, or regulatory submissions for the EOPatch 2 from August 1, 2017, through the present, including any database or document management system, custodial data sources, non-custodial data sources, corporate and personal email accounts, and paper files.

c. **Identification and Disclosure of Data Sources.**  The e-discovery vendor shall identify, log, and disclose to Insulet all data sources in Defendants' possession, custody, or control that incorporate information related to the Trade Secrets, including copies or near-duplicates thereof.  The log shall include all available metadata including document custodian, file path, and last access dates.

d. **Preservation and Quarantine of Data Sources.**  Prior to removal of any Trade Secrets, and in order to satisfy Defendants' discovery obligations and the litigation holds in place due to this and other proceedings, the e-discovery vendor shall create and preserve a copy of each of the data sources listed

5

Appx114

above that contain Trade Secrets (the "Preserved Files"). The Preserved Files shall be maintained by the e-discovery vendor until further order of the Court or written agreement of the parties. The Preserved Files shall be maintained in such a manner to ensure that if any of the files must be returned to any of the Defendants in the future, they may be accessed without undue difficulty or expense.

e. **Access to Preserved Files.** The Preserved Files shall be accessible only by (1) the e-discovery vendor, (2) Insulet, (3) outside counsel for Insulet (including experts, vendors, paralegals, and other persons or entities reasonably necessary to assist outside counsel for purposes of this litigation), and (4) outside counsel for Defendants (including experts, vendors, paralegals, and other persons or entities reasonably necessary to assist outside counsel for purposes of this litigation) (collectively, "Defendants' Outside Counsel"). Defendants' Outside Counsel may have access to, and make use of, the Preserved Files only (1) in connection with this litigation and any related appeals; (2) with the express written permission by the Court, obtained only after providing notice to Insulet; or (3) by written agreement with Insulet.

f. **Removal of Trade Secrets.** As directed by the e-discovery vendor, and after the creation of the Preserved Files, Defendants shall promptly destroy or otherwise remove from their possession, custody, or control all documents, files, CADs, and source code, including any copies, in their possession, custody, or control that contain, disclose, reflect, or are derived from the Trade Secrets; provided, however, that Defendants shall be permitted to retain

6

Appx115

possession of any such files that are reasonably necessary to continue manufacturing and distributing products permitted under the temporary exceptions provided in Paragraphs 10 and 11, but only for as long as those exceptions remain in effect.

g. **Certification of Completion of Identification and Logging of Files and Provision of Log.**  Within 60 days of entry of this injunction, the e-discovery vendor shall certify in writing to Insulet the completeness of the identification and logging of files pursuant to Paragraph 14(c).  Within 90 days of entry of this injunction (or at such other time as mutually agreed to by the parties in writing), the e-discovery vendor shall provide Insulet with the final log of data sources prepared pursuant to Paragraph 14(c).

h. **Certification of Completion of Removal of Files.**  Within 120 days of entry of this injunction, the e-discovery vendor and Defendants shall certify in writing to Insulet that Defendants are in compliance with Paragraphs 14(d).  Within 60 days of the expiration of the temporary exceptions provided in Paragraphs 10 and 11, the e-discovery vendor and Defendants shall certify in writing to Insulet that Defendants are in compliance with Paragraphs 14(f).

i. **Retention and Certification of Removal of Files by Defendants' Outside Counsel.**  Notwithstanding any other provision of this injunction, Defendants' Outside Counsel may retain possession of any files containing Trade Secrets that they acquired for purposes of this litigation to continue conducting the litigation and any related appeals, consistent with the Stipulated Protective Order in this case and any other applicable law, regulation, or court order.

Appx116

Within 60 days of the conclusion of this litigation, including any related appeals, the e-discovery vendor and Defendants' Outside Counsel shall certify in writing to Insulet that Defendants' Outside Counsel are in compliance with Paragraph 14(f).

j. **Fees and Expenses.**  All fees and expenses associated with the requirements of Paragraph 14 shall be borne solely by Defendants.

15. **Auditing Rights.**  Upon receipt of the final log of data sources prepared pursuant to Paragraphs 14(c) and 14(g), Insulet may conduct audits of any of the Defendants to ensure compliance with this injunction, as follows:

a. **Ability to Audit.**  Insulet may audit, through an independent third party chosen by Insulet, and in compliance with the Stipulated Protective Order in this case, the data sources identified in Paragraph 14(b).

b. **Results of Audits.**  The findings of such audits will be available only to Insulet, outside counsel for Insulet (including experts, vendors, paralegals, and other persons or entities reasonably necessary to assist outside counsel for purposes of this litigation), the independent third-party auditor, the Court, Defendants, and Defendants' Outside Counsel.

c. **Notice of Non-Compliance.**  If the auditor finds that any Defendant is not or may not be in compliance with the terms of this injunction, the auditor shall provide written notice and a copy of its findings to Insulet to permit Insulet to investigate the cause(s) and extent of the Defendant's non-compliance.  The auditor shall also provide written notice and a copy of its findings to the non-compliant Defendant.

Appx117

      **d.  Frequency of Audits.**  The audits may be conducted no more than twice in any twelve-month period per Defendant, and shall occur only during the course of normal business hours, and upon electronic or written notice of at least five business days to the relevant Defendant.  The parties shall use good-faith efforts to conduct the audit in a manner least disruptive to Defendants' normal business activities.

16.  **Retention of Jurisdiction.**  The Court retains jurisdiction to enforce and modify this injunction to the extent allowed by law.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  April 24, 2025

Appx118

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
INSULET CORPORATION,                    )
                                        )
            Plaintiff,                  )
                                        )        Civil Action No.
    v.                                  )        23-11780-FDS
                                        )
EOFLOW CO., LTD.; EOFLOW, INC.;         )
NEPHRIA BIO, INC.; and JESSE KIM,       )
                                        )
            Defendants.                 )
_____)


MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR POST-VERDICT DISCOVERY

**SAYLOR, C.J.**

This dispute concerns the misappropriation of trade secrets for the design and

manufacture of an insulin patch pump, the Omnipod, produced by plaintiff Insulet Corporation.

Plaintiff sued seven defendants:  EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow");

Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet

employees, Luis Malave, Steven DiIanni, and Ian Welsford.

After a month-long trial, a jury returned a verdict on December 3, 2024, finding six

defendants—all except Malave—liable for misappropriation of trade secrets in violation of the

Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").  The jury awarded plaintiff $452

million, composed of $170 million in unjust-enrichment damages and $282 million in exemplary

damages.

On February 25, 2025, pursuant to a separately negotiated Consent Permanent Injunction

and Judgment agreement between plaintiff and Malave, DiIanni, and Welsford, the Court entered

Appx119

a final judgment under Fed. R. Civ. P. 54(b) as to those defendants and issued a permanent injunction in accordance with the terms of the parties' agreement.  (ECF Nos. 924-25).

On April 24, 2025, the Court issued a permanent injunction as to the remaining defendants—that is, EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; and Jesse Kim.[1] Among other things, the injunction prohibits defendants (with certain limited temporary exceptions) from possessing or disclosing the misappropriated trade secrets anywhere in the world, and from manufacturing, selling, or seeking regulatory approval for any product developed using those trade secrets.  (ECF No. 948).  The injunction further orders the re-assignment of one of defendants' patents that discloses plaintiff's trade secrets, along with any other patents and patent applications that disclose the same invention.  It also directs defendants to transfer to plaintiff any monetary fee received from Medtronic PLC stemming from its terminated acquisition of EOFlow.  Finally, to avoid conferring on plaintiff an impermissible double recovery, in its final judgment order, the Court reduced plaintiff's monetary damages award to $59.4 million based on the costs that defendants avoided as a result of their misappropriation, plus corresponding exemplary damages.  (ECF Nos. 946-47).[2]

Plaintiff has moved under Fed. R. Civ. P. 69(a)(2) to compel post-verdict discovery concerning, among other things, defendants' current financial condition.  Plaintiff has served 11 discovery requests on defendants and has sought supplementation to four previously served requests.  Defendants refused to produce the information and oppose plaintiff's motion on the grounds that the discovery requests are premature and overbroad.

---

[1] For the sake of convenience, the term "defendants" will hereafter refer only to EOFlow, Nephria Bio, and Kim unless the context indicates otherwise.

[2] The final monetary damages award totaled $59,400,001.00, comprising unjust-enrichment damages of $25.8 million and exemplary damages of $33.6 million against EOFlow and Kim, payable jointly and severally, and nominal damages of $1 against Nephria Bio.

2

Appx120

For the following reasons, the motion will be granted.

## I.    Analysis

Rule 69(a)(2) affords "[l]iberal discovery" to a judgment creditor to obtain discovery from "any person," including a judgment debtor, so long as the discovery is "[i]n aid of the judgment or execution." *ClearOne Commc'ns, Inc. v. Chiang*, 276 F.R.D. 402, 404 (D. Mass. 2011) (quoting Fed. R. Civ. P. 69(a)(2)). "The presumption is in favor of 'full discovery of any matters arguably related to the creditor's efforts to trace the debtor's assets and otherwise to enforce its judgment.'" *Id.* (quoting *United States v. Neumann*, 1999 WL 156151, at *1 (D. Mass. Mar. 5, 1999)). When a dispute arises concerning the permissible scope of discovery, "[d]istrict courts exercise broad discretion to manage [such] matters." *See Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003).

Here, the information plaintiff seeks falls within the permissible scope of discovery under Rule 69(a)(2). First, plaintiff has requested information concerning defendants' financial condition, including (1) updated financial statements, (2) an individualized identification of each defendant's assets and liabilities, (3) descriptions of any contemplated dividend payments or other property transfers between EOFlow and its shareholders, (4) descriptions of defendants' historic and prospective capital inflows and outflows, and (5) updated sales data for EOPatch products. Such information lies squarely within the range of discovery helpful to "trace the debtor[s'] assets" and to ultimately enforce the final judgment against defendants. *See Chiang*, 276 F.R.D. at 404

Second, plaintiff seeks information concerning defendants' ongoing arbitration proceeding with Medtronic PLC, including information concerning a potential resolution and payment of a break-up fee to EOFlow. Such information is relevant to enforce the permanent

Appx121

injunction, which directs defendants to transfer to plaintiff any fee received from Medtronic related to its terminated acquisition of EOFlow. Any funds arising out of the Medtronic break-up fee will be credited towards the final monetary award. Thus, information concerning the status of the break-up fee is germane to the final judgment and therefore discoverable.

Third, plaintiff has requested a list of defendants' patents and pending patent applications. The permanent injunction order directs defendants to transfer ownership of US 2023/0248902A1 and any patents and patent applications in any jurisdiction that disclose the same invention. Although patents are generally reviewable to the public, patent-publishing rules vary by jurisdiction and patent applications may not be broadly accessible. Permitting discovery of defendants' patents and pending patent applications will aid the execution of the final judgment by enabling plaintiff to evaluate whether any additional patents beyond US 2023/0248902A1 must be transferred under the terms of the permanent injunction order. Such discovery will therefore be permitted.

Defendants nonetheless oppose the discovery requests on multiple grounds. Defendants' first contention—that the discovery requests are premature because they were served before final judgment had been entered—is now moot.

