# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INSULET CORPORATION,

*Plaintiff-Appellee,*

**v.**

EOFLOW CO., LTD., EOFLOW, INC., AND JESSE J. KIM,

*Defendants-Appellants.*

On Appeal from a Final Judgment of the United States District Court for the District of Massachusetts (No. 23-cv-11780) (Saylor, J.)

## PLAINTIFF-APPELLEE'S RESPONSE BRIEF

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000

Alexandra D. Valenti
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7351

Robert D. Carroll
Robert Frederickson III
Alexandra Lu
William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

September 26, 2025

*Counsel for Insulet Corporation*

# CERTIFICATE OF INTEREST

Counsel for Appellee certifies the following:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Insulet Corporation

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None/Not Applicable

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   None/Not Applicable

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   *Goodwin Procter LLP:* Scott T. Bluni, Timothy Keegan, James Breen, Arshjit Raince, Danit Maor, Gerard Cedrone, Jenny Zhang

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   Yes. *Insulet Corp. v. EOFlow, Co., Ltd.*, 104 F.4th 873, No. 24-1137 (Fed. Cir. June 17, 2024) (Lourie, Prost, Stark, JJ.); *Insulet Corp. v. EOFlow Co., Ltd.*, Nos. 25-1497, 25-1507 (1st Cir.).

**6.** **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

September 26, 2025                                    /s/ *Robert D. Carroll*

# TABLE OF CONTENTS

Introduction .............................................................................................. 1

Jurisdictional Statement ......................................................................... 3

Statement of the Issues .......................................................................... 3

Background ............................................................................................... 4

    A.   Insulet spends years and millions of dollars to develop the trade secrets embodied in the Omnipod Eros. ............................ 4

    B.   Defendants steal Insulet's trade secrets, but actively prevent Insulet from discovering the theft until after its commercial product launches in 2021. ........................................................ 6

    C.   After the EOPatch 2 becomes commercially available within the limitations period, Insulet obtains a sample and discovers the basis for this suit. ............................................... 14

    D.   Insulet files suit in August 2023, and the district court sends Defendants' statute-of-limitations defense to the jury. .............. 16

    E.   Even after the district court ultimately adopts Defendants' burden-shifting framework on the statute of limitations, the jury finds Defendants liable. ................................................... 17

Summary of Argument ......................................................................... 21

Argument ............................................................................................... 24

    I.   This Court lacks jurisdiction. ................................................... 24

        A.   Because Insulet's patent claims were dropped, the regional circuit has jurisdiction, not this Court. .................. 24

        B.   Insulet's withdrawing the patent claims was not an adjudication on the merits. ............................................... 27

    II.   Defendants' arguments on the statute of limitations are both legally incorrect and immaterial to the verdict. ........................ 30

        A.   Standard of review. ........................................................... 32

        B.   Defendants fail to demonstrate legal error in not giving their instruction. ............................................................... 33

C. Defendants' preferred inquiry-notice instruction would have no effect on the verdict. ...............................................40

D. Defendants' sufficiency-of-the-evidence challenge to the statute-of-limitations verdict fails. ......................................53

III. Defendants' challenge to the reasonable-measures instruction lacks merit. ...............................................................54

A. Standard of review. ............................................................54

B. Defendants cannot show either legal error or prejudice in the reasonable-measures instruction. .............................54

IV. The jury reasonably concluded that the DHF is a valuable trade secret that was extensively misappropriated by Defendants. ...............................................................................58

A. Standard of review. ............................................................58

B. Insulet adequately identified the DHF at trial. ..................58

C. The jury reasonably concluded that the DHF is a valuable compilation trade secret. ....................................64

D. The jury reasonably concluded that Defendants misappropriated the DHF. ...................................................67

V. The damages award was not an abuse of discretion. ..................69

A. Standard of review. ............................................................70

B. The district court properly allowed Insulet to keep retrospective avoided-cost damages together with the prospective injunction. .........................................................71

C. The record supports the damages award. ...........................75

D. Holding Defendant Kim jointly and severally liable with EOFlow Korea was not an abuse of discretion. ...................76

Conclusion ...........................................................................................78

# TABLE OF AUTHORITIES

**Cases:**

*AirFacts, Inc. v. de Amezaga,*
909 F.3d 84 (4th Cir. 2018) .................................................................. 66

*Alifax Holding SpA v. Alcor Sci. LLC,*
2024 WL 2932910 (Fed. Cir. June 11, 2024) ...................................... 64

*Allergan, Inc. v. Athena Cosms., Inc.,*
738 F.3d 1350 (Fed. Cir. 2013) ........................................................... 28

*Allstate Ins. Co. v. Fougere,*
79 F.4th 172 (1st Cir. 2023) .............................................. 57, 64, 65, 66

*Alta Devices, Inc. v. LG Elecs., Inc.,*
2019 WL 1924992 (N.D. Cal. Apr. 30, 2019) ...................................... 37

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,*
374 F.3d 23 (1st Cir. 2004) ................................................................. 77

*Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,*
114 F.3d 108 (8th Cir. 1997) ............................................................... 68

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.,*
663 F.3d 966 (8th Cir. 2011) ............................................................... 66

*B&P Littleford, LLC v. Prescott Mach., LLC,*
2021 WL 3732313 (6th Cir. Aug. 24, 2021) .................................. 43, 47

*BioPoint, Inc. v. Dickhaut,*
110 F.4th 337 (1st Cir. 2024) ......................................................... 76, 77

*CardiAQ Valve Techs., Inc. v. Neovasc Inc.,*
708 F. App'x 654 (Fed. Cir. 2017) ...................................................... 62

*Casco, Inc. v. John Deere Constr. & Forestry Co.,*
990 F.3d 1 (1st Cir. 2021) ................................................................... 75

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.,*
53 F.4th 368 (6th Cir. 2022) (per curiam) ............................. 61, 62, 69

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.,*
381 F.3d 1178 (Fed. Cir. 2004) ........................... 21, 24, 25, 26, 27, 28

*Ciralsky v. CIA,*
355 F.3d 661 (D.C. Cir. 2004) ................................................28

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.,*
920 F.3d 560 (8th Cir. 2019)................................................37

*Compulife Software Inc. v. Newman,*
959 F.3d 1288 (11th Cir. 2020)...........................................69

*Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas,*
982 F.3d 20 (1st Cir. 2020) .................................................63

*Dimanche v. Massachusetts Bay Transportation Auth.,*
893 F.3d 1 (1st Cir. 2018) ...................................... 33, 53, 58

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.,*
980 F.3d 1117 (7th Cir. 2020)..............................................73

*Epstein v. C.R. Bard, Inc.,*
460 F.3d 183 (2006) .................................................... 36, 37

*Federico v. Ord. of Saint Benedict in R.I.,*
64 F.3d 1 (1st Cir. 1995) .....................................................33

*Gabriel Techs. Corp. v. Qualcomm Inc.,*
857 F. Supp. 2d 997 (S.D. Cal. 2012)...................................39

*Giesecke & Devrient GmbH v. United States, Gemalto Inc.,*
2024 WL 3171658 (Fed. Cir. June 26, 2024)........................27

*Goodgame v. Am. Cast Iron Pipe Co.,*
75 F.3d 1516 (11th Cir. 1996)..............................................52

*Heagney v. Wong,*
915 F.3d 805 (Fed. Cir. 2019) .............................................76

*Heller Int'l Corp. v. Sharp,*
974 F.2d 850 (7th Cir. 1992)................................................52

*Heredia v. Roscoe,*
125 F.4th 34 (1st Cir. 2025)........................................................33, 58

*Hewlett-Packard Co. v. Mustek Sys., Inc.,*
340 F.3d 1314 (Fed. Cir. 2003) .........................................................52

*Insulet Corp. v. EOFlow, Co.,*
104 F.4th 873 (Fed. Cir. 2024)..........................................................16

*Inter-Coastal Xpress, Inc. v. United States,*
296 F.3d 1357 (Fed. Cir. 2002) .........................................................29

*Jama v. ICE,*
543 U.S. 335 (2005)................................................................38, 40

*Kemp v. United States,*
596 U.S. 528 (2022) .........................................................................40

*Knights Armament Co. v. Optical Sys. Tech., Inc.,*
654 F.3d 1179 (11th Cir. 2011).........................................................51

*Koch v. Christie's Int'l PLC,*
785 F. Supp. 2d 105 (S.D.N.Y. 2011).................................................35

*Krauser v. BioHorizons, Inc.,*
753 F.3d 1263 (Fed. Cir. 2014) .........................................................25

*Liu v. SEC,*
591 U.S. 71 (2020)............................................................................76

*Logan v. Burgers Ozark Country Cured Hams,*
263 F.3d 447 (5th Cir. 2001)............................................................25

*Menninger v. PPD Dev., L.P.,*
145 F.4th 126 (1st Cir. 2025)............................................................45

*Merck & Co. v. Reynolds,*
559 U.S. 633 (2010)............................................................35, 36, 47

*Moore v. Indus. Demolition LLC,*
138 F.4th 17 (1st Cir. 2025)..............................................................70

*Morgan-Lee v. Therapy Res. Mgmt, LLC,*
129 F.4th 93 (1st Cir. 2025)......................................................49

*Muniz-Olivari v. Stiefel Labs., Inc.,*
496 F.3d 29 (1st Cir. 2007) ...............................33, 43, 52

*Neural Magic, Inc. v. Meta Platforms, Inc.,*
659 F. Supp. 3d 138 (D. Mass. 2023)..................................55

*O.F. Mossberg & Sons, Inc. v. Timney Triggers, LLC,*
955 F.3d 990 (Fed. Cir. 2020) ...........................................27

*Ortiz v. Jordan,*
562 U.S. 180 (2011).............................................49, 61

*Phillip M. Adams & Assocs., LLC v. Dell Comput. Corp.,*
519 F. App'x 998 (Fed. Cir. 2013).......................................40

*Pie Dev., LLC v. Pie Ins. Holdings, Inc.,*
2023 WL 2707184 (5th Cir. Mar. 30, 2023) (per curiam)..................56

*Porex Corp. v. Haldopolous,*
284 Ga. App. 510 (2007)..................................................39

*PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd.,*
47 F.4th 156 (3d Cir. 2022)...............................................73

*Provisur Techs., Inc. v. Weber, Inc.,*
119 F.4th 948 (Fed. Cir. 2024)...........................................70

*RoboticVISIONTech, Inc. v. ABB Inc.,*
726 F. Supp. 3d 364 (D. Del. 2024)......................................37

*Royal Canin U. S. A., Inc. v. Wullschleger,*
604 U.S. 22 (2025).......................................................26

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods, LLC,*
580 U.S. 328 (2017)......................................................30

*SEC v. Navellier & Assocs., Inc.,*
108 F.4th 19 (1st Cir. 2024).........................................70, 76

viii

*Sokol Crystal Prods., Inc. v. DSC Comms. Corp.*,
  15 F.3d 1427 (7th Cir. 1994) ........................................... 39, 50

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
  754 F.2d 345 (Fed. Cir. 1985) ............................................... 30

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
  68 F.4th 792 (2023) ........................................ 60, 62, 73, 74

*Tatro v. Kervin*,
  41 F.3d 9 (1st Cir. 1994) ...................................................... 49

*Thomas & Betts Corp. v. New Albertson's, Inc.*,
  915 F.3d 36 (1st Cir. 2019) ........................... 33, 40, 43, 54

*TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*,
  966 F.3d 46 (1st Cir. 2020) ................................................ 64

*United States v. Woodward*,
  149 F.3d 46 (1st Cir. 1998) ................................................ 45

*Vital State Canada, Ltd. v. DreamPack, LLC*,
  303 F. Supp. 2d 516 (D.N.J. 2003) ..................................... 68

*Voda v. Cordis Corp.*,
  536 F.3d 1311 (Fed. Cir. 2008) ......................................... 32

*Ward v. Schaefer*,
  91 F.4th 538 (1st Cir. 2024) .............................................. 32

*Xitronix Corp. v. KLA-Tencor Corp.*,
  882 F.3d 1075 (Fed. Cir. 2019) ......................................... 26

*Zirvi v. Flatley*,
  433 F. Supp. 3d 448 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) ................................................................... 38

*Zunum Aero, Inc. v. Boeing Co.*,
  2024 WL 3822780 (W.D. Wash. Aug. 14, 2024), *rev'd*, 2025 WL 2364602 (9th Cir. Aug. 14, 2025) ................................ 63

*Zunum Aero, Inc. v. Boeing Co.,*
  2025 WL 2364602 (9th Cir. Aug. 14, 2025) ........................................ 60

**Statutes:**

Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*:

18 U.S.C. § 1836(b)(1) ...................................................................... 56

18 U.S.C. § 1836(d) ....................................................... 16, 21, 34, 51

18 U.S.C. § 1839(3)(A) ................................................................ 54, 56

18 U.S.C. § 1839(3)(B) .......................................................................64

28 U.S.C. § 1294(1) ............................................................................24

28 U.S.C. § 1295(a)(1) ........................................................................24

28 U.S.C. § 1331 ...................................................................................3

28 U.S.C. § 1338 ...................................................................................3

28 U.S.C. § 1367 ...................................................................................3

28 U.S.C. § 1631 .................................................................................24

28 U.S.C. § 1658(b)(1) ................................................................. 34, 36

35 U.S.C. § 286 ..................................................................................30

**Regulation:**

21 C.F.R. § 820.30(j) ..........................................................................60

# GLOSSARY

ADA ................. American Diabetes Association

CAD ................. Computer-Aided Design

CAPA ............... Corrective Action and Preventive Action

Defendants........ Defendants-Appellants EOFlow Co., Ltd., EOFlow, Inc., and Jesse Kim

DHF ................. Design History File

DTSA ............... Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376 (codified at 18 U.S.C. § 1836 *et seq.*)

EOFlow ............ Defendants-Appellants EOFlow Co., Ltd., and EOFlow, Inc.

