

Elizabeth Prelogar
T: +1 202 776 2115
eprelogar@cooley.com


December 12, 2025

Jarrett B. Perlow
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

**Re:    Insulet Corp. v. EOFlow Co., Ltd., EOFlow, Inc., Jesse J. Kim, No. 2025-1807**

Dear Mr. Perlow:

Pursuant to Federal Rule of Appellate Procedure 28(j), Appellants write to inform the Court of the Fifth Circuit's recent decision in *Computer Sciences Corporation v. Tata Consultancy Services Limited et al.*, 159 F.4th 429 (5th Cir. 2025) ("*CSC*"). In *CSC*, the Fifth Circuit held that avoided-costs damages were duplicative of an injunction that barred a defendant from using the product it developed from misappropriated trade secrets. The opinion's analysis of duplicative remedies cites the Second Circuit's reasoning in *Syntel Sterling Best Shores Mauritius Limited v. TriZetto Group*, 68 F.4th 792 (2d Cir. 2023).

In *CSC*, the defendant used misappropriated trade secrets to develop a software platform. The trial court awarded two remedies: (1) unjust enrichment damages based on the R&D costs the defendant avoided; and (2) an injunction barring the defendant from using the software platform it developed from the trade secrets. 159 F.4th at 433, 447. The Fifth Circuit, however, determined these overlapping remedies could not stand because the injunction nullified the unjust enrichment that the damages were calculated to address: "If a misappropriator has been precluded from benefitting from the trade secrets by virtue of an injunction, there is no longer any unjust benefit. Imposing both an injunction and an unjust enrichment damages award in those circumstances would be duplicative and therefore punitive." *Id.* at 450.

The plaintiff in *CSC* argued that the avoided-costs damages addressed *past* benefits to the defendant, while the injunction prevented *future* use. *Id*. But the Fifth Circuit held this theory resulted in impermissible double recovery. The avoided-costs damages aimed to put the defendant in the position it would have occupied had it developed the product without the trade secrets. But in that scenario, the defendant would have free use of the product going forward. *Id.* at 450-51. To avoid duplication, only a portion of avoided costs—representing the benefit the defendant "received *before* the imposition of the permanent injunction"—could be recovered. *Id.* at 451. Requiring the defendant to pay all development costs *and* blocking use of its product would be punitive, not compensatory.

Appellants seek relief from similarly duplicative and punitive remedies.

Sincerely,

*/S/ Elizabeth Prelogar*

Elizabeth Prelogar

**159 F.4th 429**
United States Court of Appeals, Fifth Circuit.

COMPUTER SCIENCES CORPORATION, Plaintiff—Appellee,
v.
TATA CONSULTANCY SERVICES LIMITED; Tata America International Corporation, Defendants—Appellants.

No. 24-10749
|
FILED November 21, 2025

**Synopsis**
**Background:** Software company brought action against competitor for trade secret misappropriation under the Defend Trade Secrets Act of 2016, alleging competitor used software company's trade secrets to win a contract with software company's contractor, a third party, and to develop competitor's own software platform. The United States District Court for the Northern District of Texas, Brantley Starr, J., found competitor liable, ordered competitor to pay $56 million in compensatory damages and $112 million in exemplary damages, and imposed a permanent injunction barring competitor from using software company's trade secrets or the version of competitor's software platform developed using those trade secrets. Competitor appealed.

**Holdings:** The Court of Appeals, Higginson, Circuit Judge, held that:

competitor's challenged use of software company's confidential information was unauthorized under terms of relevant contracts;

sufficient evidence supported finding that competitor acted with requisite mens rea for misappropriation;

competitor waived its argument that software company failed to define its alleged trade secrets with sufficient specificity;

district court improperly awarded duplicative unjust enrichment damages and a permanent injunction, calling for a modification of injunction to eliminate overlap;

award of exemplary damages in twice the amount of compensatory damages was not excessive; and

district court did not err in imposing injunction on non-parties.

Affirmed in part, vacated in part, and remanded with directions.

**Procedural Posture(s):** On Appeal; Motion to Modify Order or Judgment; Motion for Summary Judgment.

Appeal from the United States District Court for the Northern District of Texas, USDC No. 3:19-CV-970, Brantley David Starr, U.S. District Judge

**Attorneys and Law Firms**

Macey Reasoner Stokes, Christopher Beau Carter, Aaron Michael Streett, Baker Botts, L.L.P., Houston, TX, Thomas Edward O'Brien, Attorney (argued), Kurt Pankratz, Baker Botts, L.L.P., Dallas, TX, Justin Victor Sumner, Sumner Schick, L.L.P., Dallas, TX, for Plaintiff-Appellee.

John Franklin Bash (argued), Jacob Michael Bartels Bliss, Quinn Emanuel Urquhart & Sullivan, L.L.P., Austin, TX, Rajeev Gupta, Luke Joseph McCammon, Parmanand K. Sharma, John Matthew Williamson, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC, Arian Joseph Koochesfahani, Quinn Emanuel Urquhart & Sullivan, L.L.P., Los Angeles, CA, for Defendant-Appellant.

Before Higginson, Ho, and Wilson, Circuit Judges.

**Opinion**

Stephen A. Higginson, Circuit Judge:

 **\*433** Appellee Computer Sciences Corporation ("CSC") sued Appellant Tata Consultancy Services Limited ("TCS") for trade secret misappropriation under the Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(a), 130 Stat. 376, 376–80 (codified at 18 U.S.C. § 1836). CSC alleged that TCS had used CSC's trade secrets to win a $2.6 billion contract with non-party Transamerica and to develop TCS's own software platform BaNCS. Following an eight-day trial with an advisory jury, the district court found TCS liable, ordered TCS to pay $56 million in compensatory damages and $112 million in exemplary damages, and imposed a permanent injunction, barring TCS from using CSC's trade secrets or the version of BaNCS that TCS developed using CSC's trade secrets.

**\*434** TCS raises six issues on appeal: (1) whether the relevant contracts authorized TCS's use of CSC's confidential information [1]; (2) whether TCS acted with the requisite mens rea for misappropriation; (3) whether CSC defined its alleged trade secrets with sufficient specificity at trial; (4) whether the district court erred in awarding both unjust enrichment damages and a permanent injunction; (5) whether the exemplary damages award was excessive; and (6) whether the district court erred in imposing the injunction on non-parties. For the reasons below, we vacate the injunction and remand to the district court with instructions to issue a revised injunction, but we otherwise affirm the district court's holdings.

[1] Because TCS challenges the district court's trade secrets finding on appeal, we generally refer to this material as CSC's "confidential information" when referencing the same material that the district court referred to as CSC's "Trade Secrets" in the Findings of Fact and Conclusions of Law.

### I.

#### A.

Plaintiff-Appellee CSC, an American multinational corporation, "provides information technology services and business solutions software to its customers, including customers in the life, wealth, and annuities industry." Defendant-Appellant [2] TCS is a "global company offering technology and consulting services to its customers, including customers in the insurance industry." This case concerns two of CSC's software platforms, Vantage and CyberLife, and one of TCS's software platforms, BaNCS.

[2] The district court held that "CSC did not present adequate proof of liability against" TCS's co-defendant Tata America International Corp., a TCS subsidiary.

As summarized by the district court, Transamerica provides, through its subsidiaries, "life insurance, long-term care insurance, voluntary benefits, retirement plans, recordkeeping and advisory services, annuities, mutual funds, and other long-term savings and investment products to its customers." In 1994, CSC entered into an agreement with a subsidiary of Transamerica, under which CSC licensed certain software to Transamerica. In 1999, CSC and Transamerica amended that licensing agreement to include CyberLife (the "CyberLife Agreement"). Similarly, in 1998, CSC entered into an agreement with Transamerica's predecessor, under which CSC licensed certain software, and in 2005, CSC and Transamerica amended that licensing agreement to include Vantage (the "Vantage Agreement"). Both agreements authorize Transamerica to use and modify the software programs to benefit Transamerica. Both agreements also provide that CSC retains ownership over the software platforms and the confidential information therein, and that Transamerica may not use CSC's confidential information to reverse engineer a platform for itself.

