**2025-1807**

# United States Court of Appeals for the Federal Circuit

**INSULET CORP.,**

*Plaintiff-Appellee*

v.

**EOFLOW, CO. LTD., EOFLOW, INC., JESSE J. KIM,**

*Defendants-Appellants*

Appeal from the United States District Court for the
District of Massachusetts in No. 1:23-cv-11780-FDS,
Judge F. Dennis Saylor, IV

**BRIEF OF THE ADVANCED MEDICAL TECHNOLOGY ASSOCIATION (ADVAMED) AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE'S PETITION FOR REHEARING EN BANC**

A. SHANE NICHOLS
WARREN J. THOMAS
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree St NE, Suite 1300
Atlanta, GA 30309
(404) 645-7700
snichols@mcciplaw.com
wthomas@mcciplaw.com

*Counsel for Amicus Curiae AdvaMed*

August 12, 2026

## CERTIFICATE OF INTEREST

Counsel for *amicus curiae* the Advanced Medical Technology Association certifies the following:

1.  **Represented Entities.  Fed. Cir. R. 47.4(a)(1).**
    Advanced Medical Technology Association (AdvaMed).

2.  **Real Party in Interest.  Fed. Cir. R. 47.4(a)(2).**
    Although Plaintiff-Appellee Insulet Corporation is a member of AdvaMed, AdvaMed submits this amicus brief on behalf of the association of over 600 members, not any individual member(s). Thus, there is no real party in interest to this brief.

3.  **Parent Corporations and Stockholders.  Fed. Cir. R. 47.4(a)(3).**
    None.

4.  **Legal Representatives.  Fed. Cir. R. 47.4(a)(4).**
    None.

5.  **Related Cases.  Fed. Cir. R. 47.4(a)(5).**
    Not Applicable.

6.  **Organizational Victims and Bankruptcy Cases.  Fed. Cir. R. 47.4(a)(6).**
    Not Applicable.

Date: August 12, 2026                  */s/ Shane Nichols*
                                       A. Shane Nichols
                                       Counsel for *Amicus Curiae* AdvaMed

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iv

I.      INTEREST OF *AMICUS CURIAE* ..........................................................1

II.     INTRODUCTION ....................................................................................1

III.    ARGUMENT.............................................................................................4

    A.  The panel replaced the DTSA's "discovery of the misappropriation" with "sufficient facts to plead," creating an unnecessary dilemma for even diligent trade secret owners. ................................................................4

        1.  The statutory trigger is discovery of a misappropriation, not the accumulation of pleadable facts. ...........................................................4

        2.  The dilemma: the panel would start and exhaust the clock on allegations that would not satisfy Rule 8. ......................................................5

        3.  The single-accrual rule compounds the error. ...........................................8

    B.  "Access plus similarity" adopts an inference that Congress rejected. ............8

        1.  Drafting history shows Congress declined an invitation to enact a knowledge-plus-employment standard.......................................................8

        2.  "Similarity" is a false proxy in design convergent industries, like the medical device sector..................................................................................9

    C.  The panel's jurisdictional holding will arbitrarily reroute the medical device industry's trade secret appeals to this Court. .................................................11

IV.     CONCLUSION.........................................................................................12

## **TABLE OF AUTHORITIES**

**Cases**

*CGB Diversified Services, Inc. v. Adams*,
   2020 WL 1847733 (D. Kan. Apr. 13, 2020) ......................................................9

*Gabelli v. SEC*,
   568 U.S. 442 (2013).........................................................................................14

*Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*,
   152 F.4th 516 (3d Cir. 2025)..........................................................................7

*Heraeus Med. GmbH v. Esschem, Inc.*,
   927 F.3d 727 (3d Cir. 2019)...........................................................................7

*Intermedics, Inc. v. Ventritex, Inc.*,
   775 F. Supp. 1258 (N.D. Cal. 1991) .............................................................10

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
   285 F.3d 1353 (Fed. Cir. 2002)......................................................................6

*McDonough v. Smith*,
   588 U.S. 109 (2019).......................................................................................10