Defendants further assert that the discovery requests related to their asset transfers are unwarranted because they are based on an unsubstantiated concern that defendants may be attempting to conceal their assets. However, regardless of the credibility of those concerns, the discovery requests relate to plaintiff's efforts to trace defendants' assets and to ascertain their ability to satisfy the judgment. *See id.* Thus, information related to defendants' transfer of assets, including dividend distributions and capital raises, is discoverable and not dependent on the veracity of the asset-concealment claims.

Appx122

Defendants next contend that the discovery requests concerning the Medtronic arbitration proceeding impermissibly seek production of privileged information.  However, the contested requests focus only on communications and documents that have been shared between defendants and Medtronic; thus, the information is unlikely to be privileged.  *See Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5, 30 (1st Cir. 2011).  The two requests at issue specifically seek (1) "pleadings and contentions" that have been "filed by or exchanged between the parties" of the arbitration and (2) documents and communications related to any agreements made with Medtronic to resolve the arbitration.  (Memo. Supp. Mot. to Compel at 5).  Neither of those requests seeks internal information protected under attorney-client privilege; rather, plaintiff seeks information shared by defendants with a third party.  To the extent that defendants in good faith believe that a particular document subject to the discovery requests is privileged and not discoverable, defendants may produce a privilege log, and the parties can raise any resulting concerns as needed.  At this stage, however, given their relevance to the permanent injunction order and to the collection of the final judgment award, the discovery requests concerning the Medtronic arbitration proceeding will be permitted.

Finally, defendants contend that the request for information concerning asset transfers dating back to January 1, 2018, is overly burdensome.  Again, there is a presumption in favor of "full discovery" to facilitate plaintiff's tracing of defendants' assets and enforcement of the judgment.  *See Chiang*, 276 F.R.D. at 404.  Here, the misappropriation of plaintiff's trade secrets—which the jury found to have been done willfully and maliciously by EOFlow Co., Ltd., Kim, and Welsford—began as early as 2018.  Plaintiff may therefore reasonably inquire about past transfers of defendants' assets because that information may "reasonably relate[]" to their ability to satisfy the judgment award.  *See id.*

5

Appx123

In sum, plaintiff's post-verdict discovery requests reasonably aid the enforcement of the final judgment and permanent injunction and are therefore permissible under Rule 69(a)(2).

## II.    Conclusion

For the foregoing reasons, plaintiff's motion to compel post-verdict discovery is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  May 6, 2025                              Chief Judge, United States District Court

6

Appx124

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


INSULET CORPORATION,                    )
                    Plaintiff,          )
                                        )
                                        )
vs.                                     ) Civil Action
                                        )
                                        ) No. 23-11780-FDS
EOFLOW CO., LTD.; EOFLOW, INC.;         )
FLEX, LTD.; FLEXTRONICS                 )
CORPORATION; FLEXTRONICS                )
MEDICAL SALES AND MARKETING,            )
LTD.; LUIS J. MALAVE; STEVEN            )
DIIANNI; and IAN G. WELSFORD,           )
                    Defendants.         )


BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR



                JURY CHARGE CONFERENCE




            John Joseph Moakley United States Courthouse
                        Courtroom No. 10
                        1 Courthouse Way
                        Boston, MA 02210



                        November 27, 2024
                            10:00 a.m.



                        Valerie A. O'Hara
                     Official Court Reporter
            John Joseph Moakley United States Courthouse
                        1 Courthouse Way
                        Boston, MA 02210
                   E-mail: vaohara@gmail.com

APPEARANCES:

For the Plaintiffs:

    Goodwin Procter LLP, by ROBERT D. CARROLL, ESQ., ROBERT FREDERICKSON, III, ESQ., and WILLIAM EVANS, ATTORNEY, 100 Northern Avenue, Boston, Massachusetts 02210;

For the Defendants:

    Cooley LLP, by ADAM S. GERSHENSON, ESQ., and ZACHARY SISKO, ESQ., 500 Boylston Street, Boston, Massachusetts 02116;

    Cooley LLP, by JOHN BOSTIC, ESQ., 3175 Hanover Street, Hanover Street, Palo Alto, California 94304.

    Donnelly, Conroy & Gelhaar, LLP, by T. CHRISTOPHER DONNELLY, ESQ.  Suite 1600, 260 Franklin Street, Boston, Massachusetts 02110;

    Lambert Shortell & Connaughton, by JUSTIN P. TINGER, ESQ., 100 Franklin Street, Suite 903, Boston, Massachusetts 02110.

ALSO PRESENT BY ZOOM:

For the Defendants:

    Cooley LLP, by ELIZABETH M. FLANAGAN, ESQ., 30 S. 9th Street, 7th Floor, Minneapolis, MN 55402;

    Cooley LLP, by ALEXANDRA MAYHUGH, ESQ., 355 S. Grand Avenue, Suite 900, Los Angeles, CA 90071-1560.

    Donnelly, Conroy & Gelhaar, LLP, by TIMOTHY MADDEN, ESQ., Suite 1600, 260 Franklin Street, Boston, Massachusetts 02110.

PROCEEDINGS

THE CLERK:  All rise.  Court is now in session in the matter of Insulet Corporation vs. EOFlow, Civil Action Number 23-11780.

Would counsel please identify themselves for the record starting with the plaintiff.

MR. CARROLL:  Good morning, your Honor, Rob Carroll for Insulet Corporation.  With me, I have William Evans and Robert Frederickson.

MR. FREDERICKSON:  Good morning.

MR. GERSHENSON:  Good morning, your Honor, Adam Gershenson, on behalf of the EOFlow and, with me today in person...

MR. BOSTIC:  Good morning, your Honor, John Bostic.

MR. SISKO:  Zachary Sisko.

THE COURT:  Do we have people on Zoom or by audio?

MR. GERSHENSON:  I'm not seeing them, but I'm expecting Lowell Mead, Alex Mayhugh, and perhaps Ms. Flanagan as well.

MR. MEAD:  Good morning.

MR. DONNELLY:  Good morning.  Your Honor, Christopher Donnelly, Donnelly, Conroy & Gelhaar, for Mr. Malave, Mr. DiIanni and Mr. Welsford, and on the video is Timothy Madden from my firm.

THE COURT:  All right.  This is formally the charge

conference in this case because the evidence is closed. I circulated, again, I should say my law clerk circulated last night an updated version of the instructions. There is, I'm sure, some tinkering to be done, but there are three issues or significant issues in my mind to be resolved. Two of them I've resolved, and the third one I am struggling with, and I think it's probably going to take up most of our time today.

I also, we prepared a jury verdict form. You have a draft of it. I attempted to streamline this, which is quite difficult in context, but it's my effort to do so to try to have a verdict form that's less than 200 pages, let's say.

But let me get to the two issues, significant issues that I have resolved. The first concerns willful and malicious violations, whether clear and convincing evidence is the standard. I think it is not. I'm going to instruct on a preponderance of the evidence standard. It's based in large part on the reasoning in *Halo*, the Supreme Court case. It's not directly on point, of course, but in simple terms, there's no textural basis in the DTSA to impose a higher standard.

There are, at least, a couple of cases following *Halo* that have not imposed the clear and convincing evidence standard. I note that the *BioPoint* case itself, there was a preponderance of the evidence standard, which the Court seemed to approve without comment, so I'm going to instruct as to that lower standard of evidence, preponderance of the evidence for

the willful and malicious violations.

MR. DONNELLY: Thank you.

THE COURT: On the statute of limitations, I do think effectively burden-shifting framework should apply. The cases talk about equitable tolling. That's not really what's going on here, and the statute says a claim accrues at a particular point in time.

There's no clear principle of law governing here. It's not an equitable exception requiring equity to take this out of the normal pattern of events, but I think since the norm in limitations cases is that once the defendant has established that the case was filed outside the three-year period, that is, in here after the misappropriation occurred, then the burden shifts to the plaintiff to show that the cause of action accrued at a later time.

Part of that has to do with the practicalities of the proof, who is in a better position to show what the plaintiff actually knew or reasonably should have known.

So with something less than 100 percent confidence, I am going to instruct the jury in effect that the defendant bears the burden of showing that the lawsuit was filed more than three years after the misappropriation occurred. If the defendant does that, then the burden shifts to the plaintiff to show that the cause of action accrued within the three-year period of time.

Defendants have proposed that or have objected to my instruction that this matter ought to be considered separately as to each trade secret. That doesn't make any sense to me, to treat the trade secrets as an undifferentiated mass, so if the limitation period has expired as to any trade secret, it expires as to all.

Taking that logic forward, if a trade secret were stolen tomorrow, it would be barred because all of the trade secrets should be considered as an undifferentiated mass, so I do think it needs to be considered separately as to each trade secret, and I will circulate later this morning, I hope, that actual language.

MR. CARROLL: Your Honor, may I be heard briefly on the burden-shifting approach?

THE COURT: Yes.

MR. CARROLL: We disagree and think that's not reconcilable with *Merck*, however, if the Court has decided to apply a burden-shifting approach, I think a couple of things follow from that.

THE COURT: Yes.

MR. CARROLL: One, I think that the language proposed by the defendants in their statute of limitations defense overview mixes up the objective and subjective in a way that's confusing. They say Insulet -- however, the lawsuit was still filed by Insulet on time in Insulet proves that before

August 3rd, 2023, Insulet did not discover nor with reasonable diligence should have discovered, I think that mixes up, it doesn't --

THE COURT: I'll try to make it clear that there that there's an objective and subjective. I don't think there's any dispute really as to actual knowledge.

MR. CARROLL: I don't think there is. I don't understand that to be disputed, it's just the second part of the clause, and then the other comment I would have is on the Court's new language on burden of proof, I think it follows from the fact that it is trade secret by trade secret. We have a language suggestion on that.

THE COURT: Okay.

MR. CARROLL: This is on page 53 where the ultimate sentence of this instruction, and it says, "Instead, the claim accrues at the point when a reasonably diligent company acting in good faith could make reasonably plausible and specific allegations of trade secret."

THE COURT: Yes.

MR. CARROLL: Our suggestion is to say could make plausible and specific allegations of misappropriation of the trade secrets asserted in this case because that makes it clear that it's both trade secret by trade secret but also because the way the evidence has been argued here, there have been a lot of emails shown about concerns about IP infringement and

talking about blocking strategies.  For those in the know, that's obvious it refers to patent infringement, but there's been an effort, a defensive tactic to try to make it IP is IP, so I think that clarifying instruction would be helpful.

THE COURT:  All right.  I'll try to tinker with that language to make sure it's clear.

MR. CARROLL:  Thank you.

THE COURT:  Mr. Gershenson.

MR. GERSHENSON:  Similarly, just staying on that page, query whether it's helpful to the jury or not to include that last phrase, "sufficient to form a basis of the complaint in a court of law."  I don't know if they know that.  We have reasonably and plausible.  That makes sense.

THE COURT:  That's a fair point.  I'm struggling with that.  On the other hand, what does it mean to make a reasonable and plausible specific allegations?  At least the idea here is you have to be formal about it.  That's why I landed on that language.  In other words, you can't just say -- there's a big distinction between a cease and desist letter and filing a complaint, okay.