EOFlow Korea .. Defendant-Appellant EOFlow Co., Ltd.

EOFlow U.S. ..... Defendant-Appellant EOFlow, Inc.

FMEA............... Failure Modes and Effects Analysis

HDD................. Hardware Description Document

HRS.................. Hardware Requirements Specifications

Insulet.............. Plaintiff-Appellee Insulet Corporation

Nephria Bio ...... Defendant Nephria Bio, Inc.

ODA ................. Occlusion Detection Algorithm

PDD ................. Product Definition Document

SDD.................. Software Description Document

SOP .................. Standard Operating Procedure

SRS ...................Software Requirements Specifications

SWFMEA..........Software Failure Modes and Effects Analysis

UTSA ................Uniform Trade Secrets Act

# STATEMENT OF RELATED CASES

Because the parties dispute whether this Court or the First Circuit has jurisdiction, Defendants appealed the final judgment to this Court and Insulet cross-appealed to the First Circuit. Defendants then took a protective appeal to the First Circuit as well. This Court declined to transfer this case to the First Circuit "in favor of having the parties address the jurisdictional issues in their merits briefs." Dkt. No. 18 at 2. The parties then jointly moved the First Circuit to stay Insulet's cross-appeal until this Court rules on the jurisdictional question. That court stayed the cross-appeal "pending further order," while "express[ing] no view at this time regarding any relevant jurisdictional or other issue." Order, *Insulet Corp. v. EOFlow, Co., Ltd.*, No. 25-1497 (1st Cir. Sept. 18, 2025). The parties intend to move to stay Defendants' protective First Circuit appeal (No. 25-1507) as well.

No other cases are pending in any tribunal that will be affected by the Court's decision in this case.

**INTRODUCTION**

After a five-week trial, the jury in this case correctly concluded that Defendants brazenly stole and secretly used the trade secrets underlying Insulet's groundbreaking technology. Whichever court hears this appeal (it belongs in the First Circuit, because it does not arise under patent law) should affirm that verdict. Indeed, Defendants largely do not dispute the theft. Rather, Defendants' primary argument is that Insulet should have sued sooner—even before Defendants' product was available anywhere in the world. But the jury rejected that theory, based on a mountain of evidence showing that reasonable diligence could not have uncovered the theft by August 2020—including because Defendants concealed the stolen aspects of their device and intentionally deceived Insulet about what they were working on.

One of the four trade secrets at issue was not even stolen until early 2021, well within the limitations period. The jury was properly instructed that, even if the remaining trade secrets were misappropriated earlier, the limitations period did not start to run until reasonable diligence would have discovered the misappropriation. That instruction is entirely faithful to the statutory language: "3 years after … the

1

misappropriation … by the exercise of reasonable diligence should have been discovered."

Defendants' primary argument is that the jury should have instead been told to apply "inquiry notice"—*i.e.*, to start the clock based on mere suspicion. That is not what the statute requires, as made clear by Supreme Court authority construing similar statutory language tying accrual to "discovery," not suspicion. Nor is there any possibility that Defendants could have persuaded the jury to deem these four trade secrets untimely asserted even under that standard: ample evidence showed that no reasonable company would have even suspected, much less "discovered," misappropriation of these trade secrets outside the limitations period, in part because Defendants actively concealed their theft. Defendants' own witnesses admitted that the same purported tipoffs Defendants rely upon in their brief (*e.g.*, a trade-show display) would not provoke reasonable suspicion.

Defendants' challenge to another jury instruction, concerning reasonable measures to protect the trade secrets, likewise fails to show either legal error or prejudice. The remaining issues face a steep standard of review and fail under any standard.

## JURISDICTIONAL STATEMENT

When it entered judgment, the district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, not § 1338, and the First Circuit therefore has appellate jurisdiction. Part I, *infra.* Insulet timely cross-appealed (to the First Circuit) the day after Defendants appealed. Appx22065-22067.

## STATEMENT OF THE ISSUES

1. Whether the First Circuit has appellate jurisdiction because this case does not arise under patent law.

2. Whether the district court correctly declined to instruct the jury on the non-statutory concept of "inquiry notice," and independently, whether its decision to give a statute-of-limitations instruction more favorable to Defendants than what they requested confirms the lack of any prejudice.

3. Whether Defendants' challenge to the reasonable-measures jury instruction fails.

4. Whether substantial evidence supports the jury verdict on the fact question whether the Design History File is a protected trade secret that Defendants misappropriated.

5. Whether the district court abused its discretion in balancing equitable and compensatory remedies.

## BACKGROUND

**A. Insulet spends years and millions of dollars to develop the trade secrets embodied in the Omnipod Eros.**

Insulet pioneered a revolutionary new treatment for the millions of diabetes patients who need continual insulin therapy: the Omnipod, the world's first disposable, tubeless insulin "patch-pump." Appx20445-20446(121:6-122:5).



Appx55575. Because of its numerous improvements over existing devices, Appx20449-20451(125:7-127:8), the Omnipod has been extremely successful, with roughly half a million users today, Appx20452(128:21-25).

Insulet spent years of work and tens of millions of dollars to develop the proprietary technology for the Omnipod Eros, the innovative version of the device that launched in 2013 and has served as the foundation for more recent versions.[1] No other company has succeeded in (lawfully) designing a competitive patch-pump—even though the largest medical-device companies have invested heavily in trying. Appx20583(114:9-15); Appx21586-21589.

This case concerns four trade secrets that form the core of that proprietary technology.

*CAD files*: These are 3-dimensional computer-assisted-design renderings that capture the thousands of precise orientations and nominal dimensions for every component of the Omnipod—meaning the secret pre-manufacturing dimensions specified by the Omnipod's engineers, which are different from the post-manufacturing dimensions. These details cannot be gleaned from examining a physical sample.[2]

---

[1] Appx21149(86:3-6); Appx21150(89:21-90:7); Appx20561(27:7-18); Appx20561(26:3-27:1); Appx20556-20558(8:14-10:21); Appx21026-21027(41:12-46:16); Appx21029(54:15-21); Appx20566(45:23-25).

[2] Appx20516(50:14-51:6); Appx20518-20519(57:18-61:11); Appx21035-21036(78:17-84:3); Appx21066-21067(28:22-29:14); Appx21081(28:22-29:14); Appx21082-21083(89:1-93:21).

***Occlusion-detection algorithm***: The ODA is the Omnipod's unique, built-in method for quickly and accurately identifying any occlusion (blockage), a crucial requirement to safeguard a "patient's life and safety."[3]

***Cannula design and manufacturing process:*** The "new, innovative, all-in-one" design and manufacturing method for the Omnipod's soft cannula (needle) was critical in allowing Insulet to make the device "smaller and more affordable and more reliable." Appx20510(27:4-16); Appx20485-20488(161:1-164:19).

***Design History File:*** The DHF is a compilation of information required for securing and maintaining regulatory approval for the Omnipod Eros.[4]

### B. Defendants steal Insulet's trade secrets, but actively prevent Insulet from discovering the theft until after its commercial product launches in 2021.

Defendants misappropriated (at least) these four trade secrets and used them to launch a product in 2021. Because Insulet sued in August 2023, the limitations question turns on whether reasonable diligence

---

[3] Appx20627-20628(136:25-137:6); Appx20548(180:22-24); Appx20550-20551(188:24-189:13); Appx21105(181:17-22).

[4] Appx21023(30:14-15); Appx20579(98:22-23); Appx20993(107:22-25).

would have discovered Defendants' misappropriation by August 2020. Extensive evidence convinced the jury the answer was no.

1.      Defendant EOFlow is a small company based in South Korea. It had been working on an insulin pump based on different technology, the "EOPatch 1." Appx20670-20677(27:2-34:9). That device looked superficially like the Omnipod (it had a white, plastic casing), but operated in very different ways. Appx20671-20672(28:16-29:2). Unbeknownst to Insulet, EOFlow had no success in bringing this device to market. Appx20670(27:18-24).

So EOFlow secretly stole from Insulet. Several ex-Insulet employees whom EOFlow recruited had surreptitiously taken thousands of confidential Insulet documents embodying the trade secrets. Starting in 2018, EOFlow began cribbing wholesale from the stolen Insulet materials and building a new kind of device, one that incorporated Insulet's proprietary technology—but it kept secret from Insulet and the market what it was doing. *See generally* Appx65-76 (summarizing misappropriation evidence).[5] This new device, which Defendants internally referred to as the

---

[5] *See also, e.g.*, Appx20611-20613(72:19-80:1), Appx20622(113:22-114:23), Appx40547-41435 (exemplary documentary and testimony

EOPatch 2, Appx41445, was publicly still called the EOPatch, Appx20675-20677(32:15-34:9).

Defendants clearly knew they were engaging in misconduct, as EOFlow employees routinely shared and copied documents plainly marked "Insulet Confidential Information." Appx21145-21146(69:25-73:8); Appx20884-20886(140:25-145:5); Appx41615-41620. One of Defendants' employees wrote in chat messages that he was "stealing from insulets SWFMEA" (a part of Insulet's DHF), eliciting an "lol" response from a colleague. Appx42088-42090. Defendant Jesse Kim, EOFlow's CEO, using a winky-face emoji, made light of how the EOPatch 2 was a "piracy."[6] And in 2022, Defendants showed trade-secret documents to Insulet's largest competitors, sometimes failing even to remove Insulet logos from the documents.[7]

---

evidence regarding CAD misappropriation); Appx20620-20622(108:11-113:20), Appx20626-20629(132:21-143:1), Appx21101-21103(166:3-175:11), Appx41625-41626, Appx41485-41486, Appx41512-41542, Appx45699 (similar as to ODA); Appx20683(40:9-13), Appx21068-21069(33:8-40:1), Appx41627-41633, Appx41888-41891, Appx40392 (similar as to cannula); pp. 67-68, *infra* (similar as to DHF).

[6] Appx41480-41481; Appx41484; Appx41489-41490; Appx20705-20708(62:3-65:19).

[7] Appx21145-21146(69:25-73:8); Appx43671-43672; Appx43673-43679; Appx43680-43700.

2. During this same period, Insulet performed competitive diligence on EOFlow (as it did on other competitors),[8] including by monitoring EOFlow's website,[9] public statements,[10] and domestic and foreign patent filings,[11] but the information EOFlow made public before August 2020 largely concerned the distinct EOPatch 1 Defendants had internally abandoned. And while EOFlow received a breakthrough designation from FDA during this period, that was for a different device altogether, the EOPancreas, a patch-pump-plus-sensor that never went to market. Appx54046; Appx20586(126:1-20). So the public information Insulet saw misleadingly suggested that EOFlow's device would be built with "technology … quite different from ours"—and was hampered by design flaws. Appx54333; Appx54332; *see* Appx20557(12:13-17); Appx43523-43524; Appx20585(122:1-10).