In 2013, TCS and Transamerica entered into a Master Services Agreement (the "2013 Master Services Agreement"). Pursuant to that Agreement, Transamerica engaged TSC as a third-party consultant to provide maintenance services for Vantage and CyberLife. To facilitate this and other third-party work, Transamerica and CSC executed a Third-Party Access Addendum (the "Third-Party Addendum") in February 2014. The Third-Party Addendum served as an addendum to existing licensing agreements and generally allowed Transamerica to authorize its consultants to access, copy, execute, use and **\*435** modify CSC's software "solely for the benefit" of Transamerica. TCS was one of the contractors that were specifically named in the Third-Party Addendum.

While providing maintenance services for Transamerica, TCS was also interested in finding an "anchor client" to facilitate its entrance into the U.S. insurance industry with its own software platform BaNCS. TCS describes BaNCS as having four "layers": (1) the core layer, which "consists of foundational elements shared across all TCS BaNCS customers"; (2) the business layer, which "extends the data definitions for specific market segments"; (3) the geography layer, which "contains business processes for country-and state-specific rules and regulations, and product templates that provide insurers with a foundation for fully-compliant product launches"; and (4) the customer layer, which "acts as a repository for modifications specific to a single organization or business unit," and is specifically at issue in TCS's claims on appeal. *See infra* Section III.A.1.

In 2016, Transamerica "decided its software needed a refresh, so it initiated a vendor-selection process." Multiple vendors, including both TCS and CSC, submitted bids and conducted due diligence. At the time, TCS's BaNCS software was not

ready for use in the U.S. market as TCS was still building its U.S. "geography layer," but TCS hoped that "landing Transamerica as an anchor client would create an opportunity to adapt BaNCS for the U.S. market." In August 2017, TCS and Transamerica entered into Service Agreement No. 75 ("Service Agreement 75") to the August 2013 Master Services Agreement to enable TCS's due diligence. Service Agreement 75 required TCS to undertake a number of specific activities, including requiring TCS to: "[u]nderstand and validate [Transamerica's] operational landscape, which includes its software"; "[v]alidate the Transition Plan for each line of business"; and produce a "Comprehensive Due Diligence Report," a "[t]arget operating model for Transition Services and TPA Services," and "[c]omplete and accurate Transition Plans for each line of business." To facilitate this work, Service Agreement 75 obliged Transamerica to furnish TCS with "data" and other "required information." The agreement did not assign TCS any role in assuring that information could be disclosed.

TCS won the contract with its $2.6 billion bid. However, until TCS finished developing BaNCS for the U.S. market, it would continue to provide maintenance services for Transamerica's policies on CSC's platforms. In January 2018, TCS and Transamerica entered into a series of agreements "to, among other things, administer Transamerica's United States life insurance and annuity business lines using the TCS BaNCS™ platform." As most relevant here, the January 2018 agreements between TCS and Transamerica include an Amended and Restated Master Services Agreement (the "2018 Master Services Agreement"). [3] As part of the 2018 agreements, TCS "hired over 2,200 people who were formerly employed by Transamerica," including "former Transamerica employees who maintained Vantage and CyberLife at Transamerica." The parties and the district court refer to these people as the "rebadged employees." BaNCS was developed by TCS's separate software development team, based mostly in India.

[3]  The 2018 agreements also include: TCS Service Agreement No. 2 – 2018 MSA for TCS BaNCS Technology Platform, Application Development and IT Maintenance Services ("Service Agreement 2"); TCS Service Agreement No. 4 – 2018 MSA for Migration Services ("Service Agreement 4"); and a Core Administration System License Agreement.

**\*436**  Soon, CSC began to reach out to Transamerica, and later TCS, to express concerns about the treatment of CSC's intellectual property. CSC sent Transamerica a letter in February 2018, requesting confirmation that its intellectual property would be protected from improper disclosure to, or use by, TCS. In April, CSC reiterated its concerns and reminded Transamerica that TCS's "permitted access [to] and use of [CSC's] confidential proprietary information [was] limited to only [TCS's] performance of certain services for [Transamerica] and for no other purpose." About a week later, Transamerica's in-house counsel told TCS that, after "diligently" reviewing Transamerica's communications with third-party vendors and "proactively following up with some" vendors, "Transamerica feels very confident that we ourselves and TCS are able to move forward with the planned transition."

In June 2018, CSC began including TCS in its correspondence with Transamerica. It asserted that TCS's "receipt or use of [CSC] technology or information constitutes" a "misappropriation of trade secrets under both federal and state law, among other things," and noted that the CSC-Transamerica agreements did not contemplate using the shift from CSC's platforms to TCS's BaNCS "as an improper vehicle for [TCS] to leverage [CSC] technology and information" to "develop a competing platform." Transamerica responded, stating that it was "in full compliance with the [Third-Party] Addendum" and "ha[d] done everything reasonably possible to evidence that compliance." A month later, Transamerica again wrote to CSC, stating that, "[CSC] must understand that TCS's confidentiality obligations to Transamerica are embedded in documents which are confidential to the parties, including TCS" but also that it had "seen no indication from TCS that they have any other intentions" beyond "using [CSC's] software ... for the limited purpose of serving Transamerica and to fulfill its obligations to Transamerica." In an August 2018 letter, CSC told Transamerica and TCS that Transamerica's purported grant of a license to TCS "violates the 1994 and 1998 License Agreements as well as the 2014 Addendum." TCS later represented to Transamerica it was not using CSC's "intellectual property or proprietary information to build requirements and/or functionality" for BaNCS.

In February 2019, Transamerica reaffirmed that it would indemnify TCS in the CSC matter, but only if TCS was "compliant with its obligations under the [2018 Master Services Agreement] and related agreements, [and] if [Transamerica] has indemnity obligations." Transamerica also told TCS that the matter with CSC "does not provide a basis for TCS to withhold services." The next month,

a CSC employee who supported Transamerica—and thus had a Transamerica email address—was mistakenly copied on an email chain with TCS employees, who were sharing excerpts of the Vantage source code and technical manuals a TCS rebadged employee had provided to TCS's BaNCS development team. The email chain revealed that the BaNCS team was trying to figure out how Vantage's "rate of return" calculation worked, which CSC considers a trade secret. This discovery precipitated the present litigation.

B.

In August 2019, CSC sued TCS in federal court, pleading, among other claims, a claim of trade secret misappropriation under the Defend Trade Secrets Act (the "DTSA" or the "Act"). Discovery revealed that TCS had been using CSC's confidential information since the bidding process and had since continued to use the confidential *437 information in TCS's development of BaNCS and in the conversion of Transamerica's policies to BaNCS, and Transamerica ultimately terminated its relationship with TCS. TCS moved for summary judgment, arguing, in relevant part, that the Third-Party Addendum authorized Transamerica to grant TCS access to CSC's confidential information, and that TCS's use of CSC's information was authorized by its contracts with Transamerica. The district court denied the motion.

In November 2023, the district court presided over an eight-day trial with an advisory jury. As relevant to this appeal, the jury found that (1) CSC's source code and technical manuals for Vantage and CyberLife are trade secrets, (2) TSC acquired the manuals by improper means, (3) TSC used the manuals without express or implied consent, and (4) TSC did so willfully and maliciously. The jury recommended $70 million in compensatory damages and $140 million in exemplary damages. Thereafter, the district court issued detailed Findings of Fact and Conclusions of Law, affirming liability for TCS but reducing the compensatory damages to $56 million and the exemplary damages to $112 million. The court also entered a permanent injunction barring TCS from using CSC's trade secrets or any version of BaNCS developed using the misappropriated material in the U.S. market, prohibiting TCS employees who had access to CSC's trade secrets from working on TCS software for the U.S. market for eighteen months, and imposing a 10-year monitorship.