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)................................................................................. 3, 4, 5

*Oakwood Lab'ys LLC v. Thanoo*,
   999 F.3d 892 (3d Cir. 2021)............................................................................6

*Seatrax, Inc. v. Sonbeck International, Inc.*,
   200 F.3d 358 (5th Cir. 2000)..........................................................................8

**Statutes**

18 U.S.C. § 1836(b)(3)(A)(i)(I) ...........................................................................9

18 U.S.C. § 1836(d) .................................................................................... 4, 5, 8

35 U.S.C. § 286 ..................................................................................................11

**Other Authorities**

162 Cong. Rec. S1636 (daily ed. Apr. 4, 2016) ....................................................9

S. Rep. No. 114-220 (2016) ..............................................................................8, 9

## I.    INTEREST OF *AMICUS CURIAE*[1]

The Advanced Medical Technology Association (AdvaMed) is the world's largest medical technology association, with more than 600 member companies that develop devices, diagnostic tools, and health information systems (collectively, "medical devices").  AdvaMed's members invest billions of dollars every year designing, building, and servicing the life-sustaining medical devices on which individual Americans and the American healthcare system have come to depend. Along with more than 50 other major American industry groups and manufacturers, AdvaMed supported enactment of the DTSA to "give American businesses the tools they need to combat the theft of their valuable intellectual property."  *See* Letter from Industry Coalition to Sens. McConnell and Reid (Mar. 15, 2016).[2]  If permitted to become this Court's precedent, the panel's holding will make it more difficult for AdvaMed's members to combat the theft of their valuable trade secrets.

## II.    INTRODUCTION

The mobility of highly skilled technical personnel is an ever-present reality in the medical device industry.  Such moves are usually made lawfully and without

---

[1] No counsel for any party authored any part of this brief.  No one other than AdvaMed contributed money specifically to fund this brief's preparation.

[2] https://www.coons.senate.gov/wp-content/uploads/media/doc/Trade%20Secrets%20--%20Letter%20to%20Senators%20McConnell%20and%20Reid%203-15-16.pdf

incident.  It is commonplace for technical consultants and employees to move among competitors that are developing solutions to the same clinical challenge.  Today's prevailing trend in American legislatures is to promote even more employee mobility by eliminating restrictive barriers.

An engineer leaves a medical device company to join its competitor.  A year later, the competitor exhibits a prototype that resembles aspects of the product the engineer helped develop for his former employer.  Under the panel's decision, the DTSA's three-year limitations clock starts at the first moment of the prototype's exhibition, regardless of whether the victimized company is aware of the improper disclosure or of the exhibition.  Worse, the panel would start the clock for every trade secret in its former employee's possession, including trade secrets that cannot be discerned through a visual inspection of the product.  The majority panel overturned a unanimous multi-million-dollar jury verdict of misappropriation, on the basis of an aggregation theory that neither party urged on appeal.  For the purposes of the limitations period, the panel fixed the DTSA's triggering moment of "discovery" at a time when the accused product had never been sold anywhere in the world.

The panel's holding elevates ordinary indicia of lawful competition into a constructive "discovery" of misappropriation that triggers the DTSA's limitations period.  The panel's holding would punish the trade secret owner—rather than a

2

misappropriating competitor—for its inability to discern whether the competitor is engaged in lawful competition or trade secret misappropriation.

The panel compounds this punitive effect by expanding the rule to exhaust the trade secret owner's rights to enforce any related trade secrets embodied in the accused product. Together, the panel's errors render the least observable trade secrets the least protectable, thus forcing AdvaMed's 600+ members to make an untenable choice between a premature misappropriation action and or forfeiting enforcement of their valuable trade secrets.

The problems created by the panel's erroneous interpretation of the DTSA's limitations period will not be confined to a single circuit. Under the panel's jurisdictional holding, trade secret appeals will be arbitrarily routed to this Court for any case in which related patent counts have been raised and dismissed, regardless of whether they were adjudicated below. The panel's jurisdictional error could give nationwide effect to the panel's new interpretation of the DTSA's statute of limitations, especially for litigants in the medical device industry that commonly assert patent infringement and trade secret misappropriation claims in a single action.