Now, we know as lawyers you have Rule 11 and you have *Iqbal* and *Twombly* and all these things.  Obviously, I can't go very far down that path, but I do think it has to rise to a level of formality, in other words, you are making a real -- you're just not writing an angry letter, you're

actually doing something formal about your claims, and I'll welcome suggestions. I don't know quite how to handle this, and I'm trying to follow that Second Circuit case. Sufficient to find 12(b)(6), I could say that.

MR. CARROLL: Along those lines would be to borrow the language from *Twombly* and *Iqbal*, you know, about facts sufficient and concrete, et cetera because that is the standard.

THE COURT: That's plausible and specific, and I was trying to capture that thought, but, anyway, I welcome suggestions. I do think the point I want to make I think is the correct one that it doesn't accrue at the point where a reasonably diligent company could have written an angry letter, it's whether the reasonable and diligent company could have had enough to take formal legal action.

How I capture that concept without instructing the jury about Rule 11, *Iqbal*, *Twombly* is a difficult point, and, you know, I could flesh it out. It doesn't have to be a single phrase. I could talk about that more at length, but that's what I'm trying to do.

MR. GERSHENSON: Right, or plausible and specific allegations of trade secret misappropriation, to file a lawsuit, that may get where you want to go and also be comprehensible for the jury.

THE COURT: Let me do some more thinking about that.

MR. GERSHENSON: Thank you, your Honor.

THE COURT: I have added a sentence somewhere about the 2016 enactment of the DTSA, that the misappropriation itself has to have occurred, and I think that that is -- that's actually contrary to law. Let me find where I stuck it.

MR. GERSHENSON: Thank you, your Honor. Do you have a page, where did I point this?

MR. MEAD: 43.

THE COURT: Yes.

MR. MEAD: So there's a number of cases that have looked at this, I think consistently hold that the DTSA applies to misappropriation that commenced prior to enactment if there was continuing misappropriation of the trade secret, and we know under the DTSA, continuing misappropriation counts as a single claim.

We're happy to provide case cites, but a number of courts have looked at this, and I think it's applicable to this case as well, so I think we would object to providing the instruction is contrary to the case law and the DTSA.

THE COURT: Okay. I'm sorry, actually for some reason I grabbed a slightly older version of my instructions, the language I have, but I think I said the misappropriation has to occur after 2016 or the acquisition, disclosure, or use has to occur after 2016, and your issue is what, it does apply to a continuing misappropriation, you misappropriating in 2015 but

you're still using it in 2017, it applies, yes?

MR. MEAD:  Correct.  There are a number of cases that have looked at this, including Ninth Circuit and a number of District Courts that are all consistent.  I'm happy to provide those cites.

THE COURT:  Why don't you supply them or you can do it.

THE COURT:  Go ahead.

MR. MEAD:  I'm happy to email them.

THE COURT:  Why don't you email them, why don't you send them to Mr. McKillop, copy to the other side.

MR. MEAD:  Will do, your Honor.

THE COURT:  What I propose to do here is sort of outline what's on my mind, not make any issues -- maybe we can recess, and you can talk about it among yourselves how we get to that point or to get to some final point.

So the question is this business of actually awarding and allocating damages, so we're assuming for these purposes that trade secrets qualify as trade secrets, said they were misappropriated, and that's statute of limitations does not bar the claims, so damages.

And the damages claimed are unjust enrichment damages, which in this case is something of a hybrid between law and equity but I think it seems reasonably clear to me that the jury can decide the unjust enrichment issue.

There's no aiding and abetting liability. Joint and several liability kind of depends, under *BioPoint*, depending on a number of different factors whether individuals actually were unjustly enriched or not, how high are they up in the company and so on.

So if EOFlow were the only defendant, I think this would be fairly easy. Let's say for purposes of discussion that they received a $200 million unjust enrichment advantage. The jury can allocate that among the five trade secrets with the wrinkle that the design history file is at least partially duplicative, but putting that aside for the sake of simplicity, it's $200 million and they allocated among the five trade secrets, done.

If there is joint and several liability as to Jesse Kim, I think it's also easy. It doesn't need to be broken out separately as to him, it's like any other tort case, you just say these are the damages, and all defendants who participated are jointly and severally liable, and I suspect that's true as to EOFlow U.S. as well because it doesn't really have any separate value or existence from EOFlow Korea except, for whatever reason, it was separately incorporated, but I think it does no business that is distinct from EOFlow Korea as a practical matter.

From there, things start to get pretty complicated. Let's take DiIanni. He had no stock ownership, as I understand

it. He did earn consulting fees. He was never an employee. Let's say he was separately enriched, again, I'll pull a number out of the air. Let's say he earned $200,000 in consulting fees from the misappropriation that unjustly enriched him. That is different and separate from any unjust enrichment that went to EOFlow. It's kind of a freestanding thing.

As a mere consultant and not stock owner, it's hard to see under *BioPoint* how he could be jointly and severally liable for all of the unjust enrichment or really any of it.

Malave and Welsford are more complicated because they are employees. We can take Malave in the first instance. He's a high level executive of EOFlow. He does own stock. He was going to benefit from the sale to Medtronic, so conceivably he had a very high level of unjust enrichment, not to the tune of $200 million but maybe more to the tune of $6 million or whatever the right number is.

My understanding is there were no actual stock sales, so all of this is the value of the equity in EOFlow. It should have been at this level, and, in fact, because of the misappropriation it's at that level, and let's assume for present purposes that that distinction is $200 million.

Doesn't the stock price or stock value, which we will return to at some lower level if the $200 million unjust enrichment damages award is imposed, doesn't that capture whatever unjust enrichment Malave may have received as to his

stock? In other words, his stock has become more valuable because of the misappropriation. If damages are awarded as to the misappropriation, the stock value, and he never sold any stock, as I understand it, now it goes back to where it should have been absent the misappropriation, so he has not been separately unjustly enriched. He received a salary. He presumably did other work. I don't know if we can break out his salary that he earned from salary that was derived from unjust enrichment, maybe, maybe not.

With Welsford and Nephria Bio, obviously, there's even more layers of complication here. Was Nephria Bio enriched? Was Welsford enriched? Again, you have the value of stock ownership, or the value of salaries, benefits or consulting fees, as opposed to the value of the company itself. Maybe the stock ownership piece of it overlaps with the corporate unjust enrichment piece of it.

Does this suggest that the jury should make separate decisions as to what I'll call the EOFlow unjust enrichment, the value to the company, and, therefore, to its stock value for the unjust enrichment of $200 million, which is different from whatever value an individual may have received through consulting fees, salaries or benefits?

I don't quite know what I do with Nephria Bio and all of this, which I think had at least at some point business independent of the patch pump.

I think if I'm seeing this correctly, a jury might be able to award zero dollars in unjust enrichment or a nominal amount, and I could order injunctive relief even if the individuals weren't unjustly enriched. This is not a circumstance like breach of contract where if there are no damages there's no claim, as I understand it, you could have a claim with no actual money damages but be entitled to equitable relief.

The willful and malicious damages are limited to double the amount of the value. If the jury thought, for example, that Welsford acted willfully and maliciously but his unjust enrichment was pretty nominal, I guess they'd be stuck with that. If they said his unjust enrichment was $10,000, the most they could award on malicious and exemplary damages would be double that.

How do I put all these pieces together? How do I ask questions to the jury where I don't have to ask them 60 or 80 or 100 separate questions just on damages? How do I get from here to there? Mr. Carroll.

MR. CARROLL: I think one simplifying factor that would be appropriate for the jury verdict form and the instructions, I think it's absolutely correct, as the Court observed, that for these purposes, EOFlow Limited and EOFlow Inc. are not financially distinct entities from each other. You know, the evidence is that EOFlow, Inc. is wholly-owned.

EOFlow Limited, and they have consolidated financial statements, and so I think one way to reduce the matrix, and I realize one step is to list them together because unjust enrichment for one is unjust enrichment for both, and I think it's confusing, and I would have to stand up and say really we're asking for the same thing for both because they're not really distinct, so I think just asking for one number for both of them would be appropriate.

THE COURT: For damages, not for misappropriation?

MR. CARROLL: Well, I think for misappropriation would be appropriate also, but I realize that my friends on the other side would probably disagree with that, but I certainly for damages, you know, unjust enrichment, one is unjust enrichment to both, so I think that's a way to reduce the damages matrix.

I also think, and it sounds like this is where the Court's thinking is going.

THE COURT: My thinking is going in circles.

MR. CARROLL: I also think that Malave and Kim, it's very clear that there should be joint and several liability, right, these were the CEO and president.

THE COURT: I think that's fairly clear as to Kim, less clear as to Malave because I just can't -- I'm taking this from *BioPoint*, it's not his level of the company what extent was he personally enriched, and that's a slice, in other words, he doesn't own the whole company, he owns a slice, an important

slice.

MR. CARROLL: That's right, but $12 million is still $12 million. It's not $120 million, but it's still very substantial, and I think very much --

THE COURT: Big firm partners I think probably earn this every month.

MR. CARROLL: I agree that the other people are in a different position, but essentially grouping the controlled group around EOFlow, and that's where we believe the majority of the unjust enrichment lies, so I think it's a practical matter that's kind of the important part, most important part for the jury to decide.

THE COURT: But, again, let's take Mr. Kim. One of the things here, too, I can't have the jury awarding duplicative damages. It's one of the very difficult things here. You don't have to worry about that tort case because it's joint and several liability, you just say pick the amount necessary to compensate the victim.

This is different. We're not compensating for injury, we're saying how much have you been unjustly enriched? What value do you have that arises from the misappropriation? And one question floating around in here as well is the unjust enrichment necessary value that should have accrued for Insulet, instead it accrued to them. Obviously, that's most of what we're talking about.

But let's take DiIanni's consulting fees, that's not money that would have accrued to Insulet, but it's also money that he received in return for the misappropriation, again, assuming liability. What do I do with that? How could the jury allocate damages in such a way that's it's not duplicative? What do I tell them?

MR. CARROLL: So on the legal point, I don't believe that, you know, unjust enrichment, I agree that it is compensatory damages because it's defined by the statute, but it's equitable in nature as well, and disgorgement of unjust gains does not require, and it's not like lost profits that they would have been the gains of Insulet, it's an idea of, you know, someone else unjustly gained, even though there's no direct one-to-one, so I think that's the answer, and I think the law is pretty clear on that.

If it is helpful, I will commit that I'm not going to when I stand up on Monday and I ask the jury what to fill in, so say for one issue, which is the EOFlow Inc., EOFlow Limited, which I think it would solve a lot if the damages line --

THE COURT: Solve a slice.

MR. CARROLL: Solve a slice, solve this problem, when I ask for numbers, they are going to add up to below 230, right, so I'm not going to say 200 for EOFlow, Inc., 200 for EOFlow Limited unless they are -- it's complicated because they're considered to be different entities, 200 for

Nephria Bio, so what I ask for is going to add up less than the 230. That is the top of our range.

So in that sense, you know, I won't be in there encouraging the jury to do something that adds up to $600,000, and so I realize there's still the possibility of confusion, but that's going to be our approach.

THE COURT: Okay. Let's say you ask for $150 million, okay, and the jury agrees with you and says: EOFlow plus -- EOFlow, Inc. $150 million; Kim, $150 million. DiIanni, what do they put down there? Let's say they agree with every single thing you say.