Defendants admitted below that this public information *would not* have alerted Insulet to misappropriation. For example, EOFlow's public

---

    8  Appx20582-20584(111:10-119:19); Appx43587-43588; Appx20585-20586(124:12-125:25); Appx53983.

    9 Appx55233; Appx43523-43524.

    10  Appx20583-20588(115:3-136:11); Appx21320-21321(36:21-40:13); Appx43589-43594; Appx53997; Appx54011; Appx43523.

    11 Appx43523-43524.

materials emphasized its "electroosmotic" mechanism, which Defendants' chief technical expert admitted is fundamentally distinct from the Omnipod's technology. Appx21274-21275(37:25-41:11).[12] Indeed, this expert testified that the electroosmotic mechanism was as different from the Omnipod's technology as a "Toyota Prius" is from a "Ford Mustang," leading to a "cascading set of different engineering considerations" from the Omnipod. Appx21274-21275(37:25-41:11). Similarly, Defendants' expert on the ODA trade secret admitted that there was "nothing proprietary about the Omnipod algorithm [*i.e.*, the ODA trade secret] reflected in" a Korean-language prospectus EOFlow published shortly before August 2020. Appx21198(85:15:-87:7).

Insulet also learned during this period that EOFlow had recruited some former Insulet employees (Defendants Ian Welsford, Steven DiIanni, and Luis Malave). Appx43523-43524. This was unremarkable, as it is "common practice" for competitors "to hire folks who have relevant industry experience"; Insulet did not know the critical facts that they had

---

[12] *Accord, e.g.*, Appx20585(122:15-21); Appx43523-43524; Appx21041(102:21-104:15); Appx21275(43:14-44:7) (EOFlow's published patent disclosures related to the electroosmotic mechanism and to the outmoded EOPatch 1).

stolen secret documents and given EOFlow access to them. Appx20584(119:12-22).

Defendants also displayed shell prototypes of their pump at the 2018 and 2019 American Diabetes Association (ADA) conferences, but only under casing: the prototypes were not available for purchase or further inspection. Appx20782(139:9-17); Appx20582(112:23-123:11). Insulet representatives observed that these prototypes' exterior bore a superficial resemblance to the Omnipod's—as did other competitors' prototype patch-pumps. Appx20584(119:25-120:8). But the prototypes were non-functional and missing critical components (which would not have been visible from the exterior anyway, Appx20779-20782 (136:23-(139:17)). Specifically, Defendant Kim admitted that the samples' soft cannula had been intentionally *clipped off*. Appx20779-20780(136:23-137:14). And another Defendant, Luis Malave, admitted that simply looking at these samples *would not* have caused an observer to suspect misappropriation of the ODA, the DHF, or the cannula trade secrets. Appx20877(111:4-23).

Insulet made efforts to have direct discussions with EOFlow. But Defendants focused these conversations on their electroosmotic

11

mechanism and plans for the EOPancreas—again, technology distinct from anything in the Omnipod. Appx20585(123:12-124:5). And when Defendant Malave met face-to-face with Insulet, he demonstrated the technologically different EOPatch 1—even though Defendants were deep into work on the EOPatch 2 (thus demonstrating further efforts at concealment). Appx21231-21232(51:19-53:23). EOFlow's representatives also deliberately gave Insulet the impression that EOFlow was struggling to develop its distinct technology. Appx43524-43524; Appx20585(122:1-10).

While Insulet internally expressed interest in obtaining commercial samples of EOFlow's pump before its launch, Appx43523; Appx20585(122:22-123:11), that was not possible. EOFlow's pump was not commercially available anywhere in the world until March 2021, when EOFlow first sold it in Korea, Appx20585(123:5-11); Appx20709-20710(66:4-67:19). Nor were Defendants sharing it—and certainly not with Insulet. Appx41579. They did not even feel "comfortable" sharing a sample EOPatch 2 with EOFlow's prospective acquisition partner, Medtronic, until 2022—the only samples Defendants shared with Medtronic before this time were the outmoded EOPatch 1. Appx20831-

20832(188:10-189:11). And Insulet, like other companies, recognized that it would risk intellectual-property contamination by seeking a sample of a competitor device that was *not* publicly available. Appx20587(131:8-132:10); Appx21321-21322(40:14-41:15).

3. Insulet's reasonable misimpression concerning EOFlow's technology was compounded by Defendants' deliberate campaign to conceal the evidence of their theft during this period.

For example, in the same email chain during which Defendant Kim joked about the "piracy" behind the EOPatch 2, Defendants cautioned each other to "avoid[] mechanical features discussions" of the pirated EOPatch 2 in public. Appx41480-41484. Indeed, even when a potential commercial partner privately asked Defendants to compare the EOPatch 2's technology to the Omnipod's, Defendants instructed the EOFlow team to be "[c]areful," "to make it clear we are not stealing trade secrets but can say we are obviously familiar with that device," and to "soft sell" around the issue. Appx41603; *see also* Appx41598-41603.

Defendants took particular pains to ensure Insulet did not suspect wrongdoing. Their internal documents stressed that they "[n]eed[ed] to keep [Insulet] guessing on our corporate plans," Appx41453; that they

13

"[j]ust need[ed] to find out what [Insulet] want[ed] while keeping a low profile on our own plans," Appx41605; and that they should "not share any [non-public] material with Insulet," Appx41579. Consistent with this strategy of obfuscation, Defendants only discussed inapposite technology in public, and even went so far as to misleadingly demonstrate the obsolete EOPatch 1 to Insulet. *See* p. 12, *supra*.

Defendants' concealment efforts persisted even after this litigation began. The district court found that Defendant Ian Welsford "intentionally deleted" email accounts of employees at Defendant Nephria Bio, a U.S. subsidiary of EOFlow, containing "information [that] was unfavorable to Welsford, Nephria Bio, and EOFlow," and thus gave a spoliation instruction to the jury. Appx51; Appx21385(148:6-18).

**C. After the EOPatch 2 becomes commercially available within the limitations period, Insulet obtains a sample and discovers the basis for this suit.**

In March 2021—well within the three-year limitations window for this lawsuit—the EOPatch 2 became commercially available to a limited number of patients in South Korea. Appx20709-20710(66:4-67:19). Despite diligent efforts, Insulet was not able to obtain a sample EOPatch 2 in Korea (where Insulet does not do business) due to, among other things,

regulatory restrictions and difficulties posed by the COVID pandemic. Appx20585-20588(123:12-134:22); Appx20580(101:9-103:17).

But once EOFlow began selling the EOPatch 2 in Europe in late 2022, Insulet obtained and disassembled a sample within a few months. Appx20588(133:23-135:12). What that inspection by Insulet's engineers revealed "shocked" and "gutted" Insulet: "rather than a different product that we had been believing EOFlow to be working on, we saw a product that included a lot of elements of the Omnipod design." Appx20588(134:22-135:12); Appx20524(81:11-82:10). Having uncovered evidence of at least an infringement of Insulet's patent rights, Insulet promptly sued EOFlow's European distributor for patent infringement and obtained a preliminary injunction in Germany. Appx55555-55556.

Then, in May 2023, EOFlow announced that it had agreed to be acquired by Insulet's largest competitor, Medtronic, for $738 million. Appx20588(135:13-136:2); Appx20718(75:18-23). Medtronic, in turn, made "public statements suggesting that EOFlow had cracked the code of manufacturing [at] scale"—suggesting EOFlow had access to Insulet's secret specifications for producing the Omnipod safely and at commercial scale. Appx20588(135:16-19).

**D. Insulet files suit in August 2023, and the district court sends Defendants' statute-of-limitations defense to the jury.**

Insulet filed this lawsuit in the District of Massachusetts. Appx306-367. Full discovery eventually revealed what the district court called "overwhelming" evidence of misappropriation. Appx21173(181:10-12).[13]

Given this damning record, Defendants' primary defense has been that Insulet's DTSA complaint, filed August 3, 2023, is time-barred. A DTSA suit must be "commenced [no] later than 3 years after the date on which the misappropriation with respect to which the action would relate [1] is discovered or [2] by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Insulet undisputedly did not actually "discover[]" misappropriation of any of the four trade secrets before that date; Defendants' statute-of-limitations argument therefore comes down to the "should have been discovered" prong.

---

[13] Early in the case, the district court granted a preliminary injunction. This Court reversed that order, but took pains to "not[e] what [the panel] ha[d] not decided"—in particular, that it had "not found that Insulet has failed to adequately allege misappropriation of its trade secrets or that it cannot succeed on the merits of its claims." *Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 884 (Fed. Cir. 2024). Rather, it emphasized the inadequacy of the district court's oral explanation. *Id.* at 883.

At summary judgment, Defendants argued for a two-step framework. First, demonstrating "inquiry notice" would "start[] the clock on the DTSA statute of limitations." Appx12511. Defendants defined inquiry notice to mean mere suspicion—the moment Insulet would have "had cause for concern." Appx5199. Second, the burden would then shift to Insulet to prove that accrual should be tolled under a "discovery rule." Appx12523.

The district court agreed with Insulet that the mere-suspicion aspect of Defendants' standard "conflicts with the language of the [DTSA's] statute of limitations." Appx15-21; *see* Appx8071-8079; Appx12680-12686; Appx16356. The court concluded that "genuine disputes of material fact" required sending the limitations issue to the jury. Appx22-23.

### E. Even after the district court ultimately adopts Defendants' burden-shifting framework on the statute of limitations, the jury finds Defendants liable.

1. During trial, the district court significantly revised its view of the limitations issue.

Specifically, at Defendants' urging and over Insulet's objections,[14] the district court instructed the jury to apply a burden-shifting framework for the statute of limitations—except that the burden on Defendants at the first step was even *lighter* than the inquiry-notice standard they sought at summary judgment. The court explained that Defendants' "initial burden" only required them to "prove that the lawsuit was filed more than three years after the misappropriation *occurred*." Appx21392(173:18-21) (emphasis added). If Defendants did so, "the burden then shift[ed] to Insulet to prove that it did not actually discover the misappropriation and should not have discovered it through the exercise of reasonable diligence until a point that is within the three-year limitations period." Appx21392(173:21-25). The court gave detailed guidance on how to evaluate Insulet's proof on that point, "consider[ing] all of the facts and circumstances." Appx21391(172:5-24).

The court also instructed the jury to "consider the statute of limitations defense as to each of the asserted trade secrets separately."

---

[14] Appx19895-19896; Appx19968-19971; Appx19976; Appx19802-19805; Appx129-130(5:3-6:20); Appx153-154(29:24-30:4).

18

Appx21392(173:12-13;174:14-15).  Likewise, the verdict form asked separate statute-of-limitations questions for each trade secret.  Appx20179.

The district court's adoption of Defendants' burden-shifting instruction significantly affected the parties' trial strategy.  Because the evidence indisputably showed that three of the trade secrets (the CAD files, the ODA, and the cannula, but not the DHF) were misappropriated outside the limitations period (enough for the first step), both sides focused their presentations on whether Insulet could meet its burden at the second step to show that it could not have discovered misappropriation outside the limitations period with reasonable diligence.  Thus, Defendants told the jury that the first step was "easy" because of the undisputed evidence of theft that "occurred before August 3rd, 2020," Appx21364(64:17-22); Defendants focused their presentation on how "the burden shifts to Insulet" at the second step and argued that Insulet had failed to show that reasonable diligence would not have led to discovery outside the limitations period.  Appx21365-21367(65:13-74:19); *see also* Appx21232-21239(56:11-81:17) (testimony from Defendants' statute-of-limitations expert likewise focused entirely on reasonable diligence).

Insulet, too, focused on the second step, reasonable diligence. Appx21320-21322(36:25-42:16); Appx21359-21362(42:8-53:15).

2. After more than a day of deliberations, the jury returned a detailed and mixed verdict, finding Defendants had misappropriated the four trade secrets at issue here (the CAD, ODA, cannula, and DHF trade secrets) but not finding liability for a fifth asserted trade secret. One defendant, Malave, was let off the hook entirely (and is not a party on appeal). Appx20178-20179. In many instances (but not all), the jury concluded Defendants' misappropriation was willful and malicious. Appx20185. The jury concluded that none of the trade-secret claims were barred by the statute of limitations. Appx20179. The verdict awarded $170 million in compensatory damages and $282 million in exemplary damages. Appx20180-20187.

3. The district court denied Defendants' post-trial motions, Appx60-82, and granted Insulet a permanent injunction, Appx110-118. The court partially stayed the injunction, creating a temporary "carve-out" (which this Court has extended in duration) allowing continued sales of the EOPatch 2 to existing patients in EOFlow's two main markets—specifically, to patients that were using the device in Europe as of October

2023 (a date this Court later extended to April 2025) and to existing patients in Korea. Appx104-105; Appx112-113; Dkt. No. 18, at 2. The court also reduced the damages award by nearly $400 million, to avoid what it believed would be duplicative relief in view of the injunction. Appx92-100; Appx108.