TCS timely appealed, and we have jurisdiction over the appeal under 28 U.S.C. § 1291.

II.

We "review questions of law, including choice of law and contract interpretation, *de novo.*" *Waterfowl Liab. Co. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006). We review the district court's findings of fact only for clear error. *Kristensen v. United States*, 993 F.3d 363, 367 (5th Cir. 2021). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Bd. of Trs. New Orleans Emps. Int'l Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008). "Reversal for clear error is warranted only if the court has a definite and firm conviction that a mistake has been committed." *Id.* (quoting *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 233 (5th Cir. 2022) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "This court 'grant[s] even greater deference to the trial court's findings when they are based on determinations of credibility.' " *Id.* (quoting *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 607 (5th Cir. 2020)).

Finally, we "review[ ] the district court's grant of a permanent injunction for abuse of discretion." *M. D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018) (citing *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015)). A district court "abuses its discretion if it '(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction[,] (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning *438 its injunctive relief.' " *Id.* (quoting *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th Cir. 2014)).

III.

TCS raises six issues on appeal, three of which pertain to TCS's liability under the DTSA and three of which pertain to

the remedies awarded. We address each issue in turn, starting with the liability arguments before turning to the remedies arguments.

A.

The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). CSC was required to prove: (1) that it owns a valid trade secret; (2) that the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) that TCS misappropriated the trade secret. TCS's liability arguments pertain to the first element, *see* Section III.A.3 below, and the third element, *see* Sections III.A.1–2 below.

1.

TCS's first argument is contractual, although—as CSC highlights—TCS and CSC never contracted with one another. TCS asserts that its access to and use of CSC's information did not amount to "misappropriation" within the meaning of the DTSA because this activity was authorized by the various contracts between Transamerica and CSC and between Transamerica and TCS.[4] The DTSA defines "misappropriation" to mean:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who--

   (i) used improper means to acquire knowledge of the trade secret;

   (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

      (I) derived from or through a person who had used improper means to acquire the trade secret;

      (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

      (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

   (iii) before a material change of the position of the person, knew or had reason to know that--

      (I) the trade secret was a trade secret; and

      **\*439** (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5). The term "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.* at § 1839(6).

[4] There are nine contracts that are relevant to this case: three between CSC and Transamerica (the Vantage Agreement, the CyberLife Agreement, and the Third-Party Addendum) and six between TCS and Transamerica (the 2013 Master Services Agreement, Service Agreement 75, the 2018 Master Services Agreement, Service Agreement 2, Service Agreement 4, and the Core Administration System License Agreement). All of the contracts specify the applicable state law. Texas law governs the each of the contracts between CSC and Transamerica, while New York law governs each of the agreements between TCS and Transamerica.

TCS primarily argues that the Third-Party Addendum authorized TCS's access to and use of CSC's confidential information, including to "formulate a proposal to transition Transamerica from CSC's systems to the newer BaNCS product and then, once TCS won the competitive bidding process, implement that proposal." As described above, the Third-Party Addendum is an agreement that Transamerica and CSC executed to allow Transamerica's third-party service providers to work on CSC's software as part of the third parties' work for Transamerica. Section 3(a) of the Third-Party Addendum allows TCS "to access, copy, execute and use" CSC's software "on behalf of and solely for the benefit of" Transamerica. Section 3(c) further allows TCS "to copy, change, modify, supplement, amend, and prepare Derivative Works of the Software, if and to the same extent permitted in the [Vantage and CyberLife] Agreement[s], on behalf

of and solely for the benefit of" Transamerica. Section 5 permits Transamerica to "disclose relevant aspects of [CSC]'s confidential information" to TCS "to the extent that such disclosure is reasonably necessary for the performance of [TCS's] duties and obligations to" Transamerica.

In denying TCS's motion for summary judgment, the district court interpreted the phrase "solely for the benefit of [Transamerica]" in Section 3(a) to "prohibit[ ] uses [of CSC's software] that inure to a third party's benefit in a manner beyond ordinary pecuniary benefit for services." The court further interpreted Section 3(c) as "more difficult to satisfy" than Section 3(a) "because it also requires that the modification at issue be 'permitted in' CSC's earlier agreements with Transamerica," which "aren't permissive." Consistent with these conclusions, the district court ultimately held that "TCS acquired the Trade Secrets by improper means," that it "disclosed and used the Trade Secrets without CSC's express or implied consent," and that "such disclosure and use were not on behalf of and solely for the benefit of Transamerica."

TCS argues on appeal that the district court's "ordinary pecuniary benefit" interpretation is atextual and unworkable. But, on the contrary, both the text of the Third-Party Addendum and the broader context favor the district court's plain reading. Turning first to the text, *see Weeks Marine, Inc. v. Standard Concrete Prods., Inc.*, 737 F.3d 365, 369 (5th Cir. 2013), the most conventional reading of the phrase "solely for the benefit of [Transamerica]" is likely to mean "exclusively for the benefit of Transamerica and no one else," *see Solely*, MERRIAM-WEBSTER Dictionary, https://www.merriam-webster.com/dictionary/solely (defining "solely" to mean "to the exclusion of all else" or "without another[,] singly" and identifying synonyms such as "just," "only," and "exclusively"). The district court reached the same conclusion, but—prompted by TCS's assertions—further observed that the third parties still "must be able to receive pecuniary gain for their services under the [Third Party] Addendum."

This caveat makes sense in light of the nature of the contracting relationship and does not alter the plain reading of the provision. TCS's access under Section 3(a) **\*440** must be exclusively for Transamerica's benefit and for no one else's, including TCS. But the provision makes no demand that TCS perform its work for Transamerica for free. So, although the Third-Party Addendum does not allow TCS to benefit directly from its access to, and use of, CSC's confidential information, it does nothing to inhibit TCS's payment by Transamerica for services TCS provided. And it is irrelevant that performing these services required TCS to access CSC's confidential information because the "benefit" Transamerica receives from this access, as contemplated by Section 3(a), is distinct from the benefit TCS receives for services rendered.

TCS conflates these two "benefits" to suggest that the district court's use of the phrase "ordinary pecuniary benefit" is a "limitation" that "has no basis in the text of the provision or a reasonable understanding of the parties' intent, and it is unworkable as a practical matter." But the "benefit" TCS receives in return for its services is in no way part of, or contemplated by, the Third-Party Addendum, a contract between Transamerica and CSC. It is therefore neither atextual nor unreasonable nor unworkable to conclude that, although TCS may, of course, be paid for its services by Transamerica, it may not additionally access and use CSC's confidential information for its own benefit, as that benefit is reserved "solely" for Transamerica under the Third-Party Addendum.

In contrast, TCS's interpretation is divorced from the contractual language and effectively grafts a new clause onto Section 3(a). According to TCS, "the only reasonable interpretation of the phrase 'on behalf of and solely for the benefit of' is that so long as access to CSC's confidential information benefits Transamerica and does not benefit other parties beyond what the service provider itself receives from performing the work, it is authorized." TCS maintains—without citation to any authority—that its reading "reflects ordinary usage" because it is "natural when discussing the duty of loyalty of an agent in performing some work to exclude benefits that inure to the agent on account of the work itself." As an example, TCS observes that, while "an attorney's engagement letter might say that her work will be exclusively on behalf of, and for the benefit of, the client," the letter would not reasonably preclude "benefits to the attorney from performing that work—not just fees, but also experience that could advance her career and increased stature in the profession from a significant representation." Setting aside the conspicuous omission of the word "solely" from the phrase "solely for the benefit of," this example is simply inapposite. As discussed above, the district court correctly recognized that the language of Section 3(a) does not stop TCS from being compensated for its work—a wholly different benefit. The intangible benefits of "experience" and "increased stature" are no different; nothing in the Third-Party Addendum barred TCS from obtaining those "benefits"

by providing its services to Transamerica. However, the contemplated benefits do not extend as far as appellants argue.