The panel decision conflicts with *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), and presents a question of exceptional importance to the medical device industry. AdvaMed respectfully requests that the Court grant rehearing en banc.

3

## III.   ARGUMENT

### A.   The panel replaced the DTSA's "discovery of the misappropriation" with "sufficient facts to plead," creating an unnecessary dilemma for even diligent trade secret owners.

#### 1.   The statutory trigger is discovery of a misappropriation, not the accumulation of pleadable facts.

The DTSA's limitations period starts on "the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d).  The proper trigger is the discovery of *the misappropriation,* not the discovery of sufficient facts from which a complaint might be drafted.

Although the panel purported to apply the "more demanding" trigger of *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), Op. 10, it keyed accrual of a misappropriation claim to whether Insulet "had sufficient knowledge to state a claim … before the critical date," Op. 14; adopted the district court's observation that Insulet "plainly had at least a cause for concern" by early 2019, Op. 10; and treated as decisive the conclusions that "caused Insulet to start investigating." Op. 23. *Merck* rejected that approach, stating, "the point where the facts would lead a reasonably diligent plaintiff to investigate further … is not necessarily the point at which the plaintiff would already have discovered … 'facts constituting the violation.'" 559 U.S. at 651. "[N]othing in the text suggests that the limitations period can sometimes begin *before* 'discovery' can take place." *Id.*  A clock that

4

starts when a company starts investigating, therefore, starts *before* discovery, contrary to the text of 18 U.S.C. § 1836(d).

### 2. The dilemma: the panel would start and exhaust the clock on allegations that would not satisfy Rule 8.

Access plus similarity is a plaintiff-side doctrine of circumstantial proof—a permissive inference by which an owner proves the "use" element, conduct typically hidden within the defendant's walls. The panel's own anchor case says as much: "These showings—access and similarity—*may* support a trade secret misappropriation claim." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) (emphasis added) (reversing a summary judgment that "prematurely dismissed" such evidence; not a limitations case). The panel drew that framework from cases in which the doctrine let claims proceed. *See Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021) (reversing Rule 12(b)(6) dismissal); *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516 (3d Cir. 2025) (affirming denial of JMOL on a plaintiff's verdict); Op. 11.

The panel thus turned a permissive inference that enabled plaintiffs to protect their rights into a mandatory constructive-knowledge trigger that defeats those rights. If access and similarity cannot establish that misappropriation *occurred* without more, they cannot establish that a diligent plaintiff *knew or should have known* it occurred. Accrual cannot be easier to prove than the tort itself.

The panel also cited *Heraeus Medical GmbH v. Esschem, Inc.*, 927 F.3d 727, 735-36 (3d Cir. 2019), as applying the framework to accrual.  Op. 12.  But *Heraeus*—the only case in the panel's string cite that applied *Merck*—used it to raise the trigger standard, not lower it.  *Id.* at 734 (requiring that scienter, too, be discovered, citing *Merck*).  Heraeus knew in 2005 that the competing cement was "virtually identical to" its own, yet accrual did not arise until 2011.

*Seatrax, Inc. v. Sonbeck International, Inc.*, 200 F.3d 358 (5th Cir. 2000)—the one case the panel developed in text, Op. 12-13—held only that "Seatrax failed to exercise reasonable diligence to discover its cause of action," based on "the totality of the summary judgment evidence," not similarity alone: the similar-product evidence "when viewed alone *may not have* reasonably put Seatrax on notice of a cause of action." *Id.* at 366-67.  The sentence the panel quoted is plainly inquiry notice: events that "should have put Seatrax on notice of possible misappropriation," *id.* at 365—the approach *Merck* holds insufficient.