MR. CARROLL: Every number I ask for is going to add, if you sum, it's going to add up to 230 or less than, so I'm not going to say 150 EOFlow 150, Kim because that would be more than 230.

THE COURT: So, okay, we could solve that if that's true by saying EOFlow, EOFlow, Inc., Kim are all on one line, what about DiIanni?

MR. CARROLL: I think DiIanni should be on a different line, you know, if *BioPoint* if the Court decides that DiIanni is not joint and several, he should be on a different line, and I'm going to ask for a whole lot less.

THE COURT: Is that duplicative of the unjust enrichment that EOFlow, Inc. or EOFlow Korea, to make it simple, received? If it's not duplicative, I need to tell the

jury something.

MR. CARROLL: It is not duplicative, I mean EOFlow Korea Enterprise value, you know, was increased is our theory. DiIanni got money from them, so I will be asking for something that's, you know, a fraction of the money that he was paid.

THE COURT: Do they split out the individuals, the non-Kim individuals and say whatever damages you award must be for unjust enrichment as to these individuals, must be separate from and different from any award for the enhancement of the value of EOFlow?

MR. CARROLL: I think that would be a practical way to do that.

THE COURT: Wait, I'm sorry.

MR. CARROLL: I think Kim and the two EOFlow entities are similarly situated, and I think it would be appropriate for them to be one line, and I agree the other three individuals are differently situated. Malave is more like Kim than the other two, but I think that would be a way that would be understandable for the jury and would be a practical way to do it.

THE COURT: What about Nephria Bio and Welsford, how do they fit into all of this?

MR. CARROLL: So Nephria Bio --

MR. TINGER: Your Honor, if I may, for Nephria Bio? Sorry to interrupt.

THE COURT: I'll give you a chance to talk but we've got to do this one-by-one.

MR. TINGER: Okay, go ahead.

MR. CARROLL: So there was testimony that almost nearly all of Nephria Bio's revenue, albeit not large amounts, huge amounts of money was from essentially the misappropriation, right, the DHF work, and so I think that is nonoverlapping with the theory of EOFlow, so it's not going to be a big number, but I think it's separate and distinct from the EOFlow and EOFlow-Kim line, and then Welsford again Welsford had compensation and share ownership. Again, it's not going to be a big number compared to EOFlow.

THE COURT: Do you agree with this idea that to the extent that the value of any individual shares were inflated, that that is captured in the award to EOFlow -- in other words, an award against EOFlow, that, again, because they haven't sold stock, the value goes up or down? There's no separate unjust enrichment award necessary to take into account the stock value of the stock that Ian Welsford owns?

MR. CARROLL: I think that is conceptually accurate, however, so my plan is to ask for a total amount from Kim and EOFlow. If they're separate, that will add up to something that is, you know, at the maximum total enhanced value, right, and account for that and not double account.

If they're one line item, I'm just going to ask for

the amount that we believe we've proven as the enhanced value, so making them one line item I think solves for that, but I think conceptually that's right. It's not really the stock price, it's the enhanced value, right, and to the extent equity ownership, right, so...

THE COURT: You know, it's -- I mean, I don't need to tell you, you know, the value of the stock that you haven't sold isn't done all the time, but it's still value, it's still worth something. If I have stock today and it's $50 a share, and there's some jury award against the company, now it's worth $20 a share, I have lost that value, but it's captured, you don't need to say I don't need to pay the $30, and that's reflected in the stock value.

MR. CARROLL: I agree with that conceptually, and I think putting Kim and the two EOFlows as a single entity largely solves for that potential confusion and overlapping.

THE COURT: So as to DiIanni, Welsford, maybe -- well, let's put Malave aside for the moment because it's more complicated as to him, but let's say DiIanni and Welsford, do I say separately, you know, were they unjustly enriched, and, if so, in what amount, but it has to be broken out by trade secret, doesn't it, in other words, don't we have to have the --

MR. CARROLL: I don't know that it has to be broken out by trade secret. If they've been found to infringe the

trade secret and misappropriated the trade secrets, I don't think it has to be broken out by trade secrets, you know, the work was all of a piece.

So I actually think that's another way this can be considerably streamlined, you know, if the jury finds liability, this is all one product, right, so the unjust enrichment has to do with one thing. I actually think -- I think that's quite a task for the jury to break it out trade secret by trade secret. I don't think it's required, and I think that's an appropriate way to streamline.

THE COURT: It's a risk if that's a wrong judgment and we have to try the case again, in other words, suppose the Court of Appeals said well, all this is fine except this one trade secret wasn't really a trade secret, then we have no way of salvaging the verdict, and we have to try this case over again, and I don't know, but I find that --

MR. CARROLL: I agree that would be suboptimal, your Honor, but it's balancing, you know, the length and complexity of the jury verdict form versus that.

THE COURT: As I said, I'm not looking for a final commitment right this moment because I'm dropping a lot on you. I'm really trying to have a conversation and let you confer among yourselves. One of your associates may say you forgot this important thing or this doesn't work.

MR. CARROLL: Hopefully it won't be me.

THE COURT: Mr. Tinger, you wanted to add something?

MR. TINGER: Yes, your Honor, very briefly. If it helps with thinking about this and if at all it simplifies anything, I think Nephria Bio is much more like DiIanni. I don't think it's a separate consideration. You know, it's, you know, partially owned by EOFlow, but Nephria Bio doesn't own any stock in EOFlow. And Nephria Bio was much more like a consultant for EOFlow, so I think if we're thinking about lines on the verdict form, you know, DiIanni and Nephria Bio could be one line, and, you know, you could break up individual defendants, and then you could have the EOFlow entities, so you're talking about maybe three lines. That's kind of how I'm thinking about this, but just if that helps.

THE COURT: Okay.

MR. GERSHENSON: If I may, so I share your Honor's view that it's perplexing and worth discussing. First of all, I think that's my biggest takeaway.

The other sort of governing principles, any damages do have to be caused by the misappropriation, and that's a trade secret by trade secret issue, so this idea that we could lump them altogether doesn't make sense to me because we're going to address them separately for SOL and lump them because it's one product, it's not really about the product, it's about the information and use or misuse.

I don't think we would fight, certainly not overly

hard, about the point, the Kim issue.  I don't know about collapsing them all into one line.  I heard that there's evidence to that effect.  I didn't see or hear that evidence, but I could have missed it, but I would have to check with my client.  It seems we're ignoring the corporate form, and we're collapsing Mr. Kim, an individual who had a stake for sure, but he is not EOFlow one in the same.  So I just want to be careful and precise on that point to avoid the duplication, as your Honor reflected.

THE COURT:  Mr. Donnelly.

MR. DONNELLY:  Thank you, your Honor.  With three of the seven defendants, I have a few things to say.  Let's start with DiIanni.  DiIanni is not a shareholder, he never was of EOFlow Korea or EOFlow, Inc.  He was a consultant, and the measure of unjust enrichment can be taken from what he earned; if anything, is tied to each of the five trade secrets, and I agree with what Mr. Gershenson said.  This has to be trade secret by trade secret.  It's required by the statutory language.  It's damages caused by, sorry, unjust enrichment caused by the misappropriation of the trade secret.  Those are the words of the statute.  So we can't get away from that.

You've got the practical issue that your Honor just flagged, which is obviously very important.  So DiIanni, there's no way DiIanni can be considered a joint and several defendant under *BioPoint*.  He's exactly like Dickhaut.  In

fact, he's less involved than Dickhaut. He was a high level employee, and he collaborated, and that's what Judge Stearns based his decision on, and it was vacated.

Welsford is as simple, respectfully. Welsford does not currently own any stock in EOFlow Korea or EOFlow, Inc. The plaintiffs were locked onto this statement that if the Medtronic deal had gone through, he would have made $60,000 on the deal. He had 0.08 percent of the stock of the company or less at that point. The Medtronic deal did not go through. Welsford was fired by EOFlow, and in 2023, his stock was canceled. He testified to that. No one testified otherwise. There's no evidence otherwise. He's got no stock, so he is also for purposes of joint and several like Dickhaut, at best. And his unjust enrichment can be measured by whatever. Maybe if they can show any compensation tied to any of the five, the two trade secrets in his case, it's just the ODA and the DHF. That brings us to Malave.

Malave is a 2 percent shareholder of EOFlow. And when there's a Medtronic transaction on the horizon, that's a sum that can be measured in the seven figures. You can argue about what the seven figures are. He testified it was a lot less than 12 million. He's got a basis in it and so forth, but it ebbs and flows, as your Honor has correctly pointed out based on value of the company, so it would be a double whammy it would be double recovery. He hasn't been unjustly enriched

because there is no Medtronic transaction, so if EOFlow Korea, which is the entity whose stock he owns, gets hit here, the value of the stock is clearly going to go down. He has no enrichment there.

His personal unjust enrichment, if any, if the jury somehow can get past the fact that he didn't misappropriate anything under the statute, if they can get past that again, it would be an exercise in what portion of his compensation, his main, if not sole job responsibility was business development, so if they could tie anything to acquisition, use, or disclosure of trade secrets under the instructions your Honor is going to give, it's going to be based on some compensation-based thing, and that's it. That's all he should be exposed to.

On joint and several liability, he should not be in the mix at all. When you compare him to the three SEC and FTC disgorgement defendants in the three cases cited by *BioPoint*, one was the sole owner. That's *SEC v. Johnson*. The individual was the entity's controller and owner. In the second, 60 percent owner and CEO.

Just to remind the Court, Malave was the CEO of EOFlow, Inc., which has no revenues, it's not operating in the U.S. right now, and I'm not -- and I credit what your Honor is saying about other remedies that the Court this has at its disposal here, but for damages and joint and several damages,

that's an important point that Malave has got no position with Korea with the EOFlow Korea entity.

THE COURT: Let me if I can interject.

MR. DONNELLY: Sure, yes.

THE COURT: Should I instruct the jury that as to any defendant, it can find misappropriation but award zero or nominal damages?

MR. DONNELLY: Yes, I think your Honor should.

THE COURT: Because, again, I don't think that ends the issue, you know, they'll be an issue of equitable relief, and those chips fall wherever they fall, but I don't know that -- I don't see the statute provides for nominal damages, but effectively it could be if they say the unjust enrichment was a dollar, $10.

MR. DONNELLY: I may have spoken on zero vs. nominal damages, but they don't get the damages if they -- unless they find him liable, but they then have to decide was there any unjust enrichment, and in a case like Malave, it's a very steep uphill climb for the plaintiff to satisfy their burden on that.

Then the last point is the third disgorgement case, which is the *FTC* case that was cited by *BioPoint.* The individual was the individual's sole employer, founder, president, shareholder, and majority shareholder, not a minority shareholder.

These cases, these common law several and liability

cases that *BioPoint* is relying on have nothing to do with Luis Malave, so I think the instruction is fairly simple for them, and while I'm standing up, I would say on the verdict slip, I would request that in the jury instructions that the Court use the word, "unjust enrichment," not "compensatory damages" because I think compensatory damages is confusing here. It's unjust enrichment is the exercise.