## SUMMARY OF ARGUMENT

I.    The First Circuit has appellate jurisdiction because this case does not arise under patent law. The complaint "as amended" does not "raise[] patent law issues," *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1189 (Fed. Cir. 2004): Insulet amended the pleadings to drop the patent claims, expressly "without prejudice." EOFlow's argument that they were *really* dropped *with* prejudice is doubly flawed. The claims are not time-barred, and even if they were, that would not convert the dismissal into one "with prejudice."

II.    Defendants cannot show any error, much less prejudicial error, from the district court's decision not to give an "inquiry notice" instruction. Defendants equate inquiry notice with mere suspicion of wrongdoing. But the statute of limitations is triggered by "discover[y]" of the "misappropriation," 18 U.S.C. § 1836(d), and as the Supreme Court

21

has explained, mere suspicion falls short of the required "discovery." Instead the district court gave a set of legally correct instructions that refutes any possible claim of prejudice: for each trade secret, the jury was to decide (1) whether the misappropriation occurred outside the limitations period, and if so, (2) whether Insulet had shown that "reasonable diligence" would not have uncovered the misappropriation outside the limitations period. The first half is more favorable to Defendants than the inquiry-notice instruction they requested, and the second half Defendants do not challenge.

The jury's verdict under those instructions is amply supported. Trial focused on the second half of the standard—whether reasonable diligence would have uncovered the misappropriation by August 2020, well before EOFlow's commercial launch—and there was more than sufficient evidence for the jury to answer "no," especially given EOFlow's campaign to conceal its theft and mislead Insulet.

III. The reasonable-measures instruction was legally correct. The court directed the jury to consider the totality of the circumstances bearing on whether, at the time of the misappropriation, Insulet used reasonable measures to keep the misappropriated information secret. The jury

could even consider subsequent developments to the extent they were relevant to how Insulet treated the trade secrets at the time of the misappropriation. Defendants cannot show that the jury was prevented from considering any substantial evidence on this issue.

IV. The jury reasonably concluded that the Design History File is a protected trade secret. Defendants do not dispute that this fact question was correctly submitted to the jury. They argue only that *no* reasonable jury could have found the DHF to be a trade secret. In fact, there was ample evidence that the DHF was adequately described to the jury, was a valuable compilation trade secret, and was extensively misappropriated.

V. The district court's damages rulings were not an abuse of discretion. The court appropriately reduced the damages award once it entered an injunction, so that Insulet did not receive any double recovery for *future* injury that the injunction will stop. The court did not reduce the award to *zero*, because the court had discretion to require disgorgement of the financial benefit Defendants had already reaped by using theft to avoid costs. And the court properly exercised its discretion to

impose joint-and-several liability on EOFlow Korea and Kim, given his CEO role and substantial ownership of the company.

## ARGUMENT

### I. This Court lacks jurisdiction.

This appeal is not from a case "arising under any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1). The court with appellate jurisdiction is the First Circuit, *id.* § 1294(1), and the appeal should be transferred there, *see id.* § 1631.

### A. Because Insulet's patent claims were dropped, the regional circuit has jurisdiction, not this Court.

"Federal Circuit jurisdiction depends on whether the plaintiff's complaint *as amended* raises patent law issues." *Chamberlain*, , 381 F.3d at 1189 (emphasis added). The operative pleading when the district court entered judgment did not raise patent-law issues, and Defendants do not argue that it did.

Insulet's initial Complaint asserted thirteen counts, including claims under the DTSA, state law, and the Patent Act. Appx306-366. But the patent counts were never litigated—no discovery was had on them and the claims were not construed or adjudicated. Instead, the patent counts were stayed early in the case, Appx949, and that stay was

ultimately extended for an indefinite period, Appx55565; Appx55569; Appx249(#406).

Following the jury verdict on Insulet's DTSA claim, Insulet sought leave to amend its operative complaint to voluntarily dismiss without prejudice the stayed patent claims. Appx21408. Defendants did not oppose the request, and the district court granted the motion to amend "pursuant to Federal Rule of Civil Procedure 15," dismissing the patent claims "**WITHOUT PREJUDICE**." Appx21412. The final judgment memorializes that those claims had been "dismissed without prejudice." Appx106.

The jurisdictional consequence "is clear": Because "the plaintiff's complaint as amended" does not "raise[] patent law issues," *Chamberlain*, 381 F.3d at 1189, this Court lacks jurisdiction. This Court "ha[s] repeatedly held that an amendment to the complaint that dismisses the patent law claims without prejudice, as here, deprives this court of jurisdiction over the case." *Krauser v. BioHorizons, Inc.*, 753 F.3d 1263, 1269 (Fed. Cir. 2014). Regional-circuit precedent agrees—in the same posture present here. *Logan v. Burgers Ozark Country Cured Hams*, 263 F.3d 447, 454 (5th Cir. 2001) (regional circuit had jurisdiction where patent

claims were not tried but dismissed without prejudice, after trial but before judgment). In such circumstances, the parties are "left in the same legal position with respect to the patent claims as if they had never been filed." *Chamberlain*, 381 F.3d at 1190 (citation omitted).

The Supreme Court has recently emphasized that where "arising under" jurisdiction turns on the pleadings, "an amendment can wipe the jurisdictional slate clean." *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 34 (2025). And the jurisdictional analysis is the same whether the "arising under" question concerns federal law or patent law. *Xitronix Corp. v. KLA-Tencor Corp.*, 882 F.3d 1075, 1079 (Fed. Cir. 2019) (citation omitted). Thus, even if a case arose under federal law (or patent law) *before* amendment, once an amendment "eliminates the federal-law claims" (or patent claims), arising-under jurisdiction "dissolves." *Royal Canin*, 604 U.S. at 30; *see id.* at 28 n.1. For that reason, it is immaterial that a preliminary-injunction appeal in this case went to this Court: that was a consequence of the patent claims then in the pleadings.

**B.    Insulet's withdrawing the patent claims was not an adjudication on the merits.**

Defendants argue that even though the amendment expressly dropped the patent claims "without prejudice," those claims really were adjudicated on the merits, giving this Court jurisdiction.  That is wrong.

The key premise of Defendants' argument is that "Insulet lost [on these] claims and EOFlow prevailed."  Br.62.  This Court's cases have held the opposite:  a defendant *is not* a prevailing party just because its adversary voluntarily dismisses or amends to drop a claim without prejudice.  There has been no "'judicially sanctioned change in the legal relationship of the parties.'"  *Giesecke & Devrient GmbH v. United States, Gemalto Inc.*, 2024 WL 3171658, at *3 (Fed. Cir. June 26, 2024) (amendment) (citation omitted); *accord O.F. Mossberg & Sons, Inc. v. Timney Triggers, LLC*, 955 F.3d 990, 993 (Fed. Cir. 2020) (voluntary dismissal).

Defendants contend that dismissal here was "effectively" with prejudice because, they say, the patent claims would be time-barred if reasserted.  The factual premise is wrong and so is the legal conclusion.

1.    Taking the law first:  Defendants stress (Br.58-59) the principle that "the difference between dismissals with and without prejudice ... is functional, rather than semantic."  *Chamberlain*, 381 F.3d at 1190.

But here "without prejudice" is the correct "functional" description, because no aspect of the patent claims was ever adjudicated. *Compare id.* at 1188-90 (dismissal not truly with prejudice if reassertion requires satisfying a "condition subsequent"); *Allergan, Inc. v. Athena Cosms., Inc.*, 738 F.3d 1350, 1354 (Fed. Cir. 2013) (dismissal not truly without prejudice following meaningful adjudication). That is not just semantics.

Defendants contend (Br.59-60) that decisions from the courts of appeals show that, if a claim would be time-barred when voluntarily dropped, then dropping the claim operates as an adjudication on the merits. The cases do not say that. Instead, they stand for a proposition completely unrelated to arising-under jurisdiction or amended pleadings: when a district court enters *involuntary* dismissal "without prejudice" *as a sanction*, that decision is treated as "effectively with" prejudice if the claims could not be timely reasserted, triggering a more stringent standard of review for the sanction (or requiring more liberality in granting reconsideration). *E.g.*, *Ciralsky v. CIA*, 355 F.3d 661, 672 (D.C. Cir. 2004). That makes sense for that distinct practical purpose. But it does not remotely follow that voluntary amendment to drop claims without

prejudice operates as an adjudication on the merits for purposes of arising-under jurisdiction.

Neither this Court nor *any* court has ever done what Defendants urge: determine arising-under jurisdiction based on a dropped claim, by deciding a never-briefed time-bar defense *on the pleadings*, including fact-bound questions of accrual and tolling. "[J]urisdictional rules should be as simple as possible," because "[t]he chief and often the *only* virtue of a jurisdictional rule is clarity." *Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357, 1367 (Fed. Cir. 2002) (emphasis added; citation omitted). Defendants' approach is the opposite of simple.

2. Defendants' jurisdictional argument fails on the facts as well. Defendants base their entire untimeliness theory on the assertion that Insulet's patent-infringement claims were limited to *one* act of importation from 2018. *E.g.*, Br.57. That is inaccurate.

Insulet alleged multiple additional acts of importation of the pirated device, including to facilitate marketing and transfer to Medtronic, Appx1124(¶¶90-93), occurring in 2022 at the earliest, Appx21142(58:1-3;59:7-13). Insulet incorporated these allegations into each of its claims

of patent infringement. Appx1131(¶133); Appx1133(¶139); Appx1134(¶145).

Moreover, 35 U.S.C. § 286 operates differently than most limitation provisions: it does not "defeat[] the right to bring suit." *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348 (Fed. Cir. 1985). It just "prevent[s] any 'recovery … for any infringement committed more than six years prior to the filing of the complaint.'" *Id.* (quoting § 286). In the decision that Defendants cite (Br.61), the Supreme Court expressly did *not* decide whether § 286 is a statutory bar to suit; it decided *only* that § 286 is enough of a limitations statute to preclude applying the *non*statutory doctrine of laches. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods, LLC*, 580 U.S. 328, 338-39 (2017).

Thus, the case does not arise under patent law for the simple reason that the patent claims were never adjudicated and dropped without prejudice.

## II. Defendants' arguments on the statute of limitations are both legally incorrect and immaterial to the verdict.

On the merits, Defendants center their appeal on the statute of limitations, but their vague insistence that the district court committed prejudicial error by failing to instruct the jury to "apply" "inquiry notice" is

both legally incorrect and beside the point. Defendants cannot show legal error because their "inquiry notice" instruction would have conflicted with the DTSA's limitations provision. Still less can they show *prejudicial* error: Defendants ignore that the district court ultimately gave them a *more favorable* instruction than what they sought, and the jury still rejected their timeliness defense.

Defendants had asked for a two-step burden-shifting framework, and they got one. At the first step, instead of having to prove Insulet was on inquiry notice outside the limitations period (as Defendants had proposed), the court ruled that Defendants could simply prove that the misappropriation *occurred* outside the limitations period. At the second step, Defendants' proposal and the court's instruction were essentially the same: the burden shifted to Insulet to show timeliness under a discovery standard. *See* pp. 18-20, *supra.* It is thus unsurprising that Defendants cannot explain how they were prejudiced or what the district court was supposed to change about an instruction that *minimized* their burden at the step relevant to their "inquiry notice" theory.

The lack of prejudice is confirmed by examining the evidence trade secret by trade secret, as required by a portion of the instruction

31

Defendants do not contest. That analysis shows that one trade secret (the DHF) was not even misappropriated until well within the three-year limitations window (making the exact accrual standard irrelevant). The other three trade secrets were indisputably misappropriated outside the limitations window—meaning the entire statute-of-limitations question came down to whether Insulet met its discovery-centered burden at the second step of the burden-shifting instruction Defendants invited, a component on which they have not preserved any argument for appeal. And overwhelming evidence shows why the jury concluded Insulet did not discover any misappropriation until inside the limitations period, despite exercising reasonable diligence—among other things, Defendants actively concealed their theft and destroyed the evidence.

## A.    Standard of review.

Regional-circuit law governs. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1328 (Fed. Cir. 2008). The First Circuit reviews *de novo* whether a proposed instruction is legally correct, *Ward v. Schaefer*, 91 F.4th 538, 545 (1st Cir. 2024), but gives deference to trial judges' crafting of the charge. For instructional error to warrant reversal, Defendants "must demonstrate that the charge was erroneous and that the error was prejudicial."

*Federico v. Ord. of Saint Benedict in R.I.*, 64 F.3d 1, 3 (1st Cir. 1995); *accord Thomas & Betts Corp. v. New Albertson's, Inc.*, 915 F.3d 36, 52 (1st Cir. 2019). "A new trial will be ordered only if after reviewing the entire record [the Court] cannot fairly say that a preserved error was harmless." *Muniz-Olivari v. Stiefel Labs., Inc.*, 496 F.3d 29, 37 (1st Cir. 2007).