A more helpful analogy might be something like the following. An attorney is hired by a client to perform work using another company's e-discovery platform. To facilitate the attorney's work, the client enters into an agreement with the e-discovery platform provider to allow the attorney to access the platform's internal workings so that the attorney can tweak the e-discovery processes to maximize efficiency. To protect the e-discovery company, the agreement only allows the client to share the platform with the attorney for work that the attorney performs exclusively on behalf of and solely for the benefit of **\*441** the client. As TCS suggests, this limitation would not preclude the attorney from receiving fees from the client or incidental, intangible benefits like experience or increased stature. But it would preclude the attorney from using the e-discovery company's source code to build her own competing e-discovery platform. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 806 (2d Cir.)* (finding it "fanciful to suggest that [a company] would authorize [a competitor] to use its trade secrets to compete for business without saying so"), *cert. denied*, ––– U.S. ––––, 144 S. Ct. 352, 217 L.Ed.2d 188 (2023) (mem.).

This same analysis applies to Section 3(c), which limits TCS's "right to copy, change, modify, supplement, amend, and prepare Derivative Works of the Software" to work done "on behalf of and solely for the benefit of" Transamerica. This section also specifies that TCS may only do so "if and to the same extent permitted in the [Vantage and CyberLife] Agreement[s]." As CSC further highlights, Section 3(a) uses different phrasing but similarly limits the access rights granted to third parties to the scope of the "rights granted to [Transamerica] under the [Vantage and CyberLife] Agreement[s]." And, as the district court found and CSC reiterates, those agreements do not permit the use of CSC's trade secrets to prepare a bid for a competing contract or to develop a competing platform.

The CyberLife Agreement licensed CyberLife to Transamerica "solely" to "process data for [Transamerica's] own use," and Transamerica could not "allow any person or entity to transmit or reproduce [CyberLife] in whole or in part in any manner except as permitted" in the agreement. The Vantage Agreement permitted Transamerica to "use" Vantage "only in the manner and for the purposes expressly authorized by [the] Agreement," and its "[r]ight to [m]odify" Vantage was confined to "modify[ing] or enhanc[ing]" Vantage "to support [Transamerica]'s authorized use of" Vantage. The district court appropriately found that "CSC's license agreements with Transamerica do not contain any provisions giving Transamerica or any of its vendors the right to use the Trade Secrets to build a competing policy system" and, therefore, that "the [Third-Party Addendum] does not allow TCS to use the Trade Secrets to do so." [5]

[5] TCS also argues that its use of CSC's information was authorized under multiple of Transamerica's contracts with TCS. However, as CSC articulates, "while Transamerica's agreements with [TCS] may bear on [TCS]'s knowledge and willfulness, they cannot and do not establish authorization by CSC, the trade-secret owner and a non-party to those agreements." As discussed above, we conclude that TCS's use of CSC's confidential information to prepare its bid and develop BaNCS was unauthorized under the Third-Party Addendum agreement between Transamerica and CSC. We need not spill further ink discussing the agreements between Transamerica and TCS. Because Transamerica was not permitted to authorize TCS's access and use, TCS's access and use were necessarily unauthorized, regardless of what the agreements between Transamerica and TCS may (or may not) purport to authorize. To be sure, unauthorized access and use alone is not enough to constitute "misappropriation" under the DTSA; the plaintiff must also prove that the defendant knew or had reason to know that its conduct was improper. But that is a separate mens rea issue, addressed in Section III.A.2 below. For purposes of answering TCS's first question presented—whether TCS's use of CSC's confidential information was authorized by contract—the dispositive question is whether the Third-Party Addendum authorizes this use. It does not.

TCS further contends that the district court "erroneously ruled that TCS, not Transamerica, owns the customer layer of **\*442** BaNCS."[6] However, the relevant contractual language supports the district court's conclusion that TCS owns all portions of BaNCS, including the "customer layer." Section 10.7(a)(i) of the 2018 Master Services Agreement provides that "all results of the Services created or developed by [TCS], by itself or jointly with [Transamerica] or

others, including the Deliverables, the Procedures Manuals, the Developed Software, [or numerous other materials] developed for or relating to [Transamerica], ... (collectively, the 'Work Product') are, shall be and shall remain the property of [Transamerica]." However, "Work Product does not include any [TCS] Owned Software (including any enhancements, modifications or derivatives works of such [TCS] Owned Software or documentation related thereto) which is licensed under the Core Administration System License Agreement."

| | |
|---|---|
| 6 | The utility of this argument is not entirely clear; even if TCS were correct about the ownership of BaNCS, TCS's use of CSC's confidential information was not limited to its development of BaNCS. The district court also found that, "[b]ecause TCS acquired the Trade Secrets to develop its bid to displace CSC at Transamerica, obtain a $2.6 billion contract, and reduce its time and effort in migrating Transamerica's data to BaNCS, TCS did not acquire the Trade Secrets 'solely for the benefit of Transamerica,' as required under the [Third-Party Addendum]." |

The Core Administration System License Agreement confirms that "ownership and the title in and to Intellectual Property Rights in the Licensed Products," including "all enhancements, developments and derivative works of the Licensed Products," "are and shall at all times remain with" TCS. It further provides that "ownership of and the title in and to Intellectual Property Rights in any enhancements, developments and other work product created by or on behalf of [Transamerica] as part of the Services (excluding in respect of the Licensed Products ...), are governed by and subject to the terms and conditions of the [2018 Master Services Agreement] and the Service Agreements." The Core Administration System License Agreement defines "Licensed Products" to include the "[TCS] BaNCS application identified in Schedule 6," and Schedule 6 lists and describes a litany of "Licensed Components" of "TCS BaNCS" that "are included in the Licensed Products." The parties thus agree that the critical question is whether the "customer layer" of BaNCS is part of, or a modification of, the BaNCS components captured by this definition. If the former, it is owned by TCS; if the latter, by Transamerica.

TCS asserts that the "customer layer" of BaNCS is distinct from what TCS describes as the "generic features of the core BaNCS layers" listed in the Core Administration System License Agreement's definition of "Licensed Products" and, therefore, that its ownership is given to Transamerica under the 2018 Master Services Agreement. But, as demonstrated by CSC, the weight of the evidence does not support that conclusion. Both Suresh Muthuswami—TCS's President of the company's Banking, Financial Services, and Insurance Platforms, who executed the 2018 Master Services Agreement on TCS's behalf—and Arindam Paul—TCS's Delivery Manager for BaNCS and its corporate representative with respect to TCS's development of the customer layer—testified that TCS retained ownership of the BaNCS software. Debarati Mukhopadhyay, TCS's Product Head of BaNCS, explained in a TCS article about the BaNCS software that "the customer layer acts as a repository for modifications specific to a single organization or business unit," and that "[t]hese customer modifications are forward-compatible by design **\*443** and easily adaptable to successive updates to the core, business or geography layers of TCS BaNCS."

This evidence supports the conclusion that the "customer layer" is a collection of "modifications" to or "developments" of BaNCS, as those terms are used in the 2018 Master Services Agreement and the Core Administration System License Agreement. Additionally, the 2018 Master Services Agreement requires TCS to provide Transamerica with the source code for all "software Deliverables," whereas the Core Administration System License Agreement only requires TCS to provide the "object code of the Licensed Products." Here, TCS retained all of the BaNCS source code, including the source code for the "customer layer." This indicates that TCS understood itself, not Transamerica, to be the owner of the "customer layer" under the applicable contracts.

In contrast, TCS references only two pieces of evidence: the Schedule 6 list of "Licensed Components" and testimony from TCS's Deputy General Counsel Vinod Verghese. Verghese testified that TCS understood the 2018 Master Services Agreement to mean that "all the results of the services performed by TCS, which included the developed software, which is the customer layer of BaNCS for Transamerica, that would remain the sole property of Transamerica." This testimony contradicts the testimony offered by Muthuswami, who executed the Agreement on TCS's behalf, and of Paul, who was designated as TCS's corporate representative on the customer layer. The district court's decision to credit Muthuswami and Paul over Verghese is not clearly erroneous. See *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) ("[T]he great deference owed to the trial judge's findings

[of fact] compels the conclusion that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " (alteration in original) (quoting *In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998))).