Thus the dilemma.  Sue when the panel would start the clock, and the complaint alleges an engineer's new job and the release of a generally similar competing product; facts equally consistent with lawful competition, on which no complaint can survive Rule 8.  Or wait to develop the facts most courts require to pass Rule 8 muster—a discovered misappropriation—and have the claim time-barred under the panel's new standard.  "Simply taking a new job with a competitor

6

does not plausibly suggest misappropriation, inevitably or otherwise … [t]o infer wrongdoing from those facts would throw the plausibility standard out the window." *CGB Diversified Services, Inc. v. Adams*, 2020 WL 1847733 (D. Kan. Apr. 13, 2020) (dismissing DTSA claim pleading only access during employment and a move to a competitor.)  Congress cannot have keyed "discovery" to a moment when no court would let the plaintiff plead it—the "untenable choice between (1) letting their claims expire and (2) filing a civil suit" that the Supreme Court refuses to impose. *McDonough v. Smith*, 588 U.S. 109, 120 (2019).  Even the litigation underlying the panel's own single-accrual rule agreed that "suspicion and fear are not sufficient predicates for launching a lawsuit." *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1266 (N.D. Cal. 1991).

For AdvaMed's members, suing on mere suspicion is priced beyond much of the industry's reach.  AdvaMed's comments to the Federal Trade Commission put the median cost of litigating a trade secret case at $4.1 million where $10 to $25 million is at risk—a burden "particularly threatening to the small- and medium-sized enterprises that make up the majority of medical technology innovators." Advanced Medical Tech. Ass'n, Comment Letter on Non-Compete Clause Rulemaking, Matter No. P201200, at 6-7 (Mar. 16, 2023) ("AdvaMed FTC Comments").

### 3. The single-accrual rule compounds the error.

The single-accrual rule amplifies the panel's error by imputing a single date to every related trade secret. Op. 19. It thereby extinguishes claims involving trade secrets that no external diligence could reveal, such as an internal algorithm, or, on Insulet's evidence, a regulatory compilation taken later by another actor. *See* Dissent 12-13 (citing Appx20877(111:4-23)); Op. 4. Section 1836(d) measures accrual from discovery of "the misappropriation with respect to which the action would relate"; its continuing-misappropriation clause prevents serial accrual for the *same* continuing wrong, not the conflation of *distinct* misappropriations into the earliest alleged breach. The panel's single-accrual rule would ride roughshod over some of the medical device industry's most valuable trade secrets by rendering the least observable trade secrets—the information most dependent on trade secret protection—the least protectable.

### B. "Access plus similarity" adopts an inference that Congress rejected.

#### 1. Drafting history shows Congress declined an invitation to enact a knowledge-plus-employment standard.

The petition recounts the amendment and the warning that prompted it. Pet. 18. Congress's response was deliberate. The Committee Report explained that the employment limitations "were included to protect employee mobility," and a footnote acknowledged that "courts interpreting State trade secret laws have reached different conclusions on the applicability of the inevitable disclosure doctrine." S.

Rep. No. 114-220, at 8 & n.16 (2016). Congress legislated with that split in front of it and required instead that any condition on a departing employee's job rest on "evidence of threatened misappropriation and *not merely on the information the person knows*." 18 U.S.C. § 1836(b)(3)(A)(i)(I) (emphasis added). Senator Feinstein confirmed that the revision was made "to preserve the law in California and elsewhere," 162 Cong. Rec. S1636 (daily ed. Apr. 4, 2016); accord S. Rep. No. 114-220, at 9 (2016).

Congress did not abolish state inevitable-disclosure doctrine, but it refused to enact the knowledge-plus-employment inference as federal law. The panel nonetheless interpreted the DTSA to include the inference—not as a sword for plaintiffs, but as a shield misappropriators use to extinguish federal claims against them.

### 2. "Similarity" is a false proxy in design convergent industries, like the medical device sector.

Medical devices developed as solutions to the same clinical problem often converge in design at a high level. Design constraints including human anatomy, wearability, usability, regulatory requirements, and biocompatibility often narrow the universe of available external appearances. Insulet's executive testified that patch pumps are "all going to be in that general size and shape." Appx20541(149:8-150:6), *quoted at* Dissent 9. In this sector, the external resemblance of competing products is not a telltale of trade secret theft.