It's how we've been talking about it all morning, it's how we talked about it yesterday afternoon with your Honor, and I think that's how the statute talks. I think the words of the statute should be aligned with the words of the verdict form and the instructions. Thank you.

THE COURT: All right. Let me ask plaintiff whether they have any quick reaction to that, and then I want to take a recess both for you to think about this further and maybe even propose some actual verdict form provisions, and I'm going to talk with my law clerks about it as well. Yes.

MR. CARROLL: My off-the-cuff reaction to the change of the verdict form, Mr. Donnelly, the statute talks about unjust enrichment but defines them as a form of compensatory damages, compensatory damages.

THE COURT: Compensatory damages, you know, that is unjust enrichment.

MR. CARROLL: So I did want to raise two other points quickly, if I may.

THE COURT: Yes.

MR. CARROLL: One is on the burden-shifting on the statute of limitations. I think the burden-shifting largely undoes the application of *Merck*. I realize the Court has made its decision, but if there is a burden-shifting instruction, it should be the entire burden-shifting, which should include a fraudulent concealment instruction.

I think there's evidence of fraudulent concealment as the evidence has come out, including the representation, there was the testimony from Ms. Bradrick, Mr. Kim coming in and demonstrating what was pretty plainly the EOPatch1 device, and, you know, that was in 2019, sort of well after EOPatch2 was developed, and we would ask if there is to be a burden shift --

THE COURT: That could be folded into one of "the jury may consider any affirmative acts of concealment," their lulling whatever.

MR. CARROLL: I think that would be fine, but I think it would be appropriate to have concealment instructions if there is to be a burden-shifting instruction as part of the statute of limitations.

The other, and it's a small point, but both in the verdict form and in the jury instructions, there's discussion of valid trade secrets, and there is no concept of validity in trade secret law, is it a trade secret or not, so the value of the trade secret seems to layer on.

THE COURT: Because it's an element, you know, is the way I've framed it, and, in fact, I'm skipping over the interstate commerce in the jury verdict form entirely.

MR. CARROLL: We stipulated to --

THE COURT: So even baked into, you know, was there misappropriation is was it a valid trade secret and was the interstate commerce --

MR. CARROLL: I think was it a trade secret, right, and you define what a trade secret is.

THE COURT: All right. Let me think about that. Mr. Donnelly.

MR. DONNELLY: I think valid is critical here because there's this lower case, TS, trade secrets, in these NDAs they sign. This is a different world we're in. This is the DTSA, it has to be a trade secret in accordance with the instruction your Honor is going to give on the various requirements of a DTSA trade secret, so valid that there has to be some description of that, it's just not something hanging around in an NDA.

THE COURT: Let me think about that. One of the advantages, great advantages, monumental advantages, to giving the jury the written instructions is the jury looks at it, and the verdict form doesn't have to be as perfect or detailed, it has to be right, of course, but it doesn't have to be detailed as it otherwise might be.

And in my experience, you know, I talk to every jury, every single jury that I've ever spoken to has not only been grateful for the written jury instructions but they say they refer to them over and over and over again, and they've got to do that here, right, this is complicated stuff. So I do have confidence that they're just not going to check some boxes without thinking carefully about, you know, how they get from here to there.

All right. What I want to a do take a recess, let's call it half an hour. Again, you can mull this over, I can mull this over, start thinking about what the verdict form actually is going to look like, and I will see where we are in half an hour. We're not going to solve all these problems. I want to make this a half a day and get you all out of here.

MR. CARROLL: Your Honor, in talking about the jury verdict form, I do think it's helpful, and I don't know what the Court's practice is to have in the verdict form yes is for Insulet, no is for defendants or vice versa as parenthetical because it's clear it switches, one is not always, you know, the case, so...

THE COURT: All right. I'll look at that. This thing is prolific enough.

MR. CARROLL: I understand.

THE COURT: And to add additional words.

THE CLERK: All rise.

(A recess was taken.)

THE CLERK: All rise.

THE COURT: Thank you, you may be seated. Court is now back in session.

All right. Let me suggest a way of framing this, and I'll start by saying that I have concluded based on *BioPoint* that Jesse Kim can be jointly and severally liable, but Luis Malave, Ian Welsford and Steven DiIanni, that does not get reflected in the jury verdict form. That's a matter of law. I think in practical terms whether someone is jointly or severally liable is an issue only if the bill isn't paid, so to speak, you know, one party isn't paying their fair share and you're responsible for their share as well.

But I would propose a jury verdict form on damages, and there are subtleties that need to be addressed here, but just in simple terms, the first question as to EOFlow and Inc., which I think can be combined what is the amount of unjust enrichment and broken down by the five different trade secrets.

So let's say that Mr. Carroll says it's going to be less than $200 million because it's a nice round number, I'll say 200 million and --

MR. CARROLL: I think I said less than 230, your Honor.

THE COURT: All right. 196 to 231 I think was your sentencing guidelines range, but, anyway, EOFlow and EOFlow,

Inc. at the top, that part is easy in the sense that overall dollar amount broken down to trade secret.

I then think we have the individual defendants, including Jesse Kim. It would be a separate question as to whether or not any of them received any unjust enrichment other than any increase in the value of any ownership or interest in EOFlow, such as additional compensation, salary, consulting fees or whatever arising out of the misappropriation, so basically is there anything else? And that would be based on an assumption that any increase in the value of their EOFlow stock would be captured in the award or lack of award to EOFlow.

And then I think Nephria Bio is its own freestanding thing, but, again, did Nephria Bio, was it unjustly enriched in some way otherwise than the increased benefit to EOFlow or, you know, any value, increase in the value of EOFlow?

So that I think address this issue of double counting. Jesse Kim, they could say no, there's no additional benefit. That doesn't mean he's not jointly and severally liable for all of the damages accruing to EOFlow because he would be or from EOFlow, I should say, and I guess thinking a step ahead, I'd propose that as the individual defendants, we start with Nephria, we check a box, is there anything additional, yes, no, and then take it from there.

So we sort of have an above the line and below the

line.  Sort of defendants above the line are the two EOFlow entities, what's the total damages amount broken down by trade secrets.  Individual defendants, did they have any other unjust enrichment?  And Nephria Bio, did it have any additional unjust enrichment?  And if the answer to that is yes, then we work through that.  And then Jesse Kim would be jointly and severally liable for any damages attributable to either or both of the EOFlow entities.

Mr. Carroll.

MR. CARROLL:  Your Honor, I think that makes sense as a practical matter.  The one thing I would suggest that may simplify it, I think it would be appropriate for Jesse Kim to be on the same line with EOFlow, and what that means, we would agree not making a separate argument separate from the shared increase argument, because he's jointly and severally liable it doesn't matter.

THE COURT:  I guess I know it doesn't matter.

MR. CARROLL:  Right.  But they don't know.

THE COURT:  Go ahead.

MR. CARROLL:  The other thing I would say, I think that a nominal damages instruction actually becomes quite important under this framework because, you know, it is right that damages are not an element under the DTSA, and I think for the individual defendants, equitable relief, specific performance perhaps is going to be quite important to our

client to seek that.

THE COURT: Well, I've sort of assumed from really throughout the trial that that was a more important goal.

MR. CARROLL: It is quite important to our client.

THE COURT: But nominal damages because the damages could be zero, I mean, they could say no, no individual defendant gained anything, and, therefore, the value of their unjust enrichment separate from any stock ownership they may have is zero, but that doesn't preclude injunctive or other equitable relief.

MR. CARROLL: I agree, it could be a little confusing to jurors, you know, the liability at finding no damages, and so nominal damages is a way to avoid that potential confusion, right, it's just one dollar.

THE COURT: I feel better if you had a case saying you could award nominal damages.

MR. CARROLL: I don't as I stand here right now, but I will endeavor to find one.

THE COURT: Okay.

MR. GERSHENSON: On this point, I agree it makes sense. It seems like a sensible approach. The one question is jamming the two corporations together, I don't know that that is supported by the evidence or helpful. I fear there's going to be -- they are two different entities. I think one of them did and one of them did not employ different people and the

like.  That seems to be a step in the wrong direction from our perspective, your Honor, so we would object to that piece of it, otherwise we're good.

THE COURT:  And we do need to take into account this wrinkle of DHF incorporating the other trade secrets. Mr. Frederickson.

MR. FREDERICKSON:  I was hoping to address that, but I didn't want to get ahead of any other issues.

THE COURT:  Go ahead.

MR. FREDERICKSON:  So as you noted, the DHF, there's been two competing theories about what the value of the DHF is and how it folds into the damages analysis.  What we had proposed when your Honor had proposed the prior framework was to have the DHF be a separate question, something to the effect of, you know, please identify by filling out the box below what additional compensatory damages you would award to the plaintiff for misappropriation of the DHF.

The important nuance there is if the jury is going to award either under the original framework or what you proposed damages for the DHF, it should be clear that it's additive to the damages awarded for the CAD file or any other misappropriated trade secrets.

The situation we're trying to plan for is a scenario where let's assume that the jury awards $20 million for the CAD file and $20 million or $500,000 for the DHF.  The uncertainty

and the ambiguity is the DHF is supposed to be all encompassing or is it an iterative additive amount, and so some form of instruction either on the instructions or on the verdict form that what we are asking the jury to award when it comes to the DHF --

THE COURT: Broken out separately and are there any additional nonduplicative damages?

MR. FREDERICKSON: Exactly.

THE COURT: Okay.

MR. GERSHENSON: I would just say that sounds confusing. There's been obviously -- I won't say obviously -- it seems like there's been --

THE COURT: If that's standard, I'm not going to give them any instructions at all.

MR. GERSHENSON: Mr. Bostic can address it. I guess the question is, you know, what's been shown, what's been proven, how this case was argued so far, but you can address more fully.

THE COURT: Mr. Bostic.

MR. BOSTIC: I don't see a reason to deviate from the general approach when it comes to the DHF. I think that law requires damages be broken out is trade secret. We have a set of trade secrets here. I think that the way that the plaintiff has kind of assigned value to the DHF, they represented that it accounts for that there is some overlap here, that it accounts

for all of the value.

THE COURT: The other four is subsumed within the DHF.

MR. BOSTIC: So my concern is that breaking out separately kind of highlights it and might give the jury a misimpression as to it being in a different category.

THE COURT: But I have to somehow make sure they aren't awarding these cases, again, I don't want to try this case over again, so it has to be clear somehow that whatever damages they might award on DHF either completely matches, you know, the other four added together or is something extra. Somehow I have to get them to give an answer to that question, it's just a question of how I frame it. Yes.

MR. FREDERICKSON: We agree, we agree with the fundamental point that the damages ought to be awarded on a trade secret by trade secret basis. The DHF should be treated differently because the DHF is different. That's the fundamental thing we need to account for when getting this verdict question to the jury.

MR. BOSTIC: Each of them is different from each other one, but maybe we should consider some specific language and then circle back to this.

THE COURT: Okay. Mr. Donnelly, anything you want to add to this?

MR. DONNELLY: Yes.

THE COURT: I've just given you this big victory, you

should be smiling.

MR. DONNELLY: I'm smiling, smiling on the joint and several, your Honor. I do have, and I'm fine with the overall structure that you've proposed, but like so much of this, the devil is in the details. Because Welsford and DiIanni don't own any stock, they shouldn't be included on that fall-on question.