Denials of judgment as a matter of law are also reviewed *de novo*. *Heredia v. Roscoe*, 125 F.4th 34, 43-44 (1st Cir. 2025). For sufficiency-of-the-evidence challenges under the instructions given to the jury, "review" is "weighted toward preservation of the verdict," and a court "must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it]." *Dimanche v. Massachusetts Bay Transportation Auth.*, 893 F.3d 1, 8 (1st Cir. 2018) (citations omitted).

### B. Defendants fail to demonstrate legal error in not giving their instruction.

Defendants argue that the district court erred by failing to instruct the jury to "apply" "inquiry notice," Appx17378, which they define as "when the first event occurs that would prompt a reasonable person to

33

inquire into a possible injury at the hands of the defendant." Br.19 (citation omitted). That was not error.

1. The DTSA provides that an action is timely if it is brought within three years of when "the misappropriation … [1] is *discovered* or [2] by the exercise of reasonable diligence should have been *discovered*." 18 U.S.C. § 1836(d) (emphasis added). By its plain terms, the statute keys accrual to *discovery* of the misappropriation, either actual or constructive—the point when a reasonable investigation *ends* in knowledge of the basic facts of misappropriation. It requires more than suspicion, which *starts* investigation. Defendants never try to square their instruction with the ordinary meaning of the statutory term "discover[y]."

That ordinary meaning is clear from the Supreme Court's interpretation of materially similar accrual language in another limitations statute. A claim for securities fraud accrues upon "discovery of the facts constituting the violation," 28 U.S.C. § 1658(b)(1), which the Court construed to mean "that the cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'"—the same accrual standard as

the one later written into the DTSA. *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010).

The Court firmly rejected the same argument Defendants make here: that accrual should start at "th[e] point [when] the plaintiffs were on 'inquiry notice'"—*i.e.*, "the point where the facts would lead a reasonably diligent plaintiff to investigate further." *Id.* at 650-51. As the Court explained, "inquiry notice," as the defendants defined it, "is not necessarily the point at which the plaintiff would already have discovered ... 'facts constituting the violation.'" *Id.* at 651.

Likewise, by keying accrual to "discover[y]," the DTSA starts the clock when investigation ends and the fact of misappropriation is uncovered, not when misappropriation is first suspected and investigation commences. The district court correctly followed "the clear implications of a Supreme Court opinion interpreting almost identical language." Appx20.[15]

---

[15] Defendants emphasize (Br.26-27) that some decisions decline to extend *Merck*'s reasoning—but to *different* statutory language, *see, e.g.*, *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 115 (S.D.N.Y. 2011), which is irrelevant.

Defendants suggest that the close resemblance between the DTSA's limitations provision and the accrual standard in *Merck* is actually a distinction. The Exchange Act's limitations provision refers only to "the discovery of the facts constituting the violation," 28 U.S.C. § 1658(b)(1); *Merck* held that this language also encompasses "when a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,'" 559 U.S. at 637. Congress made the second point, about constructive discovery, explicit in the DTSA. That suggests *adoption* of *Merck*'s reasoning, not *disagreement* with it, as Defendants argue (Br.25-26).

2. a. Defendants rely mainly on string-cites rather than substance, claiming that many cases have "applied 'inquiry notice' to the DTSA statute of limitations." Br.19. But as the district court recognized, Appx19-20, even a brief examination of these cases reveals they do little to advance Defendants' argument, and often contradict it.

For example, the single First Circuit inquiry-notice case Defendants cite, *Epstein v. C.R. Bard, Inc.*, does not even involve a DTSA claim—it concerns a common-law misappropriation claim governed by state-law accrual standards for torts, and was decided before the DTSA's 2016 enactment (and before Massachusetts even enacted its own UTSA).

36

460 F.3d 183, 186-88 (2006). Similarly, a number of non-binding decisions cited by Defendants apply state common-law standards rather than the DTSA's actual accrual language, without any reasoned analysis (perhaps because they were considering parallel DTSA and state-law claims). *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565 (8th Cir. 2019) (citing only Iowa caselaw interpreting a differently worded limitations statute); *RoboticVISIONTech, Inc. v. ABB Inc.*, 726 F. Supp. 3d 364, 368-69 (D. Del. 2024) (citing a Delaware breach-of-contract case).

All of Defendants' other cases (Br.20-21)—largely unpublished district-court opinions—undercut their argument for their mere-suspicion instruction and contradict their assertion (at, *e.g.*, Br.1) that the district court was "Numero Uno" to apply a discovery-based standard. These opinions explicitly use "inquiry notice" as shorthand for the second half of the DTSA's statutory discovery standard, which starts the clock when a plaintiff "by the exercise of reasonable diligence should have discovered" the misappropriation. *E.g.*, *Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 1924992, at *12-14 (N.D. Cal. Apr. 30, 2019). Similarly, Defendants' remaining appellate case is an unpublished decision affirming, without developed analysis, a district-court opinion that likewise uses

"inquiry notice" to mean "the date on which the alleged misappropriation 'by the exercise of reasonable diligence should have been discovered.'" *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582, 586 (2d Cir. 2020).

That is the same as the standard on which the district court instructed the jury, *compare* Appx21391-21392(171:20-173:11).[16]  Because Defendants use "inquiry notice" to mean something substantively different, these cases do not support their claim of legal error.

b.  Defendants retreat to an argument that the statute *implicitly* gives "discover[y]" not its ordinary meaning, but one drawn from cases construing the UTSA.  Defendants cannot show that there was a "supposed judicial consensus" "so broad and unquestioned that [a court] must presume Congress knew of and endorsed it."  *Jama v. ICE*, 543 U.S. 335, 349 (2005).

---

[16] For similar reasons, Defendants are wrong to suggest (Br.2) that Insulet's reference to an "inquiry notice" standard during oral argument in the preliminary-injunction proceedings appeal shows that Insulet agreed with Defendants' mere-suspicion standard.  Insulet simply used "inquiry notice" to name the second part of the DTSA's discovery accrual standard.

To the contrary, a number of cases *endorse* rather than reject a discovery-centered standard.  As Defendants' self-defeating parentheticals reveal (Br.23), some of these opinions interpret the UTSA's limitations provision to provide that, "[w]hen there is reason to suspect that a trade secret has been misappropriated*, and a reasonable investigation would produce facts sufficient to **confirm** this suspicion (and justify bringing suit)*, the limitations period begins."  *Gabriel Techs. Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1003-07 (S.D. Cal. 2012) (emphasis added).  Likewise, some of the cases emphasize that "mere suspicion of possible misappropriation does not amount to objectively reasonable notice to trigger the running of the statute."  *Porex Corp. v. Haldopolous*, 284 Ga. App. 510, 516 (2007).  The same is true of other UTSA cases that Defendants cite for other propositions.  *See, e.g.*, *Sokol Crystal Prods., Inc. v. DSC Comms. Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994) ("[Plaintiff's] apprehensions were still just concerns and suspicions rather than knowledge of misuse.  They therefore do not start the clock of the statute of limitations.").

The facts of the cited cases confirm that they did not hold that incipient concerns are sufficient:  for instance, the one unpublished UTSA

opinion from this Court cited by Defendants involved evidence demonstrating that the plaintiff had outright *"knowledge"* of the defendant's "potential theft" outside the limitations window. *Phillip M. Adams & Assocs., LLC v. Dell Comput. Corp.*, 519 F. App'x 998, 1005-08 (Fed. Cir. 2013) (emphasis added) (applying Utah law).  The language Defendants quote comes from a parenthetical to a *see also* citation; it formed no part of this Court's reasoning.  Dictum does not create the type of settled "judicial consensus" that Congress implicitly ratifies; to the contrary, "[d]ictum settles nothing." *Jama*, 543 U.S. at 349, 351 n.12; *Kemp v. United States*, 596 U.S. 528, 539 (2022) (ratification requires "well-settled" meaning) (citation omitted).

### C. Defendants' preferred inquiry-notice instruction would have no effect on the verdict.

Independently, Defendants also cannot establish that the decision declining to give the inquiry-notice instruction made any difference to the verdict.  *See Thomas*, 915 F.3d at 52.  The instruction the court gave was *more* favorable to Defendants at step 1 and equivalent to Defendants' proposal at step 2.

1. The district court ultimately gave a statute-of-limitations instruction that was *more* favorable to Defendants than what they initially

asked for. Defendants urged that the district court adopt a burden-shifting framework under which, if Defendants met their burden to show initial accrual under their "inquiry-notice" standard, then the burden shifted to Insulet to toll accrual under a discovery standard. Appx17378. The district court agreed to adopt burden-shifting, and at the first step, it instructed the jury that Defendants' initial burden was only to "prove that the lawsuit was filed more than three years after the misappropriation *occurred*"—no proof of *any* notice or knowledge required. Appx21392(173:18-25) (emphasis added). That is the earliest possible accrual date: inquiry notice of misappropriation cannot happen *before* the misappropriation. Then the court shifted the burden "to Insulet to prove that it did not actually discover the misappropriation and should not have discovered it through the exercise of reasonable diligence until a point that is within the three-year limitations period." Appx21392(173:18-25). That is derived directly from the statute's text and accords with what Defendants proposed. *See* Appx17378.

Thus, the first step was *more favorable* to Defendants than the version they proposed, and the second step was *no different*. Accordingly, giving an instruction about inquiry notice could not have made any

41

difference to the jury's verdict. For three of the trade secrets (the CAD files, ODA, and cannula), the trial evidence showed that misappropriation began outside the limitations period,[17] triggering initial accrual under the district court's instructions. This is why *both parties* focused their expert testimony and their closing statements on step 2 of the burden-shifting instruction, *see* pp. 19-20, *supra*—the part of the instruction *irrelevant* to Defendants' inquiry-notice argument about step 1.

As to the DHF, the evidence showed that misappropriation did not occur until January 2021, well within the limitations period, Appx21121-21122(247:17-249:4), making the first step of the burden-shifting framework (and thus inquiry notice) irrelevant.[18]

---

[17] *E.g.*, Appx20611-20613(71:17-80:3); Appx20620-20622(108:11-113:20) Appx41595 (testimony and documentary evidence regarding misappropriation of CAD file in 2018); Appx45699; Appx21101-21103 (166:3-175:11) (similar regarding misappropriation of ODA in 2018-2019); Appx20683(40:1-13); Appx41627-41629; Appx21068-21069(35:3-40:1) (similar regarding misappropriation of cannula in 2018).

[18] Defendants claim (Br.31) that, because they had *individual files* (such as a CAD file) before 2021 that might be reproduced in the DHF, this shows the DHF was misappropriated outside the limitations period. Not so—Defendants presented zero evidence at trial that they had access to and misappropriated the *compilation of documents* that together compose the DHF outside the limitations period.

One "fail[s] to see how [Defendants] could have been prejudiced by an instruction that minimized the grounds on which" they could meet their initial burden to show accrual. *Thomas*, 915 F.3d at 64 n.15. And because "instructional error warrants a new trial only upon a showing of prejudice," that is fatal to Defendants' argument. *Id.* (citation omitted).

2. "[R]eviewing the entire record" confirms that Defendants have not shown any prejudice. *Muniz-Olivari*, 496 F.3d at 37. Prejudice must be analyzed separately for all four of the asserted trade secrets—the district court correctly instructed the jury to analyze timeliness trade-secret-by-trade-secret, Appx21392(173:12-13;174:14-15),[19] and Defendants do not challenge that instruction on appeal. Instructing the jury to "apply" an "inquiry notice" standard at the first step would have made no difference to the outcome of the burden-shifting framework on this record.

**Step 1:** The jury had extensive, unrebutted evidence that Insulet had no reason to even suspect misappropriation of the trade secrets before August 2020. It was not even on inquiry notice.

---

[19] *See also B&P Littleford, LLC v. Prescott Mach., LLC*, 2021 WL 3732313, at *6-7 (6th Cir. Aug. 24, 2021) (explaining that the timeliness analysis must proceed trade secret by trade secret).

*DHF trade secret*:  The evidence showed that the DHF trade secret was not even stolen until January 2021, *see* p. 42, *supra*, so there could not have been notice of misappropriation of that trade secret earlier.  In any event, Defendants' own witnesses admitted that no one would suspect theft of the DHF by looking at the samples EOFlow showed at conferences before August 2020.  Appx20877(111:4-17).