As to Schedule 6, TCS does not explain what aspect of the list supports its contention that the "customer layer" is not captured by the "Licensed Products" definition, as is the rest of the BaNCS software. It is true that Schedule 6 does not specifically reference the "customer layer." But it lists more than twenty "components" of BaNCS and then provides extensive descriptions of the various facets of each component. And as noted, TCS has described the "customer layer" as customer-specific modifications to the "off-the-shelf" BaNCS product. It is thus reasonable to infer that the components listed in Schedule 6 are the very components that could be modified through the "customer layer." TCS identifies nothing in Schedule 6 that is inconsistent with that conclusion.

\* \* \*

For the reasons above, we affirm the district court's holding that TCS's challenged use of CSC's confidential information was unauthorized under the terms of the relevant contracts.

**2.**

TCS argues that, even if the Third-Party Addendum did not authorize TCS's use of CSC's information, the district court clearly erred in finding that TCS knew or had reason to know that its access and use were unauthorized or, at least, in finding that TCS's misappropriation was willful and malicious.

We review for clear error. *See Kristensen*, 993 F.3d at 367. "A finding of fact is clearly erroneous if it is without substantial **\*444** evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Id.* (quoting *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009)). "[W]e show 'even greater deference to the trial court's findings when they are based on determinations of credibility.' " *Id.* (quoting *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 607 (5th Cir. 2020)).

Here, the district court found that "TCS knew its misappropriation of the Trade Secrets was wrong and intentionally misappropriated the Trade Secrets in conscious disregard of CSC's rights." The record reflects that under TCS's Intellectual Property Rights Manual, TCS was required to "secure access to third-party IP assets, via in-licensing from partners, vendors, academic institutions[,] or third-parties who own such IP assets" before use of intellectual property. But TCS's employees failed to follow their own internal procedures when they decided to use CSC's information— as the district court found, "TCS never asked CSC whether Transamerica could give TCS access to the Trade Secrets" and never asked for "guidance on what, if anything, TCS was permitted to do with respect to the Trade Secrets ...." TCS's argument that CSC had an affirmative obligation to share documents prohibiting TCS from using its Trade Secrets is thus inconsistent with its own policies.

The district court also found that "TCS knew as early as April 2018 of CSC's concerns regarding the rebadging of Transamerica employees to TCS employees," and that "TCS knew as early as June 2018 that CSC did not believe TCS was authorized to use the Trade Secrets in the ways it did." TCS responds that "a competitor's demand that TCS stop building a platform to replace its own is hardly compelling evidence of knowledge." But "actual or constructive notice that the third party's disclosure violated a duty owed to the plaintiff," will "make[ ] a defendant liable for using a trade secret ...." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 488 (5th Cir. 2016). And actual notice can be provided by the plaintiff's complaint, even though parties in trade secrets cases are often competitors. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992) (interpreting Texas's trade secret cause of action).[7]

[7] TCS argues that even if the district court could impute knowledge beginning in mid-2018, the misappropriation primarily "occurred in 2017[,]" and thus damages dating back to 2017 were inappropriate. But numerous of the district court's findings on TCS's misappropriation date back to that 2017 period, including the method by which TCS obtained the Trade Secrets in the first place.

Even if the word of a competitor did not provide notice to TCS that it was misappropriating trade secrets, the district court found that TCS's representations to Transamerica were sufficient to impute knowledge to TCS. Transamerica informed TCS that it should "not incorporate proprietary

information or intellectual property of CSC ... into the Customer Layer, except as expressly permitted in the Master Agreement between the Parties or directly by the third party." The Master Agreement did not expressly permit using CSC's information, nor did CSC direct TCS to do so. TCS responds "that Transamerica repeatedly assured TCS that its use of CSC's information was authorized." TCS points to, for example, a statement by Transamerica that it "feels very confident that we ourselves and TCS are able to move forward with the planned transition **\*445** of employees and service commencement this weekend." But this is not an explicit authorization to use CSC's information. On the contrary, the exchange appears to be referring to rebadging occurring at the time. We will not disturb the district court's decision not to credit TCS's explanation for vague messages. TCS also points to Transamerica's statement to CSC that "Transamerica is in full compliance with the [Third-Party Addendum] and the [2018 Master Services Agreement] with respect to this matter." As a factual matter, however, a statement by Transamerica to CSC does not absolve TCS of knowledge of its misappropriation.

In support of a finding that TCS as a company had adequate mens rea, CSC points out that multiple TCS employees expressed knowledge that TCS was not allowed to access CSC's information. TCS responds that the employees "were not sufficiently senior to impute their beliefs to the company ...." We have held that knowledge can be imputed to a company from an employee with "somewhat significant managerial authority 'over the sphere of the activities in question.' " *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 375 (5th Cir. 2017) (quoting *In re Signal Int'l, LLC*, 579 F.3d 478, 496 (5th Cir. 2009)). The employees in question—a manager and director—had supervisory authority over the Transamerica project at issue in this case.

TCS also challenges the district court's finding that TCS's misappropriation was willful and malicious. TCS concedes that "[i]n the district court, the parties agreed that the 'willfully and maliciously' standard could be met by 'intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret.' " Here, however, TCS urges us to instead apply a standard based on "intent to cause injury or harm" from a Fourth Circuit case involving Texas state law claims. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021). But *Steves & Sons* only acknowledges that the intent to cause injury or harm standard is *JELD-WEN*'s preferred standard; it does not take a position on what standard to apply. An out-of-circuit case taking no position on the standard is not persuasive, let alone binding, on our court.

Using the standard agreed upon by the parties, the district court made numerous findings of fact that TCS had willfully and maliciously misappropriated CSC's trade secrets. For example, TCS acknowledged that it misrepresented to Transamerica that rebadged employees were not "using any third party intellectual property or proprietary information to build requirements and/or functionality." And TCS employees shared CSC trade secrets marked as "confidential information" with the TCS BaNCS team, going so far as to share "a snapshot" when the email did not go through. The district court thus had ample basis to find that TCS's conduct was intentional and showed "conscious disregard" for CSC's rights to their information.

We therefore hold that the district court did not clearly err in finding that TCS knowingly misappropriated CSC's information or that TCS's misappropriation was willful and malicious.

### 3.

TCS's final liability argument is that CSC failed to define its alleged trade secrets with sufficient specificity. The DTSA defines "trade secret" to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, **\*446** methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). "The existence of a trade secret is a question of fact." *CAE Integrated, L.L.C. v. Moov Techs.,*

*Inc.*, 44 F.4th 257, 262 (5th Cir. 2022). But, of course, the applicable legal standard is a question of law.

In its order denying TCS's motion for summary judgment, the district court relied primarily on this court's decision in *GlobeRanger*, 836 F.3d 477. TCS seems not to contest on appeal that CSC's definitions of its trade secrets are sufficiently specific under *GlobeRanger*. Rather, TCS argues that *GlobeRanger* is not precedential because it addresses misappropriation of trade secrets under Texas law, rather than the DTSA, and that *GlobeRanger* is out of step with other circuits, which it says require greater specificity than CSC provided. TCS is correct that this panel is not specifically bound by *GlobeRanger*. It predated the DTSA and therefore applies Texas's misappropriation law. But, as CSC notes, TCS never made this argument before the district court. Instead, TCS supported its insufficient-specificity argument by endeavoring to distinguish *GlobeRanger* on the facts. Now, TCS urges us to articulate for the first time what specificity standard applies in DTSA cases and to hold that the standard differs from that articulated in *GlobeRanger* and applied by the district court here.