9

In medical device technology, external similarities may have little or no bearing on embedded algorithms, manufacturing methods, nominal engineering specifications, or regulatory compilations. Insulet's technical expert testified that nominal CAD dimensions cannot be ascertained by "open[ing a device] up and looking at it." Op. 29 n.11. The panel's "discovery" trigger is based on a "substantial similarity" between products, but the panel does not delineate where superficial similarity ends and substantial similarity begins.

Detection lag is therefore structural, not a mere failure of diligence. The discovery rule exists for injuries that are "self-concealing," *Gabelli v. SEC*, 568 U.S. 442, 450-51 (2013), and misappropriation of an unobservable trade secret is the paradigm self-concealing injury. AdvaMed told the FTC as much before this case began: "an innovator would be unlikely to learn about the misappropriation of its trade secrets until after the competitor releases its new competing product." AdvaMed FTC Comments at 5. The point is not that a trade secret owner should be allowed to wait for conclusive proof. It is that no amount of diligence examining a device's external appearance can reveal the invisible operation of an algorithm.

Medical devices often undergo a years-long FDA clearance process, during which public disclosures are limited to medical conferences and clinical trials in which few, if any, meaningful details are revealed. Under the panel's rule, however,

10

the limitations period could be exhausted by such disclosures even where no finished product is available for inspection.

A rule keyed to external similarities encourages AdvaMed's members to treat every competitor with a lookalike product as a presumptive thief, in a sector where lookalikes are the norm. Protective actions premised on innocent employee mobility will chill lawful hiring and convert routine competitive monitoring into an accrual event.

**C. The panel's jurisdictional holding will arbitrarily reroute the medical device industry's trade secret appeals to this Court.**

Medical technology companies commonly protect a single product with both patents and trade secrets. When a competitor takes both, the complaint will often plead both. Pleading both is not a litigation tactic in this sector, it is a consequence of how device innovation is protected. A patch pump's observable mechanical architecture may be publicly disclosed and claimed in a utility patent, while its unobservable occlusion-detection algorithm, manufacturing tolerances, and design-history file remain confidential as trade secrets.

That makes the panel's jurisdictional holding systematic rather than exceptional. Section 286's damages limitation runs six years back from the filing of the complaint. 35 U.S.C. § 286. Whenever a patent count is voluntarily dismissed without prejudice, after any appreciable period of litigation, a later-filed complaint could recover fewer damages than the original might have. The panel's reasoning

11

would treat that recovery-limiting dismissal as one with prejudice.  Op. 8.  For this industry, the panel's exception may well swallow the rule.

## IV.    CONCLUSION

Congress wrote the DTSA for thefts that are hard to see and indifferent to borders.  As one DTSA hearing witness put it, the Act mattered "regardless of whether or not it's South Korea or it's South Carolina."  S. Hrg. 114-881, at 23 (Karen Cochran, DuPont).  The panel's rule presumes a different Congress—one content to require a diligent American manufacturer to "discover" concealed misappropriation from a 500-page, predominantly Korean-language prospectus filed with Korean regulators or lose its trade secret rights.  Dissent 10.  The Court should grant rehearing en banc.

Date:  August 12, 2026

/s/ *Shane Nichols*
A. Shane Nichols
Warren J. Thomas
Meunier Carlin & Curfman LLC
999 Peachtree St. NE, Suite 1300
Atlanta, GA 30309
(404) 645-7700
snichols@mcciplaw.com
wthomas@mcciplaw.com

*Counsel for Amicus Curiae AdvaMed*

12

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), the undersigned counsel for *amicus curiae* certifies that this brief: (1) complies with the type-volume limitation of Fed. Cir. R. 40(i)(3) because it contains 2,566 words, excluding the parts of the brief exempted by rule; and (2) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: August 12, 2026                    */s/ Shane Nichols*
                                         A. Shane Nichols

                                         *Counsel for Amicus Curiae AdvaMed*