THE COURT: Okay.

MR. DONNELLY: Second, I don't think that there's a pathway for Ian Welsford personally to be liable for $180 million or whatever this DHF number is going to be. He was not unjustly enriched, so I'm concerned that the unjust enrichment concept is going to get lost. I think it's the question as posed in the jury verdict slip, the draft that we saw this morning is exactly the right one, which is 4 and 5, what unjust enrichment could Ian Welsford have? He didn't get any personal benefit out of the DHF being misappropriated other than possibly his compensation, some portion of his compensation that was spent misappropriating the DHF which, of course, we deny that there's any basis for that to begin with, but that's of grave concern to me with Welsford.

THE COURT: Okay. How I think this works under my proposal, the jury really couldn't make that finding, it would be EOFlow, EOFlow Inc., and then we'd have these separate questions for the individuals, and in Welsford, it would just

be did he earn anything else as a result, was he otherwise unjustly enriched to compensation?

MR. DONNELLY: Yes, and I appreciate what the Court is saying. It's, again, wording is going to be important here.

THE COURT: Yes.

MR. DONNELLY: And that's my last comment is part of what the defendants submitted Saturday evening, we have specific language on page 82 and 83, and they spill onto a little onto 84, for how to adjust the damages instruction so it's clear on a defendant by defendant, and it's for this particular defendant, and in talking this over, it may be what your Honor yesterday afternoon talked about the different apportionments. Thinking more about that, I think a word like "consideration" or "assessment" or something like that, it's not really apportionment in each instance.

THE COURT: Obviously, wherever I land on the verdict form has to fold back somehow in the instructions, that can't be the only instructions I give.

What I think makes sense right now is for me to get something on paper, so we're not talking in the abstract, you can look at exactly what it is I propose, and then you can take your shots at that as opposed to talking in the abstract. I think I'm comfortable with this general framework. I think I can make this work, and --

MR. FREDERICKSON: Can we offer one other suggestion,

your Honor?

THE COURT: Yes.

MR. FREDERICKSON: With respect to the exemplary damages, in our view, those don't necessarily need to be broken out on a trade secret by trade secret basis, just given that there will be a separate verdict on liability and a separate verdict on compensatory damages.

If the Court was looking to streamline a portion of the verdict form, just asking the jurors to award a total amount of exemplary damages on a defendant by defendant basis, the exemplary damages question likely doesn't run into the same issues about the Court of Appeals, you know, disagreeing with any portion of a verdict that maybe the damages or liability questions would, so that would be one suggestion to simplify the verdict form.

MR. GERSHENSON: I guess the question there is what are you multiplying, and that's going to be the problem, right, it has to be caused by in the first place, and so I think that it was the right approach that the Court has. We did have something to flag on that page and couple of others, although in broad strokes, we are on board fully with the verdict form as written.

On that question Number 7, exemplary damages that Mr. Frederickson raised, please -- in our view, Please identify by filling in the correct box what exemplary damages, if any,

and that would accord with the instructions that you award the plaintiff.

THE COURT: All right. Okay. Let me go do some wordsmithing with my law clerks, and, again, we'll say half an hour. Anyone can peel off if you have flights you need to catch, that's fine with me.

( A recess was taken.)

THE COURT: All right. I'm going to hand out a redraft of the jury verdict form. This is dashed off somewhat obviously, and I'm sure it can be improved, but starting at question 5, the idea here is that we -- and it does seem to me to make sense to combine EOFlow and EOFlow, Inc. I guess I haven't finally come to rest on that, but I'm having trouble seeing why it makes sense to separate them.

Anyway 5 is, you know, what are the damages and unjust enrichment damages as to the EOFlow entities, and 6 is the remaining five defendants, were they unjustly enriched from other sources, salaries, bonus, revenue, consulting fees, that arose from the misappropriation, and I've included both Jesse Kim and Nephria Bio in there.

And then question 7, 6 and 7 could be combined, and maybe that makes sense. It does seem to me to maybe cut this short, if they check no to a lot of these boxes, it cuts out a lot of confusion, I think, and then the DHF overlap is addressed in question 8. So that's the basic idea.

Let me ask a separate question, which may be a lot easier. Mr. Mead sent me this e-mail about the effective date of the DTSA continuing misappropriation. I agree all this is true. I'm wondering, do I really need this instruction or not? I mean, if the jury finds -- is there a scenario in which the jury finds a misappropriation before May 2016 but no use afterwards?

MR. CARROLL: I don't think there is, and I don't think it's necessary for that reason.

THE COURT: I mean it's just one more piece of clutter. You haven't really defended on this ground in the sense of putting it before the jury, I know you have statute of limitations defense, that's different.

MR. GERSHENSON: Correct. If the proposal is cut the original sentence that says it cannot occur before, that makes perfect sense.

THE COURT: Do we really need the whole instruction about when the DTSA became law?

MR. GERSHENSON: Yeah, I think if we could drop all of that.

THE COURT: I think drop all of that.

MR. CARROLL: I think it's just one sentence we're talking about, right?

THE COURT: Well, I added a second sentence to make sure we're picking up continuing...

MR. CARROLL: I don't think it's necessary.

THE COURT: It seems to me cluttering context. Obviously, the statute of limitations is a separate issue. This seems to me like kind of a confusing detail that really has not been the defense. I mean you haven't moved to dismiss, summary judgment on that ground.

MR. GERSHENSON: Mr. Mead, am I missing anything? I want to go right to the source.

MR. MEAD: Agree, for removing those two sentences, agreed.

MR. GERSHENSON: Thank you, your Honor.

THE COURT: All right. We'll just eliminate that. On the verdict form itself, just to be clear, once I've figured out what this thing ought to look like, I need to work backward in the jury instructions and explain what I'm going to do, but let's see if we can't get this right.

And let's start with Mr. Gershenson. Again, technically maybe the two EOFlow entities ought to be separate. Does that really make sense? Does that really move the ball forward here?

MR. GERSHENSON: I mean --

THE COURT: If you convince me they ought to be treated separately, they're separate defendants, I mean I'll hear what you have to say, I'm just trying to again declutter this as much as I can.

MR. GERSHENSON: In the interests of efficiency, we object but can move onto other issues.

THE COURT: Persuade me. You object, what's wrong with it?

MR. GERSHENSON: So I guess what's wrong with it is that they don't have the same bottom line, they don't have the same composition, I don't think as a corporate matter, they didn't employ the same people in the same way at the same time, so I don't know that as a straight up factual evidentiary matter they would or would not be enriched in the same way. They're two different companies, that's really the issue.

MR. CARROLL: I do think the evidence has been 100 percent owned by the other. It is factually true that they have consolidated financials, and so if they're joint and severally liable, I don't think there's a real difference.

THE COURT: Okay. I'll mull that a little bit more. Then again, question 6, again, I'm trying to distinguish here between valued EOFlow, which is a form of unjust enrichment and anything else in any other form to any of these people, and so one of the dangers on this is the jury may be confused well, why is Jesse Kim lumped in with Steven DiIanni? But, again, I'm trying to make this relatively simple, and the whole idea here is other forms of enrichment other than the value of EOFlow. And if they say yes, he gained other things, then, okay, go to the next question and tell me what they are and in

what amounts. And then the DHF overlap question I think needs to be asked. There's got to be a clearer way to ask that question, but I think the concept needs to be...

MR. BOSTIC: Your Honor, regarding question 8, I understand what the Court is trying to do. Our concern is that having them go through the analysis for all the trade secrets, including the DHF, for two different sets of defendants, then encountering this question might just -- I see the potential for confusion there.

I wonder if this could be addressed just by adding like a one-sentence instruction underneath the other sections of the verdict form where they're assigning a value for the DHF something to the effect of, "Because plaintiff alleges the other trade secrets are included within the DHF, you may not award any damages for the DHF that are already reflected in damages for the other asserted trade secrets."

THE COURT: Mr. Carroll.

MR. CARROLL: Mr. Frederickson.

MR. FREDERICKSON: I don't think that works. That presupposes that the jury accepts Insulet's theory of the value of the DHF where the defendants have put that the DHF was an incremental benefit, and so if they're going to -- if the jury is going to latch onto that incremental benefit, then referencing what the plaintiff's theory of the case is one side of the story and doesn't address the issue.

THE COURT:  What if it were neutral, any damages awarded to the DHF may not be duplicative of any damages awarded as to the other four?

MR. FREDERICKSON:  I think something like that does not -- whether the right word is duplicative, not overlapping, additive, pick your synonym, but I think that's right, your Honor.

THE COURT:  And then I could repeat that again when we get into, you know, if there are other damages, at the end of question 7, I could add the same thing again, you know, it could not be duplicative.

MR. FREDERICKSON:  That would work.  Ultimately at the end of the day, where we want to be if there is a finding of damages, there's no confusion when we see a bunch of numbers, the total amount that each party is awarded is an additive number.

MR. BOSTIC:  And I think that concept works, your Honor.  We need to spell out a little more what duplicative means.  The amount for the DHF cannot include, and then frame it however we think is clearest, but the amount for the DHF cannot include amounts already assigned to the other asserted trade secrets.

THE COURT:  All right.  Let me take a shot at that.  All right.  I think Mr. Bostic, do you have something else?

MR. BOSTIC:  Yes, your Honor, just briefly as to

question 6. Our concern here is that the plaintiff's damages theories as presented to the jury didn't focus on salaries, bonuses, revenues, consulting fees. They don't have the information needed to award damages on these bases, so directing them towards that kind of analysis might be problematic.

THE COURT: It might be first off cleaner if I were to combine salaries and bonus and say compensation, revenues or consulting fees. Well, Mr. Donnelly.

MR. DONNELLY: Yes, your Honor. Comment on question 6 and 7, the second sentence. "For example, you may consider any salaries, bonuses, revenues, consulting fees that arose from the misappropriation," I think it should be better phrased, "resulting from the misappropriation," which is truer to the "caused by" language in the statute.

THE COURT: Okay.

MR. DONNELLY: I have the same comment on question 7, that "for consulting fees resulting from the misappropriation," and on 7, I think the second line after the word "damages" should include, "if any,"

THE COURT: Okay. Do you want to respond to this?

MR. CARROLL: Yeah, I think it makes sense -- I think exemplars are probably important here for clarity, and I think it makes sense what the Court suggested, that compensation, so stated more generally, I think that edit makes sense, and

hopefully that would address the issue the other side raised, compensation, revenues, or consulting fees.

THE COURT: Yeah, I guess without a deep dive into the record here, I guess I'm not quite prepared to essentially direct a verdict as to any compensation as to Kim, Malave, and Welsford. There is certainly evidence as to revenue or fees earned by DiIanni and Nephria. I guess I think -- well, I'm inclined to let this go to the jury, and if you convince me after the fact if there was some award to one of those individuals for something other than the value attributable to the EOFlow, I can JNOV if it comes to that.

I don't think I'm prepared to direct a verdict that there's no evidence of any other personal benefit other than the value of EOFlow. I don't think I can say that based on my understanding of a very full and complex record.