*CAD files, ODA, and cannula trade secrets*:  For the remaining three trade secrets, Defendants' own witnesses repeatedly admitted that nothing in the public domain before August 2020—including the non-functional trade-show samples Insulet employees glimpsed—would lead a reasonable person to suspect misappropriation of *any* of the relevant trade secrets. *E.g.*, Appx20877(111:4-23). Unsurprisingly, nothing about quickly glancing at a sample device superficially resembling the external casing of the Omnipod could possibly alert someone that Defendants had stolen computer drawings giving the invisible *pre-manufacturing* dimensions for every part of the device (the CAD files); or the device's algorithm for detecting blockages in insulin delivery (the ODA trade secret); or the cannula trade secret, which EOFlow's CEO admitted was *cut off* from the samples, *see* Appx20779-20780(136:23-137:14).  Similarly, Defendants'

experts conceded at trial that EOFlow's public disclosures before August 2020 (such as the Korean-language prospectus Defendants highlight, *see* Br.11-12) did not reveal anything relevant to the trade secrets, *e.g.*, Appx21198(85:15:-87:7); *see also* pp. 9-10, *supra*.

Ultimately, the jury heard consistent testimony that Insulet had no reason to suspect misappropriation of the specific asserted trade secrets outside the limitations window (in part because Defendants deliberately misled Insulet and hid the misappropriation). *See* pp. 13-14, *supra*. So "there is no evidentiary basis in this record" to conclude that instructing the jury on Defendants' inquiry-notice standard at step 1 would affect the verdict. *United States v. Woodward*, 149 F.3d 46, 72 (1st Cir. 1998).

**Step 2:** Under Defendants' theory, step 2 requires Insulet to show that misappropriation could not have been discovered in the exercise of reasonable diligence outside the limitations period. Appx17378. The district court, adopting Defendants' burden-shifting framework, instructed the jury to apply such an analysis at step 2. *See* pp. 18-19, *supra*. Defendants never preserved any objection to the adoption of this second step, so any challenge to it is forfeited. *See Menninger v. PPD Dev., L.P.*, 145 F.4th 126, 136 (1st Cir. 2025). And because there was no dispute

that three of the trade secrets (the CAD files, ODA, and cannula) were misappropriated before August 2020, *see* p. 42, *supra*, it is clear the jury reached this second step in its analysis, and the jury *still* found that the claims as to all these trade secrets were timely.

Overwhelming evidence shows why. Consistent with Defendants' strategy of concealment, all the public information Defendants made available outside the limitations period concerned an outmoded product (the EOPatch 1), a never-realized product unrelated to the Omnipod (the EOPancreas), or technology that even Defendants' expert conceded was quite different from the Omnipod's (the electroosmotic mechanism). *See* pp. 9-12, *supra.* Despite these evident differences in design, Insulet exercised reasonable diligence and kept careful tabs on Defendants' product development, but what Insulet learned just reinforced Insulet's understanding that EOFlow was lawfully developing a superficially similar-looking device using distinct technology. *See id.*

Further, damning contemporaneous documents revealed that Defendants, who recognized they were engaged in a "piracy," Appx41480, all the while encouraged this misimpression and sought "to keep [Insulet] guessing" (Appx41453) by actively concealing their theft and

46

misrepresenting their technology—to the point where Defendants show-cased an outmoded EOPatch 1 to Insulet, and then later destroyed evidence of their piracy, prompting a spoliation instruction that Defendants do not contest on appeal. *See* pp. 13-14, *supra*. Courts "long ago recognized" that "a defendant's deceptive conduct may prevent a [reasonably diligent] plaintiff from even *knowing* that he or she has been defrauded" until well after the misconduct has begun. *Merck*, 559 U.S. at 644. Discovery-based accrual standards were developed to address such concealment. *Id.* at 644-48. Indeed, even the cases Defendants cited to the district court (*see* Appx19896) to get their burden-shifting framework make clear that a reasonably diligent plaintiff cannot discover misappropriation when its diligence is "stymied" by "conceal[ment]." *B&P*, 2021 WL 3732313, at *8.

The jury also heard extensive testimony that Insulet (or any reasonably diligent company) could not have discovered the misappropriation without having its engineers access and analyze a functional EOPatch 2.[20] And the record was equally clear why Insulet could not

---

[20] Appx21321(39:11-24); Appx20877(111:12-112:5); Appx20541(149:8-150:6); Appx20580(101:9-103:17); Appx21041-21042(102:21-106:22); Appx21321-21322(39:11-42:16)

obtain such a sample outside the limitations period: the device was not available commercially anywhere in the world until 2021, well after the August 2020 accrual date; Insulet understandably avoided obtaining non-public competitor materials to avoid intellectual-property complications; and Defendants admitted they were not "comfortable" sharing samples even with their prospective acquisition partner until within the limitations period, *see* p. 12, *supra*, let alone the very company they stole from. Against this hard evidence, Defendants' expert countered with outlandish speculation that Insulet could have obtained samples of the EOPatch 2 before August 2020 by rummaging through medical waste outside Korean hospitals to find clinical-trial samples during the COVID pandemic. Appx21246(109:14-110:7).

The jury weighed all these competing submissions and concluded that Insulet met its burden to show that a plaintiff exercising reasonable diligence would not have discovered Defendants' misappropriation of the trade secrets outside the limitations period. Since Defendants do not even dispute the portion of the instructions that were decisive to the jury's rejection of the limitations defense, or engage with the overwhelming "step 2" evidence supporting that verdict, they cannot possibly show

any prejudice from failure to give their inquiry-notice instruction at step 1 of the burden-shifting framework.  *See Tatro v. Kervin*, 41 F.3d 9, 17 (1st Cir. 1994) (instructional error harmless where it "would have had no bearing" on the ultimate verdict).

3.     Defendants' counterarguments on prejudice fail.  As an initial matter, Defendants repeatedly address their arguments to the question whether they should have won *summary judgment* before trial.  That is not the right question.  "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion."  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011); *accord Morgan-Lee v. Therapy Res. Mgmt, LLC*, 129 F.4th 93, 95 n.3 (1st Cir. 2025).  Thus, the question is whether, considering the entire trial record and the full instructions actually given, Defendants can show prejudice from failure to give their inquiry-notice instruction at step 1.  The answer is no.

Defendants hardly engage with the actual *trial* record.  To the extent they do, they seize (Br.29-30) on internal Insulet communications from before August 2020 that remark on the external resemblance to the Omnipod of non-functional prototypes of the EOPatch 2 shown at the

ADA conferences, and also discuss examining whether these prototypes might "infringe" Insulet's patents. Appx43523-43525; Appx54332; Appx55152-55153. Defendants cannot explain how a jury could leap from communications suggesting concern about *infringement of public patents* to the conclusion that Insulet had notice of *misappropriation of the trade secrets*—one of which (the DHF) was not even misappropriated until well *after* these emails were sent, *see* p. 42, *supra.* More fundamentally, this argument does not show prejudice—again, the decisive point of the statute-of-limitations analysis came at step 2, and Defendants still lost. *See* pp. 45-49, *supra.*

Beyond this, Defendants' arguments largely amount to sweeping generalities drawn from inapposite case law. For example, they argue (Br.28-29) that a line of cases establish that "(1) defendants' access to the trade secret, and (2) similarity with the defendant's design" suffices to trigger accrual as a matter of law. Many of these cases contradict Defendants' position. *E.g., Sokol,* 15 F.3d at 1430 ("in the commercial setting at issue here, suspicion and fear are not sufficient predicates for launching a lawsuit"). Others confirm that more is required for accrual, such as "damaging admissions during discovery" showing that the

50

plaintiff *knew* of misappropriation outside the limitations period. *E.g.*, *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1185 (11th Cir. 2011). More fundamentally, none of these cases helps Defendants, because Insulet proved at trial that it had no reason to know (or even suspect) that Defendants had access to the trade secrets outside the limitations period, and proved that Insulet reasonably believed (in part due to Defendants' concealment and misrepresentations) that Defendants' device used distinct technology.

Next, Defendants invoke principles that the district court *included* in the statute-of-limitations instructions. For example, Defendants point (Br.30-31) to the statute's directive that "a continuing misappropriation constitutes a single claim of misappropriation." 18 U.S.C. § 1836(d). The district court included this in its instructions, Appx21392(174:8-13), and the jury *still* found the claims timely.

As a last resort, Defendants quote (Br.13, 16) snippets in which the district court suggested adopting Defendants' standard might change the outcome—one from before trial, and one citing back to the earlier summary-judgment order. These brief statements do not even purport to examine the five weeks of trial evidence—much less to do so trade-secret-

51

by-trade-secret using the full burden-shifting standard, as unchallenged jury instructions required. Examining that record in the full context of the instructions, there is only one possible conclusion: Defendants cannot show any prejudice from the district court's decision not to give their inquiry-notice instruction.

4. Even if Defendants were successful in showing both legal error and prejudice in the instruction, that would not secure them judgment outright. The proper remedy for a successful claim of instructional error is vacatur and a new trial on the relevant issue, not reversal and entry of judgment. *E.g.*, *Muniz-Olivari*, 496 F.3d at 37 (explaining that "new trial" is remedy for prejudicial instruction); *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003) ("The verdict must be tested by the charge actually given"); *see also Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 860 (7th Cir. 1992) ("[J]udgment n.o.v. is not the correct remedy for erroneous jury instructions. The proper remedy is a new trial."); *Goodgame v. Am. Cast Iron Pipe Co.*, 75 F.3d 1516, 1521 (11th Cir. 1996) (similar).

**D. Defendants' sufficiency-of-the-evidence challenge to the statute-of-limitations verdict fails.**

Lastly, Defendants make (Br.35-36) a perfunctory argument that they are entitled to judgment even under the statute-of-limitations instruction the district court gave. But once again, Defendants hardly acknowledge the trial record, much less demonstrate—separately for each of the misappropriated trade secrets—how the "evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it]." *Dimanche*, 893 F.3d at 8.

Defendants emphasize that, under a statutory discovery standard like the one the district court applied, "discovery" means that "a reasonably diligent plaintiff would have sufficient information about th[e relevant] fact to adequately plead it in a complaint." Br.35 (citation omitted). That is *exactly* how the district court instructed the jury. Appx21391-21392(172:25-173:11). How the jury applied it to the record is a question of fact, not law, and the JMOL standard applies. That renders inapposite Defendants' string-cites to the same access-and-similarity cases that, for the reasons already given, do not even support their argument, *see* pp. 50-51, *supra*. Defendants have not explained why *no* reasonable jury could conclude, consistent with its instructions, that Insulet lacked

enough to make out a plausible claim on each trade secret until after August 2020—indeed, as already explained, the evidence supporting the jury's rejection of their defense was overwhelming. *See* pp. 45-49, *supra.*

## III. Defendants' challenge to the reasonable-measures instruction lacks merit.

The DTSA requires that a trade-secret owner take "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). Defendants claim (Br.37) that the district court erred by instructing the jury that, although they "may consider" "measures or recommendations that occurred after the time of the alleged misappropriation," ultimately "[t]he issue of whether Insulet took 'reasonable measures' to keep the information secret should be evaluated as of the time of the alleged misappropriation." Appx21389(161:4-20). There was no error.

### A. Standard of review.

On *de novo* review, Defendants must demonstrate both legal error and prejudice. *Thomas*, 915 F.3d at 52; pp. 32-33, *supra.*

### B. Defendants cannot show either legal error or prejudice in the reasonable-measures instruction.

1. The relevant portion of the reasonable-measures instruction was legally correct. Defendants misleadingly argue otherwise by selectively quoting from the instruction and then insinuating that the district

court somehow forbade the jury from considering "post-misappropriation conduct" *entirely*.  Br.38.  What they leave out is that the district court expressly instructed the jury that it "*may* consider" "measures or recommendations that occurred after the time of the alleged misappropriation."  Appx21389(161:7-10)(emphasis added).  The court explained that such evidence should be used "for the purposes of determining whether Insulet treated the disputed information as a trade secret and whether the measures it took at the relevant time to keep the information secret were reasonable."  Appx21389(161:9-13).

That is entirely in line with the case law Defendants cite, which they once again mischaracterize.  They suggest that a district court has held the DTSA's reasonable-measures inquiry does not put *any* focus on the time of misappropriation.  Br.37 (citing *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 177 (D. Mass. 2023)).  In fact, what the court observed is that though the DTSA (unlike some UTSA statutes) does not *expressly* limit the analysis that way, and so "actions taken after the alleged misappropriation are *relevant*" to the inquiry, "courts" nonetheless "have seemed to recognize a temporal limitation."  *Neural Magic*, 659 F. Supp. 3d at 177 (emphasis added).  That is exactly how the district

court instructed the jury on this issue. And that temporal limitation makes sense. Liability attaches when a trade secret "*is misappropriated*," 18 U.S.C. § 1836(b)(1) (emphasis added), and thus it is entirely logical to focus the question whether the information stolen meets the statutory definition of a trade secret (including the reasonable-measures element) on the period when misappropriation occurred.