As we have previously held, "[a]rguments not raised in the district court cannot be asserted for the first time on appeal." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 669 (5th Cir. 2004); *see also Burciaga v. Deutsche Bank Nat'l Tr. Co.*, 871 F.3d 380, 389 (5th Cir. 2017) ("We will not consider on appeal an issue not previously presented to the district court unless such review is 'necessary to prevent a miscarriage of justice.' " (quoting *Thorton v. Schweiker*, 663 F.2d 1312, 1315 (5th Cir. 1981))). Moreover, the requisite specificity for trade secrets under the DTSA is a matter of first impression for this court, and the parties' briefing of this issue is notably sparse. In light of the waiver of this issue, and the parties' minimal discussion of the necessity of addressing it, we therefore decline to take up this issue.

### B.

The district court awarded compensatory damages, exemplary damages, and a permanent injunction—all of which are generally authorized by the DTSA. TCS challenges each of these remedies on appeal, arguing: (1) that the district court erred in awarding both "avoided costs" damages and an injunction against future use; (2) that the exemplary damages award was excessive; and (3) that the injunction improperly binds non-parties.

#### 1.

The DTSA authorizes "damages for actual loss caused by the misappropriation of the trade secret" and "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss." 18 U.S.C. § 1836(b)(3)(B)(i). CSC ***447** was awarded compensatory damages in the form of unjust enrichment damages. The district court awarded CSC $56,151,583 in compensatory damages, based on testimony from CSC's damages expert Brian Napper that TCS was unjustly enriched by that amount as a result of its misappropriation. Napper used two alternate approaches to calculate the unjust enrichment damages: (1) the cost approach (also referred to as the "avoided costs" approach); and (2) the income approach. Under the cost approach, Napper "analyze[d] how much research and design costs [TCS] avoided by misappropriating [CSC's] trade secrets." Napper concluded that the cost approach yielded an unjust enrichment valuation of $56,151,583. Under the income approach, Napper "calculate[d] the profits a [TCS] expected from its misappropriation of [CSC's] trade secrets." Napper concluded that the income approach yielded an unjust enrichment valuation of $55,484,165.

The district court found that CSC had sufficiently proven both damages measures at trial and, therefore, that CSC was entitled to the greater of the two—$56,151,583 under the cost approach. The district court also entered an injunction against TCS.[8] As relevant here, the injunction bars TCS from any future use of CSC Trade Secrets or post-appropriation source code or technical documentation for BaNCS.

[8] In addition to the compensatory damages and injunction discussed in this Part, the district court awarded CSC $112,303,166 in exemplary damages (discussed in Section III.B.2 below), pre- and post-judgment interest, attorney's fees, and costs.

TCS argues that the district court erred by imposing both unjust enrichment compensatory damages and an injunction prohibiting future use because: (1) under the DTSA, "a monetary award is not available where the plaintiff has suffered no harm distinct from lost profits and will not suffer such harm in the future"; and (2) the compensatory damages and injunctive remedies are duplicative. TCS asks us to vacate the compensatory damages award, though it acknowledges

that it argued against the imposition of the injunction before the district court. [9]

[9] According to TCS, it makes more sense to vacate the damages award now that TCS has "undertaken substantial effort to comply with [the injunction's] terms by, among other things, eliminating CSC's information from its files and servers." TCS argues in the alternative that "if the damages award stands," the injunction should be vacated as duplicative.

TCS relies heavily on the Second Circuit's decision in *Syntel*. In that case, Syntel had been found liable for trade secret misappropriation under the DTSA and New York law based on evidence that showed it was "actively creating a repository of [TriZetto's] trade secrets ... to be used in future work." *Syntel*, 68 F.4th at 797. TriZetto presented expert testimony that Syntel avoided spending $285 million in research and development costs through its misappropriation and that TriZetto lost $8.5 million in profits based on the single instance where Syntel used TriZetto's trade secrets to perform a software upgrade for a third party. The jury awarded TriZetto $285 million in compensatory damages in the form of avoided development costs under the DTSA. *Id.* at 799.

The Second Circuit vacated the avoided-costs award, holding that the DTSA did not "permit[ ] recovery of avoided costs as unjust enrichment damages in this specific case." *Id.* at 806–07, 815. The court reasoned that the DTSA "provides a tool to make trade secret holders whole by further awarding 'damages for any unjust enrichment caused by the misappropriation **\*448** ... not addressed in computing damages for [their] actual loss'—i.e., in instances where the value of the secret is damaged, or worse yet—destroyed." *Id.* at 809 (quoting 18 U.S.C. § 1836(b)(3)(B)(i)(II)). Grounding its analysis in the restitutionary origins of unjust enrichment, the court highlighted various circumstances where unjust enrichment damages could be appropriate: (1) as a "money substitute" for the return of a "specific thing" that a defendant has gained; (2) where a defendant has profited from the plaintiff's trade secret; and (3) where a defendant has saved costs through the misappropriation of a plaintiff's trade secret, with the caveat that "the amount of avoided costs damages recoverable must still derive from 'a comparative appraisal of all the factors of the case,' among which are 'the nature and extent of the appropriation' and 'the relative adequacy to the plaintiff of other remedies.' " *Id.* at 810 (first quoting 1 Dan B. Dobbs, *Law of Remedies* § 4.1(1) (1993); then quoting Restatement (Third) of Unfair Competition § 45(2)).

The court reasoned that the second circumstance did not apply because Syntel's $823,899 in profit from the single instance where it used the misappropriated trade secrets was addressed in computing TriZetto's $8.5 million lost profits calculation from that same transaction, and that, otherwise, TriZetto had suffered no compensable harm. *Id.* at 811. The permanent injunction had "ended Syntel's use of TriZetto's trade secrets, and, therefore, its ability to profit from any avoided costs," and "Syntel's misappropriation did not diminish, much less destroy, the secrets' continued commercial value to TriZetto." *Id.* The court therefore held that TriZetto was "not entitled to avoided costs as a form of unjust enrichment damages in this specific case." *Id.*

TCS asserts that awarding avoided-costs damages to CSC was improper for the same reasons because CSC "retains its trade secrets in full" and "did not argue that it lost profits or that TCS's alleged use of the trade secrets in connection with the Transamerica contracts diminished their value." TCS also highlights that, prospectively, the permanent injunction "ensures that TCS cannot impair the value of those secrets going forward."

We agree with much of the Second Circuit's analysis. Its specific holding—that awarding avoided-costs damages gave TriZetto a windfall because Syntel's unjust gain (from the one instance that it actually used TriZetto's trade secrets) was already addressed in computing damages for TriZetto's actual loss—is consistent with the basic and intuitive logic that the compensatory damages award and the injunction should not be duplicative. *See Syntel*, 68 F.4th at 814.

But *Syntel* also pronounces the general rule that a secret holder can never be awarded unjust enrichment damages under the DTSA where it "suffers no compensable harm beyond its lost profits or profit opportunities," *id.* at 811, and it is not entirely clear from the opinion what the court meant by "compensable harm," beyond the example of "instances where the value of the secret is damaged, or worse yet—destroyed," *id.* at 809. To the extent that this "compensable harm" standard is intended to require proof of some quantifiable impact on the secret holder that goes beyond proof of the misappropriator's unjust enrichment, that interpretation is divorced from the text of the DTSA and from traditional understandings of the "unjust enrichment" remedy. As noted, the DTSA authorizes damages "for any unjust enrichment caused by the misappropriation of

the trade secret that is not addressed in computing damages for actual *449 loss." 18 U.S.C. § 1836(b)(3)(B)(i)(II). It does not separately require a compensable, quantifiable injury suffered by the secret holder.

While *Syntel* discusses such a requirement, it does so against a backdrop of a permanent injunction; the court highlighted that the "facts matter," as the avoided costs were already addressed by permanently enjoining the use of the misappropriated trade secrets. *See Syntel*, 68 F.4th at 810. Thus, any lack of clarity around defining a "compensable harm" is mitigated and explained by the imposition of the injunction. We decline to adopt that approach, given the myriad facts that may arise in future claims where an injunction may be inapt. However, despite *Syntel*'s more decisive language on requirements for unjust enrichment damages, the court ultimately appeared to recognize, as we do, the interplay between such damages and injunctive relief. While the "facts matter," we also maintain the importance of clarifying the contours of unjust enrichment damages as a standalone matter—isolated from the question of duplication with injunctive relief. As such, before addressing the overlap between these remedies, we first address the availability of unjust enrichment damages.