All right. Again, in the interests of time, let me make some of these suggested changes, and we'll regroup as soon as we get that done, again, give you something else to look at, and I'll also print out changes I've made to the jury instructions.

I have left blank how I instruct on what I'm doing here for the time being, but the other changes I have made, and we'll get that to you as well.

MR. GERSHENSON: Would it help for us to flag points or would you rather go and come back and we flag other points?

THE COURT: If you have other points, why don't you flag them.

MR. GERSHENSON: Please. So on the verdict form, question 1 where it says --

THE COURT: It says valid?

MR. GERSHENSON: -- and then trade secrets owned by Insulet, we think it would be simpler and shorter not to sort of misplace the focus on owned, which isn't really in dispute. We haven't been saying they don't own them, are any of the valid trade secrets, seems like a truer question in this case.

MR. CARROLL: I mean I think that would -- if ownership is truly not disputed, I think that should go in the jury instructions if it's going to be rephrased this way. If it's stipulated to, it's stipulated to. I will renew my objection to the word "valid" here, but it so sounds like the Court already decided that.

MR. GERSHENSON: And we're okay with that request on the jury instruction if that's, you know, to streamline.

THE COURT: Right now I do have a one sentence jury instruction. I'll have to say you'll have to ignore it or say if you've agreed that these -- if these are trade secrets, they're owned by Insulet. It might be simpler to leave it as it is for now. Okay.

MR. GERSHENSON: On question 5 of the verdict form, and I apologize, my notes are on the prior version. Yes. So

what compensatory damages I think should say, if any, award to the plaintiff because you mentioned the zero or nominal damages not an element.

And then on question 6, we think there should be some guidance probably at the bottom of the table saying if you checked any boxes, go to 7. I'm just checking to make sure it's still current.

MR. CARROLL: I think the number is different.

MR. GERSHENSON: I'm looking at the current. Don't we still need the -- oh, I see. Okay. I think what I'm looking at is the willful and malicious one, which maybe now 9.

THE COURT: Okay.

MR. GERSHENSON: It seems likely there should be some guidance that says something like if you checked any box here, then go to 10; if not, skip 10.

THE COURT: Okay.

MR. GERSHENSON: And then on what is now 10, we think that should say, and I may have raised this already, I apologize, what exemplary damages -- you put that. We're set on the verdict form from our perspective.

There were a couple of quick things on the instructions, if I may.

THE COURT: I'm going to redo this like an algorithm with the diamond.

MR. GERSHENSON: Flowchart. Okay. So on page 41, the

reverse engineering instruction, your Honor did correct and address the point about create, I appreciate and recognize that. The question that we still have is on the fourth paragraph and in particular where it says, you know, might not, you know, reveal anything about a competing...

THE COURT: Uh-hum.

MR. GERSHENSON: It seems like we think that paragraph should come out. If it had to be there, the real question is may or may not, and that's the question for the jury, so we don't want to be pushing them in the direction, it might not reveal X, it may or may not.

THE COURT: Okay.

MR. GERSHENSON: Then I believe Ms. Mayhugh wanted to address malice, please, the definition.

MR. CARROLL: Could I say something about reverse engineering on page 41? I think this is appropriately phrased. I mean, and I think we've discussed it for a long time yesterday.

THE COURT: I can change might to might not, might or might not.

Ms. Mayhugh, do you want me to put the word "despicable" back in there?

MS. MAYHUGH: Your Honor, we're going to propose something to streamline the definition of "malicious" to limit it to "intent to cause injury." I think you had rightly

flagged the definition particularly with the two parts whether it's to cause injury or knowing disregard. The case law supports the "intent to cause injury" definition of the malicious and KPM1581.

THE COURT: Slow down, slow down. Go ahead.

MS. MAYHUGH: So the case cite is 2024 WL 1558167.

THE COURT: Okay.

MS. MAYHUGH: It's the KPM Analytics case, and they define malicious there, "intent to cause injury," and that's what we would propose for this instruction.

MR. EVANS: I think if you look at KPM, the definition includes both of the concepts that your Honor has put in the instruction and they're disjunctive, and we think the language should remain.

THE COURT: Okay, I'll take a look at it. Let's take another quick recess.

THE CLERK: All rise.

(A recess was taken.)

THE CLERK: All rise.

THE COURT: Court is back in session. All right. Quickly, I have, I think, emailed you an update to the instructions. In my haste, I neglected to delete the DTSA instruction, which I will. I am convinced based on the *KPM* case that the malice instruction should not include the phrase "of intentional disregard for the rights of others" because

even if that is normally true, to commit misappropriation, as the opinion points out I think in a footnote, you have to disregard the rights of others, you have to disclose or use it knowing that it was acquired, it's a trade secret to its improper means, and that would allow for the possibility of exemplary damages in every case, and I don't think that could be right, so I've changed "simply designing malice" now with intent to cause injury or harm.

On the reverse engineering instruction, I think it is awkward in context to change it to may or may not. I don't think it's unfair, so I've left that alone. At this point, I've left in the business about Insulet must prove it owns the trade secret. I think it's simpler perhaps to just give that instruction than to explain that it's stipulated to and, therefore, they need not decide it. I'd be kind of surprised if the case rose or fell on that. I wouldn't be kind of surprised, I would be shocked.

I have a placeholder at this point where I need to craft an instruction that basically explains what we're doing with the jury verdict, and I think otherwise the instructions themselves are close to final in my view.

You have now been provided two options on the jury verdict form which has incorporated a number of the suggestions. The principal difference at this point is how we handle the DHF issue. Option 1 has 8, "Please identify

anything that does not overlap." Option 2 is the much more streamlined version, which simply has the sentence, "The amount you award for DHF, if any, may not overlap with any amount you award for another trade secret."

I am sorely attempted to say the least to give the streamlined version or a variation of it. Thinking about this, my concern is suppose we just say that, you know, your DHF award can't overlap any other amount, and suppose the way this played out on appeal was some of the trade secrets were upheld and some were not.

The DHF secret could be upheld, but if there's a separate smaller award that simply doesn't overlap with, I don't know, the cannula award, let's say we wouldn't know if the jury might give the larger award, the DHF having value even if the cannula is not a valid trade secret, if I'm phrasing that correctly, so the most sensible is force the jury to break this out, is there any unjust enrichment that does not overlap, and, if so, please spell it out. I'm not sure which is right, I'm just framing the problem.

Then the other thing I'm going to propose in light of the time, which is after noon on the Wednesday before Thanksgiving, I think what makes sense to have another round of discussion now. I can let you go, I will craft some of this, send this by email, and you can respond by email or Monday morning as the case may be but just if you have particular

concerns or changes, I think that makes more sense than you all sitting here delaying your travel plans while I wordsmith these things, but we can come close to finality here and clean it up, again, by email exchanges over the next few days.

So with that, let's talk about this DHF issue, again, the idea being that I would like to account for the possibility that this may play out in any one of dozens of different directions on appeal but including some trade secrets might be upheld and some not, and I don't want the whole verdict to fall if that happens.

MR. FREDERICKSON: So we think everything that you said about the two options is absolutely correct, and given the concern about potential appeal and the implications, it does seem like the slightly more complicated or at least the additional question would provide the best and the parties the most amount of information of any potential consequences of an appeal, so we would be inclined to go down that route with that separate question 8.

To address the concern Mr. Bostic raised, perhaps there is a sentence in the jury instructions that you could add that flags that this later question would be coming if the jury were...

THE COURT: I think that would be part of the -- in other words, what I'm proposing to do on this thing, on the instruction I haven't written yet is to just kind of walk

through it, and when we get to -- actually we're talking about damages, so it's assuming that we're at the point of damages to say you're first going to be asked about, you know, this EOFlow's set of damages, you're going to be asked about other possible damages, you're going to be asked a question because Insulet's intention is that the DHF in some ways incorporates or overlaps the trade secrets, I'm going to ask you to break out your damages award if you make one separately, et cetera, et cetera, and just kind of walk through that so they hear it from me as well as see it on the verdict form.  Mr. Bostic.

MR. BOSTIC:  Your Honor, just so I'm following the discussion, as I understood the Court's initial comments, the Court was leaning to option 2, the more streamlined?

THE COURT:  Yes, because streamlining is good, but if I can't do it or if it's risky to do it, I guess.

MR. BOSTIC:  I tend to agree, I think the streamlined without the additional question is appropriate.  I think the danger of the additional question is not only are we asking the jury to conflict between the DHF and the other asserted trade secrets, we're also asking them to deconflict between their initial valuation of the DHF and then this subsequent question. I view my confusion as a predictor of the jury's potential confusion on this.

THE COURT:  I can't even imagine, okay.  There's a lot of intelligent people in this room, and I'm going to exclude

myself, and I think all of us have some level of confusion I'm very much concerned about, but having said that, we've spent a month trying that case. I really, really recommend whatever the jury decides, it's upheld on appeal, and that involves sometimes asking them for specifics, so I take the point but...

MR. FREDERICKSON: The problem with the streamlined version that the jury is not ultimately deciding or at least tell us what the value of the DHF is.

THE COURT: I guess that's exactly the point, and we can't make this quite perfect, you know, there are a lot of variables here, but, anyway, I take the point. Mr. Donnelly.

MR. DONNELLY: Yes, thank you, your Honor. Question 7 I would ask the Court to just align the second sentence with the first sentence. The first sentence refers to against each individual defendant, and then the second sentence says "any unjust enrichment you award due to the individual defendants," plural. I think it should be "award due to each individual defendant."

THE COURT: Yes. Okay.

MR. DONNELLY: As I understand it, we'll have an opportunity to review your next round of jury instructions and submit comments?

THE COURT: That would be my, yeah, I think that -- I don't need to go anywhere but home, but I also don't want to impose on any of you, and at this point I think I'm down on the

wordsmithing level other than how specific I get about DHF, and I just don't know it's productive to have all of you sit here or wait in the court.

MR. DONNELLY: I understand that, your Honor. I would just flag that same issue that I just raised on the instruction, especially where your Honor is giving an instruction early on that defendants singular is being used as a shorthand. There's a few places, particularly in the damages instructions where there's a reference to the defendants plural --

THE COURT: Okay.

MR. DONNELLY: -- that's concerning to me particularly.

THE COURT: All right, I'll try to take a look at that. Anything else you want to?

MR. GERSHENSON: There are a couple of things, but I can take them up. The first is, not surprisingly, the defendants reserve objections to the instructions where deviated from what we submitted. The defendants would renew our Rule 50 motion at the close of evidence.

THE COURT: That motion remains denied without prejudice.

MR. GERSHENSON: Thank you, your Honor. Then in terms of the closing, just very quickly, sort of two issues really, one is duration, and the other is content.

THE COURT: Yes, duration, particularly, yes, go ahead.

MR. GERSHENSON: So I would propose for defendants 75 to 90 minutes to defer to your Honor's instruction. And then in terms of the contents, we just wanted to know specifically can slides contain trial testimony, Number 1?

Number 2, can slides -- I know you mentioned verbatim use of the instructions, can those be on the slides or not? And then in terms of the verdict form, I could imagine a slide of the verdict form, but I would not think it would be permissible for either party to be filling in that form for the jury.