2. Defendants' cursory claim of prejudice (Br.38-39) also fails. It is based on the argument that the instruction impeded their attempt to argue slowness to sue—repackaging their unsuccessful limitations argument as a reasonable-measures argument. But the statute does not treat filing a prompt misappropriation lawsuit as a "measure[] *to keep such information secret*," 18 U.S.C. § 1839(3)(A) (emphasis added), the only "measures" that matter for this purpose.[21] Nor would a jury that rejected Defendants' limitations arguments be remotely likely to credit this one.

---

[21] The only DTSA case they cite is *Pie Dev., LLC v. Pie Ins. Holdings, Inc.*, 2023 WL 2707184, at *3 (5th Cir. Mar. 30, 2023) (per curiam), which held that the plaintiff failed to state a claim for misappropriation because it did not keep its business plan confidential *at all*. The brief reference to the plaintiff's delay is cumulative; the court never asserted that the owner of a *protected* trade secret who successfully proves misappropriation in a timely lawsuit can still lose its trade-secret protection on the theory that it did not sue fast enough.

In the end, Defendants attempt to re-cast as prejudicial instructional error what really amounts to a complaint that the jury did not accept their narrative concerning Insulet's reasonable measures. But they ignore that "the standard is reasonableness, not perfection," *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 193 (1st Cir. 2023), and they once again hardly even engage with the actual record at trial. The jury credited extensive evidence that Insulet "met[] …and in many cases exceeded [standard industry] practice" for reasonable measures, Appx20982(62:22-63:1)—including "promulgation of internal-security policies, [a] requirement that employees execute non-disclosure agreements," "restriction of access to trade-secret materials," and other "physical and digital security measures," Appx66 (summarizing evidence); *see* Appx20982-20986(62:22-78:11). Insulet also presented evidence it continuously refined its protections for the trade secrets *after* the period relevant to the misappropriation,[22] and that Insulet exercised industry-standard diligence at all times, *see* pp. 9-13, *supra*.

---

[22] Appx20942-20943(105:15-110:2); Appx20953(151:9-13); Appx20954-20955(156:11-157:8); Appx20985(75:10-76:14); Appx20986(77:5-78:11).

**IV. The jury reasonably concluded that the DHF is a valuable trade secret that was extensively misappropriated by Defendants.**

Defendants next attack the evidentiary sufficiency of the jury's verdict on the DHF trade secret, but the trial record amply supports the jury's verdict.

**A. Standard of review.**

*De novo* review applies, *Heredia*, 125 F.4th at 43-44, but Defendants must demonstrate that no reasonable jury could have reached the jury's verdict, *Dimanche*, 893 F.3d at 8.

**B. Insulet adequately identified the DHF at trial.**

Defendants paint the DHF (Br.43) as "inconsistent and amorphous," and suggest that Insulet needed to march the jury page-by-page through the DHF to properly identify it. That is wrong.

1. There was no mystery about the DHF's identity. At trial, Julie Perkins, Insulet's Vice President of Global Regulatory Affairs, took the jury through the carefully organized content and structure of the DHF, Appx21009-21012(170:22-184:13); Appx21022(25:11-28:15), which was admitted as Exhibit 2177, *see* Appx45764-53939. In doing so, she summarized different categories of documents in the DHF and showed exemplary documents from each, including the Omnipod's Product

Definition Document (PDD), Failure Modes and Effects Analyses (FMEAs), Software and Hardware Description Documents (SDD and HDD), and Requirements Specifications (SRS and HRS), Appx21009-21012(170:22-184:13); Appx21022(25:11-28:15)—categories that were further fleshed out by other Insulet witnesses.[23]

Indeed, *every* witness from *both* sides who was asked about the DHF at trial readily understood and explained what it was. As Defendant Ian Welsford testified, the DHF is "the full history of the process of the design of a medical device," including "the documents and data that help assure that the device has been designed and developed and tested to be safe." Appx20905(221:6-222:9). Insulet's engineer Jason O'Connor described it using nearly identical terms: "the DHF ... it's the full history of the design. So all the different documents, the procedures, drawings, risk analysis, all the different revisions of that." Appx20520(68:6-12). Several other witnesses independently repeated the same understanding of the DHF's scope.[24] This unanimity was unsurprising, given the DHF

---

[23] *E.g.*, Appx20523(77:8-80:20); Appx20545(167:1-168:8); Appx20557(12:3-23); Appx21070-21073(44:25-53:1); Appx21099(159:18-22); Appx21102-21105(169:4-172:9,173:21-177:15,182:7-183:4).

[24] Appx20579(98:19-23); Appx20993(107:3-108:3); Appx21143(61:22-

has a defined regulatory meaning that is widely understood in the medi-cal-device industry, *see* 21 C.F.R. § 820.30(j); Appx21283(73:19-22).

This presentation was more than enough for reasonable identification of the DHF at trial. "Although a plaintiff must identify its claimed trade secrets at trial with sufficient specificity to allow the jury to determine whether the information meets the statutory definition of a trade secret … it need not precisely define the boundaries of each claimed trade secret." *Zunum Aero, Inc. v. Boeing Co.*, 2025 WL 2364602, at *1 (9th Cir. Aug. 14, 2025) (citations omitted). For that reason, courts have repeatedly held that a summary presentation suffices.

For example, the Second Circuit concluded that a software-developer plaintiff's "97 asserted [product] manuals and guides trade secrets" were adequately identified to the jury through general overview testimony about the manuals as a group, more detailed testimony concerning one "representative example," and demonstratives summarizing all the manuals and "linking the title of each individual manual or guide to specific exhibits." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 803 (2023). Similarly, the Sixth Circuit rejected

24).

60

a defendant's argument that a compilation trade secret consisting of the plaintiff's "entire research-and-development process," including thousands of articles, was a "constantly shifting trade secret" and insufficiently identified. *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381-84 (6th Cir. 2022) (per curiam). The plaintiff had presented "[s]ubstantial evidence" of the trade secret "at a level of depth beyond merely listing technical concepts," including testimony summarizing the processes and the large body of documents underlying it. *Id.* The identification of the DHF was even more extensive than what was found sufficient in these cases.

3.    Defendants' arguments to the contrary lack merit.    Once again, Defendants repeatedly mis-frame the issue (*e.g.*, Br.41, 44) as whether the district court should have granted their *pre-trial* motions for judgment against the DHF trade secret. But "the full record developed" at trial has "supersede[d] the record existing at the time of" that pre-trial motion practice. *Ortiz*, 562 U.S. at 184. The question now before this Court is whether, "[w]hen all the [trial] evidence, along with all the reasonable inferences that may be drawn from it, is viewed in the light most favorable to [Insulet], it constitutes sufficient support for the jury's

determination that the" DHF was "in fact [a] trade secret[]." *Syntel*, 68 F.4th at 803. For the reasons given, the answer is yes.

Next, Defendants assert (*e.g.*, at 41-42) that the DHF, consisting as it does of many documents across 15 categories, was simply too large to be adequately identified. But as this Court and others have explained, there is no size limit for trade secrets. *E.g.*, *CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 708 F. App'x 654, 662 (Fed. Cir. 2017) ("That Trade Secret 4 may describe 63 ... separate devices does not mean that there is a lack of specificity."); *Syntel*, 68 F.4th at 803 ("97 asserted [product] manual[s] and guides"); *Caudill Seed*, 53 F.4th at 382, 385 (trade secret encompassing company's "entire research-and-development process"). Defendants are obviously wrong that the extraordinary scale of their theft shields them from liability.

Defendants further complain (Br.43-44) that Insulet only entered "excerpts" of the DHF into evidence through Exhibit 2177. That misstates the record: Ms. Perkins testified that Exhibit 2177 is a complete hardcopy of the DHF as it existed when it was improperly retained by Paul Hamm, who later misused the file on Defendants' behalf. Appx21010(175:13-15). Also misleading are Defendants' attempts to

manufacture inconsistencies in Ms. Perkins's testimony about the presence of SOPs (Standard Operating Procedures) and CAPAs (Corrective Action and Prevention Actions) in the DHF. On SOPs, Ms. Perkins explained that, although these files are not stored inside the DHF itself, "they are the playbook that are followed to create all of the documents and the design that's in the DHF," "[a]nd so a lot of the documents that are in the DHF will refer to the SOP that they follow." Appx21022(26:5-11). Similarly, Ms. Perkins gave a detailed account of which specific CAPAs are kept in the DHF (those related to the design of the Omnipod), as well as which are not (*e.g.*, "process-related CAPAs"). Appx21025(37:5-38:19). Ultimately, these issues concerning "credibility" and "evidentiary conflicts" are for the jury. *Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas*, 982 F.3d 20, 31 (1st Cir. 2020).

Lastly, Defendants point (Br.44-45) to a batch of cases purportedly "emphasiz[ing] the importance of th[e] rule requiring specific trade secret identification." Some of these cases are not good law. *E.g.*, *Zunum Aero, Inc. v. Boeing Co.*, 2024 WL 3822780, at *14 (W.D. Wash. Aug. 14, 2024), *rev'd*, 2025 WL 2364602 (9th Cir. Aug. 14, 2025). Others involve readily distinguishable facts—as when the plaintiff offers only a single-sentence

"high-level summary of the purpose of the alleged trade secrets" and points to one of *defendants'* internal documents for identification, *Alifax Holding SpA v. Alcor Sci. LLC*, 2024 WL 2932910, at \*5 (Fed. Cir. June 11, 2024), or when a party "could not articulate what aspect[] of the [claimed information] qualified as a trade secret but instead generally refer[s] th[e] court to the record," *TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 53-54 (1st Cir. 2020). "In contrast" to those cases, "here [Insulet] has consistently maintained that the" DHF is a compilation trade secret consisting of specifically enumerated categories that Insulet matched to particularized evidence at trial. *Allstate*, 79 F.4th at 197 (distinguishing *TLS*).

### C. The jury reasonably concluded that the DHF is a valuable compilation trade secret.

The jury was presented with and reasonably credited extensive evidence that the DHF is a compilation trade secret that derived "independent economic value[] … from not being generally known to, and not being readily ascertainable through proper means by, another person." *See* 18 U.S.C. § 1839(3)(B).

Multiple witnesses testified that the DHF provides an essential compendium of design information that no competitor could duplicate

without engaging in the same years-long process of trial-and-error Insulet did to design the Omnipod. *See, e.g.*, Appx21040-21041(99:25-102:2); Appx20523(77:8-80:20). Witnesses also testified that having a fully compiled DHF is critical to validating the safety and quality of a medical device. *E.g.*, Appx21008(166:14-167:2); Appx20905(221:4-223:2). Indeed, one of the first questions asked by Medtronic as it evaluated EOFlow for acquisition was, "[i]s there a design history file, DHF?" (Appx43726; Appx20715-20727(72:3-84:25); *see also* Appx43720-43731)—because a DHF is required by regulators to prove a device was properly designed and safe. Defendants' own expert admitted that the DHF is valuable because it provides "the history of how [the] product was successfully developed and delivered." Appx21290(103:7-13).

This was more than enough for a jury to reasonably conclude the DHF is a valuable trade secret. Courts have regularly concluded that a file providing a compendium of critical information (public and non-public) qualifies as a trade secret "when it would have been immensely difficult to collect and compile [the information] in the form in which it appeared in the compilation." *Allstate*, 79 F.4th at 189 (customer spreadsheets). The same reasoning has been applied to regulatory files. *E.g.*,

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 973 (8th Cir. 2011) (compilation of processes, procedures, techniques, and specifications for Rolls-Royce's Model 250 engine, required for FAA certification); *cf. AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96-97 (4th Cir. 2018) (flowcharts that "succinctly display the vast amounts of [industry] data required for [a] type of audit").

In response, Defendants (Br.44-46) argue that the DHF cannot qualify for trade-secret status because Insulet did not go line-by-line through the documents separating public from non-public information in the file. But "the inclusion of some information which could have been obtained from public sources does not mean the compilations were not trade secrets"; the relevant standard is whether "it would have been immensely difficult" for a competitor "to collect and compile [the information] in the form in which it appeared in the compilation." *Allstate*, 79 F.4th at 189; *AvidAir*, 663 F.3d at 973 (similar); *AirFacts*, F.3d at 97 (similar). Indeed, the district court specifically instructed the jury on these principles. Appx21387-21388(156:23-157:11). Defendants do not dispute that these instructions were correct, and they fail to explain how no

reasonable jury could conclude that the DHF satisfied the standard set forth in the instructions.