As a general matter, interpreting unjust enrichment damages under the DTSA as having no compensable harm requirement comports with the definition of unjust enrichment at its core. As explained in *Syntel*, " 'unjust enrichment['] is 'a basis of civil liability involving a claim for recovery that sometimes also goes by the name restitution.' " *Syntel*, 68 F.4th at 809 (quoting *Unjust Enrichment*, BLACK'S LAW DICTIONARY (11th ed. 2019)). The remedy focuses on the benefit to the defendant, rather than the impact on the plaintiff. *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011) ("Liability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant. While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss."); *id.* at § 42 cmt. f ("The minimum liability in restitution for benefits obtained by misconduct is the value of anything wrongfully taken from the claimant, whether or not the taking causes measurable harm to the claimant.").

This understanding is consistent with longstanding law in our circuit on trade-secret misappropriation. *See, e.g., Univ. Computing v. Lykes-Youngstown Corp.*, 504 F.2d 518, 537–39 (5th Cir. 1974) (measuring the "value of the secret to the defendant" is "usually the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury," making the " 'appropriate measure of damages ... not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret.' " (quoting *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957))); *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012) ("Damages in misappropriation cases can take several forms," including "the development costs the defendant avoided incurring through misappropriation," and "[t]his variety of approaches demonstrates the 'flexible' approach used to calculate damages for claims of misappropriation of trade secrets." (citations omitted)).

The remaining questions, then, are two-fold. First, the threshold inquiry is *450 not whether the secret holder suffered compensable harm beyond "actual loss," but whether the misappropriator was unjustly enriched by the misappropriation in a manner that is not captured by the measurement of the secret holder's "actual loss." As discussed above, *Syntel* generally suggests that a broader, context-specific analysis is required before determining whether unjust enrichment damages, such as avoided costs, may be awarded. *Syntel*, 68 F.4th at 810. To clarify our reading of the statute, *contra Syntel*, we set aside the possibility of an injunction: if misappropriating trade secrets allows a misappropriator to avoid $1 million in costs for trade secrets they continue to leverage, requiring that misappropriator to pay $1 million in avoided-costs damages simply puts them in the same financial position they would have been in had they not misappropriated trade secrets at the secret holder's expense. *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011) ("Liability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant."). If unjust enrichment damages were not available, the misappropriator would be allowed to keep the benefit of its own misdeeds at the secret holder's expense. That would be a windfall.

Second, the more pertinent concern is whether the unjust enrichment damages measurement overlaps with either the "actual loss" damages measurement or with, as more relevant here, injunctive relief. If a misappropriator has

been precluded from benefitting from the trade secrets by virtue of an injunction, there is no longer any unjust benefit. Imposing both an injunction and an unjust enrichment damages award in those circumstances would be duplicative and therefore punitive. The outcome in *Syntel* is consistent with this understanding; the court determined that the past benefit Syntel had received was captured by the "actual loss" calculation and that Syntel could not benefit in the future due to the permanent injunction. *See Syntel*, 68 F.4th at 814; *see also id.* at 809 ("The [DTSA] permits a plaintiff to recover both its actual losses and a misappropriator's unjust benefit caused by misappropriation, so long as there is no double counting."); *id.* at 810–11 ("[T]he DTSA's equitable remedies work as a powerful tonic to reduce the harm a trade secret holder suffers beyond its lost business. The DTSA allows district courts to enjoin the misappropriation of a trade secret to prevent its continued use and/or its diminution in value.").

The question of duplication is the crux of TCS's position. TCS argues—both as a matter of blackletter law and under the DTSA—that requiring TCS to pay the costs it avoided in developing BaNCS by using CSC's trade secrets compensates CSC for the very same harm that the injunctive remedy already prevents by barring TCS from using CSC's trade secrets or that version of BaNCS in the future. TCS does not contest the measure of the unjust enrichment damages. For its part, CSC simply counters that the avoided-costs damages are compensation for past benefits that TCS received, thus getting TCS "back to square one," while the injunction prevents TCS's future use of CSC's trade secrets. CSC is only partially right.

The unjust enrichment damages award is an estimation of the costs that TCS would have incurred had it developed BaNCS in the same way but without the benefit of CSC's trade secrets. It aims to get TCS back to square one. But that "square one" is not the position that TCS was in before it ever accessed or used **\*451** CSC's trade secrets. It is the position that TCS would have been in had it actually incurred the necessary costs to redevelop BaNCS on its own. And because, in this counterfactual, TCS would have incurred the costs to redevelop BaNCS, it would necessarily have had access to its redeveloped version of BaNCS. At present, however, the unjust enrichment damages award requires TCS to pay for the cost of redeveloping BaNCS, while the injunction prohibits TCS from accessing its redeveloped version of BaNCS. Similar overlap would occur even with the alternate "income approach" measure of unjust enrichment damages, which estimates TCS's profits from misappropriating CSC's trade secrets, including profits from "transforming" Transamerica's policies to BaNCS and profits from the ultimate usage of the redeveloped BaNCS platform.

But there is not complete overlap. First, both the avoided-costs measure and the income measure capture some benefit that TCS received *before* the imposition of the permanent injunction. Second, in addition to enjoining TCS's use of BaNCS moving forward, the injunction also bars TCS from further accessing, using, possessing, or retaining any of CSC's trade secrets. This portion of the injunction is not duplicative as it prevents further use of the trade secrets, while the unjust enrichment damages measure only the amount of TCS's unjust enrichment from its past use of the trade secrets to redevelop BaNCS.

The resulting question, then, is the proper remedy to eliminate the overlap. TCS would prefer for us to vacate the unjust-enrichment damages award and leave the injunction in place. But without complete overlap, TCS's requested vacatur of the entire award is improper. The better solution here—both legally and logistically—is instead to reduce the scope of the injunction to eliminate the overlap. In addition to being simpler than undertaking a fact-intensive recalculation of damages, adjusting the injunction rather than the damages award recognizes that "injunctions are an extraordinary remedy, to be granted only when a party is threatened with injury for which he cannot obtain a sufficient legal remedy." [10] *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 328 (5th Cir. 1997); *see also* 4 ROGER M. MILGRIM, MILGRIM ON TRADE SECRETS § 15.02 (measuring an unjust enrichment award "by the value of the misappropriated trade secret ... may preclude an award of injunctive relief on the theory that having received the full value of its trade secret, the owner is not entitled to further relief").

[10] This remedy also better comports with TCS's arguments before the district court, where TCS asserted both that an avoided-costs measurement was the proper measure of damages and that imposing an injunction would be inappropriate because CSC had failed to show that legal remedies would be inadequate.

We therefore vacate the injunction and remand to the district court to modify the injunction to eliminate its prohibition on TCS's use of "Post-Misappropriation BaNCS Material,"

while maintaining the bar on TCS's access to and use of CSC's trade secrets.

**2.**

In addition to compensatory damages, the advisory jury determined that CSC should be awarded $140,000,000 in exemplary damages. In its Findings of Fact and Conclusions of Law, the district court then reduced this amount to $112,303,166 because "the DTSA expressly authoriz[es] '2 times' the amount of compensatory damages."

 **\*452** Exemplary damages are authorized under the DTSA when a defendant acts "willfully and maliciously" in misappropriating a trade secret. 18 U.S.C. § 1836(b)(3)(C). TCS concedes that if we affirm the district court's finding that TCS acted in a willful and malicious manner—which we do, *see supra* Section III.A.2—the district court had discretion to award some amount of exemplary damages. But TCS argues that, regardless, the amount of the award "was legally excessive and should be vacated or reduced."