Those are -- and the last one is we heard in the opening a few times we're here because defendants did not take responsibility. I'm not sure what that meant. I don't know what fact or law that's even referring to. It seemed odd or confusing, I don't know. It didn't refer to statements which would be off the table and nonexistent from the other party, so I don't think we should argue we didn't take responsibility and that's why we're here. Those are the points for the closing I want to redress.

THE COURT: Let's talk about duration.

MR. CARROLL: My plan is approximately 60 Minutes.

THE COURT: How many? 60?

MR. CARROLL: 6-0.

THE COURT: Yes, when you say 90 --

MR. GERSHENSON: My team kicked me under the table. I was referring to the closing arguments, and I would defer to Mr. Tinger and Mr. Donnelly.

MR. DONNELLY: For our clients, we're going to do the same thing namely, I'm going to address Malave, Madden is going to address DiIanni, I'm going to address Welsford, and we're aiming for 15 to 20 minutes per party.

THE COURT: For each of those?

MR. GERSHENSON: For each of those.

THE COURT: That seems to be way too long since there's so much you can build off of whatever Mr. Gershenson says, and those parties are -- I mean, I know you're representing individual defendants here. That's an hour for three individual defendants before we get to Nephria.

MR. TINGER: Your Honor, Justin Tinger for Nephria. I'm planning on 15 minutes or less.

THE COURT: All right. Let me -- we'll obviously have to allow for plaintiff's rebuttal. So at the risk of stating the obvious, jurors are not masochistic. Nobody likes to sit for long periods of time with people just talking to them. You have to do what you have to do, but in my experience, jurors are visibly restless with long or duplicative or unnecessarily detailed closings. I'm sure you've heard the cliche' there's no soul saved after the first hour. You know, you need to be

quite careful about this. In my experience, closing arguments are weirdly disorganized. I don't know why that's true, but it is true with all kinds of unnecessary stuff and duplication and rambling and so on.

So I'm not going to be artificial about this because it's hard to do that, but I think 60 minutes for plaintiff, 75 for EOFlow, 10 for each of Mr. Donnelly's clients and 10 to 15 for Nephria is probably generous. I won't cut you off in mid-sentence.

Again, I'll let you do what you need to do, but, again, in my experience, which has been gained sometimes painfully, lawyers don't even do dry runs of their closings, and they tell me it's going to be half an hour, and after an hour and 15 minutes when I'm gently clearing my throat, you know, the lawyer will start to say well, I still have 17 topics left to address. Oh, wait did I say 17, I really meant 19, so it really ought to be tightly constructed. The object is not to beat everyone to death, the object is not to cover your rear, the object is to persuade them that your client's view of the evidence is correct.

And I have to allow plaintiff's time for rebuttal. I normally say three minutes, I think maybe 10 or 15 is more the right order here. I will allow you to put up testimony and show it if it's a final transcript. I'll allow that for both sides. I will allow you to in limited doses show you a portion

of what you expect my instruction to be, and I will allow you to show the verdict form. I beg you not to do the animation where you start, you know, checking no, no, no, no, it's time-consuming and doesn't really get you anywhere. It's hard for me to police every rhetorical flourish like taking responsibility.

Obviously, I expect the arguments will be in bounds and conform to the evidence and the law. You know, sometimes people get carried away. I'll ask you not to get carried away, but, you know, a phrase like "take responsibility," if you're right, it doesn't have any particular meaning here, but it's also not particularly harmful or impactful on the case.

No one is going to be so inflamed by that that they're going to return a verdict because of it, so I would I guess again repeat the object here is to be persuasive. I don't even like the phrase "closing argument." I don't like the argument. You've not here to argue with anyone, you're here to persuade, and persuasion consists of lots of different things, but a big part of that is getting to the point, and you don't need to make every single point that you could possibly make or talk about every single piece of evidence or everything that occurred in the trial but to get to the heart of your case in a reasonably and organized and expeditious fashion.

So, and, of course, we need to take breaks and all of that. Anyway, it's going to be what we need to get done that

day because I'm starting another trial. Yes.

MR. CARROLL: Your Honor, just two points about the closings. One is it is my desire to keep to 60 minutes, but if I go -- I think it would be fair for plaintiff to be able to take up to 75 if the EOFlow and Kim defendants alone are going to take 75. That's not my intention.

THE COURT: I'm not going to cut you off, but, you know, if you say you need more than 60, think 65, when the defense says 75 to 90, how about 76?

MR. CARROLL: Understood, your Honor. The other question I had and I raised with Mr. Gershenson, I haven't spoken with Mr. Donnelly about it yet, it is my plan to design the closing so as not to reveal the detail of trade secrets and not to ask the Court to seal the courtroom, and I'm designing slides that way as well.

So I wanted to check with the defendants if that's also their intention, and, you know, I think it's one thing for the talk track to be in a more general level. If there are slides, I understand to be displayed on the jurors's monitors, it has to be displayed on that monitor?

THE COURT: We can unplug that monitor.

MR. CARROLL: That would be a way to deal with it.

THE COURT: The other direction or something. I understand the point. There will be interest, I think, in this. You know, we're going to have law clerks and spectators

and people who want to watch these arguments.  For better, for worse, our law clerk population is exactly the kind of people who wind up taking jobs at places like Goodwin or Cooley, and they want to see what you're doing and how you're doing it, and I think I will be sympathetic to that, and I think, Matt, we can't turn off that big screen independently, you can't turn it on and off?

THE CLERK:  I can move it.

THE COURT:  All right.  But, anyway, it would be best not to have to pause, kick everybody out of the courtroom, which is going to be more than one or two people and bring them back in.  Do what you need to do.  Having proceeded the way we have, I'm prepared to continue to proceed that way, and it would be nice if you could draw the distinction between the documents themselves and the spoken word.

MR. CARROLL:  Thank you, your Honor.

THE COURT:  Is there anything else?

MR. BOSTIC:  Your Honor, if I could briefly be heard on the adverse inference instruction?

THE COURT:  Yes.

MR. BOSTIC:  As Mr. Gershenson said, we preserve our previous objections here, but I just want to flag one thing for the Court.  We do think it's important that the specific Nephria Bio email accounts be called out in the instructions so that the scope of what the instruction applies to is clear to

the jury, and that might not be as important in other cases as it is here where the jury has heard evidence of other deletion outside the context of the Court's order, and I'm thinking specifically of Paul Hamm.

The jury's heard evidence about how some of his electronic content was deleted as part of a restructuring of Nephria Bio's IT system that nothing to do with this litigation, more of his information was deleted in the normal course of business when he left Nephria Bio, but that was before any knowledge or even before the litigation had commenced, so that has nothing to do with the Court's order, and then there was also some testimony and cross-examination about how he produced documents in this case and multiple thumb drives, so, you know, in the interest of just providing to the jury some clarity about what this covers and what it doesn't, we think those four counts should be identified.

MR. CARROLL: I think, your Honor, one critical piece is that we're just not talking about EOFlow's accounts, they were the entire Microsoft accounts, and Dr. Welsford testified that on cross that they used those accounts to communicate with each other and with EOFlow and with Medtronic, and so I think the focus on emails is confusing.

I actually think it's also disputed which ones were deleted and which ones were not. That was part of the spoliation dispute, and, of course, we don't know for sure

because they were deleted, so I think that that risk should fall upon the spoliator in this case, Dr. Welsford and the others.

THE COURT: I will think about it, but I'm disinclined to even address the topic again. I said what I said at the time, which was in context of the specific things applying to Welsford. There were other things deleted, to be sure, sometimes in the course of business, sometimes maybe not. You have to stay within those bounds.

You know, plaintiff can't say, and as you heard, Paul Hamm, you know, you draw an adverse instruction, adverse inference against Nephria or EOFlow because of what Paul Hamm did. That's not what I instructed, so it has to be within the bounds of what I said, but I'm disinclined to return to the topic. I think I'll just leave it where it is, but I'll think about it as well.

MR. BOSTIC: Understood. Can I make the Court aware of one additional fact when it comes to the content of the closing arguments? May I approach, your Honor?

THE COURT: Yes.

MR. BOSTIC: I just passed up the declaration of Brian Chasse in support of defendants's opposition to the motion for the adverse inference. This is relevant because in the opening and in evidence presentation, plaintiffs had highlighted an email from Brian Chasse to Mr. Welsford and

highlighted specific language in that email that something to the effect, I want to triple check that this e-mail should be deleted, for obvious reasons, and they highlighted "for obvious reasons." I think the risk is that the jury has inferred from that Mr. Chasse was attempting to warn Mr. Welsford about this litigation and confirmed that he really wanted to take this step.

This declaration, paragraph 5 makes it clear that at the time he sent that email, Mr. Chasse didn't even know about this litigation, so when he was asking for confirmation and saying for obvious reasons, I want to confirm this with you, we know for a fact that had nothing to do with a reminder about this litigation. I think it's been a little misleading to the fact it's been held out that way.

THE COURT: This is not in evidence in the case?

MR. BOSTIC: That's correct.

THE COURT: You didn't call Brian Chasse. I don't remember testimony from Welsford about this particular issue so...

MR. BOSTIC: That's correct. We did try to complete the picture here, but since the Court knows and since plaintiff's counsel knows, we would ask the Court to discourage plaintiff's counsel from highlighting that language in the same way that might leave the jury with the wrong impression.

MR. CARROLL: The facts in evidence are that

Dr. Welsford received this e-mail triple checking and then he said yeah, go ahead and delete it, and he knew about this litigation. I'm not going to stand up there and say what Brian Chasse thought, it's not in evidence, and it's not for me to say.

THE COURT: I'm going to leave that where it is. All right. Have a Happy Thanksgiving, all. I am hopeful that whatever email I send you with the final or reasonably final versions of this is going to occur within the next couple of hours as opposed to halftime of the football game. You may know that I was raised in Michigan, and despite living here for 40 plus years, I do have feelings about the Detroit Lions. In fact, I wanted to ask Mr. O'Shea. He went to University of Detroit. Couldn't do it in front of the jury, obviously. I hope like all right-thinking people that you are going to be cheering for the Lions otherwise.

MR. CARROLL: 100 percent, your Honor.

THE COURT: I'll make a factual finding that I have questions about the sincerity of that.

THE COURT: Anyway, have a great Thanksgiving, all, and as I told the jury, remember that there is a great deal to be thankful for, and I hope it will be some respite from what you've been doing, working very hard over the last month, six weeks, year, and barring further developments, I will see you at 8:30 Monday, December 2nd.

MR. CARROLL:  Thank you, your Honor.

MR. GERSHENSON:  Thank you, your Honor.

(Whereupon, the hearing was adjourned at 12:41 p.m.)


C E R T I F I C A T E


UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS ) ss.

CITY OF BOSTON )

I do hereby certify that the foregoing transcript, Pages 1 through 71 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 23-11780-FDS, INSULET CORPORATION vs. EOFLOW CO., LTD., et al. and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated November 30, 2024.

s/s Valerie A. O'Hara

_____

VALERIE A. O'HARA
OFFICIAL COURT REPORTER

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1807

**Short Case Caption:** Insulet Corp. v. Eoflow, Co. Ltd., et al.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13940__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/22/2025

Signature: /s/ Adam S. Gershenson

Name: Adam S. Gershenson