### D. The jury reasonably concluded that Defendants misappropriated the DHF.

Despite what the district court called the "overwhelming" evidence on this issue, Appx21173(181:10-11), Defendants argue that Insulet did not prove that the DHF was misappropriated. The jury reasonably disagreed.

The trial record showed Paul Hamm (an employee of Defendants EOFlow U.S. and Nephria Bio) took thousands of Insulet documents and saved them on a thumb drive, including a folder called "*all* DHF docs" for the "Eros pod project." Appx21121(248:8-23) (emphasis added); Appx22849. Hamm admitted he accessed and opened documents on that thumb drive in his time working for Defendants, and forensic evidence showed the same. Appx20996(117:12-119:15); Appx21121-21122(247:17-249:4).

Indeed, the jury saw evidence that Hamm and other employees of Defendants acknowledged in real time that they were "stealing from [I]nsulet[']s SWFMEA" (part of the DHF). Appx42088; Appx20999(129:1-14). Ultimately, Defendants were shown to have

accessed and used significant chunks of the DHF, including foundational design documents like the PDD, SRS, SDD, HRS, and HDD, and risk analyses like the FMEAs.[25] And given the district court's adverse-inference instruction, Appx21385(147:23-148:18), and testimony from Insulet's forensic expert that his analysis was limited by, among other things, Mr. Hamm's deletion of his files, Appx21121(246:1-247:2), the jury was permitted to infer that Defendants misused even more DHF information.

In response, Defendants cite (Br.46-47) a pair of out-of-circuit, pre-DTSA cases in which, because the plaintiffs claimed that a specific "combination" of elements (and *only* that combination of elements) was a trade secret, the court looks for evidence whether the defendant "received all [the] elements." *Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111-12 (8th Cir. 1997) ("specific combination of all five" mathematical "elements" identified as a proprietary yield management system); *Vital State Canada, Ltd. v. DreamPack, LLC*, 303 F. Supp. 2d 516,

---

[25] Appx42092-42125; Appx43851-43873; Appx54063; Appx54064; Appx54066; Appx21056(164:21-24); Appx20996(117:12-119:15); Appx21121(247:17-249:4); Appx21121(248:8-23); Appx20610-20611(66:2-70:12); Appx21072(49:13-53:1); Appx20613(78:8-12); Appx20895(182-183); Appx21386-21387(151:15-155:16).

529 (D.N.J. 2003) (specific combination of steps for a "Gel Delivery System"). But the general rule is that "total, stem-to-stern appropriation is unnecessary to establish liability; appropriation of a 'substantial portion' is sufficient." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314-15 (11th Cir. 2020); *Caudill Seed*, 53 F.4th at 384-86 (similar). That was what the district court instructed the jury, Appx21390(168:1-11), and Defendants have not challenged those instructions. So instructed, a jury could reasonably conclude that Insulet proved least a substantial misappropriation of the DHF.

## V. The damages award was not an abuse of discretion.

The jury awarded Insulet $452 million in compensatory and exemplary damages. After issuing a permanent injunction broadly prohibiting Defendants from using the trade secrets, the district court reduced the damages award by nearly $400 million to avoid any possibility of a double recovery. *See* pp. 20-21, *supra.* And the court concluded that Defendant Jesse Kim, EOFlow Korea's CEO and a major shareholder of the company, should be held jointly and severally liable with EOFlow Korea for damages flowing from the misappropriation scheme he orchestrated. Appx79-80.

69

Defendants' three challenges to the reduced damages award all lack merit.[26]

## A. Standard of review.

Regional-circuit law applies. *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 956 (Fed. Cir. 2024). The district court's reduction of the damages award and its imposition of joint-and-several liability on Kim are both reviewed for abuse of discretion. *Moore v. Indus. Demolition LLC*, 138 F.4th 17, 41 (1st Cir. 2025) (reduction in damages); *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 43 (1st Cir. 2024) (joint and several liability).

---

[26] Defendants have not challenged any aspect of the permanent injunction. If, however, this Court narrows or vacates the injunction while leaving any portion of the liability verdict in place, the Court should remand for the district court to reconsider its reduction of damages accordingly.

Insulet timely noticed a cross-appeal in the First Circuit (No. 25-1497) to ensure that it can pursue this relief. On September 18, 2025, the First Circuit stayed the cross-appeal pending this Court's decision on the parties' jurisdictional dispute. Should this Court determine it has jurisdiction and needs to reach the remedies issues preserved by Insulet's cross-appeal, Insulet will promptly move the First Circuit to transfer the cross-appeal to this Court.

**B.** **The district court properly allowed Insulet to keep retrospective avoided-cost damages together with the prospective injunction.**

Defendants fail to demonstrate that the district court abused its discretion by allowing Insulet to keep just $59.4 million of the original $452 million damages award.

1. In reducing the damages award, the district court reasoned that it was "based in substantial part on defendants' future, unrealized gains," and thus "overlaps to a significant degree with the requested injunction." Appx93. At the same time, the court recognized that "[i]njunctions prohibiting the future use of misappropriated trade secrets may permissibly coexist with unjust-enrichment damages based on previously avoided costs." Appx94. Accordingly, the court examined whether the record showed that part of the damages award reflected Defendants' avoided costs.

The record did so. The parties do not seriously dispute that the jury's damages award largely tracked the "'market-value' theory" presented by Insulet's damages expert, Justin McLean. Appx93; Appx96; Appx21148(81:12-82:19). Specifically, the jury awarded precisely the amount of compensatory damages McLean calculated under the market-

71

value approach for the CAD files, cannula, and ODA trade secrets. Appx96; Appx21154(105:18-106:16); Appx20180. McLean testified that his damages estimates for each of these trade secrets under the market-value approach incorporated research-and-development costs that Defendants had avoided through misappropriation: as relevant here, $15 million for the CAD files, $9 million for the cannula, and $2.2 million for the ODA, for a total of $26.2 million in avoided costs for those trade secrets. Appx21150(90:2-5); Appx96. Because the jury had followed the market-value approach to the dollar for these trade secrets, the court permitted Insulet to keep this $26.2 million in avoided-cost damages, plus the $33.6 million in associated exemplary damages. Appx96-100.

By contrast, the jury had not followed either of McLean's damages approaches for the DHF, and so the court declined to permit Insulet to retain any damages for that trade secret, "to ensure that there is no real risk of duplicative recovery." Appx97.

2.    The district court's reduction of the damages award is well-supported.

Appellate courts regularly uphold remedial awards in misappropriation cases that pair damages for avoided costs with a permanent

72

injunction against future harm. *E.g.*, *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1128-33 (7th Cir. 2020) ($140 million in unjust-enrichment damages for "avoided research and development costs" granted together with a permanent injunction); *PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd.*, 47 F.4th 156, 163-64 (3d Cir. 2022) ($8.8 million in damages for "the development costs [the defendant] avoided" together with permanent injunction). That is because there is generally no double-recovery issue with pairing these two forms of relief. An avoided-costs award does not cover a "period of use that overlaps with the period covered by [an] injunction"; instead, avoided-costs damages correspond to "past use of the misappropriated trade secrets for which [a plaintiff] [i]s entitled to damages." *PPG*, 47 F.4th at 163-64.

The district court reasonably followed this logic. The avoided-cost "damages and [the] permanent injunction cover[] entirely separate periods of past and potential future use of misappropriated trade secrets." *Id.*

3.     Defendants argue (Br.51-53) that the Second Circuit's decision in *Syntel* mandates a different result. It does not.

There, the defendant "never developed or sold a competing software product using [the plaintiff's] trade secrets" at all, and the plaintiff had offered "no proof" that the defendant had "us[ed] [the] trade secrets to gain a significant head start into the market." 68 F.4th at 812. On "the specific facts of this case," the panel concluded that "an unjust enrichment award of avoided costs was unavailable" when a forward-looking injunction had already issued. *Id.* at 814. But the panel stressed that "future cases may present a range of factual scenarios" where avoided costs can be awarded together with injunctive relief—for example, when "the defendant used the claimant's trade secrets in developing its own product, thereby diminishing the value of the trade secret to the claimant." *Id.* at 812 (brackets, citation, and quotation marks omitted).

As the district court explained, Appx95, this is not a scenario where Defendants never reaped tangible benefits from their theft—*e.g.*, "never developed or sold a competing … product using [Insulet's] trade secrets," *id.* at 812. Instead, the evidence showed that Defendants bypassed millions of dollars in costs by using misappropriation to launch a product that has been on the market for years.

Defendants retreat to arguing (Br.54) that these damages are "speculative," because the jury did not separately identify avoided-cost damages in the verdict form. But as the district court noted, McLean's testimony, which no one seriously disputes the jury credited, specifically and separately broke down the avoided-costs component the district court allowed Insulet to keep. Appx93; Appx96; *see* pp. 71-72, *supra.* That is not speculation.

## C. The record supports the damages award.

Defendants next fall back (Br.53-54) to a cursory argument that there "was not a sufficiently reliable basis to sustain Insulet's damages award" in any event. Their contention is that McLean, in forming his damages opinion, was not entitled to rely on Insulet engineer Ian McLaughlin's retrospective estimates concerning the amount of resources the company used to develop the trade secrets.

Defendants cannot show that the jury's award "exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it." *Casco, Inc. v. John Deere Constr. & Forestry Co.*, 990 F.3d 1, 13 (1st Cir. 2021) (citations omitted). McLaughlin explained the basis of his estimates in detail and demonstrated strong recall of his

professional life's work:  researching and developing the Omnipod. Appx20559-20562(19:16-29:10).  He testified that he developed his estimates through extensive consultation with the other engineers who also "were at Insulet during [the relevant] time frame."  Appx20560(21:10-22:6).  Defendants vigorously cross-examined McLaughlin, Appx20573-20577(73:17-90:22), but the jury determined his testimony was credible. That determination was theirs to make.  *Heagney v. Wong*, 915 F.3d 805, 819 (Fed. Cir. 2019).

### D.  Holding Defendant Kim jointly and severally liable with EOFlow Korea was not an abuse of discretion.

Finally, imposing joint-and-several liability on Kim was no abuse of discretion.

The "common law permit[s] 'some flexibility to impose collective liability' in equity, specifically on 'partners engaged in concerted wrongdoing.'" *BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 351 (1st Cir. 2024) (quoting *Liu v. SEC*, 591 U.S. 71, 90-91 (2020)).  That standard is met when an individual plays an "authoritative role" at a company engaged in wrongdoing and "shared in [the] profits" of the misconduct.  *Navellier*, 108 F.4th at 43.  At trial, Insulet showed this was the case with Kim. Kim admitted that he "owned over 5.6 million shares of EOFlow" Korea,

a "stake" that "represented 18.6 percent of the total issued and outstanding shares" as of the time the Medtronic acquisition was announced, such that he stood to make "[a]t least over $100 million," Appx20721-20722(78:16-79:2), from a transaction fueled by the misappropriation he directed.

In response, Defendants invoke (Br.54) judicial estoppel, but for that doctrine to apply, "the estopping position and the estopped position" must be "mutually exclusive," and "the responsible party must have succeeded in persuading a court to accept its prior position." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). Defendants cannot prove the first requirement: as the district court stressed, Insulet "never asserted that Kim and EOFlow Korea should *not* be held jointly and severally liable." Appx80. Insulet asked the jury to award nominal damages against Kim precisely *because* it sought to avoid double-counting with damages against EOFlow Korea. Appx157(33:5-13); Appx158(34:17-24).

Lastly, Defendants invoke (Br.56-57) opinions finding joint-and-several liability inequitable when an individual defendant is a "minor," "non-owner employee" of the co-defendant company. *BioPoint*, 110 F.4th

at 352-53. The contrast between those cases and the facts here just confirms that the district court's decision was no abuse of discretion.

## CONCLUSION

The appeal should be transferred to the First Circuit. If this Court reaches the merits, it should affirm the judgment.

September 26, 2025

William M. Jay
Matthew Ginther
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000

Alexandra D. Valenti
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7351

Respectfully submitted.

/s/ *Robert D. Carroll*
Robert D. Carroll
Robert Frederickson III
Alexandra Lu
William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

*Counsel for Insulet Corporation*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), it contains 13,946 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Office 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

September 26, 2025                    /s/ *Robert D. Carroll*

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF  system.

I further certify that all parties will be electronically served via email and by the CM/ECF system.

September 26, 2025                    /s/ *Robert D. Carroll*