TCS relies on *State Farm Mutual Automobile Insurance Company v. Campbell* for the proposition that any ratio of exemplary damages to compensatory damages higher than 1:1 can exceed "the outermost limit of the due process guarantee" when "compensatory damages are substantial ...." 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). This is a misreading of *Campbell.* In *Campbell*, the Court rejected an exemplary damages award in the ratio of 145:1— plainly far more extreme than the 2:1 ratio at issue here. *Id.* The Court observed that "[s]ingle-digit multipliers are more likely to comport with due process" before contemplating a hypothetical scenario in which a 1:1 ratio might be the maximum allowable "based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* Notably, the Court in *Campbell* built on the holding in *BMW of North America, Inc. v. Gore*, which endorsed punitive damages in a 4:1 ratio. 517 U.S. 559, 581, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513.

TCS emphasizes *Campbell*'s holding that "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 575, 116 S.Ct. 1589). The Supreme Court has instructed lower courts to evaluate several factors to determine reprehensibility, including whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* TCS argues that none of these factors apply, because the district court's ruling merely "faulted TCS for failing to adequately respond to CSC's letters expressing concern—letters from a competitor that had just lost its client to TCS and that had erroneously accused TCS of using CSC's information to benefit other customers."

The district court, however, did far more than that. It made findings that TCS: "knew its misappropriation of the Trade Secrets was wrong and intentionally misappropriated the Trade Secrets"; "refused to contact CSC" despite multiple notices of misappropriation; "made misrepresentations to Transamerica" regarding use of the information; intentionally "provided CSC source code copybooks to TCS off-shore resources to create duplicate copybooks"; and failed to discipline its employees for any misconduct. While it is true that the harm was not physical or related to health and safety and that CSC did not have financial vulnerability, the district court's fact finding shows that TCS's conduct involved repeated action and that TCS acted maliciously and through repeated deceit by using rebadged employees to obtain CSC's information.

Finally, we have held that when "Congress has effectively set the tolerable proportion [of exemplary to compensatory damages], the three-factor *Gore* analysis is **\*453** relevant only if the statutory cap itself offends due process." *Abner v. Kansas City S. R. Co.*, 513 F.3d 154, 164 (5th Cir. 2008). Here, the district court conformed to the proportion set forth in the DTSA—a ratio no higher than 2 times the compensatory damages—and based this decision in its findings of fact and in caselaw from this circuit finding "that the statutory maximum civil penalty offers the appropriate award" when the "reprehensible conduct" does not implicate violence, health, or safety, but does involve trickery, deceit, and "a larger pattern of misconduct." *Lincoln v. Case*, 340 F.3d 283, 293–94 (5th Cir. 2003). Given those findings, as the Supreme Court and our court have recognized, "a higher ratio may be needed where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.'" *Id.* at 294 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589).

We therefore affirm the district court's award of exemplary damages in twice the amount of the compensatory damages.

3.

Finally, TCS asserts that the district court erred by extending the injunction to bind non-parties. Rule 65(d)(2) of the Federal Rules of Civil Procedure provides that an injunction may only bind "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." FED. R. CIV. P. 65(d)(2). In its final judgment, the district court defined "TCS Parties" to mean "TCS and their respective affiliates, successors, directors, officers, employees, consultants, agents, servants, and attorneys, and any and all other persons who are in active concert or participation with any of them."

TCS moved to amend the judgment, arguing in relevant part that the injunction should be amended to define "TCS Parties" consistent with the terminology used in Rule 65(d). Namely, TCS proposed to revise the definition to exclude TCS and TAIC's affiliates, successors, directors, officers, employees, consultants, agents, servants, and attorneys from the definition of the "TCS Parties." In its "limited opposition," CSC objected to the position that "affiliates, directors, and successors are not within the scope of the injunction under the 'active concert or participation' prong," and urged the district court to leave the definition as is or modify it to include the aforementioned parties. The district court denied TSC's motion without providing analysis.

Before us, the parties expend little effort on this issue. Despite TCS's assertion that "there was no lawful basis to enjoin non-parties," it acknowledges that non-parties "who are in active concert or participation" with a party may be enjoined under Rule 65(d)(2). The Supreme Court has explained that Rule 65(d)(2) is "derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945). For that reason, non-parties may be bound by an injunction, as long as they fall within the parameters of Rule 65(d)(2). *See id.* at 14, 65 S.Ct. 478 ("The term 'successors and assigns' in an enforcement order of course may not enlarge its scope beyond that defined by the Federal Rules of Civil Procedure. Successors and assigns may, however, be instrumentalities through which defendant seeks to evade an order or may come within the description of persons in active concert or **\*454** participation with them in the violation of an injunction."); *see also Ganpat v. Eastern Pacific Shipping PTE, Ltd.*, 66 F.4th 578, 585–86 (5th Cir. 2023) (rejecting party's argument that an injunction was over-broad for purporting to bind a particular non-party affiliate).

In *Le Tourneau Co. v. N.L.R.B.*, this court considered the National Labor Relations Board's request for rehearing on the basis that the court's injunction referenced only the Le Tourneau Company and did not explicitly bind the company's "officers, agents, successors and assigns." 150 F.2d 1012, 1012 (5th Cir. 1945). The court denied rehearing and explained why adding the requested language was "wholly unnecessary":

> A decree of injunction, like other personal judgments, binds parties and their privies, and only these. This Company's officers, agents and successors, though not parties to this case personally, are privies of the Company. All that is necessary hereafter to bind any of them is to notify them of the injunction. As to assigns, they may or may not be bound by such an injunction. If the assignment be of the Company's whole plant and business, it is probable the assignee would be bound as a successor. If the parking lots alone were sold off for another use, we take it the injunction would not affect the new owner. Of course a sham sale to evade the injunction would not be allowed to succeed. Persons who are not parties nor in law affected by an injunction cannot be brought within it by naming them in it. While it is common practice to write into injunctions such broad expressions as are under discussion, they really have no effect.... [The entities described by Rule 65(d)(2)] are bound whether

named or not. Nothing is gained by multiplying words about them.

*Id.* at 1012–13 (internal citations omitted).

Here, TCS has not pointed to any specific non-party that it believes the district court has impermissibly enjoined. The parties apparently agree that affiliates, directors, successors, and consultants can legally be bound by an injunction but only to the extent allowed by Rule 65(d)(2)(C). Their only disagreement, then, is whether the district court's definition of "TCS Parties" captures that agreement. To some extent, altering the definition seems unnecessary because, regardless, the permissible reach of the injunction is set by Rule 65(d)(2)(C). *See Le Tourneau Co.,* 150 F.2d at 1012–13; *Regal Knitwear,* 324 U.S. at 14, 65 S.Ct. 478. Still, by intermingling the terms "affiliates," "directors," and "consultants" (which require "active concern or participation") with the terms that appear in Rule 65(d)(2)(B) (which do not), the existing definition of "TCS Parties" risks conflating these categories. For that reason, we direct the district court on remand to modify the definition of "TCS Parties" as follows, which more closely mirrors CSC's offered compromise:

> "TCS Parties" means (i) TCS and TAIC; (ii) their officers, agents, servants, employees, and attorneys; and (iii) other persons who are in active concert or participation with anyone described in subsections (i) or (ii) (including directors, affiliates, successors, and consultants).

This definition tracks the language of Rule 65(d)(2) and reflects the parties' shared position that non-parties who do not fall within subsection (d)(2)(B) can be enjoined but only if they are "in active concert or participation" as provided by subsection (d)(2)(C).

**\*455 IV.**

For the foregoing reasons, we VACATE the injunction and REMAND to the district court for the issuance of a revised injunction consistent with this opinion—namely, removing the bar on TCS's future use of post-appropriation BaNCS material and clarifying that the scope of the injunction comports with Rule 65(d)(2). We otherwise AFFIRM the rulings of the district court on all remaining issues.

**All Citations**

159 F.4th 429

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.